UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| ROBERT STROUGO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:20-cv-00165 |
| | ) | CLASS ACTION |
| Plaintiff, | ) ) | |
| | ) | Judge Waverly D. Crenshaw, Jr. |
| vs. | ) | Magistrate Judge Jeffery S. Frensley |
| | ) | |
| TIVITY HEALTH, INC., DONATO TRAMUTO, ADAM C. HOLLAND, and DAWN ZIER, | ) ) ) | CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | ) | |
| Defendants. | ) ) | |
| | ) | |

- 1 -

4836-0564-3985.v2

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................6

III.    PARTIES ...............................................................................................................6

IV.     DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT .............10

        A.      Beginning in 2018, Lost Business and Missed Revenue Guidance Sparked Fears that Tivity Was Losing Ground to Competitors.........................................11

        B.      In a Desperate Turnaround Attempt, Tivity Announces the Nutrisystem Acquisition ...................................................................................13

        C.      Tivity Obscured Nutrisystem's Dismal Diet Season and Misrepresented that It Was on Track to Achieve Its Nutrition Segment Guidance ........................17

        D.      Tivity Fires Tramuto and Reveals Massive Losses; Investors Suffer Millions of Dollars in Damages...................................................................27

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..............................................................29

        A.      False and Misleading Statement and Omissions Regarding 1Q19 ......................30

        B.      False and Misleading Statement and Omissions Regarding 2Q19 ......................35

        C.      False and Misleading Statement and Omissions Regarding 3Q19 ......................40

VI.     DEFENDANTS' FALSE FINANCIAL STATEMENTS ..................................44

        A.      Relevant Accounting Concepts Governing Goodwill and Indefinite-Lived Intangible Assets.................................................................45

                1.      Accounting Principles Governing Goodwill and Goodwill Impairment...................................................................................45

                        a.      Goodwill Impairment Analysis – Evaluation of Impairment Indicators.........................................................46

                        b.      Goodwill Impairment Test – Step 1 and Step 2.............................47

                        c.      Disclosing the Likelihood of Impairment .....................................48

                2.      Accounting Principles Governing Indefinite-Lived Intangible Assets ..................................................................................49

- i -

B.     The Nutrition Segment Goodwill and Nutrisystem Tradename Were Impaired by 2Q19 ................................................................51

     1.     Goodwill Was Impaired by 2Q19 ...........................................51

         a.     A Sustained Decrease in Share Price (and Corresponding Decline in Market Capitalization) Was an Impairment Trigger ...................................................................................51

         b.     Multiple Examples of Poor Nutrition Segment Financial Performance by the End of 2Q19 Were Impairment Triggers .................................................................................53

             (1)     Poor Financial Performance in the FY19 Diet Season Was an Impairment Trigger .................................54

             (2)     The Nutrition Segment 2Q19 Revenue and Adjusted EBITDA Decline Compared to 2018 Was an Impairment Trigger .................................................56

             (3)     The Reduction in Nutrition Segment Future Revenue and Adjusted EBITDA Guidance in 2Q and 3Q 2019 Was an Impairment Trigger ........................56

         c.     The Increased Competitive Environment for Nutrisystem Was an Impairment Trigger ........................................57

     2.     The Nutrisystem Tradename Was Impaired No Later than 2Q19 ............59

     3.     The Same Adverse Factors Purportedly Causing the Disclosed 4Q19 Impairment Charge Already Existed by 2Q19 .................................61

     4.     Defendants Had No Reasonable Basis to Believe the Nutrition Segment Goodwill and Nutrisystem Tradename Were Not Impaired by 2Q19 .....................................................................62

VII.     LOSS CAUSATION ................................................................................64

VIII.     ADDITIONAL SCIENTER ALLEGATIONS ..............................................66

     A.     Defendants Made False and Misleading Statements Just One Month Before Their Fraud Was Revealed ..........................................................66

B.    Defendants Intentionally Obfuscated the Nutrition Segment's Negative Results ........................................................................................67

C.    Numerous Executives Resigned or Were Fired Under Suspicious Circumstances ................................................................................69

IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE .................................69

X.    CLASS ACTION ALLEGATIONS .................................................................71

COUNT I .......................................................................................................73

COUNT II ......................................................................................................74

XI.    PRAYER FOR RELIEF .................................................................................75

4836-0564-3985.v2

## I. INTRODUCTION

1. This is a securities fraud class action brought on behalf of those who purchased or acquired Tivity Health, Inc. ("Tivity" or the "Company") common stock between March 8, 2019 and February 19, 2020, inclusive (the "Class Period"), pursuing remedies under the Securities Exchange Act of 1934 (the "1934 Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder.

2. Tivity provides fitness and health improvement programs primarily to seniors and Medicare members. The Company was formerly known as Healthways, Inc. and changed its name to Tivity Health, Inc. in January 2017. Tivity's common stock trades on the NASDAQ Global Select market ("NASDAQ") under the ticker symbol "TVTY."

3. Prior to the Class Period, beginning in late 2017, Tivity found itself under increasing competitive pressures from its own customers – insurance companies who contracted with Tivity to provide their members access to Tivity's flagship SilverSneakers fitness program. Following an announcement that one of Tivity's largest clients would be launching its own in-house fitness center program and cancelling certain contracts with Tivity, and with its organic growth increasingly under threat, the Company began looking for ways to protect and increase its market share, including through a potential acquisition.

4. On December 10, 2018, Tivity announced that it had entered into a definitive agreement to acquire Nutrisystem, a company primarily engaged in direct to consumer marketing of pre-packaged frozen food. While Defendants claimed the acquisition would allow Tivity to provide an "integrated portfolio of fitness, nutrition and social engagement programs" and evolve Tivity into "a holistic" health and wellness business, nothing could have been further from the truth.

- 1 -

5.     Rather than allowing Tivity to pursue the transformational change promised by Defendants, Nutrisystem was itself in dire straits, unable to meet its own FY18 financial projections and suffering from dwindling sales due to misleading promotional offers, ineffective advertising, lack of innovation and intense competition.  Skeptical of Defendants' purported rationale for the transaction, investors reacted very negatively to the merger announcement, and Tivity's stock declined over 30% in a single day, instantly wiping out over $530 million in market capitalization, and causing one of the largest single day stock price declines in the Company's history.  Soon, what started as a colossal blunder turned to fraud.

6.     Undeterred, and unwilling to admit that what Tivity's since-fired CEO Donato Tramuto ("Tramuto") characterized as his "one chance . . . [to] define a transformative opportunity in the company," was, in his words, "the wrong mistake," the merger closed on March 8, 2019, just three weeks shy of the end of 1Q19.  In their release that same day, Tramuto and Dawn Zier ("Zier") (Nutrisystem's then-CEO, who became Tivity's COO and President after the acquisition before also getting fired) doubled down, touting Nutrisystem's and Tivity's "successful track records" and their "powerful offering" of "a holistic approach to addressing critical health needs, lowering healthcare costs, and creating additional value for shareholders, health plans, fitness partners, members and consumers."

7.     Internally, Nutrisystem was still in turmoil at the time of the merger.  For Nutrisystem, a successful first quarter of the year, known as the "diet season," was critical to its annual performance, as Nutrisystem relied on customers acquired during this time to generate revenues during the remainder of the year, when new customer acquisitions dropped off.  Yet 1Q19 was not going according to plan.  Former Nutrisystem sales representatives and marketing personnel, all of whom worked for Nutrisystem during 1Q19, reported that call volumes and sales

- 2 -

results during 1Q19 failed to meet the company's expectations. Call center staff were laid off. The misleading nature of Nutrisystem's marketing made it difficult to attract and sign up new customers. Salespeople were focused on "retention calls" to try to persuade customers not to quit. While Tivity would later admit that Nutrisytem's performance had not met their expectations and that FY19 was "a step backward," at the time Defendants dissembled, falsely touting the Nutrition segment's strong performance.

8. On May 8, 2019, Defendants issued a release announcing the Company's 1Q19 financial results, including the Nutrition segment's (legacy Nutrisystem) financial results since the date of acquisition. Defendants touted the Company's strong 1Q19 results, including $13.3 million in adjusted earnings before interest, taxes, depreciation and amortization ("EBITDA") for Nutrition, and represented that Tivity was "on track" to meet the Nutrition segment's adjusted EBITDA guidance of $90-$100 million for the year.

9. These statements were false and misleading. In truth, Defendants knew that the Nutrition segment had performed poorly during 1Q19, as the Company's diet season had been a failure. Moreover, while Defendants touted $13.3 million in adjusted EBITDA for the Nutrition segment post-acquisition, Defendants intentionally failed to disclose that Nutrisystem had incurred a massive $8.3 million *in losses* during the pre-merger weeks of 1Q19, resulting in adjusted EBITDA of just $5 million for 1Q19, or *62% lower* than the results reported by Defendants. As a result of the Nutrition segment's poor performance in 1Q19, Defendants knew that the Nutrition segment was not on track to meet the Company's FY19 adjusted EBITDA guidance, and Defendants had no reasonable basis, and did not in fact believe, that the Nutrition segment would achieve its projected guidance.

10.     As the year progressed, Defendants continued to conceal the extent of poor performance plaguing the Company.  On August 7, 2019, Defendants issued a release announcing the Company's 2Q19 financial results, which admitted that the "the nutrition business did not meet our expectations for the quarter."  Defendants also announced lower guidance for the remainder of the year, including reduced guidance for the Nutrition segment's adjusted EBITDA from $91-$101 million, to $80-$84 million.  The next day, Tivity filed its 2Q19 Form 10-Q, which stated that "[w]eak performance during diet season *could* negatively impact our Nutrition segment's performance for the remainder of the year," and warned that they *might* have "paid more for Nutrisystem than the value we will derive from the acquisition."  Nevertheless, Tramuto stated that the 2Q19 results showed that the Nutrition segment was still "on track according to plan," that revenue synergies were "beginning to take shape" and that "further momentum will occur as the year unwinds."

11.     These statements were also false and misleading.  In truth, Defendants knew or recklessly disregarded that the Nutrition segment was not on track to meet even the Company's reduced FY19 adjusted EBITDA guidance, and Defendants had no reasonable basis, and did not in fact believe that the Nutrition segment would achieve this guidance.  Moreover, the Nutrition segment's poor diet season performance was *already* negatively impacting the Company's FY19 performance outlook, yet investors did not understand the extent of the Company's problems, as Defendants continued to conceal the true facts regarding the Company's diet season underperformance.  Finally, as a result of Tivity's prolonged stock price weakness following the acquisition announcement, as well as the Nutrition segment's sustained poor operating performance and increasing competition, Defendants had no reasonable basis to believe, and did not in fact believe, that Tivity's goodwill and tradename were fairly valued as of 2Q19.

- 4 -

12. By the time Defendants announced Tivity's 3Q19 results on November 12, 2019, the situation had gone from bad to worse. While publicly telling investors that the Nutrition segment's 3Q19 results "came in as expected" and that 4Q19 adjusted EBITDA margins were expected to improve, internally Defendants were taking unprecedented steps to salvage Tivity's FY19 results by literally giving away Nutrisystem food to new customers through a Buy One, Get One Free ("BOGO") offer weeks before the start of the FY20 diet season. This scheme created a double whammy of negative effects for the Nutrition segment, contributing to missed revenue and adjusted EBITDA numbers in 4Q19, while simultaneously poaching customers from the upcoming diet season and further undermining the Company's prospects for FY20.

13. Just weeks later, on December 9, 2019, less than a year after announcing the merger, Zier was "mutually terminated," and resigned from her role on the board of directors. No reason for Zier's sudden termination was given, and no successor was named.

14. On February 19, 2020, when Defendants could no longer sustain their scheme, the true state of affairs at Tivity began to be revealed. Tivity issued a release announcing its financial results for 4Q19 and FY19, admitting that "the nutrition business has not worked out as well as planned since the completion of the acquisition in March 2019," and announcing that Tramuto had been summarily fired. Contrary to Defendants' representations during the Class Period, Tivity admitted that FY19 had been "a step backward" and disclosed that the Nutrition segment had missed its 4Q19 and FY19 revenue and adjusted EBITDA targets, while also announcing lower-than-projected guidance for FY20.

15. At the same time, the Company announced a $377 million charge directly related to the Nutrisystem acquisition. The $377 million charge consisted of a $240 million impairment

- 5 -

charge to lower the value of the Nutrisystem trade name, and a $137 million impairment charge to reduce the value of the goodwill associated with the Nutrisystem acquisition.

16.　　On this news, Tivity's stock price fell more than $10 per share, or 45.49%, to close at $12.50 per share on February 20, 2020, causing tens of millions of dollars in damages to Tivity investors, who suffered economic harm as the truth about Tivity, its operations, and its prospects began to be revealed.

17.　　This action seeks to recover these damages suffered by Lead Plaintiff and the Class.

## II.　JURISDICTION AND VENUE

18.　　The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

19.　　Venue is proper in this District pursuant to 28 U.S.C. §1391(b).  A substantial amount of the acts, statements and omissions giving rise to the claims at issue occurred in this District.  Tivity's corporate headquarters are located in this District and Defendants are subject to personal jurisdiction in this District.

20.　　In connection with the acts, statements and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ.

## III.　PARTIES

21.　　Lead Plaintiff Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund ("Lead Plaintiff"), acquired Tivity securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.  ECF Nos. 25-2, 25-3.

- 6 -

Lead Plaintiff was chartered in 1988 and represents union members in the sheet metal industry and related trades.

22. Defendant Tivity is incorporated in Delaware, with principal executive offices located at 701 Cool Springs Boulevard, Franklin, Tennessee 37067. Tivity's common stock trades on the NASDAQ under the ticker symbol "TVTY." As a provider of fitness and health improvement programs, Tivity claims a network of over 16,000 fitness centers and nearly 75 million eligible members for the SilverSneakers, Prime Fitness (or "Prime"), Wisely Well and WholeHealth Living ("WholeHealth") programs and products.

23. Defendant Tramuto served at all relevant times as Tivity's Chief Executive Officer ("CEO") and a member of its board of directors until his abrupt termination on February 18, 2020. In May 2013, Tramuto was elected to the Company's board of directors. Tramuto also served as Chairman of the board from June 2014 to November 2015. On August 7, 2015, the Company announced Tramuto's appointment as President and CEO effective November 1, 2015. As CEO, Tramuto had the power to and did control publicly disseminated information about the Company, was quoted in press releases, regularly spoke on quarterly earnings calls, and signed SEC reports. During 2019, Tramuto received over $4.7 million in total compensation. Tramuto also cashed in on over $1.3 million in stock on November 7, 2018, just one month shy of the Company's announcement of the disastrous Nutrisystem acquisition.

24. Defendant Zier served as Tivity's President, Chief Operating Officer ("COO") and a member of its board of directors from the date of the Nutrisystem acquisition on March 8, 2019, until her sudden termination on December 4, 2019. Prior to joining Tivity, Zier served as President, CEO and a director of Nutrisystem, Inc., until its acquisition by Tivity. During her tenure with the Company, Zier was responsible for Tivity's nutrition and fitness divisions and

4836-0564-3985.v2

reported directly to Tramuto. As President and COO, Zier had the power to and did control publicly disseminated information about the Company, was quoted in press releases, and regularly spoke on quarterly earnings calls. During 2019, Zier received over $11.3 million in total compensation.

25. Defendant Adam C. Holland ("Holland") served at all relevant times as Tivity's Chief Financial Officer ("CFO"). As CFO, Holland had the power to and did control publicly disseminated information about the Company, was quoted in press releases, regularly spoke on quarterly earnings calls, and signed SEC reports. During 2019, Holland received over $1.4 million in total compensation. In addition to his overall responsibility for Tivity's financial planning and analysis, forecasting and budgeting, and external financial reporting, Holland was a former senior auditor with the global accounting firm Ernst & Young, and holds a Master's degree in Accountancy. As such, Holland was extremely knowledgeable about accounting rules and regulations impacting Tivity and its financial reporting.

26. The defendants referenced above in ¶¶22-25 are collectively referred to herein as the "Defendants." The defendants referenced above in ¶¶23-25 are collectively referred to herein as the "Individual Defendants."

27. During the Class Period, the Individual Defendants were privy to confidential, proprietary information concerning Tivity, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Tivity. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects through internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or

board of directors meetings and committees thereof, and through reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers (and with respect to Tramuto and Zier, also as directors) were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Tivity's business.

29. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and releases alleged herein to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

30. As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, throughout the Class Period, registered with the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to Tivity's financial condition and performance, growth, operations, financial statements, business, products, markets,

management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Tivity common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.     The Individual Defendants are liable as participants in a scheme and wrongful course of conduct that operated as a fraud or deceit on purchasers of Tivity common stock. The scheme: (a) deceived the investing public regarding Tivity's business, operations and management, and the intrinsic value of Tivity common stock; and (b) caused Lead Plaintiff and members of the Class (defined below) to purchase or acquire Tivity common stock at artificially inflated prices.

## IV.     DEFENDANTS' SCHEME AND FRAUDULENT COURSE OF CONDUCT

32.     Tivity was founded in 1981 as American Healthcorp, and began trading publicly in 1991. In 1999, the Company was renamed American Healthways, Inc. Then, in 2006, renamed Healthways, Inc., and renamed yet again as Tivity in 2017. From its inception, the Company purported to provide specialized, comprehensive disease management services designed to improve the quality and lower the cost of healthcare for people with one or more chronic diseases such as diabetes, cardiac disease and respiratory disease. In more recent years, the Company claimed it delivered solutions and services designed to help people improve their well-being, health and productivity, and to "keep healthy people healthy."

33.     In July 2016, the Company began a new strategy to focus on its three core healthcare programs – SilverSneakers senior fitness, Prime, and WholeHealth (collectively known as Tivity's "Healthcare" segment).

- 10 -

34.     At the beginning of the Class Period, SilverSneakers, Tivity's flagship fitness program for senior citizens, represented the vast majority, 80%, of the Company's revenues.[1] Tivity's customers are primarily health insurance companies, who contract with Tivity to provide access to fitness programs to their members. By enrolling in SilverSneakers, members of Medicare Advantage, Medicare Supplement and various group retiree plans can access gyms and fitness locations across the country, including exercise classes and social opportunities, at no additional cost.

35.     For a time, it appeared that Tivity's focus on its Healthcare segment, especially SilverSneakers, had paid off. Following its decision to focus on its Healthcare segment in July 2016, the Company's stock price tripled in just one year, and its margins significantly improved.

### A.     Beginning in 2018, Lost Business and Missed Revenue Guidance Sparked Fears that Tivity Was Losing Ground to Competitors

36.     In November 2017, a large SilverSneakers client, which represented about 15-17% of Tivity's overall revenue, announced that it would be launching its own competitive fitness center program in 2018. While admitting that they had been aware of this negative development since April 2017, yet had failed to inform investors at that time, Defendants asserted the Company was still well-positioned for growth. For instance, in January 2018, Tramuto assured investors that SilverSneakers was poised for "significant growth," and Holland hinted at a "big windfall of revenue," in the second half of 2018, saying the "early results are a home run" and "we're well on track."

---

[1]     Tivity's Prime business offers access to fitness centers to members aged 18 to 64 through commercial health plans, employers and exchanges, and accounted for approximately 17% of Tivity's revenues. The WholeHealth program offers discounted access to approximately 80,000 health providers (including chiropractors, physical, occupational, speech and massage therapists, acupuncturists and complementary and alternative medicine) to adults over age 50 through health plans and employers, and represented about 3% of the Company's business portfolio.

- 11 -

37.     In fact, Tivity was not well positioned for growth in 2018, and began searching for new ways to replace the revenue lost to its large client-turned-competitor, and mitigate the impact of any future client defections.  On January 10, 2018, Tivity held a presentation at the JPMorgan Healthcare Conference ("JPMorgan Conference"), where Tramuto explained that Tivity's goal was to increase enrollment, including through "smart capital allocation to continue to drive forward growth in the earnings per share ("EPS") by leveraging our brand further in terms of that highway of members."  Tramuto stressed that Tivity would take a "disciplined approach" to any acquisition and that the company would have "to expand the membership" and "expand the enrollment," "be capital light," "be incremental to our free cash flow" and "advance our A-B-C-D strategy."[2]

38.     On February 22, 2018, Tramuto told investors that the Company was evaluating its "options for capital allocations in 2018 such as . . . potential tuck-in acquisitions."  Tramuto further explained that one of Tivity's "key priorities" to increase market share would be to "identify and align with other companies whose products and/or services will support and enhance" the Company, and that Tivity intended to "deploy[] capital in a way that is accretive both to our financials and to our strategy" in 2018.

39.     As 2018 progressed, the growth Tivity promised failed to materialize, and Tivity missed analysts' expectations ***every quarter***.  Increased competition was significantly impacting SilverSneakers revenue growth, while threatening to increase Tivity's costs and pressuring EBITDA.

---

[2]    Tramuto defined Tivity's A-B-C-D strategy as: "A [] was to add new members in all networks; B was to build more engagement with the members that we had; C was to partner with other products and services that could help to drive enrollment and engagement; and D was to deepen the relationship with our fitness partners."

- 12 -

40.     On June 1, 2018, Tivity hosted its "Analyst & Investor Day" conference in New York, where Tramuto and Holland sought to reassure investors about the Company's prospects, highlighting several purported key "levers" that would lead to "organic growth" for the Company. Tramuto also discussed Tivity's expansion strategy, which would "build greater momentum for the organization" through a potential acquisition. Tramuto specifically assured investors that he would apply "three disciplines" to any acquisition: (1) the company would need to be "accretive both strategically and accretive financially"; (2) the company would not be "capital intensive"; and (3) the company would need to "put more enrollment and engagement fuel in the engine."

### B.     In a Desperate Turnaround Attempt, Tivity Announces the Nutrisystem Acquisition

41.     On December 10, 2018, following nearly a year of stalling SilverSneakers visits, increased competition and lower Prime activations, Tivity announced it had entered into a definitive agreement to acquire Nutrisystem for $1.3 billion in cash and stock. Nutrisystem sold weight loss products consisting primarily of pre-packaged and frozen foods. In contrast to Tivity, Nutrisystem was not marketed to senior citizens through health insurance plans – food products were sold directly to consumers through television and internet marketing, as well as through certain retailers to adults in their mid-40's to early 50's. And while SilverSneakers members were very loyal to the brand, Nutrisystem customers were not, and often chose not to renew their orders after only a few months of dieting.

42.     Nevertheless, Tramuto claimed that the Nutrisystem combination would provide health insurance providers and SilverSneakers members with an "integrated portfolio of fitness, nutrition and social engagement programs" and grow Tivity into "a holistic" health and wellness business. According to Defendants, the main justification for the Nutrisystem acquisition was the concept of "calories in and calories out," a strategy to address the growing obesity epidemic in the

- 13 -

United States – with nutrition representing the "calories in" and fitness representing the "calories out." Tramuto contended that "the compelling rationale about [the Nutrisystem] transaction is that there will be growth opportunities" including revenue synergies from "cross-platform engagement," to "attract new users, increase enrollment and enhance engagement among current users." As such, Tramuto claimed, the acquisition made Tivity "even more confident" in the Company's SilverSneakers "enrollment and engagement goals." Tramuto further claimed that the merger would "create [a] unique new value proposition for shareholders, health plans, fitness partners, members and consumers," and create "double digit accretion to Tivity Health's adjusted EPS in 2020 and beyond."

43.     Although Defendants had been evaluating options for a potential acquisition for nearly two years, and had been targeting the nutrition market for approximately 18 months, Tivity didn't approach Nutrisystem until September 2018, a mere three months before the acquisition was announced, after having been unsuccessful in consummating other options.

44.     Moreover, while Tramuto had stressed that Tivity would take a "disciplined approach" to any acquisition, and that the company would have "to expand the membership," "expand the enrollment," "be capital light," and "be incremental to our free cash flow," the Nutrisystem acquisition did not meet these criteria.

45.     The acquisition did not offer a meaningful opportunity to drive enrollment and engagement with SilverSneakers members. The companies' business models differed dramatically – while Nutrisystem's business was highly seasonal, with sales peaking during the first few months of the year (referred to in the industry as the "diet season") before sharply falling off, there was little to no seasonality in Tivity's healthcare business, with revenue spread more or less evenly throughout the year. The companies' demographics also differed substantially –

- 14 -

Nutrisystem's main demographic was mid-40's to early 50's whereas Tivity's was 65+. Due to the differing age demographics, it was unlikely that the majority of Nutrisystem's younger customers would be interested in or even eligible for SilverSneakers. Nutrisystem's products also were not a good fit for SilverSneakers members. As Defendants previously stressed, SilverSneakers members "engage because they like the community and social benefits." Nutrisystem, on the other hand, was purely a pre-packaged food and weight-loss company that had high customer turnover and offered no opportunity for social interaction. Further, Defendants' rationale that insurance company and enterprises would increasingly reimburse for Nutrisystem products as a key social determinant of health implied a massive shift in historic behavior that was risky and unlikely to occur in relatively short order. Therefore, cross-selling opportunities to drive enrollment and engagement were almost nonexistent.

46. Nutrisystem was neither financially nor strategically accretive. Indeed, while Nutrisystem generated strong revenue growth in 2016 and 2017,[3] it had missed its 3Q18 and 4Q18 guidance, and Nutrisystem's 2018 revenue fell 1% from $697 million in 2017 to $691 million and its adjusted 2018 EBITDA fell 5% from $109.4 million in 2017 to $104.1 million. In 2018,

---

[3] Nutrisystem's pre-2018 revenue growth was allegedly the result of deceptive marketing, to which the company had reverted in 2013 following a **20-year** consent decree with the FTC banning misleading ads. *See In the Matter of Nutri/System, Inc.*, 116 F.T.C. 1408 (Dec. 22, 1993); *see also* https://seekingalpha.com/article/4080627-drop-50-now-nutrisystems-advertising-backed-shoddy-science. After the consent decree was lifted, Nutrisystem allegedly reverted back to its old ways, launching a nationwide advertising campaign involving "a host of misrepresentations," such as misleading consumer and celebrity testimonials, misleading "'before' and 'after' photos," and misleading claims that consumers would "lose up to 20 lbs. by New Year's!" and "lose 5 lbs." in the first week. *See* "Petition to Investigate Nutrisystem Inc. in Connection with Deceptive Weight Loss Advertising Practices," submitted by Bryan Cave LLP, January 2015. Nutrisystem's reversion to its "old tricks" and "egregious" diet claims – not organic growth ' were believed to be "the real driving force behind [Nutrisystem's] business momentum" after 2013 and resulted in Nutrisystem being reported to the FTC again in 2017. *See* https://seekingalpha.com/article/4080627-drop-50-now-nutrisystems-advertising-backed-shoddy-science.

- 15 -

Nutrisystem had a poor diet season with fewer new customers, as a result of unsuccessful advertising and media campaigns that suffered from "creative fatigue," as well as extended upfront buys of TV ad spots that failed to produce sufficient viewership and raised the cost of customer acquisition. At the time of the acquisition, Nutrisystem's growth had stalled, and there was no indication or prospects of any improvement on the horizon.

47. Strategically, the companies were also misaligned. Defendants had stressed numerous times that Tivity's focus was on finding opportunities to solve the growing loneliness and social isolation problem among the senior population. Nutrisystem was a weight management product which did not offer more opportunities for social interaction – in fact, its pre-packaged delivered meal kept seniors more isolated. Additionally, while Defendants emphasized Nutrisystem's "marketing expertise" as justification for the acquisition, Nutrisystem had an unproven and underutilized digital marketing campaign that fell well behind competitors, and was overly reliant on stale television advertising featuring the same spokesperson for over a decade. As a result, news of the Nutrisystem acquisition was very poorly received by Tivity investors.

48. On the day of the announcement, Tivity's stock declined over 30%, instantly wiping out over $530 million in market capitalization in a single day – one of the largest stock price declines in Tivity's history. Nevertheless, in spite of the intense negative reaction to the merger announcement, Defendants continued to complete the transaction.

49. On February 19, 2019, Defendants issued a press release reporting 4Q18 results and announcing Tivity's FY19 full-year guidance. While Nutrisystem announced standalone financial guidance for FY19, Tivity incorporated Nutrisystem's expected 2019 results from the anticipated closing of the proposed transaction on March 8, 2019 through December 31, 2019 (the "2019 Stub Period") into its combined financial guidance for FY19, including revenues of $534

4836-0564-3985.v2

million to $550 million and adjusted EBITDA of $91 million to $101 million for the Nutrition segment.[4]   According to Tivity, adjusted EBITDA was an important metric because it was the "specific measure of operating performance" used to quantify "profitable growth."

50.    During a conference call for investors held the same day, Tramuto stated that Tivity would benefit from Nutrisystem's "marketing and media expertise" and that they were "laying the groundwork to quickly capitalize on the revenue synergies."  Tramuto stated that "this combination represents a transformational step in both delivery and executing on [Tivity's] next growth opportunity, creating, what I believe, will be a new revenue stream that will integrate nutrition, fitness and social engagement solutions to support overall health and wellness" and reiterated "near and mid-term" revenue synergy opportunities.

### C.     Tivity Obscured Nutrisystem's Dismal Diet Season and Misrepresented that It Was on Track to Achieve Its Nutrition Segment Guidance

51.    On March 8, 2019, the start of the Class Period, Tivity issued a release announcing the completion of the acquisition.  In the release, Tramuto and Zier touted Nutrisystem's and Tivity's "successful track records" and their "powerful offering" of "a holistic approach to addressing critical health needs, lowering healthcare costs, and creating additional value for shareholders, health plans, fitness partners, members and consumers."

52.    On May 8, 2019, Tivity, Traumto, Zier and Holland announced the Company's 1Q19 financial results – the first quarter which included at least partial results from the combined Company.  For Nutrisystem, its performance in the first quarter, known as "diet season," is critical. During this time, demand for weight loss solutions is at its highest, and Nutrisystem spent heavily

---

[4]    In the presentation slides accompanying the February 19, 2019 4Q18 and FY18 investor call, Tivity modified the Nutrition segment's adjusted EBITDA outlook for the full-year to $90 to $100 million.

4836-0564-3985.v2

on marketing in order to attract new customers who would drive Nutrisystem's revenues for the remainder of the year. If, however, Nutrisystem failed to execute a successful diet season strategy, and failed to attract enough new customers, this poor performance would negatively impact the company's financial results for the remainder of the year, and truthful disclosures regarding Nutrisystem's diet season performance were critical to allow investors to understand its prospects and future financial performance.

53. During a conference call to announce the Company's 1Q19 financial results, Tramuto stated that the Nutrition segment "benefited from *strong* adjusted EBITDA" of $13.3 million, was "*independently performing well*," and that these "*positive results*" would "drive greater momentum" across the Company. Zier emphasized the Nutrition segment's "*solid first quarter*," and reassured investors that the Company was "confident" in their guidance, that they were "*on plan*," and that the Nutrisystem business was "definitely back on track" after a poor FY18 performance. Holland similarly stated the Nutrisystem acquisition was "*on track*," that he was "pleased" with the Company's first quarter "achievements," and that the integrated companies were "delivering" and had "performed well across several key metrics, including revenue and adjusted EBITDA" on a standalone and combined basis.

54. Defendants' statements that Tivity was on track to achieve its 2019 adjusted EBITDA guidance for the Nutrition segment was false because, undisclosed to investors, Nutrisystem had already incurred an $8.3 million adjusted EBITDA loss for the period January 1, 2019 to March 7, 2019.[5] But, by closing the acquisition in the middle of the diet season, on March 8, 2019, Tivity was able to avoid reporting this adjusted EBITDA loss, and instead misleadingly

---

[5]    Defendants would not disclose the full picture of the Nutrition segment's adjusted EBITDA for FY19 until February 19, 2020, after Tramuto had been fired, when they finally admitted that the Nutrisystem had incurred $8.3 million in losses from January 1, 2019 to March 7, 2019.

4836-0564-3985.v2

reported a $13.3 million positive adjusted EBITDA for the period March 8 to March 31, 2019, which failed to account for the losses incurred in 1Q19 prior to the merger's close, making it appear that the diet season had been far more successful than it had in fact been.

55. Further, Defendants did not in fact believe, and had no reasonable basis to believe, that their FY19 Nutrition segment adjusted EBITDA and revenue guidance were achievable, as the full (known to Defendants but undisclosed) 1Q19 Nutrition segment adjusted EBITDA of $5 million, and revenues of $191.6 million, were substantially *lower* than 1Q18 Nutrisystem adjusted EBITDA of $5.8 million and revenues of $210.9 million. Because the Nutrition segment's 1Q19 results were already underperforming Nutrisystem's 1Q18 results, and because Defendants knew that "a shortfall in expected results in the first quarter can often result in lower performance for the remainder of the year," Defendants did not in fact believe, and had no reasonable basis to believe, that the Nutrition segment could achieve *higher* adjusted EBITDA and revenues in FY19 than Nutrisystem had achieved in FY18 following a more successful diet season.

56. For example, based on Nutrisystem's historical performance of its FY18 adjusted EBITDA, Defendants knew the Company was already in a $2.2 million hole in order to achieve the mid-point of the FY19 adjusted EBITDA guidance for the Nutrition segment. Yet, investors were misleadingly led to believe that the Nutrition segment was "on track" to achieving its guidance, as Defendants touted a strong start to the merger, including $13.3 million in adjusted EBITDA for the Nutrition segment.

57. Nutrisystem's poor diet season financial results are consistent with reports by former Nutrisystem employees, all of whom worked for the company during the Class Period.

58. Over 90% of Nutrisystem sales were generated through its direct-to-consumer ("DTC") channel, which included substantial television marketing. Unlike SilverSneakers,

- 19 -

Nutrisystem was heavily dependent on television advertising to attract and drive new customers to its in-house customer call center, which Tramuto described as Nutrisystem's "beacon." Sales agents in the call center, paid primarily on commission, took in-bound calls largely generated from these television ads and tried to convert them into sales. Indeed, Zier stated that television advertising accounted for the majority of Nutrisystem's budget "because it gets the awareness" and is "a very good way to reach" Nutrisystem's "target audience" of consumers.

59.     Television advertising not only accounted for the "lion's share of [Nutrisytem's] media," the DTC channel also delivered the "lion's share of the Nutrition unit's revenue and profit" making it "the single most powerful lever" driving customer acquisition. In fact, Nutrisystem's business model was so dependent on television advertising that it described it as the "top of the funnel," used to drive "awareness" and revenue, and it was recognized by Tivity executives that "nothing good can happen without new customer starts" originating from this sales funnel.

60.     During the 2019 diet season, however, major problems emerged in this sales funnel.

61.     A former Nutrisystem sales representative, who worked in Nutrisystem's call center prior to and throughout the 2019 diet season, confirmed that the 2019 diet season failed to meet the company's expectations. This sales representative, like many other sales representatives in Nutrisystem's call center, was tasked with selling Nutrisystem food to individuals who called the company in response to marketing efforts, as well as placing outbound calls to potential customers to close additional sales. According to this sales representative, the volume of incoming calls expected by the company during the 2019 diet season simply never materialized. As a result, this sales representative could spend hours at the beginning of a shift waiting for phone calls that never occurred. The lack of incoming calls was upsetting to the sales representatives because the majority of their potential earnings came from commissions on sales, and a lack of phone calls

- 20 -

meant lower sales and few, if any, commissions. It was also upsetting to the sales representatives' managers, who were paid commissions on their sales representatives' sales, and whose incomes were negatively impacted by the company's ineffective marketing efforts and poor performance. According to this sales representative, the 2019 diet season was the slowest his/her colleagues had ever seen; and s/he left the company following the 2019 diet season because s/he was unable to earn the level of commissions other sales representatives had been able to achieve in prior years.

62.     Another former Nutrisystem sales representative who worked in Nutrisystem's call center prior to, throughout, and after the 2019 diet season also confirmed that the 2019 diet season failed to meet the company's expectations. This sales representative confirmed that the volume of incoming calls expected by the company during the 2019 diet season never materialized, and sales representatives would spend hours waiting for the phone to ring or making retention calls – trying to get customers not to quit, rather than signing up new customers. This sales representative reported that while Nutrisystem hired and trained new sales representatives in November and December 2018 in order to prepare for the 2019 diet season, a number of these new sales representatives were laid off just weeks into the diet season because the volume of calls simply did not materialize. This sales representative confirmed that the low call volume negatively impacted the sales representatives, some of whom would take the month of December off work while Nutrisystem trained new employees, in anticipation of being able to earn high commissions when the diet season started in January. This sales representative had discussions with his/her colleagues about how the lower-than-expected sales and commissions were negatively impacting their lives, as they had counted on such earnings in planning their finances. This sales representative attributed Nutrisystem's poor 2019 diet season performance to Nutrisystem's

ineffective marketing and stated that Nutrisystem's misleading marketing claims made it difficult for the company's sales representatives to attract and sign up new customers.

63.     A former Nutrisystem marketing manager, who worked in Nutrisystem's marketing department for several years until leaving the company around the time of the merger, confirmed that the 2019 diet season failed to meet the company's expectations.  According to this marketing manager, it was evident within the first few weeks of January 2019 that the company's diet season results were not meeting expectations.  S/he learned this through conversations with the company's Chief Marketing Officer, Senior Vice President of Marketing, and Vice-President of e-commerce. S/he also learned this through analytical tools the company used to measure how marketing and sales were performing and through the fact that call volume to the call center was not meeting the company's expectations and the company was not hitting its revenue targets.  The marketing manager confirmed that Nutrisystem's calendar was built around the diet season and that an unsuccessful diet season would negatively impact the company for the rest of the year.  The marketing manager reported that a cause of Nutrisystem's poor 2019 diet season performance was a stale marketing program that recycled content from the prior year and failed to engage customers. The marketing manager reported that his/her colleagues expressed concerns about this approach at the time and that many of them were not surprised when the 2019 diet season failed to perform adequately.

64.     As the year wore on, the Nutrition segment's performance continued to decline, yet Defendants continued to falsely tout its successes.  On August 7, 2019, Tivity provided updated FY19 guidance, which lowered adjusted EBITDA for the Nutrition segment to $80-$84 million. Nevertheless, Tramuto stated that the 2Q19 results showed that the Nutrition segment was still "on track according to plan," that revenue synergies were "beginning to take shape" and that "further

momentum will occur as the year unwinds." Tramuto also falsely stated that Tivity had "high confidence" that its strategic approach would "result in improved results for the 2020 diet season" and cited "early success in revenue synergies" for the Nutrition segment, which was "very encouraging."

65.     During the same call, Zier stated that, "[b]ased on all indicators, we believe that, for the remainder of the year, we will be able to exceed prior year new starts and [have] forecasted as such." The next day, in its 2Q19 Form 10-Q, Tivity announced that the Nutrition segment's adjusted EBITDA for the first 6 months of 2019 was $48 million.

66.     Like 1Q19, however, the Nutrition segment was not "show[ing] improvement," and it was not "on track according to plan" nor "moving in the right direction." Rather, the performance of the Nutrition segment continued to be dragged down due to the poor results of the diet season in 1Q19, increased competition, declining customers, and lack of innovation, as well as other ongoing operational missteps.

67.     Defendants' first half of 2019 Nutrition segment adjusted EBITDA results of $48 million also continued to mislead investors, as the Company still didn't disclose the complete Nutrition segment results, including adjusted EBITDA, for 1Q19. Instead Defendants continued to obscure the $8.3 million in losses in the first 9 weeks of the quarter, making the Nutrition segment appear approximately 21% more profitable than it actually was.

68.     Because of the above, Defendants knew in August 2019 that Tivity was not "on track" to meet even the lowered 2019 Nutrition segment adjusted EBITDA guidance of $80-$84 million. Rather, Defendants already knew that the Company could not meet the lowered 2019 Nutrition segment guidance because the poor diet season had spilled over to negatively impact the

- 23 -

second quarter results, including 2Q19 adjusted EBITDA that was 8% lower than the prior year.[6] In fact, Defendants already knew based on the disappointing 2019 diet season, including declining customers, increased competition and the $8.3 million in undisclosed losses in 1Q19, that the Company could not meet the lowered 2019 Nutrition segment guidance because Tivity's poor diet season had negatively impacted 1Q19 and 2Q19 and would continue to negatively impact the Nutrition segment for the remainder of the year.

69.     On August 8, 2019, Tivity filed its 2Q19 Form 10-Q with the SEC, which contained even more false and misleading statements, including warning of risks that had already come to pass.  Specifically, the 2Q19 Form 10-Q falsely warned that "[w]eak performance during diet season could negatively impact our Nutrition segment's performance for the remainder of the year," even though the poor diet season had *already* negatively impacted Tivity's 2Q19 results, and Tivity continued to obscure $8.3 million in 1Q19 losses from investors.  The Form 10-Q also falsely stated that Tivity "*may* fail to realize the anticipated benefits and cost savings of the acquisition of Nutrisystem," and noted "the *possibility* that we paid more for Nutrisystem than the value we will derive from the acquisition" even though, as described in detail in ¶¶120-170, these risks had also already come to pass, and Defendants were required to assess and impair the Nutrition segment's goodwill and the value of Nutrisystem's trade name, by 2Q19, yet failed to do so in violation of generally accepted accounting principles ("GAAP").

70.     On November 12, 2019, Defendants issued a release announcing Tivity's 3Q19 financial results, continuing to tout the Nutrition segment performance in spite of known and

---

[6]     Similarly, the Nutrition segment's 1Q19 adjusted EBITDA performance was 14% lower than the prior year.

- 24 -

worsening business trends, which demonstrated that Defendants' financial guidance was unattainable.

71.     In their November 12, 2019 release, Defendants reaffirmed the Nutrition segment's updated financial guidance and on the same day reported Nutrition segment adjusted EBITDA of $65.7 million for the first 9 months of FY19 in the Company's 3Q19 Form 10-Q.  Tramuto stated that the 3Q19 financial results had "met our expectations" and that the Nutrition segment had "solid momentum" and had "gained traction" since the acquisition, which positioned Nutrisystem to return to "growth" during the upcoming FY20 diet season.  Zier stated that the Nutrition segment's 3Q19 results "came in as expected," that 4Q19 performance was "on track" and "on plan," and that the FY20 diet season strategy would "lead to stabilization, growth and reduced volatility."  Holland stated that the Nutrition segment's 3Q19 adjusted EBITDA was "within our expectations" and that 4Q19 Nutrition segment EBITDA margins were expected to "improve."

72.     Like 2Q19, however, the Nutrition segment had not "gained traction," and it was not "on track" or "well-positioned."  Rather, the performance of the Nutrition segment continued to suffer from the after-effects of the poor diet season in 1Q19 and, as Tivity would later admit following the Class Period, increased competition, declining customers, lack of innovation and ongoing operational missteps.

73.     Indeed, at the same time Holland told investors that the Nutrition segment's margins were expected to "improve" in 4Q19, and would achieve "growth" in the FY20 diet season, Defendants were quietly taking steps that ***undermined*** the Nutrition segment's performance.  Specifically, in a desperate attempt to salvage its FY19 results, Defendants started quietly rolling out an unprecedented BOGO sale in early November 2019, effectively launching the FY20 diet season weeks ahead of schedule.  The BOGO offer generated incremental orders

- 25 -

but, as Tivity admitted at the end of the Class Period, had the negative effect of driving down revenues and gross margins, while lower average selling prices ("ASP") would "provide a headwind to Nutrisystem revenue and EBITDA growth in 2020." In addition, the BOGO offer had a "rob Peter to pay Paul" effect of poaching sales that typically would have occurred in 1Q20, further undermining the Company's prospects for FY20. *See* ¶¶12, 79, 83, *infra*.

74. Defendants' first nine months of FY19 Nutrition segment adjusted EBITDA results of $65.7 million also continued to mislead investors, as the Company still didn't disclose the complete Nutrition segment results, including adjusted EBITDA for the first quarter. Defendants continued to hide the $8.3 million in losses in the first nine weeks of the quarter, making the Nutrition segment appear approximately 14.5% more profitable than it actually was.

75. Because of the above, Defendants knew during 3Q19 that Tivity was not "on track" to meet even the lowered 2019 Nutrition segment adjusted EBITDA guidance of $80-$84 million. Rather, Defendants already knew based on the disappointing 2019 diet season, including declining customers, increased competition and the $8.3 million in undisclosed losses in 1Q19, that the Company could not meet even the lowered 2019 Nutrition segment guidance because Tivity's poor diet season had negatively impacted 2Q19 and 3Q19 and would continue to negatively impact the Nutrition segment for the remainder of the year. Further, Defendants reiterating the Nutrition segment's adjusted EBITDA guidance in November 2019, after the unprecedented BOGO sale had already begun, which demonstrated Defendants utter lack of confidence in achieving the guidance.

76. Again, Tivity's 3Q19 Form 10-Q, filed with the SEC on November 13, 2019, continued to make false warnings of so-called risks that had already come to pass, warning that "[w]eak performance during diet season ***could*** negatively impact our Nutrition segment's

performance for the remainder of the year," even though the poor diet season continued to impact Tivity's 3Q19 results, and Tivity continued to obscure the $8.3 million 1Q19 losses from investors. And again, Tivity misleadingly stated that it "***may*** fail to realize the anticipated benefits and cost savings of the acquisition of Nutrisystem" and noted "the possibility that we paid more for Nutrisystem than the value we will derive from the acquisition," even though, as described in detail in ¶¶120-170, these risks had also already come to pass and Defendants were required to assess and impair the Nutrition segment's goodwill, and the value of Nutrisystem's trade name, by 2Q19, yet failed to do so in violation of GAAP.

77.     Then, on December 4, 2019, just nine months after the acquisition of NTRI, Tivity shocked investors by announcing the "mutual termination" of former Nutrisystem CEO Zier and her resignation from the board of directors.  No reason for Zier's sudden termination was given, and no successor was named.

### D.     Tivity Fires Tramuto and Reveals Massive Losses; Investors Suffer Millions of Dollars in Damages

78.     On February 19, 2020, Tivity issued a release disclosing its 4Q19 and FY19 financial results.  In the release, Tivity announced that Tramuto had been summarily fired and had resigned from the board of directors.  In addition, the President of the Nutrition segment, Keira Krausz ("Krausz"), had also resigned, effective February 18, 2020.

79.     The release admitted that the "'Nutrition segment had a disappointing end to 2019,'" which included "a non-cash impairment charge of $(377.1) million," which contributed to a net loss for the Company of $272.8 million in 4Q19.  The $377 million charge consisted of an impairment charge to lower the Nutrisystem tradename value by $240 million and a $137 million goodwill impairment charge relating to the Nutrisystem acquisition.  The February 19, 2020 release also disclosed that 4Q19 Nutrition segment revenues came in at $113.7 million, a 12.2%

- 27 -

decrease compared to 4Q18, and 4Q19 Nutrition segment adjusted EBITDA totaled $13.9 million, which missed Tivity's guidance and the market's expectations.  Tivity further issued devastating FY20 earnings guidance for Nutrisystem, which was approximately 43% below the initial FY19 earnings guidance made at the time of the Nutrisystem acquisition.

80.     The release also finally disclosed the 2019 Stub Period results for the Nutrition segment, and *for the first time* disclosed the $8.3 million Nutrition segment adjusted EBITDA losses in the pre-merger portion of 1Q19.  Defendants also belatedly admitted that FY19 adjusted EBITDA for the Nutrition segment had "benefited from the timing of certain expenses in relation to the acquisition date," as depicted below:

**Nutrition Segment**
*Dollars in millions*

| | Three Months Ended December 31, 2019 | Fiscal Year 2019 (3/8/19 – 12/31/19) | Nutrisystem, Inc. 2019 Prior to Acquisition (1/1/19 – 3/7/19) (2) |
|---|---|---|---|
| Nutrition Revenues | $113.7 | $498.1 | $134.0 |
| Nutrition Adjusted EBITDA | $13.9 | $79.6 | ($8.3) |
| Nutrition Adjusted EBITDA Margin | 12.2% | 16.0% | (6.2%) |

(2) Reflects results from January 1, 2019 through March 7, 2019, prior to the Company's acquisition of Nutrisystem on March 8, 2019.  These results are excluded from the Company's reported results for fiscal year 2019.  Adjusted EBITDA for the period January 1, 2019 through March 7, 2019 excludes $17.1 million of acquisition, integration, and project costs.

81.     On February 19, 2020, Tivity hosted a conference call to discuss its 4Q19 and FY19 results.  During the call Kevin G. Wills ("Wills"), the Independent Chairman of the board of directors, commented on Tramuto's dismissal, admitting that "*we have not been satisfied with the performance of our Nutrition business*, and we believe the company will benefit from a transition to a new CEO."  Wills further admitted that the Company was "disappointed" with Nutrisystem's performance, which had suffered from "increased competition," "operational missteps" and a "lack of innovation."

82.     Tivity's interim CEO, Robert Greczyn ("Greczyn"), also admitted that, "the Nutrition business has not worked out as well as planned *since the completion of the acquisition in March 2019*."  Tommy Lewis ("Lewis"), Tivity's Interim President of the Nutrition Business Unit, admitted that "*last year was a step backward*" and that "*after experiencing a year of decline*

- 28 -

*in new customers, industry history shows it's a tremendous challenge to reverse the trend for the next diet season*," directly contradicting remarks Tramuto had made just a month prior at a JPMorgan Conference, where he assured investors that he was "confident" the Nutrition segment investment "is going to pay off during this diet season."

83.     Holland admitted that the Nutrition segment's adjusted EBITDA "was below our expectations" and was impacted by lower revenue and lower gross margin "reflecting the impact of marketing promotions that were executed in Q4 of 2019."  Lewis further revealed that due to the continuing promotional activities, "a lower anticipated average selling price is expected to provide a headwind to Nutrisystem revenue and EBITDA growth in 2020."  In essence, Tivity's aggressive use of discounts negatively impacted average selling price and margins in the final weeks of FY19, sacrificing the traditional FY20 diet season in a desperate attempt to try to drive customer growth and salvage FY19 results.

84.     On this news, Tivity's stock price fell $10.43 per share, or 45.49%, to close at $12.50 per share on February 20, 2020.

85.     On May 6, 2020, Anthony Sanfilippo, Chairman of the board of directors, stated that after a comprehensive review, the board of directors would "'explore strategic alternatives with respect to the Nutrition business, including a possible [sale].'"  In a final coda, on October 19, 2020, Tivity announced the sale of Nutrisystem to a private equity firm for $575 million – less than half of the $1.3 billion the Company paid to acquire the business just a year prior in March 2019.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

86.     During the Class Period, Defendants materially misled investors, thereby maintaining and inflating the price of Tivity securities, by publicly issuing false and misleading

- 29 -

statements and omitting to disclose material facts necessary to make Defendants' statements not false and misleading.

**A.    False and Misleading Statement and Omissions Regarding 1Q19**

87.    The Class Period begins on March 8, 2019, when Tivity issued a release titled "Tivity Health Completes Acquisition of Nutrisystem," which announced the completion of the Nutrisystem acquisition for approximately $1.3 billion.  The press release also quoted Defendants Tramuto and Zier, in relevant part:

> "We welcome Nutrisystem's powerful brands and talented team to the Tivity Health family.  ***Both Nutrisystem and Tivity Health have successful track records improving health, both in the lives of consumers and health plan members, as well as in the communities where we do business.  That experience, coupled with our shared commitment to our varied stakeholders, will power successful execution on the many opportunities that lie ahead***," said Donato Tramuto, Tivity Health's Chief Executive Officer.

> *            *            *

> "***Since the announcement of the transaction in December, we've been working on plans for a smooth integration that will allow us to quickly capture significant revenue and cost synergies across the combined company***," Zier said.  "We've assembled a strong and experienced leadership team that will be focused on rapidly bringing an integrated suite of offerings to market.  I am excited for this new chapter and strongly believe Tivity Health's expertise in fitness and deep relationships in healthcare, combined with Nutrisystem's nutrition and consumer engagement and marketing expertise, can change the paradigm for health and wellness and provide ***significant growth opportunities as we go forward***."

88.    On May 8, 2019, Tivity issued a release reporting its 1Q19 results wherein the Company reported $214.1 million in revenues, affirmed financial guidance for FY19 and reported that the Nutrisystem integration was "***on track***."  The 1Q19 Release also highlighted combined adjusted EBITDA of $39.5 million for 1Q19 "***which include[d] $13.3 million from Nutrisystem***."

89.    In the 1Q19 Release, Trumoto stated he was "'pleased with Tivity Health's first quarter financial results'" and that the Nutrition segment "'***benefited from strong adjusted EBITDA***.'"  With regard to the Nutrition segment, Holland stated "'[Tivity's] integration efforts

- 30 -

[of Nutrisystem] are going well and we are *on track* to deliver the $9 million to $12 million of cost synergies for 2019 previously discussed.'"

90. The 1Q19 Release then affirmed guidance previously issued on February 19, 2019, before the close of the transaction, which included both Tivity and Nutrisystem's combined revenue, stating in relevant part:

> *Following the close of the transaction, Tivity Health affirms prior guidance for revenue, adjusted EBITDA and cost synergies and provides additional details for combined financial guidance for 2019. This combined financial guidance includes the expected results for the Healthcare segment for the full year 2019 and the expected results for the Nutrition segment from March 8, 2019 through December 31, 2019:*
>
> - revenues in a range of $1,146 million to $1,177 million; and
>
> - adjusted EBITDA in a range of $240 million to $258 million.

91. Also on May 8, 2019, Tivity hosted a conference call to discuss its 1Q19 results. During the call, Tramuto highlighted the first quarter's "*positive results*," stating:

> I am very pleased with our first quarter financial results and today there are 5 key areas that I'd like to comment on. *First, and as indicated in our revenue and adjusted EBITDA results for this quarter, our Healthcare and Nutrition segments are strong and independently performing well*.

92. During the 1Q19 conference call, Holland stated he was "pleased with [the Company's] achievements this quarter highlighted by the completion of our acquisition of Nutrisystem on March 8," including the Nutrition segment, which "*delivered $57.6 million in revenue with adjusted EBITDA of $13.3 million*" during the 2019 Stub Period and further added:

> Along with the integration of the Nutrisystem organization, we now have been operating as 1 company for 60 days and I'm pleased to report that we're delivering against those core priorities. *Both businesses on a standalone and combined basis performed well across several key metrics, including revenue and adjusted EBITDA*.

- 31 -

93.     Holland also "affirmed" guidance for the Nutrition segment, and discussed the Company's FY19 outlook, stating that "we are very excited about the prospects for the company, our progress on the integration and our long-term growth opportunity."

94.     Zier stated that:

> ***Nutrisystem finished the quarter strong*** as we introduced new creative that focused more on the value of our program, expanded our top-of-funnel digital sources and layered back in television spend, which we believe we cut too far back on in January. As a result, we had a strong close to the quarter with March customer starts finishing higher than January on lower spend. For the remainder of the year, we're expecting customer starts to be stronger than prior year.

In addition, Zier touted the progress of the Nutrisystem integration and revenue synergies, stating:

> Just as I think, there are significant opportunit[ies] for the [Nutrition segment] brands over time to leverage Tivity Health's health plan and partner relationships, there is also tremendous opportunity for the SilverSneakers and Prime products to capitalize on the performance-based and precision engagement capabilities that the company has gained by way of [the Nutrisystem] acquisition.

*     *     *

> ***The Nutrition division is on track to achieve its numbers. We're seeing abundant interest in a combined fitness and nutrition solution and we're excited about the revenue synergies as we move forward***.

95.     During the question and answer session that followed the 1Q19 conference call, Defendant Zier stated that the Nutrition segment "***saw improvement in customer acquisition trends in March. So the cadence of our business is shifting slightly for this year. And that March starts came in very strong and we're confident as we go ahead in the guidance that we provided. I feel the business is definitely back on track***." Defendant Tramuto concurred, stating "we have low-hanging fruits that we're grabbing. . . . So I think you can tell in my voice that certainly we are optimistic by what the future holds for us."

96.     On May 9, 2019, Tivity issued its 1Q19 Form 10-Q with the SEC, reporting the Company's financial results for the quarter ended March 31, 2019 and reiterating Nutrition segment adjusted EBITDA of $13.3 million.  The 1Q19 Form 10-Q stated in relevant part:

> Our financial statements and accompanying notes are prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP").   In our opinion, the accompanying consolidated financial statements of Tivity Health®, Inc. and its wholly-owned subsidiaries, including the results of Nutrisystem®, Inc. ("Nutrisystem") acquired on March 8, 2019, (collectively, "Tivity Health," the "Company," or such terms as "we," "us," or "our") reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement.

*     *     *

> Following the acquisition of Nutrisystem in March 2019, we organize and manage our operations within two reportable segments, based on the types of products and services they offer: Healthcare and Nutrition.   The Healthcare segment consists of SilverSneakers senior fitness, Prime Fitness and WholeHealth Living.  The Nutrition segment provides weight management products and services.

> Each segment's profit is measured as earnings before interest, taxes, depreciation and amortization ("EBITDA") excluding acquisition and integration costs and restructuring and related charges, as shown below:

(In thousands)

| | Three Months Ended March 31, 2019 | | |
|---|---|---|---|
| | Healthcare | Nutrition | Consolidated |
| Revenues | $        156,527 | $        57,567 | $        214,094 |
| | | | |
| Adjusted EBITDA | $        26,129 | $        13,344 | $        39,473 |
| Acquisition and integration costs | | | 17,052 |
| Restructuring and related charges | | | 1,591 |
| Interest expense | | | 7,666 |
| Depreciation and amortization | | | 3,582 |
| Income before income taxes | | | 9,582 |
| | | | |
| Total assets as of March 31, 2019 | $        456,017 | $        1,614,571 | $        2,070,588 |

97.     In addition, the 1Q19 Form 10-Q contained certifications pursuant to section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") certifying that Defendants Tramuto and Holland had reviewed the SEC filing, and: (1) it did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period

covered by this report"; (2) "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report"; (3) disclosure controls and procedures "ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared"; (4) internal controls over financial reporting "provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; and (5) disclosed to the Company's auditors and the audit committee: "(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting."

98.     Defendants' 1Q19 statements, set forth in ¶¶87-97, *supra*, were materially false and misleading for the following reasons:

(a)     Defendants' purportedly "strong" $13.3 million in adjusted EBITDA for the Nutrition segment (¶¶88-89, 91-92, 96) intentionally obscured ***$8.3 million in losses*** in the first quarter, making the first quarter Nutrition segment appear approximately 166% more profitable than it actually was (¶¶9, 54, 80, 82, 174, 179-182);

(b)     the Nutrition segment was not "strong," did not have a "successful track record[]," and was not "on track," nor "performing well" (¶¶87-89, 91, 94-95). Rather, multiple former sales representatives and marketing personnel, all of whom worked for Nutrisystem during

- 34 -

1Q19, reported that call volumes and sales results during the 2019 diet season failed to meet the Company's expectations. ¶¶7, 57-63. Call center staff were laid off. *Id*. The quality of Nutrisystem's sales leads declined. *Id*. Salespeople were focusing their efforts on retention. *Id*. And Nutrisystem's misleading marketing claims made it difficult for the company's sales representatives to attract and sign up new customers. *Id*.;

(c) Defendants were not "confident" that the Nutrition segment's adjusted EBITDA guidance of $90-$100 million was "on track" (¶¶88, 90, 93-95), rather Defendants knew that, after a failed 2019 diet season, and after accounting for the unreported $8.3 million in losses in the first quarter, guidance for the remainder of the year was no longer achievable (¶¶9, 45, 54-63, 79-83, 174, 179-182); and

(d) As a result, the Form 10-Q did not fairly present the financial condition and results of operations of the Company.

## B. False and Misleading Statement and Omissions Regarding 2Q19

99. On August 7, 2019, Tivity issued a release announcing results for 2Q19 ended June 30, 2019. The 2Q19 Release reported revenues of $340.4 million, operating income of $49.9 million, net income of $18.1 million, EPS of $0.38, net intangible assets of $956.3 million, net goodwill of $791.7 million, updated financial guidance for 2019, and stated, in relevant part that:

> adjusted EBITDA from continuing operations for the second quarter of 2019 was $70.3 million. This includes $1.3 million of cost synergy benefits and $34.7 million from the nutrition segment and excludes $11.4 million of acquisition, integration, and restructuring costs associated with the Nutrisystem acquisition. This compares to adjusted EBITDA from continuing operations of $35.1 million for the second quarter of 2018.

Tramuto stated in the 2Q19 Release:

> "*While the nutrition business did not meet our expectations for the quarter, a comprehensive optimization plan has been developed and we believe the execution of this strategy will result in improved results for the 2020 diet season for the core nutrition business*. We are also executing a broader expansion that

- 35 -

will take us beyond weight loss to offer nutrition-based solutions that will differentiate us in the marketplace and enable a platform to address aspects of the social determinants of health."

100.     The 2Q19 Release also reported that the Nutrition segment revenue was $182.9 million, and adjusted EBITDA was $34.7 million in 2Q19.  In addition, the release updated 2019 financial guidance, stating in relevant part:

> *In light of the aforementioned results for the second quarter and the Company's expectations for the remainder of the year, Tivity Health is updating financial guidance provided on February 19, 2019*.  The consolidated financial guidance below includes the expected results for the Healthcare segment for the full year 2019 and the expected results for the Nutrition segment from March 8, 2019 through December 31, 2019:

|  | Updated 2019 Guidance | Previous 2019 Guidance |
|---|---|---|
| Consolidated Revenues | $1,127 million to $1,142 million | $1,146 million to $1,177 million |
| Healthcare Segment Revenues | $625 million to $630 million | $612 million to $627 million |
| Nutrition Segment Revenues 3/8-12/31 | $502 million to $512 million | $534 million to $550 million* |
| Consolidated Adjusted EBITDA | $229 million to $239 million | $240 million to $258 million |
| Healthcare Segment Adjusted  EBITDA | $140 million to $143 million | $140 million to $145 million |
| Nutrition Segment Adjusted EBITDA 3/8-12/31 | $80 million to $84 million | $91 million to $101 million* |
| Anticipated Cost Synergies | $9 to $12 million | $9 to $12 million |
| Consolidated Earnings Per Diluted Share | $1.11 to $1.32 | $1.35 to $1.67 |
| Consolidated Adjusted Earnings Per Diluted Share | $2.14 to $2.32 | $2.24 to $2.52 |

*Nutrition segment revenues and adjusted EBITDA ranges are implied based on February 19, 2019 guidance.

101.     Also on August 7, 2019, Tivity hosted a conference call to discuss its 2Q19 results. During the call, Tramuto assured investors that "just 5 months after the closing of Nutrisystem, our revenue and cost synergy initiatives are on track according to plan and further momentum will occur as the year unwinds."  In addition to "cost synergies [that] are on track," Tramuto stated that the Company's "revenue synergies are beginning to take shape," stating:

> *We're just 5 months out from the closing of our Nutrisystem acquisition.  We are fiercely executing on our plan to leverage the assets of these 2 businesses to drive significant long-term shareholder value*.
>
>          And with that, I'd like to focus on a few key highlights, specific to our second quarter results, which include: first, increased strong momentum in our Healthcare business; secondly, *early success in revenue synergies; and thirdly, optimization and expansion of our Nutrition business*.

*          *          *

- 36 -

*We are applying a strategic approach [in the Nutrition segment] that is very similar to what we did in the Healthcare business unit, and we have high confidence that we can execute another successful transformation.*

*As part of this plan, in the next 2 quarters, we will make additional investments of approximately $3 million into channel expansion, marketing technology, product innovation and operational capabilities as well as to the menu and branding, all of which is contemplated in our revised guidance issued earlier today. An integrated approach to these investments will, we believe, strengthen our position in the upcoming diet season and beyond*.

102. Zier addressed the Nutrition segment results for the first half of the year, saying that "[we] were pleased with our results in March" and April results were "also encouraging," and added "*[b]ased on all indicators, we believe that, for the remainder of the year, we will be able to exceed prior year new starts and forecasted as such*."

103. On August 8, 2019, Tivity filed its 2Q19 Form 10-Q with the SEC, reporting the Company's financial results for the quarter ended June 30, 2019, including Nutrition segment adjusted EBITDA of $34.7 million for the second quarter and $48 million for the first half of 2019. The Form 10-Q also reported revenues of $340.4 million, operating income of $49.9 million, net income of $18.1 million, EPS of $0.38, net intangible assets of $956.3 million and net goodwill of $791.7 million. The 2Q19 Form 10-Q stated in relevant part:

Our financial statements and accompanying notes are prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP"). In our opinion, the accompanying consolidated financial statements of Tivity Health®, Inc. and its wholly-owned subsidiaries, including the results of Nutrisystem®, Inc. ("Nutrisystem") acquired on March 8, 2019, (collectively, "Tivity Health," the "Company," or such terms as "we," "us," or "our") reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement.

\*    \*    \*

Each segment's *profit* is measured as earnings before interest, taxes, depreciation and amortization ("EBITDA") excluding acquisition and integration costs and restructuring and related charges, as shown below:

| (In thousands) | Three Months Ended June 30, 2019 | | | Six Months Ended June 30, 2019 | | |
|---|---|---|---|---|---|---|
| | Healthcare | Nutrition | Consolidated | Healthcare | Nutrition | Consolidated |
| Revenues | $ 157,481 | $ 182,896 | $ 340,377 | $ 314,008 | $ 240,463 | $ 554,471 |
| Adjusted EBITDA | $ 35,681 | $ 34,667 | $ 70,348 | $ 61,810 | $ 48,010 | $ 109,820 |
| Acquisition and integration costs | | | $ 8,999 | | | $ 26,049 |
| Restructuring and related charges | | | 2,352 | | | 3,943 |
| Interest expense | | | 23,661 | | | 31,328 |
| Depreciation and amortization | | | 9,084 | | | 12,666 |
| Income before income taxes | | | $ 26,252 | | | $ 35,834 |
| Total assets as of June 30, 2019 | | | | $ 395,395 | $ 1,620,112 | $ 2,015,507 |

104.    In addition, the 2Q19 Form 10-Q outlined various "Risk Factors" including the risk that "*[i]f* [the Company] fail[s] to successfully implement [its] business strategy, our financial performance and our growth *could* be materially and adversely affected."  The 2Q19 Form 10-Q stated:

> We *may* fail to realize the anticipated benefits and cost savings of the acquisition of Nutrisystem, which *could* adversely affect the value of our Common Stock.
>
> The success of the acquisition of Nutrisystem will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining the business of Nutrisystem with our legacy business. Our ability to realize these anticipated benefits and cost savings is subject to certain risks including:
>
> *        *        *
>
> - the possibility that we paid more for Nutrisystem than the value we will derive from the acquisition[.]

105.    The 2Q19 Form 10-Q also stated that "[t]he seasonal nature of the business of our Nutrition segment *could* cause our operating results to fluctuate," and further noted:

> The business of our Nutrition segment is seasonal, with revenue generally greatest (and advertising expenses generally highest) in the first calendar quarter, also known as diet season.  Weak performance during diet season *could* negatively impact our Nutrition segment's performance for the remainder of the year.

106.    In addition, Tivity's 2Q19 Form 10-Q contained SOX Certifications which were substantially identical to those identified in ¶97, *supra*, certifying that Defendants Tramuto and Holland had reviewed and certified the SEC filing was in accordance with GAAP.

107. Defendants' 2Q19 statements, set forth in ¶¶99-106, *supra*, were materially false and misleading for the following reasons:

(a)     the Nutrition segment was not "on track," "tak[ing] shape," nor experiencing "early success," and Defendants had no reasonable basis to be "pleased with our results" (¶¶101-102, 104-105).  Rather Defendants knew that during the first half of 2019 the Nutrition segment was $8.3 million less profitable than reported, Defendants had suffered a poor 2019 diet season in the first quarter and was facing insurmountable headwinds due to the Company's expected declining profitability that it historically experienced in the back half of the year (¶¶11, 66-69, 79-83, 174, 179-182);

(b)     Defendants' first half 2019 adjusted EBITDA for the Nutrition segment continued to intentionally obscure ***$8.3 million in losses*** in the first quarter (¶¶67, 80, 100, 103), making the first half of 2019 Nutrition segment appear approximately 21% more profitable than it actually was (¶¶11, 66-69, 79-83, 174, 179-182);

(c)     Defendants did not "believe" that a "comprehensive optimization plan" would help the Company achieve the Nutrition segment's lowered adjusted EBITDA guidance of $80-$84 million (¶¶99-100, 104-105), rather Defendants knew that, after accounting for the failed 2019 diet season and the unreported $8.3 million in losses in the first half of 2019, even the lowered guidance was not achievable based on the historical decline in Nutrition segment profitability in the last half of the year (¶¶11, 45, 66-69, 79-83, 174, 179-182); and

(d)     Tivity's 2Q19 financial statements were not in fact prepared in accordance with GAAP, and did not fairly present Tivity's financial condition and results of operations in all material respects as Defendants failed to timely write down the value of the Nutrisystem tradename and Nutrition segment goodwill, in violation of GAAP (¶¶11, 66-69, 79, 106, 120-170, 173).  As

a result, Defendants overstated Tivity's intangible assets, goodwill, operating income, net income and EPS in the Company's public financial statements for 2Q19.  *Id.*

## C. False and Misleading Statement and Omissions Regarding 3Q19

108.    On November 11, 2019, Tivity issued a release announcing results for 3Q19.  The 3Q19 Press Release reported revenues of $303.9 million, operating income of $41.6 million, net income of $13.9 million, EPS of $0.29, net intangible assets of $951.7 million, net goodwill of $791.7 million, reaffirmed financial guidance for 2019, and highlighted that:

> adjusted EBITDA for the third quarter of 2019 was $56.8 million, which benefited from combined cost synergies of $2.9 million.  Adjusted EBITDA includes $17.7 million from the Nutrition segment (inclusive of synergies) and excludes $5.5 million of acquisition, integration, and restructuring costs associated with the Nutrisystem acquisition.  This compares to EBITDA of $36.6 million for the third quarter of 2018.

109.    In the 3Q19 Release, Tramuto stated: "'*The nutrition segment also met our expectations reflecting an improved focus on execution and new investments in the O-E strategy*.'"

110.    Also on November 12, 2019, Tivity hosted a conference call to discuss its 3Q19 results.  During the call, Zier assured investors that "*The Nutrition business unit's third quarter results came in as expected, and Q4 quarter-to-date performance is on plan*," and added the following remarks:

> *As we historically have done during the second half of the calendar year, our focus within the nutrition business unit shifts to preparing for a successful 2020 diet season*.  And we're also executing the OE strategy that we announced last quarter.  As a reminder, the OE strategy encompasses: One, optimizing the core business to support 2020 diet season growth; and two, expanding the business to launch new revenue channels that will diversify us from being singularly dependent on the direct response advertising-based approach.
>
> *We believe the execution of this strategy will lead to stabilization, growth and reduced volatility*. . . .

111.    On the 3Q19 call, Defendant Zier stated:

- 40 -

I'm pleased with the Nutrition business unit's performance this quarter and the progress we're making on the revenue synergy front. *We're on track related to our inventory planning, 2020 diet season preparation and we are executing on the OE strategy*.

112. Defendant Holland also "reaffirmed" FY19 guidance and stated, "we are pleased with our results and *are tracking within our annual guidance communicated in the August earnings release*," adding that:

> Our Q3 adjusted EBITDA for the Nutrition segment was $17.7 million or 12.3% of segment revenues. This amount includes approximately $2.2 million in benefits from cost synergies. *As a reminder, the Nutrition segment's historical quarterly EBITDA cadence typically delivers the largest contribution during the second quarter each year. This year's sequential decline from Q2 to Q3 landed within our expectations based on its historical pattern and the new OE investment activity underway during the third quarter*.
>
> *     *     *
>
> *We expect fourth quarter Nutrition segment EBITDA margins to improve sequentially from Q3 to Q4 due to improving gross margin trends and lower marketing expenses as a percentage of revenues*.

113. Donato also assured investors that "*[j]ust eight months post close of our Nutrisystem acquisition*," the Company had "solid momentum," had "gained traction" and had "*positioned our Nutrisystem segment with a focus on the right strategic imperatives to return that business to growth. And fourth, we have made the necessary investments in the last quarter within the Nutrition business unit to ensure positive momentum entering into the 2020 diet season*."

114. On November 12, 2019, Tivity filed its 3Q19 Form 10-Q with SEC, reporting the Company's financial results for the quarter ended September 30, 2019. The 3Q19 Form 10-Q stated in relevant part:

> Our financial statements and accompanying notes are prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP"). In our opinion, the accompanying consolidated financial statements of Tivity Health®, Inc. and its wholly-owned subsidiaries, including the

- 41 -

results of Nutrisystem®, Inc. ("Nutrisystem") acquired on March 8, 2019 (collectively, "Tivity Health," the "Company," or such terms as "we," "us," or "our") reflect all adjustments, consisting only of normal recurring adjustments, necessary for a fair statement.

\*        \*        \*

Each segment's profit is measured as earnings before interest, taxes, depreciation and amortization ("EBITDA") excluding acquisition and integration costs and restructuring and related charges, as shown below:

| (In thousands) | Three Months Ended September 30, 2019 | | | Nine Months Ended September 30, 2019 | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Healthcare | Nutrition | Consolidated | Healthcare | Nutrition | Consolidated |
| Revenues | $ 159,979 | $ 143,918 | $ 303,897 | $ 473,987 | $ 384,382 | $ 858,369 |
| Adjusted EBITDA | $ 39,177 | $ 17,662 | $ 56,839 | $ 100,986 | $ 65,673 | $ 166,659 |
| Acquisition and integration costs | | | $ 5,259 | | | 31,306 |
| Restructuring and related charges | | | 281 | | | 4,225 |
| Interest expense | | | 23,006 | | | 54,334 |
| Depreciation and amortization | | | 9,700 | | | 22,366 |
| Income before income taxes | | | $ 18,593 | | | $ 54,428 |
| Total assets as of September 30, 2019 | | | $ 379,926 | $ 1,625,578 | $ 2,005,504 |

115.    In addition, the 3Q19 Form 10-Q reiterated various "Risk Factors" including the risk that "*if* [the Company] fail[s] to successfully implement our business strategy, our financial performance and our growth *could* be materially and adversely affected."  In addition, the 3Q19 Form 10-Q stated:

We *may* fail to realize the anticipated benefits and cost savings of the acquisition of Nutrisystem, which *could* adversely affect the value of our Common Stock.

The success of the acquisition of Nutrisystem will depend, in part, on our ability to realize the anticipated benefits and cost savings from combining the business of Nutrisystem with our legacy business.  Our ability to realize these anticipated benefits and cost savings is subject to certain risks including:

\*        \*        \*

•    the possibility that we paid more for Nutrisystem than the value we will derive from the acquisition[.]

116.    The Company also addressed the "Risks Relating to Our Nutrition Segment" in the 3Q19 Form 10-Q, including "the seasonal nature of the business," stating:

- 42 -

The business of our Nutrition segment is seasonal, with revenue generally greatest (and advertising expenses generally highest) in the first calendar quarter, also known as diet season. Weak performance during diet season ***could*** negatively impact our Nutrition segment's performance for the remainder of the year.

117. In addition, Tivity's 3Q19 Form 10-Q contained SOX Certifications which were substantially identical to those identified in ¶¶97, 106, *supra*, certifying that Tramuto and Holland had reviewed and certified the SEC filing were in accordance with GAAP.

118. Then, on January 15, 2020, Tivity participated in the JPMorgan Conference where Defendant Tramuto continued to assure investors that "***we are confident***" that the Nutrisystem investment "***is going to pay off during this diet season***," and that he was "happy with the results," of the FY20 diet season.

119. Defendants' 3Q19 statements, set forth in ¶¶108-118, *supra*, were false and misleading for the following reasons:

(a)    the Nutrition segment did not have "solid momentum," it had not "gained traction," and it was not "on track," and Defendants had no reasonable basis to be "pleased" or "confident" about the 3Q19 Nutrition segment results. ¶¶109-113, 118. Rather Defendants knew that during the first three quarters of 2019 the Nutrition segment was $8.3 million less profitable than reported, Defendants had suffered a poor 2019 diet season, increased competition, declining customers, lack of innovation and ongoing operational missteps, and the Nutrition segment was experiencing insurmountable headwinds due to the Company's historical declining profitability in the back half of the year. ¶¶45, 79-83, 174, 179. Further, the Nutrition segment was offering unprecedented discounts, which ultimately reduced revenues and margins in 4Q19, as well as negatively impacting the Company ability to execute a successful FY20 diet season (¶¶12, 73, 75);

(b)    Defendants' third quarter and year-to-date 2019 adjusted EBITDA for the Nutrition segment continued to intentionally obscure $8.3 million in losses in the first quarter

- 43 -

(¶¶108, 112, 114-116), making the Nutrition segment's first three quarters of 2019 appear approximately 14.5% more profitable than it actually was (¶¶12, 74, 79-83, 174, 179-182);

(c)     Defendants were not "on track" to meet even the lowered 2019 Nutrition segment adjusted EBITDA guidance of $80-$84 million (¶¶111, 115-116), rather Defendants knew that, after accounting for the failed 2019 diet season, including declining customers, increased competition and the unreported $8.3 million in losses in 1Q19, even the lowered guidance was not achievable based on the historical decline in Nutrition segment profitability in the final months of the year, and there was no reasonable basis to believe that this historical trend was reversible (¶¶45, 79-83, 174, 179-182); and

(d)     Tivity's 3Q19 financial statements were not in fact prepared in accordance with GAAP, and did not fairly present Tivity's financial condition and results of operations in all material respects as Defendants failed to timely write down the value of the Nutrisystem tradename and Nutrition segment goodwill, in violation of GAAP (¶¶11, 79, 97, 117, 120-170).  As a result, Defendants overstated Tivity's intangible assets, goodwill, operating income, net income and EPS in the Company's public financial statements for 3Q19.  *Id*.

## VI.     DEFENDANTS' FALSE FINANCIAL STATEMENTS

120.    SEC regulations require that public company registrants file regular year-end and quarterly public financial statements on Forms 10-K and 10-Q respectively. The SEC requires that such financial statements must be prepared in accordance with GAAP.[7]

---

[7]     GAAP comprises the standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) provides that financial statements filed with the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure.

121. Defendants' statements that Tivity's financial statements were prepared in accordance with GAAP as set forth in ¶103, however, were materially false and misleading because Defendants failed to timely write down the value of the Nutrisystem tradename and Nutrition segment goodwill, in violation of GAAP. As a result, Defendants overstated Tivity's intangible assets, goodwill, operating income, net income and EPS in the Company's public financial statements for the quarters ended June 30 and September 30, 2019.

### A. Relevant Accounting Concepts Governing Goodwill and Indefinite-Lived Intangible Assets

#### 1. Accounting Principles Governing Goodwill and Goodwill Impairment

122. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business acquisition or merger. Accounting Standards Codification ("ASC")[8] 820-10-20 *Fair Value Measurement*, defines this respective fair value of the assets acquired and liabilities assumed in an acquisition as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 350-20-35-16 Intangibles – *Goodwill and Other*, further defines goodwill assigned to individual reporting units as "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill." A reporting unit is an operating segment of a company or one level below an operating segment.

123. Tivity paid $1.29 billion in total consideration to acquire Nutrisystem on March 8, 2019. Immediately following the acquisition, Tivity organized its business into two operating

---

[8] The SEC has the statutory authority for the promulgation of the GAAP for public companies and has generally delegated that authority to the Financial Accounting Standards Board ("FASB"). The FASB's promulgated standards are generally contained within the FASB ASC, which are considered to be the highest standards of GAAP.

4836-0564-3985.v2

segments: the "Healthcare" segment, consisting of Tivity's legacy business, and the newly formed "Nutrition" segment, dedicated entirely to the newly acquired Nutrisystem subsidiary. For purposes of its goodwill impairment testing, Tivity disclosed these two operating segments to be its reporting units. At the closing, Tivity performed an analysis of the fair value of Nutrisystem's assets and liabilities, valuing the Nutrisystem tradename at $800 million, and recording $457 million in excess purchase price as goodwill, which constituted the entire balance of goodwill reported within the Nutrition operating segment.

124. Accounting rules require that most assets be reviewed periodically to determine if the asset's value has declined enough to be considered "impaired." Pursuant to ASC 350-20-35-2, goodwill "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." Following an acquisition, ASC 350-20-35-28 through -30 requires goodwill to be tested for impairment annually and, as is at issue here, for any interim quarter when certain events occur or circumstances are present or change.

125. To assess whether events or circumstances identified in an interim quarter triggered a test for goodwill impairment, ASC 350-20-35-3A required that Tivity test goodwill for any quarter when an assessment of "qualitative factors" determines that it was more likely than not (that is a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill.

### a. Goodwill Impairment Analysis – Evaluation of Impairment Indicators

126. The qualitative assessment for goodwill impairment analysis requires impairment testing for any quarter when certain qualitative factors of impairment are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30.11. These qualitative factors are often referred to as "triggers," "triggering events," or

- 46 -

"impairment indicators." Pursuant to ASC 350- 20-35-3C, examples of such triggering events include, but are not limited to, the following:

> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development[.]
>
> *    *    *
>
> d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods[.]
>
> *    *    *
>
> g. If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

127. ASC 350-20-35-3E required Defendants to test for goodwill impairment if any triggering events, including but not limited to any of the examples given above, alone or in combination, made it more likely than not the fair value of the Nutrition segment reporting unit was less than its book value or carrying amount. ASC 350-20-35-3E also provides that the triggering events must be considered holistically. In other words, even if no individual triggering event is sufficient, on its own, to make it more likely than not the fair value of the reporting unit has declined below its book value, if the "totality" of the events and circumstances described above, made it more likely than not that the fair value of a reporting unit during an interim quarter was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.

### b. Goodwill Impairment Test – Step 1 and Step 2

128. ASC 350-20-35-4 provides that "[t]he first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying

- 47 -

amount, including goodwill." ASC 350-20-35-11 in turn, describes step two of the goodwill impairment analysis: "If the carrying amount of reporting unit goodwill exceeds the implied fair value of that goodwill [as determined in step 1], an impairment loss shall be recognized in an amount equal to that excess." Such an impairment charge must be immediately recognized by a charge (increase to expense) against earnings. ASC 350-20-35-2, 4, 8, 9, 11, 14-17.

129. As discussed below at ¶¶137-152, Tivity met multiple examples of the specific triggering circumstances set forth in ASC 350-20-35-3C above, indicating that the Nutrition segment goodwill was already likely impaired by the quarter ended June 30, 2019, requiring an impairment test be performed.

### c. Disclosing the Likelihood of Impairment

130. The SEC, concerned that investors be given information adequate to assess the probability of future goodwill impairment for reporting units at risk of impairment, asks registrants to disclose either the percentage by which the fair value of the reporting unit currently exceeds the carrying value, or that the reporting unit is not at risk of impairment[9]:

> 9510.2 Estimates related to goodwill impairment testing are commonly considered critical by registrants. As a result, the staff has developed guidance regarding these disclosures with the objective of ensuring that investors are provided with information that allows for an assessment of the probability of a future material impairment charge. . . .
>
> 9510.3 Registrants should consider providing the following disclosures for each reporting unit that is at risk of failing step one of the impairment test (defined in ASC Topic 350):
>
> > a)     The percentage by which fair value exceeded carrying value as of the date of the most recent test; . . .

---

[9]     SEC Division of Corporate Finance Financial Reporting Manual, TOPIC 9 - Management's Discussion and Analysis of Financial Position and Results of Operations (MD&A), Section 9500 - *Critical Accounting Estimates,* Subsection 9510 - *Goodwill Impairment.*

9510.4 A registrant need not provide these disclosures if the registrant asserts and discloses that material goodwill does not exist at reporting units that are at risk of failing step one or that no reporting units are at risk. Registrants should consider disclosing the supporting rationale if material goodwill is allocated to a reporting unit that is at risk, but disclosure is deemed unnecessary.

131.    The SEC requires such disclosure of negative material trends, and whether goodwill impairment is likely or not during interim periods.[10]

### 2.    Accounting Principles Governing Indefinite-Lived Intangible Assets

132.    As part of the Nutrisystem acquisition, Tivity acquired the Nutrisystem tradename, which is considered an "indefinite-lived" intangible asset for financial reporting purposes. The Company valued the Nutrisystem tradename at $800 million at the acquisition date, and attributed the entire amount to the Nutrition operating segment. Similar to goodwill impairment testing, GAAP also requires that indefinite-lived intangible assets such as tradenames, "shall be tested for impairment annually and more frequently if events or changes in circumstances indicate that it is more likely than not that the asset is impaired." ASC 350-30-35-18.

133.    Triggering events for long-lived intangible assets also share considerable overlap with goodwill impairment triggering events and circumstances as set forth in ASC 350-20-35-3C. Examples of indefinite-lived intangible asset triggering events or changes in circumstances that may indicate impairment are set forth in ASC 350-30-35-18B, and include:

In assessing whether it is more likely than not that an indefinite-lived intangible asset is impaired, an entity shall assess all relevant events and circumstances that could affect the significant inputs used to determine the fair value of the indefinite-

---

[10]    This disclosure was applicable to Tivity's 2019 interim quarterly financial statements, as problems with the Nutrition segment constituted new information subsequent to the 2018 annual financial statements, thus requiring disclosure. *See* 17 C.F.R. §210.10-01(5) - *Interim financial statements*, and SEC Financial Reporting Manual [S-K 303(b)], §9250.1 *Interim Period Requirements.*

lived intangible asset. Examples of such events and circumstances include the following:

* * *

b.      Financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset[.]

* * *

e.      Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (in both absolute terms and relative to peers), or a change in the market for an entity's products or services due to the effects of obsolescence, demand, competition, or other economic factors (such as the stability of the industry, known technological advances, legislative action that results in an uncertain or changing business environment, and expected changes in distribution channels) that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset[.]

134.    The impairment test methodology for indefinite-lived assets is similar to, and consistent with, the impairment testing process described above for goodwill. Once a determination was made that one or more of the circumstances or triggers listed above revealed it was more likely than not that the Nutrisystem tradename was impaired during an interim quarter, GAAP required Defendants to apply a two-part test to determine whether the Nutrisystem tradenames were, in fact, impaired:

If after assessing the totality of events and circumstances . . . an entity determines that it is more likely than not that the indefinite-lived intangible asset is impaired, then the entity shall calculate the fair value of the intangible asset and perform the quantitative impairment test . . . for an indefinite-lived intangible asset [consisting] of a comparison of the fair value of the asset with its carrying amount. If the carrying amount of an intangible asset exceeds its fair value, an entity shall recognize an impairment loss in an amount equal to that excess. [ASC 350-30-35-18F to 35-19.]

- 50 -

135.    As discussed below at ¶¶157-161, Tivity met multiple examples of the specific triggering circumstance set forth in ASC 350-30-35-18B above, indicating that the Nutrisystem tradename was likely already impaired and required testing by the quarter ended June 30, 2019.

**B.    The Nutrition Segment Goodwill and Nutrisystem Tradename Were Impaired by 2Q19**

**1.    Goodwill Was Impaired by 2Q19**

136.    Prior to filing of its Form 10-Q for the quarter ended 2Q19, Tivity, Tramuto, Holland and Zier had actual knowledge of multiple impairment triggers as set forth in ASC 350-20-35-3C above, indicating that it was more likely than not that the Nutrition segment goodwill was impaired.  As such, GAAP required that management perform a goodwill impairment test no later than 2Q19.  The impairment indicators at the time included:

**a.    A Sustained Decrease in Share Price (and Corresponding Decline in Market Capitalization) Was an Impairment Trigger**

137.    ASC 350-20-35-3C(g), as detailed at ¶126 above, indicates that "a sustained decrease in share price (consider[ed] in both absolute terms and relative to peers)," can be a key triggering circumstance requiring testing for goodwill impairment.  Similarly, because a decrease in share price always creates a corresponding decrease in market capitalization,[11] a decrease in market cap is also a potential indicator of impairment.  Indeed, Defendants' own disclosure in Tivity's FY19 Form 10-K confirms their view of the central role that market capitalization plays in the Company's goodwill impairment testing:

> ***During a quantitative review of goodwill***, we estimate the fair value of each reporting unit based on a discounted cash flow model or a combination of a

---

[11]  Market Capitalization, commonly referred to as "market cap," is calculated by multiplying the total number of a company's outstanding shares by the current market price of one share. https://www.investopedia.com/terms/m/marketcapitalization.asp#:~:text=Market%20capitalization%20refers%20to%20the,market%20price%20of%20one%20share.

- 51 -

discounted cash flow model and market-based approaches, and ***we reconcile the aggregate fair value of our reporting units to our consolidated market capitalization***. . . .

138.     In Tivity's case, a stock price decline triggering event was clearly present, as Tivity experienced an immediate, significant, and sustained decline in its stock price and market cap beginning with the announcement of the Nutrisystem acquisition.   After the acquisition announcement on December 10, 2018, Tivity's stock price fell precipitously from the previous trading day's closing price of $40.61 per share, to close on December 10, 2019 at $27.65 per share – an astonishing single trading day decline of 32%, and one of the largest single day stock price declines in Tivity's history.   As illustrated in the chart below, Tivity's stock continued its significant, sustained decline over the following six months, to a closing price of $16.44/share on the last trading day of 2Q19, a 60% decline from the closing price prior to the Defendants' December 2018 Nutrisystem merger announcement.  This stock decline corresponded to a $883 million decline in market capitalization.



4836-0564-3985.v2

139.     Tivity's massive 60% stock price and 53% market capitalization decline was a key indicator of likely Nutrition segment goodwill impairment.  The sustained and severe stock price decline, beginning directly with the Nutrisystem acquisition announcement, indicated that the market's estimate of future cash flow and earnings (including specifically those attributable to Nutrisystem), would be negatively affected.

140.     Indeed, the SEC's Office of the Chief Accountant has explained the significance of recent stock price declines in a goodwill impairment analysis:

> [I]t would not be reasonable for a registrant to simply ignore recent declines in their stock price, as the declines are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in a higher required rate of return or a decline in the market's estimated future cash flows of the company.[12]

141.     Tivity, Tramuto, Zier and Holland had actual knowledge of this stock price decline. Tivity's 60% stock price and 53% market cap decline by the end of 2Q19, by itself, constituted an impairment trigger requiring that Defendants move to step 1 and perform a quantitative goodwill impairment test no later than 2Q19.  Defendants violated GAAP by either failing to review goodwill for impairment at 2Q19 or, if they did review goodwill, failing to take the necessary impairment charge at the time.

**b.     Multiple Examples of Poor Nutrition Segment Financial Performance by the End of 2Q19 Were Impairment Triggers**

142.     ASC 350-20-35-3C(d), as detailed above at ¶126, indicates that "[o]verall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or

---

[12]   Robert G. Fox III, Professional Accounting Fellow, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments, Washington, D.C. (Dec. 8, 2008), available at https://www.sec.gov/news/speech/2008/spch120808rgf.htm.

earnings compared with actual and projected results of relevant prior periods" is an example of an impairment indicator or trigger that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Prior to the filing of Tivity's 2Q19 Form 10-Q on August 8, 2019, not one, but numerous examples of this triggering indicator were known to Defendants, including:

**(1)  Poor Financial Performance in the FY19 Diet Season Was an Impairment Trigger**

143.  As alleged at ¶¶45, 105, 116, the Nutrisystem business is highly seasonal, with revenue and advertising expense the highest in the first calendar quarter, and the lowest in the fourth calendar quarter. Tivity refers to this first calendar quarter as "diet season" and admitted that "[w]eak performance during diet season could negatively impact our Nutrition segment's performance for the remainder of the year."

144.  Accordingly, because financial performance during the "diet season" has an outsized impact on the Nutrition segment's financial performance for the remainder of a particular calendar year, poor performance during the critical three-month diet season is an impairment trigger. Indeed the Company acknowledged as much when it disclosed in the FY19 Form 10-K that a poor beginning in just the first two months of the 2020 diet season was a factor in Defendants' decision to perform the belated year end FY19 goodwill impairment test that resulted in a $137.1 million goodwill impairment charge for the Nutrition reporting segment in FY19:

> During the fourth quarter of 2019, the Nutrition reporting unit fell short of its expected operating results, primarily due to lower revenue and margins in the direct to consumer business attributed to fewer customer starts and heavier promotional pricing than expected.[13]  As compared to our internal multi-year operating forecast, ***these trends continued into January and February 2020, the start of diet season. In the weight loss industry, revenue is typically greatest in the first calendar quarter, and a shortfall in expected results in the first quarter***

---

[13]  Considering that Defendants directly controlled whether and to what extent Nutrisystem engaged in "promotional pricing," in the first place, is it hard to understand how such "promotional pricing," could have been "heavier … than expected."

- 54 -

*can often result in lower performance for the remainder of the year*. In addition, we determined in January 2020 that our forecasted revenue from QVC were expected to decline in 2020 primarily due to a reduction of orders for, and the promotion of our products.[14] As a result of all of the above factors, we reduced our multi-year operating forecast for the Nutrition reporting unit and established lower expectations of future operating results. ***We performed a quantitative impairment analysis as described above and determined the carrying value of goodwill for the Nutrition reporting unit was impaired. As a result, we recorded a $137.1 million goodwill impairment loss related to goodwill assigned to the Nutrition reporting unit***. . . .

145. The 4Q19 impairment charge was untimely, and should have been taken six months earlier. Disappointing preliminary diet season results in 1Q20 were far from a sudden, new phenomenon at Nutrisystem. As alleged at ¶52-63, 80, 98, nine months earlier, at the close of 1Q19, the Nutrition segment had suffered, yet at the time concealed, dismal 1Q19 diet season financial results. Worse, as indicated in the table below, notwithstanding the fact that the 1Q19 Nutrisystem dismal diet season was itself preceded by a similarly poor Nutrisystem diet season in 1Q18, the 1Q19 diet season revenue and adjusted EBITDA ***declined*** compared to the same quarter 2018. For example, Nutrisystem's 1Q19 diet season generated only $5 million in adjusted EBITDA, declining 14% compared to an also dismal $5.8 million adjusted EBITDA for the 1Q18 diet season quarter. Similarly, 1Q19 revenue declined 9.2% over the comparable 1Q18 diet season figure.

---

[14] Defendants' reference in the quote to reduced FY20 QVC revenues as a factor triggering the 4Q19 impairment testing is itself misleading – QVC only accounted for a miniscule 2.6% of total Nutrtrition segment revenues in 1Q20, which was an ***improvement*** over 2Q19 QVC revenues as a percent of total Nutrition segment revenues of 1.9%.

| 2019 Nutrition Segment Quarterly Revenue and Earnings Decline vs. Prior Year Nutrisystem Results (in millions) | | | | | | |
|---|---|---|---|---|---|---|
| | 1Q 2018 | 1Q 2019 | % Decline | 2Q 2018 | 2Q 2019 | % Decline |
| Revenue | $210.9 | $191.6 | (9.2%) | $191.3 | $182.9 | (4.4%) |
| Adjusted EBITDA | $5.8[1] | $5.0 | (14%) | $37.7[1] | $34.7 | (8.0%) |
| Note[1]: 2018 Nutrisystem Adjusted EBITDA figures exclude stock comp expense to align with Tivity reporting methodology, as set forth in 1Q-3Q 2019 earnings release supplemental material. | | | | | | |

146.    The two back-to-back dismal FY18 and FY19 financial diet season performances constituted an impairment trigger by 2Q19, particularly after the 1Q19 diet season results were known to be worse than the FY18 comparable diet season quarter.  Yet Defendants ignored this impairment indicator in 2Q19, and failed to record the necessary goodwill impairment charge in either 2Q19 or 3Q19.

**(2)    The Nutrition Segment 2Q19 Revenue and Adjusted EBITDA Decline Compared to 2018 Was an Impairment Trigger**

147.    In 2Q19, the Nutrition segment continued to perform worse than it had before the Company acquired it in March 2019.  For example, as the table in ¶145 demonstrates, the Nutrition segment 2Q19 revenues and adjusted EBITDA declined 4.4% and 8.8% respectively compared to the same quarter 2Q18, despite the fact that Tivity claimed to be enjoying cost saving synergies in FY19 as a result of the acquisition, that were not available in FY18.  Tivity, Tramuto, Zier and Holland had actual knowledge of this downturn in 2Q19 performance, and this information was central to Tivity's operation.

**(3)    The Reduction in Nutrition Segment Future Revenue and Adjusted EBITDA Guidance in 2Q and 3Q 2019 Was an Impairment Trigger**

148.    As alleged above at ¶¶52-63, 80, due to the Nutrisystem business' poor performance in 1Q19 prior to and immediately following the March 2019 acquisition, Defendants

- 56 -

knew that the Nutrition segment was not on track to meet the revenue and earnings guidance provided to the market in 1Q19. This recognition was belatedly illustrated by Defendants' reduction in financial guidance to the market in 2Q19. As alleged above at ¶¶64-69, however, what was not shared with the market was the Individual Defendants' understanding that the Nutrisystem business was performing so poorly that the Nutrition segment would not meet the updated and reduced 2Q19 guidance when proffered.

### c. The Increased Competitive Environment for Nutrisystem Was an Impairment Trigger

149. ASC 350-20-35-3C(b), as detailed at ¶126 above, indicates that "[i]ndustry and market considerations such as . . . an increased competitive environment, [or] a change in the market for an entity's products or services" is an example of an impairment indicator or trigger that would more likely than not reduce the fair value of a reporting unit below its carrying amount.

150. During the 2019 diet season, Nutrisystem faced an intense spike in competition, as Defendant Zier admitted on a February 19, 2019, 4Q18 conference call, stating that Nutrisystem saw a "spike in competition," which led them to pull-back their media spend so as to refine their marketing strategy as the competition was "driving up short-term cost." Zier explained that "given the competitive environment," they had "cut back too far on TV," "as other competitors jumped into the space," and admitted that "we did see more [competitors], in the digital space, quite a few more people."

151. The increase in competition continued during 2Q19. On April 25, 2019, an Oppenheimer analyst noted that "the increasing competition and fast-changing trends remain a concern in the core NTRI business." On May 9, 2019, a Jefferies analyst reported that the "slow start in January and early February from intense competition of the usual suspects as well as new competitors heightened concerns."

- 57 -

152.    During the August 7, 2019 2Q19 investor call, Zier admitted that the spike in competition was not limited to the start of the diet season – but that it was still an increasing challenge.  In fact, as Chardan's August 23, 2019 analyst report noted, Tivity lowered its 2019 guidance "due to a more competitive-than expected year so far for the Nutrisystem segment."  On the 2Q19 investor call, Zier admitted that "2019 has been a tough year," in particular due to the impact of "new competitive entrants," and that "we fell short on the innovation front as our program failed to resonate as strongly as we expected and needed it to in the current competitive environment."

153.    The triggering events and circumstances described in ¶¶137-152 above, taken individually and collectively, clearly constituted indicators that it was more likely than not that the Nutrition segment goodwill was impaired no later than 2Q19.  Accordingly, ASC 350-20-35-28 to -30 required that Defendants perform the two-step impairment test prior to filing Tivity's 2Q19 Form 10-Q, and record the necessary impairment charge.  Yet there is no indication that Defendants performed the required impairment test for the either 2Q19 or 3Q19.[15]  Managements' lowered revenue and earnings guidance in 2Q19 made clear that they believed the decline in the Nutrition segment's overall financial performance by the close of 2Q19 was expected to have a significant adverse impact on the segment's future earnings, cash flows and revenue growth and, as such, would negatively impact a future discounted cash flow analysis required to test goodwill impairment.  Had Defendants properly tested goodwill for impairment prior to the issuance Tivity's 2Q19 financial statements and prepared the required discounted cash flow analysis, it

---

[15]  Tivity's 2Q19 and 2Q19 Forms 10-Q were silent as to whether the Company reviewed goodwill for impairment during those quarters, despite SEC guidance at 17 C.F.R. §210.10-01(5), and SEC Financial Reporting Manual §§9250.1, 9510 asking for such disclosure.

- 58 -

would have been clear that the Nutrition segment goodwill was impaired by the close of 2Q19, requiring an impairment charge in the 2Q19 financial statements.

154. Instead, Tivity, Tramuto, Zier and Holland repeatedly (and falsely) assured investors that Tivity reviewed goodwill for impairment during interim quarters if an impairment trigger indicated goodwill may be impaired:

> We review goodwill for impairment at the reporting unit level (operating segment or one level below an operating segment) on an annual basis (during the fourth quarter of the fiscal year) *or more frequently whenever events or circumstances indicate that the carrying value may not be recoverable*. . . .

155. This statement was either: (i) false to the extent Defendants did not review impairment at the reporting unit level whenever events or circumstances indicate that the carrying value may not be recoverable, as was the case in 2Q19 and 3Q19, or (ii) misleading if Defendants did review goodwill for impairment in 2Q19 and 3Q19 yet failed to took the required charges.

156. By failing to record goodwill impairment on a timely basis, Defendants violated GAAP and SEC rules as described herein and materially overstated the value of Tivity's goodwill, operating income, net income and EPS for 2Q19, as indicated in the table at ¶168 below. Defendants' failure to remedy this improper accounting in the following quarter during 3Q19, caused Tivity's public financial statements for 3Q19 to also be improperly inflated in the same way, and for the same reasons.

## 2. The Nutrisystem Tradename Was Impaired No Later than 2Q19

157. Similar to goodwill impairment, Defendants misled investors by failing to write down the value of Tivity's indefinite-lived intangible assets by the time of the filing of the Company's 2Q19 and 3Q19 Forms 10-Q. As a result, the financial statements included in Tivity's 2Q19 and 3Q19 Forms 10-Q were not presented in accordance with GAAP and SEC rules as Defendants' claimed, and were therefore false and misleading.

- 59 -

158.     Because of the considerable overlap of triggering events and circumstances requiring impairment testing for both goodwill and tradename intangible assets as noted above at ¶133, the triggering events indicating Tivity's goodwill was impaired by 2Q19 also indicated that the Nutrisystem tradename was likely impaired and thus required impairment testing by 2Q19.

159.     For example, in assessing whether it was more likely than not that the Nutrisystem tradename was impaired, ASC 350-30-35-18B(b) states that declining revenue, earnings, actual or projected, are a triggering indicator of potential intangible asset impairment:

> Financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods that could affect significant inputs used to determine the fair value of the indefinite-lived intangible asset.

160.     This triggering circumstance is essentially identical to the similarly worded trigger for goodwill impairment set forth in ASC 350-20-35-3C(d) above at ¶126.  Accordingly, the same numerous examples of poor financial performance at ¶¶142-152, reveal that prior to the filing of Tivity's 2Q19 Form 10-Q on August 8, 2019, Defendants were also aware of numerous triggering events requiring that the Nutrisystem trade name be tested for impairment by 2Q19.  Examples of these triggering events and circumstances included two back-to-back years of poor diet season financial performance, declines in actual FY19 quarter over quarter Nutrition segment revenues and adjusted EBITDA, and declines in forecasted revenue growth and adjusted EBITDA guidance.

161.     The triggering events and circumstances described in ¶¶142-152, 159 above, taken individually and collectively, clearly constituted indicators that it was more likely than not that the Nutrisystem tradename was impaired no later than 2Q19.  Accordingly, ASC 350-30-35-18F to - 35-19 required that Defendants perform the two-part impairment test for long-lived intangible assets prior to the filing of Tivity's 2Q19 Form 10-Q.  Had Defendants appropriately tested the Nutrisystem tradename for impairment prior to the issuance Tivity's 2Q19 financial statements, as

- 60 -

required by GAAP, it would have been clear that the Nutrisystem tradename was impaired by the close of 2Q19, requiring an impairment charge in the 2Q19 financial statements.

162. By failing to take an actual impairment charge and write-down the Nutrisystem tradename, Defendants violated GAAP and SEC rules as described herein and materially overstated the value of Tivity's intangible assets, operating income, net income and EPS in 2Q19 and 3Q19, as indicated in the table at ¶168 below. Defendants' failure to remedy this improper accounting in 3Q19, caused Tivity's public financial statements for the quarter ended September 30, 2019 to also be improperly inflated in the same way, for the same reasons.

### 3. The Same Adverse Factors Purportedly Causing the Disclosed 4Q19 Impairment Charge Already Existed by 2Q19

163. Substantially the same underlying factors that Tivity blamed for causing management to test for and record goodwill and tradename impairment charges in 4Q19 already existed by the end of 2Q19. For example, Tivity's FY19 Form 10-K impairment disclosure cited in ¶144 above gave the following impairment indicators as reasons for the 4Q19 Nutrition segment impairment test and charge: 1) The Nutrition segment reporting unit fell short of expected 4Q19 operating results due to fewer customer starts and heavier promotional pricing; 2) these negative trends continued into the January and February 2020 diet season; 3) a forecasted decline in QVC revenue; and 4) these adverse circumstances caused management to reduce the Nutrition segment multi-year operating forecast and lower established expectations of future operating results.

164. The same adverse factors disclosed in 4Q19 however, were present in 2Q19.[16] For example, as asserted herein, the Nutrition segment reporting unit was already performing poorly

---

[16] As alleged at ¶144, the claim that the reduced QVC revenue forecast was an impairment trigger was a red herring. By 2Q19, QVC revenues were not material and accounted for less than 2% of Nutrition segment revenues.

in 1Q19 and 2Q19 due to a reduction in customer starts. ¶¶52-63. Additionally, the poor beginnings to the 2020 diet season were already preceded by two back-to-back poor diet seasons in 1Q18 and 1Q19. ¶¶9-11, 46, 60-63, 145-146. Further, as alleged herein, prior to 4Q19, Tivity had already reduced the Nutrition segment's operating forecast and future guidance at the end of 2Q19.

165.    Because essentially the same underlying financial factors that Tivity blamed for causing management to test for and record goodwill and tradename impairment charges in 4Q19 already existed by the end of 2Q19, the same impairment charges belatedly taken in 4Q19 should have been recorded in the quarter ended June 30, 2019. Due to Defendants' failure to properly record these impairment charges in 2Q19, goodwill and intangible assets remained improperly inflated in 3Q19. Defendants however, again failed to take the required impairment charges in 3Q19, and, as a result, again issued false financial statements for that quarter that did not comply with GAAP and SEC rules.

### 4.    Defendants Had No Reasonable Basis to Believe the Nutrition Segment Goodwill and Nutrisystem Tradename Were Not Impaired by 2Q19

166.    Defendants' decision to ignore Nutrition segment goodwill and Nutrisystem tradename impairment triggers and avoid writing down the impaired segment goodwill and tradename in 2Q19 and 3Q19 did not reasonably align with the information Defendants had in their possession at the time. Such a decision was made in the face of overwhelming red flags and contrary to the facts as described at ¶¶137-162 that either did or should have alerted Defendants to test goodwill and the Nutrisystem tradename for impairment no later than 2Q19. Defendants had no reasonable basis to believe that the fair value of the Nutrition segment, including its future revenues and cash flows, would exceed its carrying amount at 2Q19, because they ignored the goodwill impairment indicators present, ignored their reduced 2Q19 Nutrition segment operating

forecast, and avoided the required impairment test at 2Q19 that would have clearly indicated that a goodwill write-down was necessary.

167.    Similarly, Defendants had no reasonable basis to believe that the fair value of the Nutrisystem tradename, including forecasted future revenue growth, would exceed the carrying amount of the tradename at 2Q19 because they turned a blind eye to the long-lived intangible asset impairment indicators present, ignored the reduced revenue guidance in 2Q19, and either avoided the required impairment test at 2Q19 or ignored the results of such a test that would have clearly indicated that a write-down of the tradename was necessary.

168.    By failing to record goodwill and tradename impairments on a timely basis, Defendants violated GAAP and SEC rules as described herein, and materially overstated the value of Tivity's goodwill, intangible assets, operating income, net income and EPS in its public financial statements included in Tivity's 2Q19 and 3Q19 Forms 10-Q, as more fully illustrated in the table below:

### Tivity Health, Inc.,
### Overstatment of Assets & Income (in thousands, except per share amounts)

| Assets: | 2nd Quarter ended 6/30/2019 | | | | 3rd Quarter ended 9/30/2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | As Originally Reported | Actual | Overstatement | % Overstated | As Originally Reported | Actual | Overstatement | % Overstated |
| Intangible assets, net | $ 956,289 | $ 716,289 | $ 240,000 | 33.5% | $ 951,711 | $ 711,711 | $ 240,000 | 33.7% |
| Goodwill, net | $ 791,736 | $ 654,636 | $ 137,100 | 20.9% | $ 791,735 | $ 654,635 | $ 137,100 | 20.9% |

| Income (loss): | As Originally Reported | Actual | Overstatement | Overstatement as % of Reported | As Originally Reported | Actual | Overstatement | Overstatement as % of reported |
|---|---|---|---|---|---|---|---|---|
| Operating income (loss) | $ 49,913 | $ (327,187) | $ 377,100 | 755.5% | $ 41,599 | $ (335,501) | $ 377,100 | 906.5% |
| Net income (loss) | $ 18,137 | $ (284,803) | $ 302,940 | 1670.3% | $ 13,920 | $ (302,940) | $ 316,860 | 2276.3% |
| Earnings per share: | $ 0.38 | $ (5.96) | $ 6.34 | 1668.3% | $ 0.29 | $ (6.32) | $ 6.61 | 2279.8% |

169.    The overstatements of financial statement asset and income line items in the table above were material.  For example, the failure to timely impair the Nutrisystem tradename and Nutrition segment goodwill resulted in overstatements of intangible assets and goodwill of 34%

and 21% respectively for both 2Q19 and 3Q19. This is particularly notable considering the fact that intangible assets and goodwill were far and away the two largest assets on the Company's balance sheet, accounting for an astounding **86%** of Tivity's $2.0 billion in total assets at June 30, 2019. As such, material impairment of either of these two assets would be of great importance to investors.

170. Tivity's overstatement of income was more severe. For example, while Defendants reported operating income of $49.9 million in 2Q19, the correct figure they should have reported was a $327 million operating *loss*. Similarly, while Defendants reported net income of $18.1 million in 2Q19, as corrected they should have reported a $327 million net *loss*. While these overstatements were clearly quantitatively material, they were also ***qualitatively*** material as the overstatements improperly changed a loss into income.[17] As the table demonstrates, the overstatements were also material in 3Q19.

## VII. LOSS CAUSATION

171. As detailed herein, Defendants made false and misleading statements and/or omitted material information during the Class Period concerning Tivity's business and financial prospects. Defendants' fraudulent scheme and wrongful course of conduct was designed to and did artificially inflate, maintain, and manipulate the price of Tivity common stock and deceived Lead Plaintiff and the Class (defined below), causing purchasers of Tivity common stock to suffer economic harm as the truth reached the market. When the circumstances concealed by Defendants' prior misrepresentations and omissions began to come out, it caused the price of

---

[17]  SEC Staff Accounting Bulletin No. 99 – ***Materiality*** states that, when assessing materiality of a financial statement item, qualitative factors such as whether the misstatement changes a loss into income may well indicate that an otherwise small misstatement is qualitatively material even if it is quantitatively immaterial.

- 64 -

Tivity common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchase or acquisition of Tivity common stock at inflated prices during the Class Period, and the decline in the price of Tivity common stock when the relevant truth began to be revealed, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

172. On February 19, 2020, Tivity issued a release announcing its financial results for 4Q19 and FY19. Tivity disclosed that its "Nutrition segment had a disappointing end to 2019," and that 4Q19 Nutrition segment revenues came in at $113.7 million, a 12.2% decrease compared to the same quarter last year, and 4Q19 Nutrition segment adjusted EBITDA totaled $13.9 million, which missed analysts' expectations. The February 19, 2020, release also announced that Tramuto had been summarily fired and resigned from the board and that the President of the Nutrition Business Unit, Krausz, had resigned, effective February 18, 2020.

173. In addition, the release admitted that Tivity had taken an impairment charge of $377 million, contributing to a net loss for the Company of $272 million in 4Q19. The $377 million charge consisted of an impairment charge to lower the Nutrisystem tradename by $240 million and a $137 million goodwill impairment charge relating to the Nutrisystem acquisition.

174. On February 19, 2020, Tivity also hosted a conference call to discuss its 4Q19 and FY19 results. During the call, Tivity's interim CEO, Greczyn, admitted that, "the nutrition business has not worked out as well as planned since the completion of the acquisition in March 2019." Lewis, Tivity's Interim President of the Nutrition Business Unit, admitted that "last year was a step backward" and that "after experiencing a year of decline in new customers, industry history shows it's a tremendous challenge to reverse the trend for the next diet season."

- 65 -

175.     On this news, Tivity's stock price fell $10.43 per share, or 45.49%, to close at $12.50 per share on February 20, 2020.

176.     The decline in the price of Tivity common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of Defendants' scheme and fraudulent misrepresentations and omissions to investors and the market, and such corrective disclosures were within the zone of risk concealed by Defendants' fraud. The timing and magnitude of the price decline in Tivity's common stock compared to the market and its peers negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate and maintain the price of Tivity common stock and the subsequent significant decline in the value of Tivity common stock when Defendants' prior misrepresentations and other fraudulent conduct  began to be revealed.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.     Defendants Made False and Misleading Statements Just One Month Before Their Fraud Was Revealed

177.     Defendants' February 19, 2020, disclosure of Tivity's missed 4Q19 and FY19 financial results, lowered guidance, as well as the belated impairments to the Nutrition segment's goodwill and trade name, came just one month after Tivity, Tramuto and Krausz addressed investors, several weeks after the close of FY19, at the January 15, 2020, JPMorgan Conference in San Francisco, California.

178.     During the conference, Krausz, who would resign just a month later, stated that Tivity was "happy with the results," of the 2020 diet season. Tramuto, who would be fired just a

month later, suggested that the investments in Nutrisystem were paying off, and the Company's vision for a transformative change was on track: "I think you can tell by the encouraging comments on the investments that we're glad that we were transformative last year and not just transactional."

179.     Just one month later, on February 19, 2020, Tivity said the exact opposite. According to board of directors Chairman Wills, Tivity had "not been satisfied with the performance of our Nutrition business," which had suffered from "increased competition," "operational missteps," and "lack of innovation," while interim CEO Greczyn stated that "the nutrition business has not worked out as well as planned since the completion of the acquisition in March 2019."  Lewis, Interim President of the Nutrition segment, admitted that "last year was a step backward" and that "after experiencing a year of decline in new customers, industry history shows it's a tremendous challenge to reverse the trend for the next diet season."  In other words, Tivity's investments in Nutrisystem *had not* been successful.

**B.     Defendants Intentionally Obfuscated the Nutrition Segment's Negative Results**

180.     Defendants intentionally timed the merger closing to hide Nutrisystem's poor performance.  The success of the diet season is critical to Nutrisystem's performance each year. Within each diet season, marketing and promotion expenses early in the quarter lead to revenues attributable to such spending later in the quarter, as well as throughout the remainder of the year. Here, Defendants chose to close the merger at the beginning of March, after the majority of marketing and promotion expenses had already been incurred, thereby allowing Defendants to report favorable adjusted EBITDA as a combined company, while obfuscating the pre-merger expenses required to achieve such adjusted EBITDA which were incurred earlier in the quarter, pre-merger.

- 67 -

181.     Specifically, when Defendants reported the Company's results for 1Q19 on May 8, 2019, they intentionally reported adjusted EBITDA for its Nutrition segment from the date of merger **only**, not for the entire quarter.  As a result, while Defendants reported $13.3 million in adjusted EBITDA for the Nutrition segment between March 8, 2019 and March 31, 2019, they knew, but failed to disclose, that Nutrisystem's full 1Q19 adjusted EBITDA was in fact ***$8.3 million lower***, coming in at just $5 million for the quarter, and below the adjusted EBITDA necessary for Defendants to meet their recently announced guidance for FY19.  Defendants' incomplete and wildly misleading disclosures gave the impression that Nutrisystem was vastly more profitable than it actually was, and that the Nutrition segment's FY19 prospects were far better than they actually were.  For example, a May 10, 2019 analyst report from Barrington Research noted that "[t]he nutrition business generated an exceptionally strong $13.3 million in [adjusted] EBITDA," and a May 9, 2019, analyst report from William Blair reported "nutrition adjusted EBITDA much better than anticipated at $13.3 million," when in fact the Nutrition segment's 1Q19 results underperformed its 1Q18 results.  A May 9, 2019, analyst report published by Craig Hallum Capital Group, LLC, recognized that due to the timing of the Nutrisystem acquisition, Tivity's EPS was "slightly inflated," in part due to increased debt expense, yet reported that "January and February are roughly breakeven in EBITDA for Nutrisystem," when in fact Nutrisystem suffered an $8.3 million loss.  Indeed, it was not until the end of the Class Period, on February 19, 2020, that Defendants finally reported the Nutrition segment adjusted EBITDA for 1Q19.

182.     Defendants had actual knowledge, and admitted during the Class Period, that "[w]eak performance during diet season could negatively impact our Nutrition segment's performance for the remainder of the year."  By failing to provide investors with a complete and

accurate picture of the Nutrition segment's 1Q19 adjusted EBITDA, Defendants misled investors regarding the Tivity's expected financial performance for both 1Q19 and the remainder of the fiscal year.

### C. Numerous Executives Resigned or Were Fired Under Suspicious Circumstances

183.    On December 9, 2019, less than nine months after the merger closed, Tivity announced that Zier had been "mutually terminated," and resigned from the Company's board of directors.  Zier's termination came without any warning, and without any plan for a successor to take her place.  Zier was personally responsible for Nutrisystem being acquired by Tivity, signed the merger agreement on behalf of Nutrisystem, and was responsible for Tivity's Nutrition segment as COO and President following the merger.

184.    On February 19, 2020, Tivity announced that Tramuto had been summarily fired, effective February 18, 2020, and resigned from the Company's board of directors.  Tramuto's termination came without any warning, and without any plan for a successor to take his place. Instead, board of directors member Greczyn took over as Interim CEO while the Company formed a search committee to look for a replacement.  Tramuto was personally responsible for Tivity acquiring Nutrisystem, signed the merger agreement on behalf of Tivity, and told investors it had been the product of a 24-month process he had undertaken in search of a transformative acquisition.

185.    At the same time, Tivity announced that Krausz, Division President of the Nutrition segment, had suddenly resigned from the Company the previous day.

## IX.    APPLICABILITY OF PRESUMPTION OF RELIANCE

186.    In light of Defendants' pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

187. Lead Plaintiff's claims for securities fraud are also asserted under the fraud-on-the-market theory of reliance. The market price of Tivity's common stock was artificially inflated by the false and misleading statements and omissions complained of herein. Defendants' false statements and omissions inflated the price of, and maintained the artificially inflated price of, NASDAQ-traded common stock both before and during the Class Period.

188. The Class Period inflation in the price of Tivity's common stock was eliminated when the financial conditions, business risks and other information concealed by Defendants' fraud was revealed to the market.

189. During the Class Period, the market for Tivity common stock was an efficient market for the following reasons, among others:

(a) Tivity common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

(b) During the Class Period, a high volume of Tivity common stock traded on the NASDAQ;

(c) As a regulated issuer, Tivity filed periodic public reports with the SEC and NASDAQ;

(d) Tivity regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press and other similar reporting services;

(e) During the Class Period, Tivity was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote

- 70 -

reports based on the publicly available information disseminated by Defendants about Tivity. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)     Tivity had substantial institutional ownership during the Class Period.

190.     Through the foregoing mechanisms, the information publicly disseminated by Defendants about Tivity and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in Tivity stock, the information disseminated by Defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of Tivity publicly traded securities.

191.     Under these circumstances, all purchasers of Tivity common stock during the Class Period suffered similar injury through their purchase of Tivity common stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## X.     CLASS ACTION ALLEGATIONS

192.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased Tivity common stock during the Class Period and were damaged thereby (the "Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

193.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tivity shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time, Lead Plaintiff believes that there are thousands of members in the proposed Class, if not more.  Record owners

- 71 -

and other members of the Class may be identified from records maintained by Tivity, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

194.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

195.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

196.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Tivity;

(c)    whether the price of Tivity common stock was artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

197.    A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### (Against All Defendants)

198.     Lead Plaintiff incorporates ¶¶1-197 by reference.

199.     During the Class Period, Defendants disseminated or approved the statements as specified above in §V, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

200.     Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

      (a)     employed devices, schemes and artifices to defraud;

      (b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      (c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with its purchases of Tivity common stock during the Class Period.

201.     Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Tivity's business, operations and financial condition as specified herein.

202.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

- 73 -

203.     As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of Tivity common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Tivity common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which Tivity common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants (but not disclosed in Defendants' public statements during the Class Period), Lead Plaintiff and the other Class members purchased Tivity common stock during the Class Period at artificially high prices.

204.     Lead Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for Tivity common stock, and suffered losses when the relevant truth was revealed.  Lead Plaintiff and the Class would not have purchased Tivity common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

205.     As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period transactions in Tivity common stock.

206.     By reason of the foregoing, Defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

### COUNT II

### For Violation of §20(a) of the 1934 Act
### (Against All Defendants)

207.     Lead Plaintiff incorporates ¶¶1-206 by reference.

4836-0564-3985.v2

208. Defendants were controlling persons of Tivity within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or directors of Tivity, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

209. In particular, each of these Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

210. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of Tivity common stock during the Class Period when the relevant truth was revealed.

211. By reason of the foregoing, the Defendants named in this Count violated §20(a) of the 1934 Act.

## XI. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Awarding such other and further relief, including equitable and/or injunctive relief, as the Court may deem just and proper.

DATED:  November 13, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SARA B. POLYCHRON
CAROLINE M. ROBERT
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

ROBBINS GELLER RUDMAN
  & DOWD LLP
SHAWN A. WILLIAMS
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)

Lead Counsel for Lead Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

ALLOTTA FARLEY CO., L.P.A.
MICHAEL E. HEFFERNAN
2222 Centennial Road
Toledo, OH  43617
Telephone:  419/535-0075
419-535-1935 (fax)

Additional Counsel for Lead Plaintiff

4836-0564-3985.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on November 13, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
   & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:20-cv-00165 Strougo v. Tivity Health, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **David Bricker**
  dbricker@tenlaw.com

- **Gustavo F. Bruckner**
  gfbruckner@pomlaw.com

- **Guillaume Buell**
  gbuell@tenlaw.com,emclaughlin@tenlaw.com,8927635420@filings.docketbird.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Joseph B. Crace , Jr**
  jcrace@bassberry.com,llewis@bassberry.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Wallace Wordsworth Dietz**
  wdietz@bassberry.com,lbilbrey@bassberry.com

- **Michael E. Hefferman**
  mheffernan@allottafarley.com

- **Logan R. Hobson**
  lhobson@kslaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Brandon R. Keel**
  bkeel@kslaw.com

- **Madeline Korber**
  mkorber@tenlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com

- **Sara Polychron**
  spolychron@rgrdlaw.com,nhorstman@rgrdlaw.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Caroline M. Robert**
  crobert@rgrdlaw.com

- **Brian Schall**
  brian@schallfirm.com

- **John Tate Spragens**
  john@spragenslaw.com,spragenslaw@ecf.courtdrive.com

- **Tivity Investor Group**
  PKNASHLAW@AOL.COM

- **Shawn A. Williams**
  shawnw@rgrdlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)