# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT STROUGO, individually and on behalf of all others similarly situated,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 3:20-cv-00165** |
| **TIVITY HEALTH, INC.,** *et al.,* | ) ) | |
| **Defendants.** | ) ) | |

## <u>MEMORANDUM OPINION</u>

Pending before the Court in this securities action relating to Tivity Health Inc.'s acquisition of Nutrisystem, Inc. is Plaintiff Sheet Metal Workers Local No. 33's Motion for Class Certification (Doc. No. 125). That motion has been fully briefed by the parties (Doc. Nos. 126, 131, 149), an evidentiary hearing was held at Tivity's request (Doc. No. 133), and supplemental briefs have been filed (Doc. Nos. 168, 172). For the reasons that follow, Plaintiff's Motion for Class Certification will be granted.

## I. Background

The alleged facts underlying this case were set out in a prior opinion of this Court relating to Defendants' Motion to Dismiss. Drawn from the Consolidated Complaint (Doc. No. 105), those facts are as follows:

> Tivity Health, Inc. provides fitness and wellness programs geared toward senior citizens. (Compl. ¶ 2). Donato Tramuto served as Tivity's Chief Executive Officer and Adam Holland served as Chief Financial Officer. (Id. ¶¶ 23, 25). Hoping to expand the business in the face of intense competition, Tivity acquired Nutrisystem, a company known for its diet programming, for $1.3 billion. (Id. ¶¶ 6, 41–43, 51, 123). Following the acquisition, which became final on March 8, 2019, Dawn Zier, who was Nutrisystem's former top executive, became Tivity's President and Chief Operating Officer. (Id. ¶¶ 6, 24).

It is alleged that Tivity painted a deceitfully rosy picture of the Nutrisystem acquisition (the "Nutrisystem Claim").[1] (Id. ¶¶ 52–77). Executives misled investors about Nutrisystem's performance in the beginning of 2019 and the acquisition's impact on Tivity's new "nutrition segment." (Id). Tivity misstated that the new segment was "on track" and "performing well" despite its poor performance from the onset. (Id. ¶¶ 8–9, 54–55, 80, 98, 181). At the heart of Tivity's alleged cover-up were misstated financial statistics. Specifically, the company reported that its adjusted earnings before interest, taxes, depreciation, and amortization ("EBITDA") was $13.3 million.(Id. ¶ 8). But this number failed to account for an $8.3 million loss that resulted in an actual adjusted EBITDA of $5 million. (Id. ¶¶ 8–9, 53–54, 56, 88, 94–95, 98, 178).

In August 2019, Defendants again told investors that Tivity's nutrition segment results were "on track according to plan," (Id. ¶¶ 10, 64, 69, 101), and continued to report an adjusted EBITDA that failed to account for the $8.3 million loss. (Id. ¶¶ 9, 54 67–69, 74–76, 98(a), 107(a), 119(a)). Despite these assurances, however, Tivity launched a "Buy One, Get One Free" offer to customers, allegedly to recoup the hidden Nutrisystem losses. (Id. ¶ 12). Soon after the offer's launch, on December 9, 2019, Zier was "mutually terminated" without explanation. (Id. ¶ 13).

Then, on February 19, 2020, Defendants disclosed, for the first time in nearly a year, the $8.3 million adjusted EBITDA loss. (Id. ¶¶ 14, 78–83, 174, 179). Executives also admitted to the weaknesses of the Nutrisystem acquisition and announced a charge that reduced the value of the goodwill associated with the acquisition (the "Goodwill Claim"). ((Id.; see also ¶¶ 15, 79, 173).

Lead Plaintiff Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund acquired Tivity securities between March 8, 2019 and February 20, 2020.2 They brought this putative class action under Federal Rule of Civil Procedure 23 against Tivity, Tramuto, Holland, and Zier ("Defendants") on behalf of all those who purchased Tivity securities during that period. (Id. ¶¶ 21, 192).

(Doc. No. 116 at 1-3, Strougo v. Tivity Health, Inc., 551 F. Supp. 3d 839, 844-45 (M.D. Tenn. 2021)

(footnote omitted).

Based upon those alleged facts and the record that has been developed, Plaintiff seeks to certify a class consisting of the following:

---

[1] Although not identified as such in the Complaint, Tivity characterizes Plaintiff's claims as being the "Nutrisystem," "Goodwill," and "Scheme" Claims.

2

> All persons who purchased or otherwise acquired the common stock of Tivity Health, Inc. between March 8, 2019, and February 19, 2020, inclusive. Excluded from the Class are Tivity, Donato Tramuto, Adam C. Holland, and Dawn Zier, members of their immediate families, and any entity of which Defendant has a controlling interest, and the legal representatives, heirs, predecessors, successors, or assigns of any excluded party.

(Doc. No. 126 at 1). Plaintiff also requests that Robbins Geller Rudman & Dowd LLP be appointed as Class Counsel. (Id.).

## II. Standards Governing Class Certification

Class actions are "'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013) (quoting Califano v. Yamasaki, 442 U.S. 682, 700–701 (1979)). Consequently, a class action can be certified only if, "after rigorous analysis," a court is satisfied that the prerequisites of Rule 23(a) have been met and that the action falls within one of the categories under Rule 23(b). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C., 935 F.3d 496, 503 (6th Cir. 2019).

Rule 23(a) establishes four requirements for class certification: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a). "These four requirements – numerosity, commonality, typicality, and adequate representation – serve to limit class claims to those that are fairly encompassed within the claims of the named plaintiffs because class representatives must share the same interests and injury as the class members." In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig., 722 F.3d 838, 850

(6th Cir. 2013).  Rule 23(b), in turn, provides in pertinent part that when the requirements of Rule 23(a) are met a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b).

The decision whether to certify a class is committed to the sound discretion of the district judge, and turns on the particular facts and circumstances of each individual case.  In re Whirlpool, 722 F.3d at 850.  This may require "the court to probe behind the pleadings before coming to rest on the certification question," and this "analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'"  Comcast, 569 U.S. at 33 (quoting Dukes, 564 U.S. at 350).  Nevertheless, at the class certification stage, the court can only consider "those matters relevant to deciding if the prerequisites of Rule 23 are satisfied," and "may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'"  In re Whirlpool, 722 F.3d at 851-52 (quoting Messner v. Northshore Univ. Health Sys., 669 F.3d 802, 811 (7th Cir. 2012)).

### III.  Application of the Governing Standards

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)."  Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II"), 573 U.S. 258, 276 (2014).  This is because "Rule 23(b) requires a showing that *questions* common to the class predominate . . . in favor of the class."  Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 459 (2013) (emphasis in original).  "Common questions are those 'that can be proved through evidence common to the class.'"  Bridging Communities Inc. v. Top Flite Fin. Inc., 843 F.3d 1119, 1124 (6th Cir. 2016) (quoting In re Whirlpool Corp., 722 F.3d

4

at 858). That said, "plaintiffs seeking class certification 'need not prove that each element of a claim can be established by classwide proof: What the rule does require is that common questions predominate over any questions affecting only individual [class] members.'" Id. "In other words, '[t]o satisfy the predominance requirement in Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof.'" Id. at 1124-25 (quoting Beattie v. CenturyTel, Inc., 511 F.3d 554, 564 (6th Cir. 2007)).

This is precisely the issue here, with Tivity arguing that the predominance factor is not met for three reasons: (1) lack of reliance; (2) the incapability of measuring damages on a classwide basis, and (3) the lack of a common "scheme" to defraud investors.

## A. Reliance

Tivity notes "[i]t is axiomatic that Plaintiff must prove as an essential element of its securities fraud claims that it relied on the allegedly false or misleading statements when purchasing stock." (Doc. No. 131 at 1) (citing Amgen Inc., 568 U.S. at 462-63. Tivity also argues that "because reliance is an essential element of Plaintiff's claims, and the inquiry into reliance is inherently individualized. . . . Plaintiff must establish that a presumption of reliance applies to obtain class certification." (Id. at 7) (citing Halliburton II, 573 U.S. at 263). Although the Court agrees with both propositions of law, it cannot conclude, as Tivity does, that Plaintiff is not entitled to class certification based upon its alleged inability to prove reliance.

Reliance is "essential" because "proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury." Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I"), 563 U.S. 804, 810 (2011). Although the "traditional (and most

5

direct) way" for a plaintiff to demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction . . . based on that specific misrepresentation," this is often unfeasible and "places an unnecessarily unrealistic evidentiary burden on the [securities] plaintiff who has traded on an impersonal market." Basic Inc. v. Levinson, 485 U.S. 224, 245 (1988). Furthermore, "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively" would prevent such plaintiffs "from proceeding with a class action, since individual issues" would "overwhelm[ ] the common ones." Id. at 242. To address those problems, the Supreme Court in Basic established a rebuttable presumption for securities plaintiffs under a "fraud on the market theory" that is based on this hypothesis:

> "[I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business . . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations."

Id. at 241-242 (quoting Peil v. Speiser, 806 F.2d 1154, 1160–1161 (3rd Cir. 1986)); see also In re BancorpSouth, Inc., No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("The Basic fraud-on-the-market presumption is based on the premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.").

Application of the presumption announced in Basic is not automatic, however. Instead, "a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock

between the time the misrepresentations were made and when the truth was revealed." <u>Halliburton II</u>, 573 U.S. at 258.

Nor is the <u>Basic</u> presumption conclusive: "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." <u>Basic</u>, 485 U.S. at 248. "So for example, if a defendant could show that the alleged misrepresentation did not, for whatever reason, actually affect the market price, or that a plaintiff would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud, then the presumption of reliance would not apply." <u>Halliburton II</u>, 573 U.S. at 269.

Here, the Consolidated Complaint alleges – and there is seemingly no dispute – that Tivity's stock price fell $10.43 per share, or 45.59% to close at $12.50 per share on February 20, 2020. This occurred after Tivity issued a release the day before "announcing its financial results for 4Q19 and FY19." (Doc. No. 105, Cmpl. ¶ 172). The release disclosed (1) Tivity's "Nutrition segment had a disappointing end to 2019"; (2) the "4Q19 Nutrition segment revenues came in at $113.7 million" which was "a 12.2% decrease compared to the same quarter last year"; (3) the "4Q19 Nutrition segment adjusted EBITDA totaled $13.9 million, which missed analysts' expectations"; and (4) Tramuto had been summarily fired. (<u>Id.</u>, ¶¶ 172, 175). In a conference call that same day, newly-appointed interim executives admitted that "the nutrition business has not worked out as well as planned since the completion of the acquisition in March 2019"; "last year was a step backward"; and "after experiencing a year of decline in new customers, industry history shows it's a tremendous challenge to reverse the trend for the next diet season." (<u>Id.</u> ¶ 174).

Notwithstanding the dramatic drop in stock value when news of Nutrisystem's poor

performance broke on February 20, 2020, Tivity argues that the <u>Basic</u> presumption is unwarranted because the allegedly corrective information in that earnings release had been previously disclosed to the market, meaning that it could not have impacted the price on February 19, 2020. (Doc. No. 131 at 11). That is, Plaintiff has not shown a price impact, either on the front end or back end.[2]

As already noted, Plaintiff's primary contention is that Tivity made materially false or misleading statements or omission beginning on March 8, 2019. Such statements allegedly continued, with Tivity including reporting on August 7-8, 2019 that the Nutrition segment was experiencing "early success," that it was "pleased with [the] results," and again on November 11-12, 2019 reassuring investors that its Nutrition segment was "on track" and "on plan." (Doc. No. 105, Consol. Compl. ¶¶ 10, 100-105). Absent from the statements and disclosures was Nutrisystem's poor performance for the portion of Q1 2019 occurring before the Tivity-Nutrisystem merger closed ("the Q1 Stub Period"). Specifically, Plaintiff alleges "Tivity concealed that Nutrisystem incurred a massive $8.3 million loss during the premerger weeks of first quarter 2019 ("1Q19"), resulting in an actual adjusted EBITDA of a mere $5 million for 1Q19, or 62% lower than the $13.3 million they reported post-merger." (Doc. No. 126 at 3).

In support of its position that there was no price impact notwithstanding Plaintiff's allegations and the release and statements on February 19, 2020, Tivity begins by asserting that, on

---

[2] "There are two ways that a defendant can show lack of price impact. First, a defendant can provide direct 'evidence of no front-end price impact' – meaning that when an alleged misrepresentation was made, it 'had no discernable impact on [the] stock price.' Second, a defendant can [provide] evidence of no back-end price impact – meaning that there was no decrease in price following a claimed corrective disclosure." <u>In re Chicago Bridge & Iron Co. N.V. Sec. Litig.</u>, No. 17 CIV. 01580 (LGS), 2019 WL 5287980, at *7 (S.D.N.Y. Oct. 18, 2019). <u>See also</u> <u>Zwick Partners, LP v. Quorum Health Corp.</u>, No. 3:16-CV-02475, 2019 WL 1450546, at *10 (M.D. Tenn. Mar. 29, 2019). In short, "price impact may be demonstrated either at the time the alleged misrepresentations were made [front-end], or at the time of their correction [back-end]." <u>In re Bancorp South, Inc.</u>, 2017 WL 4125647 at *1.

various occasions, it disclosed the "weak 2019 diet season[.]" (Doc. No. 131 at 11). For example, on February 19, 2019, "Nutrisystem management noted during a joint earning conference call with Tivity that 'early diet seasons trends indicate mixed results' and the 'response in January started out softer than anticipated.'" (Doc. No. 131 at 11). Further, during an earnings conference call on May 9, 2019, Tivity noted that "January and February did start of a little weaker than expected." (Id. at 11-12). Also on May 9, 2019, "Tivity provided pro forma review and earning for Q1 2019 adjusted to include operating results of Nutrisystem from January 1, 2019 to March 7, 2019," and those results showed that "net income decreased by approximately $8.8 million" when Nutrisystem's performance during that period was included. (Id. at 12).

Those same arguments were addressed and rejected by the Court in ruling on Tivity's Motion to Dismiss. As the Court pointed out, the allegations are that Tivity repeatedly assured investors on several occasions during that class period that "the nutrition segment has 'performed well across several key metrics,' including revenue and adjusted EBITDA,' and that the segment's performance was 'on track.'" (Doc. No. 116 at 6) (citations to Complaint omitted). Furthermore, the EBITDA was "the key metric . . . 'used to evaluate performance,'" and Tivity doubled down on that metric in "specific press releases, conference calls, SEC filings, and investor presentations." (Id.). While Tivity may have stated that the Nutrition Segment started off "a little ["softer" or] weaker than expected," and "indicated mixed results," this does not address Plaintiff's central allegation that Tivity never disclosed the Nutrition segment's $8.3 million net loss until February 19, 2020. The "pro forma review" on May 9, 2019 showing a net income decrease of $8.8 million hardly sufficed to establish investor knowledge because it did not show the adjusted EBITDA. Indeed, Tivity was informed that investors found the Nutrition Segment Q1 EBITDA "difficult to

9

understand," with one investor stating that Tivity was "hiding NTRI Q1 EBITDA," and another indicating he "could not follow the EBITDA for the nutrition business – full year vs stub period[.]" (Doc. No. 147-5, 146-6 at 11, 22). A Jefferies analyst commented that "[w]e don't think that [Nutrisystem's pre-transaction EBITDA losses] has been fully appreciated by investors," although Jefferies guesstimated Nutrisystem's Stub Period EBITDA losses to be around $9 million. An analyst at Crag-Hallum, on the other hand, concluded in both August and November 2019 that "January and February are roughly breakeven in EBITDA for Nutrisystem." (Doc. No. 184-4 at 13).

In an effort to shore up its argument that there was no price impact with the adjusted EBITDA revelation on February 19, 2020, Tivity relies primarily upon the expert opinion of Dr. Paul A. Gompers, the Eugene Holman Professor of Business Administration at the Harvard Business School.[3] In both his expert report (Doc. No. 132-1) and at the evidentiary hearing before the Court, Dr. Gompers presented several reasons why he believed the market already knew about Nutrisystem's poor performance before the February 19, 2020 disclosures. Tivity succinctly summarizes those reasons as follows:

> First, before the start of the alleged class period, on February 19, 2019, Tivity issued its projected revenue and EBITDA guidance for FY 2019. Although the Nutrisystem merger had not closed, the deal had been announced, and thus Tivity also included in its release a reference to Nutrisystem's announced projections, noting that Nutrisystem's performance would only impact Tivity following the close of the deal. That Nutrisystem guidance projected that Nutrisystem "would earn between 100 and $110 million of EBITDA" in 2019, with the first quarter accounting for 5-6%, or approximately $5-$6.6 million. At this time, neither Tivity nor Nutrisystem disclosed Nutrisystem's actual performance for Q1 2019, but that was to be expected, as the quarter was still in progress[.]

---

[3] The Court found Dr. Gompers to be a credible witness for the most part, but was underwhelmed by his testimony.

Second, on May 8 and 9, 2019, after the merger with Nutrisystem closed, Tivity issued its earnings release and Form 10-Q for Q1 2019. These disclosures revealed the performance of the company overall for Q1 2019, as well as the results of Tivity's two new divisions: the Healthcare Segment (Tivity's legacy business), and the Nutrition Segment (Nutrisystem's legacy business). With respect to the Nutrition Segment, the release and Form 10-Q noted that Tivity was reporting only Nutrisystem's Q1 performance for the period of the quarter when Tivity actually owned Nutrisystem. Tivity thus disclosed that Nutrisystem earned $13.3 million in EBITDA for the portion of Q1 when it was owned by Tivity. At the same time, however, to provide investors insight into what the company's performance would have looked like for Q1 2019 if Tivity had owned Nutrisystem for the full quarter, Tivity also included pro forma financial statements in its Form 10-Q. Those pro forma financial statements revealed to investors that Nutrisystem had a net income loss of $8.8 million for the Q1 Stub Period.

Tivity also re-affirmed its 2019 guidance that had been issued in February 2019. See Ex. 3 at 3. That guidance, as noted above, indicated to the market that Nutrisystem expected to earn $5-$6.6 EBITDA million during all of Q1 2019, and that is exactly what happened. Nutrisystem's actual Q1 2019 EBITDA of $5 million met the company's guidance.

Third, on August 7, 2019, Tivity issued its earnings release for Q2 2019. In addition to reporting Q2 2019 earnings, Tivity lowered its 2019 earnings guidance from what had been announced in February. And, along with its release, Tivity provided an earnings supplement presentation, which walked through the Q2 performance and compared the revised guidance to the initial guidance, both for the full company and for the separate reporting segments. For the Nutrition Segment, Tivity further provided a comparison of the revised guidance for the period of the year when Tivity owned Nutrisystem versus what that guidance would look like had Tivity owned Nutrisystem for the full year. "[B]ecause the only difference between those two numbers is the performance of Nutrisystem before Tivity owned it . . . that difference represents the EBITDA performance of Nutrisystem from January 1st to March 7th," which revealed a $9 million EBITDA loss for Nutrisystem's Q1 Stub Period.

(Doc. No. 168 at 4-5) (internal citations omitted). "Both as a matter of financial economics and commonsense," Tivity argues, these disclosures "prove that the information Plaintiff claims revealed the 'truth' of the Nutrisystem Claim – *i.e.* the February 19, 2020 disclosure of Nutrisystem's $8.3 million EBITDA loss – did not impact stock price." (Id. at 7).

11

Recently, the Supreme Court addressed price impact and the <u>Basic</u> presumption, holding that "[t]he defendant bears the burden of persuasion to prove a lack of price impact." <u>Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.</u>, 141 S. Ct. 1951, 1963 (2021). This burden is by a preponderance of the evidence: "The defendant must 'in fact' seve[r] the link between a misrepresentation and the price paid by the plaintiff – and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat." <u>Id.</u> at 1962. "The district court's task is simply to assess all the evidence of price impact – direct and indirect – and determine whether it is more likely than not that the alleged misrepresentations had a price impact." <u>Id.</u> at 1963.

To sever the link in this case, Tivity must show a complete lack of price impact. <u>Waggoner v. Barclays PLC</u>, 875 F. 3d 79, 99-103 (2d Cir. 2017); <u>In re Chicago Bridge & Iron Co. N.V. Sec. Litig.</u>, No. 17 CIV. 1580 (LGS), 2020 WL 1329354, at *4 (S.D.N.Y. Mar. 23, 2020); <u>Monroe Cnty. Employees' Ret. Sys. v. S. Co.</u>, 332 F.R.D. 370, 395–96 (N.D. Ga. 2019); <u>City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ</u>, 322 F. Supp. 3d 676, 687 (D. Md. 2018). Tivity has not come close to carrying its burden.

To begin, if it is true that investors knew about Nutrisystem's lagging performance before the February 19, 2020 disclosures, then the argument can be made that (1) the disclosures were not material; and (2) materiality is not suitable for determination at the class certification stage. <u>See Id.</u> at 459 (holding that "[w]hile [plaintiff] certainly must prove materiality to prevail on the merits, . . . such proof is not a prerequisite to class certification"). Indeed, Plaintiff forwards that as one basis to reject Tivity's loss causation argument.

To be sure, the securities laws "overlap[] to some extent," <u>Lorenzo v. Sec. & Exch.</u>

Comm'n, 139 S. Ct. 1094, 1109 (2019), but this does not mean, as Plaintiff argues, that the "materiality question [] is superfluous to the Court's Rule 23 analysis[.]" (Doc. No. 172 at 1). Indeed, to so hold would require the "court to split some very fine hairs" because, under Hallburton II, "a district court must be willing to consider evidence offered by the defense to show that the alleged misrepresentations did not actually affect the price of the securities." In re Allstate Corp. Sec. Litig., 966 F.3d 595, 600, 608 (7th Cir. 2020). Accordingly, the Court turns to Gompers' opinion and the substantive reasons why Tivity has not shown by a preponderance of the evidence that its alleged misstatements had no price impact.

At the hearing, Gompers testified that "what Nutrisystem said on February 19, 2019, was that they would earn between 5 and $6.6 million of EBITDA in the first quarter of 2019, for the whole quarter, from January 1st to March 31st." (Doc. No. 164 at 19). He then pointed out that Nutrisystem's actual 1Q19 EBITDA was $5 million, which was within the projections. (Id. at 20). All this may be true, but it is unhelpful and does not add even a feather to Tivity's side of the preponderance of the evidence scale. This is because the Form 8-K relied upon by Gomper was not filed until February 19, 2020. That day is the last day of the proposed class period and hence class members would not have been in a position to make the comparison that Gomper's made.

Dr. Gompers also asserted that investors should have known about the financial state of Nutrisystem and its approximate 1Q19 EBITDA on August 7, 2019 when Tivity issued a release announcing its 2Q19 financial results, as well as guidance for the remainder of FY19. Attached to the Form 8-K filed with the SEC on that day was a "Q2 2019 Earning Release – Supplemental Material" that included a "Consolidated Basis – Updated 2019 Financial Guidance" chart, as well as a "Nutrisystem Stand-Alone Full Year Basis – Updated 2019 Financial Guidance" chart. (Pf's

13

Hrg. Exh. Tab 9).

Those charts show Nutrition Segment guidance ranges for all of FY19, as well as for just the post-acquisition (March 8, 2019 to the end of the year) period. Dr. Gompers testified that because the only difference between the guidance ranges was whether the Stub Period was included, investors were in a position to approximate Nutrisystem's Stub Period EBITDA by simply calculating the difference between the midpoints of the two guidance ranges. By his calculation, this difference was $9 million based upon the information contained in the following table from the Supplemental Material:

| Metric | 2019 Guidance Updated | 2019 Guidance Original |
|---|---|---|
| Nutrition Segment Adjusted EBITDA Stub Period (3/8 – 12/31) [1,2] | $80 - $84 [*] | $91 - $101 [**] |
| Nutrition Segment Adjusted EBITDA (1/1 – 12/31) [1, 2, 3, 4] | $71 - $75 [*] | $90 - $100 |

(Pf. Hrg. Exh. Tab 9). Looking at the first column, the mid-point of the Nutrition Segment Adjusted EBITDA for the Stub Period is $82 (80+84=164÷2=82), and the mid-point of the Nutrition Segment Adjusted EBITDA for the year $73 (71+75=156÷2=73). This leaves a difference of $9 million (82-73=9).

Why reasonable investors would necessarily take it upon themselves to make the calculation is unclear, particularly given that the calculation comes from the last page of the Supplemental Material. See Lea v. TAL Educ. Grp., 837 F. App'x 20, 28 (2d Cir. 2020) (collecting cases for the proposition that "'buried' information is insufficient to constitute adequate disclosure"). Moreover, nothing in the materials informs investors which chart should be used, or why the "2019 Guidance

14

Updated" column should be used over the "2019 Guidance Original" column. If one does the same math utilizing the second column, the midpoint of the Nutrition Segment Adjusted EBITDA Stub Period is $96 (91+101=192÷2=96), the mid-point of the Nutrition Segment Adjusted EBITDA for the year is $96, leaving a difference of $1 million (96-95=1). The reason for an $8 million difference between the columns is unexplained in the Form 8-K.

In addition to the foregoing, Dr. Gompers criticizes an "event study" performed by Plaintiff's expert, W. Scott Dalrymple, C.F.A., that showed a cause-and-effect relationship between the release of new, Tivity-specific information (good or bad), and the movement in Tivity's stock price (up or down). (Doc. No. 127-2, Dalrymple Rpt. ¶¶ 51-69). However "there generally 'is no reason to burden the court with review of an event study and the opposing expert's attack of it,'" unless "'defendants present evidence of lack of price impact or that the market was inefficient,'" neither of which Tivity has done. Weiner v. Tivity Health, Inc. (Tivity I"), 334 F.R.D. 123, 134 (M.D. Tenn. 2020) (quoting Angley v. UTi Worldwide Inc., 311 F. Supp. 3d 1117, 1126 (C.D. Cal. 2018)). "Besides, '[d]ebates about the precise *degree* to which stock prices accurately reflect public information are ... largely beside the point.'" Id. (quoting Halliburton II, 573 U.S. at 272) (emphasis in original).

Based on the evidence presented, the Court cannot say "'news of [the allegedly concealed truth] credibly entered the market and dissipate the effects of the misstatement,'" or that "'the causal connection between the alleged fraud and the market price was broken'" before the release and statements on February 19, 2020. Id. (quoting In re Allstate Corp. 966 F.3d at 606). Even if it did, Gompers' opinion does not address Plaintiff's "Goodwill" as opposed to the "Nutrisystem" Claim. And, as noted below, Plaintiff's "Scheme Claim" is necessarily intertwined with its

15

misrepresentation claim.

Tivity argues that a class for the "Goodwill Claim" would run from August 8, 2019 through February 19, 2020, with the start date being when Tivity filed its Form 10- for the Second Quarter 0f 2019. According to Tivity, this time frame corresponds to the first filing for which Plaintiff claims goodwill and the Nutrisystem tradename were overstated.

The fundamental problem with this argument is that Tivity fails to accept that it is required to show a *complete* lack of price impact. Tivity has not attempted to dispute price impact with respect to the alleged statements and omissions concerning Tivity's goodwill and tradename, and Gompers has admitted that he was not asked to opine on such. (Doc. No. 164 at 13). This failure exists even though the Complaint alleges that Tivity's stock price increased by 8.2% on May 9, 2019 by 6.2% on November 13, 2019, movement that arguably would not have occurred had the true nature of Nutrisystem's financial situation been known and understood by investors. To the extent Tivity believes it is entitled to shorten and limit the class period without showing a complete lack of price impact, the Court disagrees. See In re CenturyLink Sales Pracs. & Sec. Litig., 337 F.R.D. 193, 210–11 (D. Minn. 2020) ("Defendants' expert admits that there were statistically significant price drops following two of the three disclosure dates. This is sufficient to prevent Defendants from "sever[ing] the link" between the alleged misrepresentations and any impact on [the company's] stock price."); Monroe Cnty. Employees' Ret. Sys., 332 F.R.D. at 395–96 ("[N]umerous courts addressing class certification have refused to shorten class periods by dismissing subsequent corrective disclosures where some but not all of the stock price declines following the alleged corrective disclosures were statistically significant. Instead, these courts found that the question of what caused the stock price to decline is an ultimate merits question for which

16

plaintiffs bear the burden at trial, not at class certification."); KBC Asset Mgmt. NV v. 3D Sys. Corp., No. 0:15-2393-MGL, 2017 WL 4297450, at *7-*8 (D.S.C. Sept. 28, 2017) (declining to shorten the class period where only the first of two alleged corrective disclosures was followed by a statistically significant stock price decline).

## B. Damages

Tivity presents several arguments in support of its position that "Plaintiff has failed to present a model capable of measuring damages on a class-wide basis, consistent with Plaintiff's theories of liability, as required by Comcast[.]" (Doc. No. 131 at 3). The Court is unpersuaded by any of them.

Tivity begins by criticizing Mr. Dalrymple for failing to "run any analysis to determine estimated class-wide damage" and for "provid[ing] a generic and boilerplate statement" about damages. (Id.). However, the question is not whether he has already made the damages calculation, but whether an appropriate methodology exists for making the calculations. Comcast, 569 U.S. at 34 (emphasis added) (indicating that for certification to be proper plaintiff must show "damages are *capable of measurement* on a classwide basis").

In his expert report, Mr. Dalrymple sets forth a methodology that can be utilized. Specifically, he intends to (1) use an "event study" approach to estimate the artificial inflation in the stock; (2) remove the effects of confounding information using "standard financial analysis and valuation tools" and then estimated share price inflation for each day'; and (3) calculate damages for each class member by determining "the difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and (b) share price inflation associated with shares sold at the time they were sold after one or more curative events[.]" (Doc. No. 127-2,

17

Dalrymple Rpt. at ¶¶ 90-96).

  The methodology Mr. Dalrymple proposes, *i.e.* using an event study to calculate out-of-pocket damages, is hardly new or novel. <u>Monroe Cnty. Employees' Ret. Sys.</u>, 332 F.R.D. 370, 398 (N.D. Ga. 2019) (collecting cases). In fact, "[i]t is a feature of virtually every securities action, which must account for stock fluctuations unrelated to the particular theory of liability asserted in the case." <u>Luna v. Marvell Tech. Grp., Ltd.</u>, No. C. 15-05447 WHA, 2017 WL 4865559, at \*6 (N.D. Cal. Oct. 27, 2017). Nevertheless, and even though he does not contend that damages cannot be calculated on a class wide basis (Doc. No. 165, Tr. at 57), Dr. Gompers takes issue with Mr. Dalrymple's approach insisting (among other things) that Mr. Dalrymple (1) "describes a general damages approach that he does not demonstrate is capable of measuring class-wide damages given the facts in this case"; (2) "fails to propose a damages methodology that could account for time-varying inflation during the Putative Class Period consistent with Plaintiff's theories of liability"; (3) "does not demonstrate that his proposed methodology could measure the price impact of the other information released" on February 19, 2020; and (4) "does not demonstrate that 'standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with Plaintiff's theory of liability.'" (Doc. No. 132-1, Gompers at ¶¶ 58, 72, 77, 92).

  At this point in the discussion, it is probably worth noting that several readers may experience déjà vu, believing they have read this before. This is because this same expert (Dr. Gompers) made substantially the same criticism about the same sort of methodology (an "event study") on behalf of the same Defendant (Tivity) in <u>Weiner v. Tivity Health, Inc. ("Tivity I")</u>, No. 3:17-cv-01469. Specifically, Dr. Gompers criticized plaintiff's expert Chad Coffman, CFA, because he (1) "has not demonstrated that he can develop a class-wide damages model that is

consistent with Plaintiff's theory of liability"; (2) "does not specify how he would account for time-varying inflation consistent with Plaintiff's theory of liability"; (3) "does not specify how he would account for potential overreaction" by investors: and his approach was "problematic." Weiner v. Tivity Health, No. 3:17-cv-01469 (M.D. Tenn) (Tivity I, Doc. No. 93-2 Gompers Rpt. at ¶¶ 75, 94, 105, 113)

Dr. Gompers' criticism of Mr. Dalrymple is no more persuasive now than his criticism of Mr. Coffman was two years ago. See Weiner v. Tivity Health, Inc., 334 F.R.D. 123, 138 (M.D. Tenn. 2020) ("Dr. Gompers' criticisms of utilizing an 'out-of-pocket' model in this case do not alter this Court's conclusion that predominance exits and certification is appropriate. For example, he asserts that the proposed model does not account for time-varying inflation and potential overreactions. These arguments are premature."). Nor are they any more persuasive now then they were four years ago. See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp., No. 4:08CV0160, 2018 WL 3861840, at *14 n.12 (N.D. Ohio Aug. 14, 2018) ("Dr. Gompers' Comcast-related opinions have been rejected in 11 cases 10 of them, including two within the Sixth Circuit, with certification of the class in each generally based upon Comcast-related plaintiff expert opinions[.]"); Angley v. UTI Worldwide Inc., 311 F. Supp. 3d 1117, 1129 (C.D. Cal. 2018) (rejecting Dr. Gompers' criticism and pointing out that "courts have recognized the event study/out of pocket method is an accepted method for calculating damages in securities fraud class actions") As is his apparent practice, Dr. Gompers did not even bother to read this Court's opinion in Weiner before testifying in this case. (Doc. No. 164 at 9); see Ohio Pub. Emps. Ret. Sys., 2018 WL 3861840, at *14 (quoting the following testimony by Dr. Gompers: "My opinions are based on my feeling. They are based on the standards in financial economics. They are not based on legal

decisions.")

## C. Scheme Claim

With regard to the "Scheme Claim," Tivity argues "the law is clear that scheme claims must be independent and distinct from misrepresentation claims." (Doc. No. 131 at 24). Tivity continues:

> To allege a claim for scheme liability under Section 10(b), Plaintiff must demonstrate that the 'scheme' consists of more than alleged misstatements or omissions. A scheme claim must identify what specific 'deceptive act[s],' other than the challenged misstatements themselves, were performed.

(Doc. No. 131 at 24-25).

In support of its position, Tivity cites a handful of cases, all of which were decided before the Supreme Court's decision in Lorenzo which explained that Section 10(b) of the Exchange Act and SEC Rule 10b-5 "capture a wide range of conduct" and are "intended to root out all manner of fraud in the securities industry." 139 S.Ct. at 1101. Although "[t]he Sixth Circuit has not defined the elements of 'scheme liability' under Rule 10b-5," Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc., No. 220CV02553STATMP, 2022 WL 989240, at *14 (W.D. Tenn. Mar. 31, 2022), many courts post-Lorenzo courts have found that scheme claim liability can be based upon misrepresentations or omissions and not just deceptive acts. See In re Firstenergy Corp., No. 2:20-CV-3785, 2022 WL 681320, at *7 (S.D. Ohio Mar. 7, 2022); SEC v. Efuel Efn Corp., No. 5:19-CV-482-30PRL, 2021 WL 7541513, at *4 (M.D. Fla. Nov. 12, 2021); Puddu v. 6D Glob. Techs., Inc., 2021 WL 1198566, at *10–11 (S.D.N.Y. Mar. 30, 2021); Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp., 514 F. Supp. 3d 942, 951 (S.D. Tex. 2021); In re Cognizant Tech. Sols. Corp. Sec. Litig., No. CV166509ESCLW, 2020 WL 3026564, at *17 (D.N.J.

June 5, 2020); <u>SEC v. Kameli</u>, No. 17 C 4686, 2020 WL 2542154, at *14 (N.D. Ill. May 19, 2020).

Tivity offers no compelling explanation as to why this Court should not join the growing trend.

### III.  <u>Conclusion</u>

Based upon the record and for the reasons set forth above, the Court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Accordingly, Plaintiff's Motion to Certify Class (Doc. No. 125) will be granted, and the Court will certify a class consisting of all those who purchased or otherwise acquired Tivity common stock between March 8, 2019, and February 19, 2020.  Further, the law firm Robbins Geller Rudman & Dowd LLP will be appointed as class counsel

An appropriate Order will enter.

_____

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE