# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| ROBERT STROUGO, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Lead Plaintiff, | ) ) | |
| v. | ) ) | No. 3:20-cv-00165 |
| TIVITY HEALTH, INC., et al., | ) ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Lead Plaintiff Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund ("Lead Plaintiff"), on behalf of all of those who purchased Tivity Health, Inc. ("Tivity") stock between March 8, 2019 and February 19, 2020, bring this putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a) ("Securities Exchange Act").[1]  Lead Plaintiff alleges that Defendants Tivity, former Tivity Chief Executive Officer ("CEO") Donato Tramuto ("Tramuto"), Chief Financial Officer ("CFO") Adam C. Holland ("Holland"), and President and Chief Operating Officer ("COO") Dawn Zier ("Zier") (collectively, "Defendants") misled investors about the success of Tivity's acquisition of Nutrisystem, Inc. ("Nutrisystem"), as well as the valuation of Tivity's goodwill and the Nutrisystem tradename.  Now before the Court is Defendants' Motion for Summary Judgment (Doc. No. 213), which has been fully briefed, heard at oral argument, and is ripe for review (see

---

[1] As the Court noted in its Memorandum Opinion on Defendants' motion to dismiss, "[p]rior to consolidation, Robert Strougo filed the initial complaint in this action.  (See Doc. No. 1).  For ease of reference, the parties and the Court have kept Strougo's name in the caption even though Sheet Metal Workers is Lead Plaintiff."  (Doc. No. 116 at 2 n.2).

Doc. Nos. 213–14, 226, 233, 284–85).[2]  For the following reasons, Defendants' motion will be granted in part and denied in part.  Lead Plaintiff's Motion to Supplement Status Conference (Doc. No. 284), which is opposed by Defendants (Doc. No. 285), will be granted.

## I.    BACKGROUND AND UNDISPUTED FACTS[3]

Contrary to Defendants' assertions, the briefing before the Court is far from "narrowly tailored."  (Doc. No. 234 at 2).  The parties' nearly-200 pages of briefing on the statements of undisputed material facts proves unhelpful, as it is marred with manufactured disagreements and inappropriate argument.  (Doc. Nos. 227, 234).  To make matter worse, the parties have filed more than 2,500 pages of exhibits, many of which are not pertinent to the dispute at hand.  (Doc. Nos. 227–30, 234).  Considering the needlessly expansive record the parties have developed on this motion, and that the Court has already recounted the basic facts of this case on multiple occasions, (see Doc. No. 116 at 1–3; Doc. No. 178 at 1–2), the Court finds it unnecessary to delve into the intricacies of the various events pertinent to this case.  Instead, the Court will describe the relevant circumstances only as necessary for the purposes of resolving the instant motion.

---

[2] Both parties are guilty of violating this Court's Local Rules in their briefing.  As an example, Lead Plaintiff's response to Defendants' statement of undisputed material facts does not comply with Local Rule 56.01(c), as it is a far cry from providing only concise statements "demonstrating that the fact[s] [are] disputed" with support by "specific citation[s] to the record."  Meanwhile, Defendants' reply to Lead Plaintiff's response to the statement of undisputed material facts (Doc. No. 234) was filed in contravention to this Court's Local Rules.  L.R. 56.01(d) (providing for a reply to a statement of undisputed material facts only "[i]f the non-moving party has asserted additional disputed facts[.]").  Because Defendants' reply filing is improper, the Court will only cite to Lead Plaintiff's response to Defendants' statement of undisputed material facts in this section.

[3] The undisputed facts in this section are drawn from the undisputed portions of Defendants' statements of facts (Doc. No. 227), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Consolidated Complaint ("Consolidated Complaint") (Doc. No. 105) that are not contradicted by the evidence in the record.

2

On December 10, 2018, Tivity announced it would acquire Nutrisystem. (Doc. No. 227 ¶ 1; Doc. No. 105 ¶ 41). At that time, Tramuto served as Tivity's CEO, and Holland served as its CFO. (Doc. No. 105 ¶¶ 23, 25).

The next month, Tivity included "financial forecasts prepared by Nutrisystem management" in its January 2019 Form S-4, which included Nutrisystem's estimated adjusted earnings before interest, taxes, depreciation, and amortization ("aEBITDA") of $763 million. (Doc. No. 228-10 at 4). On February 19, 2019, Nutrisystem announced that it reduced its 2019 revenue guidance to "the range of $682 to $702 million and adjusted EBITDA between $100 and $110 million." (Doc. No. 215-32 at 3). The same day, Tivity issued earnings guidance for 2019, which reflected Nutrisystem's adjusted reduced 2019 guidance and predicted: $1.146 billion to $1.177 billion in revenue; $240 million to $ 258 million in aEBITDA; and $9 million to $12 million in cost synergies. (Doc. No. 227 ¶¶ 61, 62; Doc. No. 215-31 at 4).

On March 8, 2019, Tivity announced the closing of its acquisition. (Doc. No. 227 ¶ 1). That day, Tivity recorded $445.7 million as the value of Nutrisystem's goodwill, and $800 million as the value of Nutrisystem's tradename.[4] (Doc. No. 227 ¶¶ 5, 8). Following the acquisition, Zier,

---

[4] Pursuant to Generally Accepted Accounting Principles ("GAAP"), because Tivity recorded Nutrisystem's goodwill, Tivity was required to test that goodwill "at least annually[,] for impairment at a level of reporting referred to as a reporting unit." (Doc. No. 227 ¶ 9(citing ASC 350-20-35-1)). In addition to the annual test, ASC 350 also required Tivity to perform interim goodwill impairment tests to determine "if an event occurs or circumstances change that indicate that the fair value of the entity (or the reporting unit) may be below its carrying amount (a triggering event)." (Id. ¶ 12 (citing ASC 350-20-35-66)). If, after assessing the totality of the events or circumstances, Tivity determined that it was "more likely than not that the fair value of a reporting unit is less than its carrying amount," then Tivity was required to perform the goodwill impairment test." (Id. ¶¶ 9, 12 (citing ASC 350-20-35-3E)). If Tivity determined that no triggering event had occurred making it more likely than not that the fair value of a reporting unit had fallen below its carrying amount, no interim quantitative impairment test would be required. (Id. ¶ 16). If Tivity reached the opposite conclusion, ASC 350 would require it to perform an interim quantitative impairment test. (Id. ¶ 12 (citing ASC 350-20-35-3E)). This process also applies to intangible asset assessments. (Id. ¶ 16 (citing ASC 350-30-35-18F)). One of the cornerstones of

3

who was Nutrisystem's former President and CEO, became Tivity's President and Chief Operating Officer ("COO"). (Doc. No. 105 ¶¶ 6, 24). Keira Krausz ("Krausz"), who was Nutrisystem's former Nutrisystem Chief Marketing Officer, became Tivity's President of the Nutrition Business Unit. (Doc. No. 215-54 at 13).

On May 8, 2019, Tivity affirmed its February 19, 2019 guidance in its earnings results for Q1 2019.[5] (Doc. No. 227 ¶ 65). In its release, Tivity noted that it was including Nutrisystem's financial results for only a portion of Q1 2019 following the closing of the transaction, but did not include Nutrisystem's financial results for the stub period from January 1, 2019 to March 7, 2019 ("Stub Period"). (Doc. No. 227 ¶¶ 74, 76; Doc. No. 228-29 at 1, 4). It further stated that the Nutrisystem integration was "on track." (Doc. No. 227 ¶¶ 74, 76; Doc. No. 228-29 at 1, 4). This was based on the reported aEBITDA for the Nutrisystem segment (i.e., the "nutrition segment") from March 8 to March 31, 2019 that came to $13.3 million, ensuring Tivity was moving toward its continued expectation to deliver $9 million to $12 million in cost synergies for 2019. (Doc. No. 227 ¶¶ 74, 76; Doc. No. 228-29 at 1, 4). A day later, Tivity filed its Form 10-Q for Q1 2019, including in its balance sheet the $445.7 million in goodwill and $800 million in intangible assets for the Nutrisystem tradename that Tivity recorded on the day the acquisition closed. (Doc. No. 215-6 at 12). It also included *pro forma* financials describing Tivity's "results as if the acquisition of Nutrisystem had occurred on January 1, 2018."[6] (Id. at 11).

Lead Plaintiff's case is that Defendants allegedly failed to properly follow these procedures throughout the 2019 fiscal year in regard to Nutrisystem's goodwill and tradename.

[5] In its opinion, the Court will refer to the four quarters of the fiscal year as Q1 (comprising of January 1 to March 31), Q2 (comprising of April 1 to June 3), Q3 (comprising of July 1 to September 30), and Q4 (comprising of October 1 to December 31).

[6] Put simply, Tivity's *pro forma* financials demonstrate to investors the financial position Tivity would have been in had it acquired Nutrisystem at a prior date—in this case, on January 1, 2018. These metrics are used to show investors how Tivity's acquisition of Nutrisystem impacted

4

On August 7, 2019, Tivity issued another press release announcing its earnings for Q2 2019. (Doc. No. 215-33). That release stated that revenues increased to $340 million, "including nutrition segment revenues of $182.9 million"; income from continuing operations was $18.1 million; net goodwill of $791.7 million, and stated:

> Adjusted EBITDA from continuing operations for the second quarter of 2019 was $70.3 million. This includes $1.3 million of cost synergy benefits and $34.7 million from the nutrition segment and excludes $ 11.4 million of acquisition, integration, and restructuring costs associated with the Nutrisystem acquisition. This compares to adjusted EBITDA from continuing operations of $ 35.1 million for the second quarter of 2018.

(Id. at 2–3). In its release, Tivity reduced its 2019 earnings guidance on the nutrition segment as follows:

- Revenues: $534 million to $550 million (previous 2019 guidance) to $502 million to $512 million (updated 2019 guidance); and
- Consolidated Adjusted EBITDA: $91 million to $101 million (previous 2019 guidance) to $80 million to $84 million (updated 2019 guidance).

(Id. at 4). Tramuto told investors that "a comprehensive optimization plan ha[d] been developed" that Tivity believed would "result in improved results for the 2020 diet season" for the nutrition business. (Id. at 3). That day, Tivity filed with the SEC an earnings supplement presentation describing its Q2 2019 performance and reduced financial guidelines. (Doc. No. 227 ¶ 87). As relevant here, Tivity's filing included updated 2019 guidance for the nutrition segment based on when it acquired Nutrisystem, as well as for all of 2019. (Id. ¶ 88).

On November 5, 2019, in Q3 2019, Tivity released a memo describing an impairment assessment it conducted on the Nutrisystem segment. (Doc. No. 215-16 at 2; Doc. No. 227 ¶ 34). In it, Tivity concluded "no impairment existed as of the test date as the fair value of the reporting

---

Tivity's historical financial position and operations to date by retroactively folding Nutrisystem's operations into Tivity's historical results. *Pro forma* numbers are, by definition, hypothetical.

unit of $1.436 billion exceeded its carrying value of $1.183 billion[.]"  (Doc. No. 215-16 at 3).

Further, according to the memo, Tivity "performed a quantitative impairment test of the

Nutrisystem tradename in connection with the triggering event identified above" and "concluded

no impairment existed as of the test date as the fair value of the tradename of $829 million exceeds

its carrying value of $800 million."  (Doc. No. 215-16 at 5).

On November 12, 2019, Tivity issued a press release affirming its August 7, 2019

guidance.  (Doc. No. 215-33 at 4).  In that release, Tramuto stated that the nutrition segment had

"met [Tivity's] expectations reflecting an improved focus on execution and new investments in []

strategy."  (Doc. No. 230-47 at 3).  The same day, Tivity filed an earnings supplement presentation

with the SEC, describing its Q3 2019 performance and again included slides comparing guidance

for the nutrition segment for the period that Tivity owned Nutrisystem, and for all of 2019.  (Doc.

No. 227 ¶ 93).  Less than a month later, on December 9, 2019, Tivity announced that "[e]ffective

December 4, 2019, the employment relationship between Tivity . . . and Dawn M. Zier, the

President and Chief Operating Officer of the Company, was mutually terminated."  (Doc. No. 215-

51 at 3).

As relevant here, on February 19, 2020, Tivity issued two separate press releases

(collectively, "Corrective Disclosure").  First, Tivity issued a press release announcing its Q4 2019

and full year 2019 results, as well as providing financial guidance for Q1 and full year of 2020

("Financial Press Release").  (Doc. No. 227 ¶ 99).  The Financial Press Release opened with the

following evaluation of the nutrition segment:

> [W]hile the Nutrition segment had a disappointing end to 2019, it remains
> profitable, and we believe it will continue to generate significant cash flow.
> Management and our Board of Directors are committed to making the right
> investments for this business with a focus on innovation, execution, and new
> advertising strategies to return the business to growth.

6

(Doc. No. 228-19 at 8). The guidance in the Financial Press Release provided the details on

Tivity's losses in Q4 2019, stating:

> Net loss in the fourth quarter of $(323.1) million included a non-cash impairment charge of $(377.1) million in the Nutrition segment. In connection with its annual impairment test, the Company concluded that the fair values of both goodwill and the Nutrisystem tradename were below their carrying amounts. As a result, the Company recorded non-cash impairment charges to lower the carrying amount of goodwill and the Nutrisystem tradename by $(137.1) million and $(240.0) million, respectively. These impairment losses primarily resulted from a reduction in the Company's long-term forecast for the Nutrition segment. The Company does not expect the impairment charge to have an impact on future operations, or affect its liquidity, cash flows from operating activities, or compliance with the financial covenants in its credit agreement. In addition, the Company recorded a purchase accounting measurement period adjustment to accelerate amortization of the customer list intangible asset to more closely align with the estimated economic benefit. When compared to the Company's guidance for 2019, this acceleration resulted in incremental amortization expense of $17.4 million for 2019. Adjusted EBITDA was $55.5 million and $222.1 million for the fourth quarter and fiscal year 2019, respectively. The Company benefited from cost synergies realized of $5.4 million during the fourth quarter and $9.8 million during the fiscal year. The Company remains on track to deliver on its stated cost synergy and integration goals.

(Id. at 9). The Financial Press Release provided further information on the nutrition segment,

disclosing the $8.3 million Nutrisystem pre-merger aEBITDA losses from the Stub Period, and

stating:

> Revenues in the Nutrition segment were $113.7 million for the fourth quarter and $498.1 million for the fiscal year since acquisition. Fiscal year 2019 adjusted EBITDA for the Nutrition segment was $79.6 million, which benefited from the timing of certain expenses in relation to the acquisition date of March 8, 2019 as reflected in the table above. Adjusted EBITDA includes $3.7 million and $7.0 million of benefits from cost synergies for the fourth quarter and fiscal year 2019, respectively.

(Id. at 10).

Second, Tivity issued a press release stating that Tramuto was terminated "without cause"

as the Company's Chief Executive Officer effective February 18, 2020 ("Employment Press

7

Release"). (Doc. No. 215-54 at 4). The Employment Press Release also stated that Krausz resigned from her position as President of the Nutrition Business Unit. (Doc. No. 215-54 at 4, 13).

By close of the market the next day, Tivity's stock price fell by more than $10.00 per share—more than 45% in share value—to close at $12.50 per share. (Doc. No. 230-12).

Following the instant events, Lead Plaintiff Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund brought suit against Defendants for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Lead Plaintiff alleges, and now seeks to prove to a jury, that: (1) leading up to and after the Nutrisystem acquisition, Defendants painted a deceitfully optimistic picture of the acquisition through false statements exaggerating Nutrisystem's financial status alongside omissions of Nutrisystem's aEBITDA loss from the Stub Period ("Nutrisystem Claim"); and (2) Defendants made material misrepresentations and omissions in Tivity's quarterly filings starting in 2019 regarding Nutrisystem's tradename and goodwill, failing to account for their impairments ("Goodwill Claim").[7] Now before the Court is Defendants' motion for summary judgment on Lead Plaintiff's Section 10(b), 20(a), and scheme claims. (Doc. No. 213).

## II. LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return

---

[7] Defendants characterize Lead Plaintiff's Section 10(b) and Rule 10b-5 claim as two separate claims: the Nutrisystem Claim and the Goodwill Claim. The Court interprets Lead Plaintiff to dispute this characterization. (Doc. No. 226 at 14 (referring to the "so-called Nutrition Claim"), 17 (referring to the "so-called Goodwill Claim")). However, given Lead Plaintiff does not expressly object to this characterization as faulty in some material respect, and acknowledging that the parties have consistently addressed Lead Plaintiff's Section 10(b) claim in this manner throughout the course of this litigation, the Court will do the same here and will consider the Nutrisystem and Goodwill Claims to be separate for the purposes of resolving the instant motion.

a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (citation and quotations omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

## III.    ANALYSIS

Defendants contend they are entitled to summary judgment on all of Lead Plaintiff's claims, or at minimum, a shortened class period. (Doc. No. 214). Lead Plaintiff disagrees, arguing there are genuine disputes of material fact on all issues Defendants raise that make summary

9

judgment inappropriate, and that Defendants' request for a shortened class period is baseless. (Doc. No. 226). The Court will address the parties' respective arguments by claim below.

### 1. Section 10(b) and Rule 10b-5 Claims

Defendants argue that they are entitled to summary judgment on Lead Plaintiff's Section 10(b) and Rule 10b-5 claims, i.e., the Nutrisystem and Goodwill Claims. "Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010) (quoting Frank v. Dana Corp., 547 F.3d 564, 569 (6th Cir. 2008)). As the Court previously articulated at the motion to dismiss stage, "[t]here are six elements to a securities-fraud suit under Section 10(b) and Rule 10b-5: '(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 469 (6th Cir. 2014) (citing Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 38–39 (2011)); see also Dougherty v. Esperion Therapeutics, Inc., 905 F.3d 971, 979 (6th Cir. 2018). Defendants move for summary judgment on the first, second, and sixth elements of the Nutrisystem and Goodwill Claims. The Court will address Defendants' arguments, by element, below.

### A. First Element: Materially False or Misleading Statement or Omission

First, Defendants contend they are entitled to summary judgment on the first element of the Nutrisystem and Goodwill Claims because Lead Plaintiff cannot show they made a material misrepresentation or omission on either claim. See Omnicare, 769 F.3d at 469. To establish an actional material misrepresentation or omission, a plaintiff must demonstrate two things: "(1) that

10

a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." Id. at 470 (citing Matrixx, 563 U.S. at 38)). On the first element, a plaintiff must show either that the defendant made "an affirmative statement that is misleading or false" or "fail[ed] to disclose information when it had a duty to do so." Omnicare, 769 F.3d at 470–71. There is "[a] duty to affirmatively disclose" such that an omission may be actionable "'when there is insider trading, a statute requiring disclosure,'" or, as relevant in this case, "'an inaccurate, incomplete[,] or misleading prior disclosure.'" City of Monroe Emps. Ret. Sys. v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005) (quoting In re Digital Island Sec. Litig., 357 F.3d 322, 329 n.10 (3d Cir. 2004)).

On the second element, "the analytic approach for evaluating 'materiality'" is no clearer than the first. Omnicare, 769 F.3d at 471. It is therefore informative to look at the materiality requirement's purpose, which is "not to attribute to investors a child-like simplicity, an inability to grasp the probabilistic significance of [opinion statements], but to filter out essentially useless information that a reasonable investor would not consider significant, even as part of a larger 'mix' of factors to consider in making his investment decision.'" Id. at 471–72 (quoting Basic, Inc. v. Levinson, 485 U.S. 224, 234 (1988) (citation and quotations omitted)). To that end, "'[m]isrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." In re Sofamor Danek Grp., Inc., 123 F.3d 394, 400 (6th Cir. 1997) (citation and quotations omitted). In simple terms, a "'fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.'" Basic, 485 U.S. at 231 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). A fact is immaterial, and not actionable under Section 10(b) and Rule 10b-5, if it is a statement including "'vague, soft,

puff[ery] [] or obvious hyperbole' upon which a reasonable investor would not rely." In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004) (quoting In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 897 (8th Cir. 2002)). The Supreme Court has articulated why the issue of materiality is one not often best resolved at summary judgment:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established [statements or] omissions are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law by summary judgment.

TSC Indus., 426 U.S. at 450 (citation and quotations omitted). Consequently, "[c]ourts generally reserve such questions for the trier of fact." Helwig v. Vencor, Inc., 251 F.3d 540, 563 (6th Cir. 2001) (en banc). With these standards in mind, the Court turns to the parties' arguments on this element.

### 1. Nutrisystem Claim

As articulated above, the heart of the Nutrisystem Claim is that Defendants fraudulently failed to disclose to investors that Nutrisystem suffered a substantial aEBITDA loss during the Stub Period. (See, e.g., Doc. No. 105 ¶¶ 54, 67, 74). That Nutrisystem suffered a $8.3 million aEBITDA loss during the Stub Period is not in dispute. (Doc. No. 228-19 at 10). Nor is it disputed that when Tivity reported its Q1 results on May 8, 2019—the first earnings release after acquiring Nutrisystem—it did not include that loss. (Doc. No. 227 ¶¶ 74, 76; Doc. No. 228-29 at 4). Instead, Tivity disclosed that it was reporting only on Nutrisystem's performance from March 8 to March 31, 2019, which constituted a positive $13.3 million in aEBITDA. (See Doc. No. 227 ¶¶ 74, 76;

Doc. No. 228-29 at 4). Lead Plaintiff argues that Defendants' omission of Nutrisystem's $8.3 million aEBITDA loss in the Stub Period, an omission it contends Defendants did not clear up for investors until the Corrective Disclosure on February 19, 2020, was materially misleading because it painted a faulty picture of Nutrisystem's success leading up to and after the acquisition.

Defendants now move for summary judgment, contending they had no duty, statutory or otherwise, to disclose Nutrisystem's $8.3 million aEBITDA loss in the Stub Period prior to February 19, 2020.[8] (Doc. No. 214 at 15–18). Defendants present evidence demonstrating that no statute, regulation, or GAAP required Tivity to disclose Nutrisystem's financial performance pre-merger. (Doc. No. 227 ¶¶ 76–78). Lead Plaintiff counters with expert testimony to dispute Defendants' arguments, asserting that the SEC required disclosure to inform investors of the proper context of Nutrisystem's performance at the time of its acquisition. (Doc. No. 229-68 at 13–15). Lead Plaintiff further argues that Defendants touting Nutrisystem's success and expectations to surpass its prior guidance rendered Tivity's initial disclosures omitting the Nutrisystem Stub Period loss misleading, therefore requiring its disclosure. (Doc. No. 226 at 14–15).

Defendants also contend the omitted information on the Nutrisystem Stub Period in Tivity's initial financial disclosures on the Nutrisystem acquisition was not material. In support, Defendants rely upon: (1) Tivity's initial disclosure results for Q1 2019, which indicated that it was only reporting on Nutrisystem's performance "for the 24-day period March 8, 2019 through March 31, 2019" (Doc. No. 227 ¶¶ 74–75); (2) Nutrisystem's full performance for Q1 2019, which

---

[8] Given the dispute of fact on this alleged material omission, see supra, the Court need not address Defendants' arguments they are entitled to summary judgment on the "synergy" and "guidance" statements. (Doc. No. 214 at 12, 14). In any event, the Court does not find these arguments legally relevant considering those challenged statements all relate to the disputed material omission on Nutrisystem's Stub Period performance.

13

was in line with previously reported guidance (id. ¶¶ 64, 86); (3) Tivity's Form 10-Q for Q1 2019, with *pro forma* financials showing that Nutrisystem had an $8.8 million net income loss (id. ¶ 83); and (4) Tivity's August and November 2019 disclosures showing Nutrisystem had an approximate $9 million aEBITDA loss for the pre-merger portion of Q1 2019. (Doc. No. 215-6 at 11; Doc. No. 227 ¶ 88).

In response, Lead Plaintiff counters with evidence that investors did not fully appreciate Tivity's limited initial disclosures on the Nutrisystem acquisition and subsequent disclosures of Nutrisystem's losses. Specifically, Lead Plaintiff presents evidence that: (1) Nutrisystem manipulated its financials to meet its prior guidance (Doc. Nos. 150-3, 150-4; Doc. No. 229-27 at 2 (discussing "how critical [it] is hitting the Q1 [EBITDA] guidance[,]" and asking "[w]hat can we cut to make the number"); Doc. No. 229-28 (discussing how Nutrisystem's aEBITDA number was formed without the Stub Period included); (2) Tivity's proffered *pro forma* financials did not disclose Nutrisystem's Stub Period $8.3 million aEBITDA loss (Doc. No. 229-68 ¶ 45 n.47; see Doc. No. 215-6 at 11; Doc. No. 227 ¶ 88); and (3) Tivity's August and November 2019 disclosures did not correct investors' perceptions about Nutrisystem's performance during the Stub Period (Doc. No. 215-48 at 2 ("We don't think that [the Nutrition EBITDA's $9 million headwind] has been fully appreciated by investors.")).

At this stage, viewing the facts in Lead Plaintiff's favor, it has established a genuine dispute of material fact on both prongs of the first element of its Nutrisystem Claim. First, Lead Plaintiff presents sufficient evidence to create a genuine dispute of material fact on whether Defendants had a duty to disclose Nutrisystem's Stub Period loss considering Tivity's prior misleading financial disclosures. Critically, it is undisputed that Tivity did not disclose Nutrisystem's Stub Period loss in its initial results for Q1 2019. There is also evidence that Defendants made this

14

omission while touting Nutrisystem's success and expectations to surpass its guidance. If the trier of fact credits this evidence, they could reasonably find Defendants had a duty to disclose the previously omitted information about Nutrisystem's Stub Period loss because that omission rendered the Q1 2019 results, and potentially other statements, incomplete or misleading. Given this, Lead Plaintiff has raised a genuine dispute of material fact on whether Defendants had a duty to correct its prior disclosure omitting Nutrisystem's poor Stub Period performance. See City of Monroe, 399 F.3d at 669.

Second, there is also sufficient admissible evidence in the record to raise a genuine dispute of fact on whether this omission was material to investors. True, Defendants' cited evidence demonstrates that at least some of the Nutrisystem loss was revealed through the *pro forma* statements and the August and November 2019 investor slides. And Defendants are correct that Lead Plaintiff "cannot state a claim of misrepresentation premised upon facts that were admittedly disclosed." (Doc. No. 214 at 25 n.8 (citing Sable v. Southmark/Evicon Capital Corp., 918 F. Supp. 324, 333 (S.D.N.Y. 1993)). However, there is competing evidence in the record demonstrating that the Nutrisystem Stub Period loss was not disclosed in Q1 2019, and that Defendants' *pro forma* and August and November 2019 disclosures did not clearly disclose Nutrisystem's Stub Period loss to correct investor understanding. Because there is sufficient evidence to raise a genuine dispute of material fact on whether explicit disclosure of the Nutrisystem $8.3 million aEBITDA loss would have significantly altered the total information available to investors, whether, when, and to what extent Defendants made a material omission in not disclosing that loss is a dispute of fact best resolved by the jury. Basic, 485 U.S. at 231–32; Sofamor, 123 F.3d at 400. Accordingly, Defendants' motion will be denied on this ground.

## 2. Goodwill Claim

Lead Plaintiff's Goodwill Claim is premised on the notion that Defendants sought to give investors a deceptively rosy impression of the success of the Nutrisystem acquisition by fraudulently misrepresenting Tivity's goodwill and Nutrisystem tradename values in its financial disclosures in 2019. See supra, Section I. Defendants argue Lead Plaintiff cannot show the first prong of this element, that Defendants made any misleading statements or omissions on this claim, given they complied with GAAP by evaluating impairment triggers each quarter, properly determined no impairment was required until year-end, and ensured those evaluations were affirmed as reasonable by Tivity's auditor, PwC. (Doc. No. 214 at 3–7; see Doc. No. 227 ¶¶ 4, 5, 8, 12, 16, 21–23, 18, 19, 22, 25, 26, 27–29, 30, 32, 36–44, 46–50)). Defendants further emphasize that accounting for these values requires significant judgment calls that cannot be deemed fraudulent absent extreme circumstances. (Doc. No. 214 at 4). In response, Lead Plaintiff takes issue with Defendants' characterization that its Goodwill Claim comes down to "the appropriate use of GAAP." (Doc. No. 26 at 17). Instead, Lead Plaintiff points to evidence that Defendants knew they overpaid for Nutrisystem and were aware that Nutrisystem's forecasts were false before closing the acquisition, as evidenced by Defendants lowering the 2019 expectations internally in February 2019. (Id. at 18).

The Court finds the question of whether there is a genuine dispute of material fact here to be a close call. Still, viewing the entire record before the Court in Lead Plaintiff's favor, the evidence presents more than just a hindsight critique of assumptions made by Defendants in calculating Tivity's goodwill and Nutrisystem tradename such that there is a genuine dispute of fact on whether Defendants made misleading or false statements in Tivity's financials. On one hand, Defendants present various pieces of evidence demonstrating their compliance with GAAP

16

in determining the goodwill and tradename values throughout the 2019 fiscal year, including statements from PwC. On the other, there is evidence in the record that Defendants were misleading PwC in their financial memoranda to hide the nutrition segment's poor performance.

For instance, Lead Plaintiff presents evidence that Tivity's interactions with KPMG, Tivity's valuation group, suggest it was trying to hide negative facts about the nutrition segment from PwC by reframing its financial calculations in a misleadingly favorable light. (See Doc. No. 228-62 at 5; Doc. No. 229-17 at 2 ("From a [profit and loss] perspective, you're actually better off not consolidating [Nutrisystem] for the [first] two months of the year . . ."); Doc. No. 228-56 (email stating it "may not be in [Tivity's] interest to show the [Nutrisystem] period prior to March 8"). Defendants place great weight on PwC's agreement with Tivity's accounting determinations in Q2 and Q3 2019, but PwC's accreditation of Defendants' financials loses its weight if Lead Plaintiff can show Defendants presented PwC with skewed data on the nutrition segment.

Further, Lead Plaintiff cites to internal communications at Tivity that, if credited by a jury, show Defendants harbored serious doubts about Nutrisystem's value late into 2019, but chose to conceal those doubts or delay acting on them in their financial reporting. As one example, there is evidence that Zier ratified Tivity's Forms 10-Q despite knowing the Nutrisystem values were premised on overly optimistic information. (Doc. No. 228-17 at 2–3; Doc. No. 228-22 at 2; Doc. No. 230-23 at 2; Doc. No. 230-59). In another example, Holland texted Tramuto about a conversation with a board member about "possibly pushing for earlier impairment." (Doc. No. 228-57 at 2). Hours later, Tramuto stated that in the impairment test, all Tivity needed was to get to "$90 million or more" of standalone Nutrisystem EBITDA for 2020, given the "best reason [is] to wait until [the 2020] diet season" to finish. (Doc. No. 229-24 at 2).

17

Viewing all this evidence in Lead Plaintiff's favor, there is a genuine dispute of material fact on whether Defendants made false or misleading statements about the value of Tivity's goodwill and the Nutrisystem tradename that the jury must resolve at trial.

## B. Second Element: Scienter

Defendants next contend they are entitled to summary judgment on the second element of the Nutrisystem and Goodwill Claims, scienter. "In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." Doshi v. Gen. Cable Corp., 823 F.3d 1032, 1039 (6th Cir. 2016) (citation and quotations omitted). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Frank v. Dana Corp., 646 F.3d 954, 959 (6th Cir. 2011) (quoting PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 681 (6th Cir. 2004), abrogated on other grounds by Matrixx, 563 U.S. at 48–50) (quotations omitted). Scienter requires "more than negligence and is akin to conscious disregard." Doshi, 823 F.3d at 1039 (citation and quotations omitted). When considering whether scienter is present, courts consider "a non-exhaustive list of nine factors:"

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

Id. at 1040 (quoting Helwig, 251 F.3d at 552).

Like materiality, scienter involves "[m]ixed questions of law and fact," and is "peculiarly within the province of the trier of fact[.]" SEC v. Merch. Cap., LLC, 483 F.3d 747, 766 (11th Cir.

2007) (citation omitted). Given this, "summary judgment is appropriate [only] if no reasonable jury could find that a defendant acted without scienter." SEC v. Watkins Pencor, LLC, 810 F. App'x 823, 830 (11th Cir. 2020) (citing SEC v. Lyttle, 538 F.3d 601, 603–04 (7th Cir. 2008)). For this reason, "it is unusual to grant summary judgment," unless "the nonmoving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation," SEC v. Ficken, 546 F.3d 45, 51 (1st Cir. 2008), which Lead Plaintiff has not done in this case.

### 1. Nutrisystem Claim

Turning to the Nutrisystem Claim, Defendants contend Lead Plaintiff cannot prove scienter for the statements that Lead Plaintiff alleges are misleading due to the omission of Nutrisystem's Stub Period aEBITDA loss.[9] (Doc. No. 214 at 19). Defendants' arguments on this point largely reflect those made on the first element. See supra, Section III.1.A.1. In addition, Defendants assert that they did not sell stock during the class period, supporting a finding that there was no scienter. (Doc. No. 214 at 19–21). In response, Lead Plaintiff refers to its arguments on the first element, see supra, Section III.1.A.1, and further notes that stock sales are unnecessary to show scienter. (Doc No. 226 at 24).

Here, the Court again finds there is a genuine dispute of material fact on scienter on the Nutrisystem Claim. For the reasons stated above, many of Defendants' arguments are disputed and are therefore insufficient to carry Defendants' burden here. See supra, Section III.1.A.1. Further, Defendants' argument that they did not buy stocks, while in their favor, is not dispositive considering the totality of the circumstances test scienter is subject to. (See Doc. No. 226 at 16 n.108 (citing In re LDK Solar Sec. Litig., 584 F. Supp. 2d 1230, 1247 n.6 (N.D. Cal. 2008) for the

---

[9] Because the Court already finds there is a genuine dispute on scienter on the Nutrisystem Claim, the Court need not address Defendants' additional arguments on this element further (Doc. No. 214 at 18–19). See supra, Section III.1.A.1.n.8.

proposition that "it is unnecessary for defendants to engage in insider trading . . . to establish scienter")). Based on the evidence in the record, there are various factual issues for the jury to consider, including: the closeness in time of the fraudulent omissions and the later disclosure of the Nutrisystem $8.3 million aEBITDA loss; whether Defendants disregarded the most current factual information about Nutrisystem's financial status before making statements pertaining to the success of its acquisition; and whether Defendants' purported disclosures prior to February 19, 2020 were done in a way that its negative implications could only be understood by those with a high level of sophistication. Helwig, 251 F.3d at 552.

Considering the record in Lead Plaintiff's favor, a reasonable juror could find that Defendants purposely misled investors into thinking the Nutrisystem acquisition was a success by omitting the Nutrisystem Stub Period loss in Tivity's initial financial disclosures and hiding that loss in subsequent disclosures. Platsis v. E.F. Hutton & Co., 946 F.2d 38, 40 (6th Cir. 1991). Given this, the Court does not find this to be one of the unusual circumstances in which summary judgment is appropriate on scienter. See Ficken, 546 F.3d at 51. Accordingly, Defendants' motion will be denied on scienter on the Nutrisystem Claim.

### 2. Goodwill Claim

The result is the same on Defendants' argument that it is entitled to summary judgment because Lead Plaintiff cannot show scienter on the Goodwill Claim. Defendants contend that Lead Plaintiff's theory of scienter, that Defendants "turned a blind eye to the long-lived intangible asset impairment indicators present," (Doc. No. 116 at 14), has been proven false by the evidence in the record. (Doc. No. 214 at 8). Defendants contend that the undisputed evidence showing that Tivity considered the relevant factors when performing the requirement impairment assessments in Q2 and Q3 of 2019 and performed an interim quantitative impairment test disproves Lead Plaintiff's

theory of scienter as a matter of law. (Id.). Further, Defendants assert that Tivity's reliance on PwC's review of its procedures, as well as Defendants' lack of stock sales, show there is no scienter. (Id. at 10–11). In response, Lead Plaintiff again relies on many of its arguments pertaining to the first element of its Goodwill Claim, citing to Tramuto's and Holland's discussions about the impairment testing and goodwill valuation process, Zier's affirmance of the Tivity Forms 10-Q, and Defendants' interactions with KPMG (Doc. No. 226 at 18–20). See supra, Section III.1.A.2.

Considering this evidence together and in Lead Plaintiff's favor, the Court finds there is a genuine dispute of fact on whether Defendants had the requisite scienter on the Goodwill Claim. As Defendants emphasize, there is evidence in the record suggesting Defendants did not have the requisite scienter to materially misstate the goodwill and Nutrisystem tradename values in Tivity's financials. For example, Tramuto and Holland did not themselves perform the Q2 and Q3 2019 impairment analyses. (Doc. No. 215-10; Doc. No. 215-16). Instead, Ryan Wagers ("Wagers"), Tivity's Chief Accounting Officer, and Marcus Heitor ("Heitor"), Tivity's Vice President of Accounting and Controller, handled the Q2 and Q3 assessments, respectively. (Doc. No. 215-10; Doc. No. 215-16). Wagers and Heitor both testified that they followed GAAP, and were under no pressure to reach a particular result. (Doc. No. 227 ¶¶ 51, 53, 54, 55, 76). Further, Defendants are correct that Tramuto and Holland simply signing SEC filings and Sarbanes-Oxley certifications is not, without more, evidence of scienter. Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1068 (9th Cir. 2008) (awareness of day-to-day workings does not establish scienter); In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087–88 (9th Cir. 2002) (same). And the undisputed fact that no individual Defendants sold shares during the class period weighs in Defendants' favor.

21

But that is not all that is contained in the record. Text messages indicating that Tramuto and Holland knew its goodwill was impaired yet tried to conceal it, emails indicating that Defendants worked with KPGM to mislead PwC, and emails demonstrating Zier reviewed Tivity's financial statements without consideration of Nutrisystem's prior losses, are sufficient to create a dispute of fact on scienter. See supra, Section III.1.A.2. Indeed, this evidence creates several genuine disputes of material fact, including: the divergence between internal commentary from Zier, Tramuto, and Holland and external statements on Tivity's goodwill and Nutrisystem's tradename; the closeness in time of Tivity's allegedly false financial disclosures on the nutrition segment and the later Corrective Disclosure; and the disregard of current factual information on the nutrition segment while making contemporaneous financial disclosures. Helwig, 251 F.3d at 552.

Viewing the record evidence under the totality of the circumstances, a reasonable juror could conclude Defendants intentionally misconstrued Tivity's goodwill and Nutrisystem tradename values to hide that the Nutrisystem acquisition failed. Given the conflicting evidence in the record, Defendant's motion will be denied on scienter for the Goodwill Claim.

### C. Zier's Liability on the Goodwill Claim

In another attack on the second element of Lead Plaintiff's Goodwill Claim, Defendants maintain that Zier cannot be liable because the evidence conclusively establishes that she is a "maker" of the material misrepresentations in question. (Doc. No. 214 at 11). In pertinent part, Rule 10b-5 prohibits "any person, directly or indirectly . . . to *make* any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b) (emphasis added). Rule 10b-5 counsels that the "maker of a statement" is any person "with ultimate authority over the statement, including its content and whether and how to communicate

22

it." <u>Janus Capital Grp. v. First Derivative Traders</u>, 564 U.S. 135, 142 (2011). In the post-<u>Janus</u> world, a maker of a statement is an individual who "signed the company's statement; ratified and approved the company's statement; or where there statement is attributable to the executive." <u>In re Fannie Mae 2008 Secs. Litig.</u>, 891 F. Supp. 2d 458, 472 (S.D.N.Y. 2012) (citations omitted); <u>see</u> <u>Omnicare</u>, 769 F.3d at 476 (among other things, scienter based on who issued the misrepresentation, authorized it, or ratified or tolerated it) (citations omitted).

Defendants now renew their arguments from the motion to dismiss stage that Zier is not a "maker" of the misrepresentations in the Goodwill Claim because she did not sign the Form 10-Qs, nor did she have involvement in preparing the financials or Tivity's accounting assessments. (Doc. No. 214 at 12; <u>see</u> Doc. No. 116 at 14–15). In response, Lead Plaintiff points to various pieces of evidence that, among other things, Zier is a "maker" under <u>Janus</u> based on her review and ratification of Tivity's Forms 10-Q. (Doc. No. 228-22 at 2 (Zier receiving an email requesting review and feedback of a Form 10-Q); Doc. No. 230-23 at 2 (same); Doc. No. 230-59 at 2 (same)). While scant, the Court must review this evidence in Lead Plaintiff's favor. In doing so, the Court finds Lead Plaintiff's proffered evidence barely sufficient to demonstrate that there is a genuine dispute of material fact on whether Zier "ratified and approved" Tivity's Form 10-Qs for the purposes of being a "maker" of the material misrepresentations the Goodwill Claim is premised upon. <u>Fannie Mae</u>, 891 F. Supp. 2d at 472; <u>see</u> <u>Omnicare</u>, 769 F.3d at 476. Accordingly, the Court rejects Defendants' argument that Zier is entitled to summary judgment on the Goodwill Claim on this ground.

### D. Sixth Element: Loss Causation

The Court turns to Defendants' final argument on the Nutrisystem and Goodwill Claims, that Lead Plaintiff cannot establish the sixth element—loss causation. "Loss causation is the causal

link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp., 830 F.3d 376, 384 (6th Cir. 2016) (citation and quotations omitted). "It partakes of the traditional elements of loss and proximate causation," in that "'a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor.'" Id. (quoting Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005). Defendants contend Lead Plaintiff's theory of loss causation fails on two grounds: (1) Lead Plaintiff cannot present evidence of loss causation; and (2) Lead Plaintiff is not entitled to damages resulting from the announcement of Zier's departure. (Doc. No. 214 at 21–23). The Court will address each argument in turn.

### 1. Evidence of Loss Causation

The class period in this case ends on February 19, 2020, when Tivity issued the Financial and Employment Disclosures. (Doc. No. 105 ¶¶ 14–16). There is no dispute that shortly thereafter, Tivity's stock price plummeted—more than a 45% one-day drop in share value. (Doc. No. 230-12). Lead Plaintiff asserts this price collapse was caused by the market learning the truth about Defendants' fraud, given the February 19, 2020 Corrective Disclosure revealed: (1) Nutrisystem's $8.3 million aEBITDA loss in the Stub Period; (2) a $337.1 million impairment charge to the goodwill and tradename related to Nutrisystem, confirming those assets had been previously overvalued; (3) poor financial results from Q4 2019, particularly on the Nutrisystem segment; (4) sharply-reduced earnings guidance for 2020; and (5) Tramuto's termination and Krausz's resignation. (Doc. No. 215-54; Doc. No. 228-19).

Defendants argue that Lead Plaintiff cannot show loss causation based on the Corrective Disclosure, given Lead Plaintiff's putative expert, Scott Dalrymple ("Dalrymple"), does not

disaggregate the "corrective" and "non-fraudulent" information in the Corrective Disclosure to determine what amount of Tivity's stock decline, if any, is attributable to Defendants' alleged fraud. (Doc. No. 214 at 21–22). Specifically, Defendants contend Dalrymple's failure to disaggregate items like Tivity's Q4 and 2019 fiscal year results and executive departures, among other things, from the "corrective" information in the Corrective Disclosure dooms Lead Plaintiff's claim. (Id.; see Doc. No. 132-1). In opposition, Lead Plaintiff contends both Defendants' characterization of Dalrymple's reports and the scope of the fraud alleged are inaccurate. (Doc. No. 226 at 22–23).

Defendants are correct that Lead Plaintiff must show that its "losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." In re Williams Sec. Litig.-WCG Subclass, 558 F.3d 1130, 1137 (10th Cir. 2009). However, a brief review of Dalrymple's reports confirms that Defendants' position may, to some degree, be a mischaracterization of the record. As Lead Plaintiff emphasizes, Dalrymple states that he "expressly disaggregates the impact of [at least some] non-fraud related information," including the Healthcare segment financial information, and market and industry factors. (Id.; Doc. No. 228-4 ¶¶ 105–06). Further, Dalrymple expressly determined Tramuto's and Krausz's departures had "limited, if any, negative impact on Tivity's share price[.]" (Id. ¶ 104 n.226). In any event, Dalrymple opines that the purported "non-fraud" factors that remain in his analysis— Tivity's Q4 and 2019 financials, its projections for 2020, and the departures of Tramuto and Krausz— are appropriately considered as within the "zone of risk" concealed by Defendants' fraud. (Id. ¶¶ 11, 70, 94, 100, 104–06).

Defendants do not argue that items within the "zone of risk" of alleged fraud cannot be accounted for in the loss causation analysis. Lentell, 396 F.3d at 172 (allowing for losses within

25

the zone of risk concealed by a misrepresentation or omission). Nor do Defendants produce an alternative quantification of the drop attributable to non-fraud factors, or explain whether the aggregation that Dalrymple *does* perform, limited as it may be, is deficient or facially unreliable. (Doc. No. 214 at 22). These omissions make Defendants' argument here distinguishable from the non-binding cases upon which they rely. See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA), LLC, 752 F.3d 82, 95–97 (1st Cir. 2014) (finding district court did not abuse its discretion in excluding the plaintiff's expert testimony that "made a judgment call as to confounding information without any methodological underpinning"); Phillips v. Scientific-Atlanta, Inc., 489 F. App'x 339, 342–43 & n.4 (11th Cir. 2012) (affirming district court's grant of summary judgment where plaintiff's expert did not separate confounding factors from the alleged fraud and plaintiff failed to argue that confounding factors were part of the fraud disclosure to the district court). Ultimately, Defendants fail to both fully appreciate the nuance of Dalrymple's analysis and to explain why his analysis is insufficient. Given this, Defendants do not carry their burden to establish why they are entitled to summary judgment. Rodgers, 344 F.3d at 595.

What the parties dance around, and what is of great concern to the Court, is the admissibility of Dalrymple's opinions. Although it is evident from the face of Dalrymple's reports that he made some efforts to disaggregate the losses attributable to Defendants' fraudulent and non-fraudulent activity, the extent and reliability of the methodology in doing so is very unclear. (See generally Doc. No. 228-4). For example, Dalrymple opines, without more, that he has "not seen evidence that the cost of executive terminations and accelerated replacement of Mr. Tramuto materially affected earnings expectations." (Id. ¶ 104 n.226). The Court is also troubled that Dalrymple seems to rely on Lead Plaintiff's definition of what factors were within the zone of risk, rather on his own expert analysis. (Id. ¶ 104 ("I understand Plaintiff alleges the executives'

departures were within the zone of risk[.]")).  At bottom, the Court is skeptical that Dalrymple did a sufficiently rigorous analysis of the record for his opinions to be reliable for presentation to a jury.  The belated authority Lead Plaintiff relies upon in support of the contrary does little to assuage these concerns.  See Grae v. Corr. Corp. of Am., 2021 WL 1100799, at *20–22 (M.D. Tenn. Mar. 23, 2021) (finding Dalrymple's report that did not separate information because it was within the zone of risk of the fraud alleged—which had already been verified as reliable after a Daubert hearing—sufficient to demonstrate a dispute of fact on loss causation in a case where "there was no sudden, comprehensive corrective disclosure" that contained potentially non-fraud related news).

The Court is aware of and has seriously considered that "[a]n expert's report is not a talisman against summary judgment."  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  Still, there is no Daubert motion before the Court, and Defendants do not challenge the reliability of Dalrymple's methods at this time.  Without more from Defendants as the movant, the Court is inclined to follow the general guidance to be wary of granting summary judgment "[w]here, as here, there are conflicting expert reports presented" on a given issue.  See Harris v. Provident Life & Accident Ins. Co., 310 F.2d 73, 79 (2d Cir. 2002) (quotations omitted).  Because this stage of the proceedings requires this Court to view all of the evidence in Lead Plaintiff's favor, without "weigh[ing] the evidence, judg[ing] the credibility of [the] witness[], or determin[ing] the truth of the matter[,]" the Court must give Dalrymple's reports credence.  Anderson, 477 U.S. at 249.  Accordingly, Defendants' motion will be denied on this point.

### 2.  Damages for Zier's Departure

Defendants next argue that summary judgment is warranted to the extent Lead Plaintiff seeks damages resulting from the announcement of Zier's departure.  (Doc. No. 214 at 23–24).

27

Defendants assert that Lead Plaintiff's efforts to recoup these damages are inappropriate given it did not plead this theory of liability, nor can it show it is successful on the merits. (Id.). In response, Lead Plaintiff argues that the "formidable pleading requirements" of the PSLRA do not apply to loss causation; Lead Plaintiff sufficiently pled Zier's departure in multiple paragraphs in the Complaint; and there is ample evidence for a jury to conclude her termination was "within the zone of risk concealed by Defendants' fraud[.]" (Doc. No. 226 at 23).

Here, the Court assumes Lead Plaintiff did sufficiently plead that Zier's departure was within the zone of risk of Defendants' alleged fraud. Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) (a plaintiff must provide a defendant only "with some indication of the loss and the causal connection that the plaintiff has in mind" at the pleading stage); Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 157 (2d Cir. 2007) (a plaintiff must show "a sufficient connection between [the fraudulent conduct] and the losses suffered"). Still, applying the loss causation principles described above, see supra, Section III.1.D, the Court agrees with Defendants that there is no evidence that Tivity's announcement of Zier's departure revealed Defendants' fraud such that it caused Tivity's inflated stock price to dissipate, negating Lead Plaintiff's assertion it is entitled to such damages. See Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 726 (11th Cir. 2012) (plaintiff must show that the materialization of the fraudulently concealed risk caused the price inflation to dissipate).

The pleadings, briefing, and evidence in the record all support this conclusion. Indeed, the entire premise of Lead Plaintiff's Section 10(b) and Rule 10b-5 claim is that the Corrective Disclosure revealed—for the *first* time—the fraudulent conduct Defendants committed as relating to the Nutrisystem and Goodwill Claims. (Doc. No. 105 ¶¶ 14–16). Lead Plaintiff doubles down on this in its briefing, as it argues that Tivity's various disclosures throughout 2019 (the *pro forma*

28

financials, and the August and November 2019 disclosures) did not reveal any of Defendants' fraud prior to the Corrective Disclosure in February 2020. (Doc. No. 226 at 13, 15). Further, the plain language of Tivity's announcement over Zier's departure makes no mention of any of the fraud alleged. (See Doc. No. 215-51 at 3). Regardless of whether Zier departed from Tivity to "pursue other career opportunities" or because of "Nutrisystem's financial performance," (see Doc. No. 227 ¶ 97), there is no evidence in the record demonstrating that investors would have attributed her departure to the Nutrisystem and Goodwill fraud. Lead Plaintiff's references to Defendants' internal comments about Zier's time at Tivity does not change this. (See Doc. No. 226 at 7).

On the record before the Court, Lead Plaintiff has at best shown that Zier's departure "stirred investors' concerns that other unknown problems were lurking in [Tivity's] past." Omnicom, 597 F.3d at 514. This generalized investor reaction to Zier's departure accounting for an "abnormal return of $2.23 per share[,]" by Dalrymple's calculation, (Doc. No. 228-4 ¶ 89), is "far too tenuously connected—indeed, by a metaphorical thread—to the" Nutrisystem and Goodwill Claims to support liability. Omnicom, 597 F.3d at 514; c.f. In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 587 (S.D.N.Y. 2014), aff'd, 604 F. App'x 62 (2d Cir. 2015) (dismissing Section 10(b) claim where the plaintiff "d[id] not allege that the announcement of [the CEO's] resignation itself revealed any fraud"); Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc., 645 F. Supp. 2d 210, 229 (S.D.N.Y.2009) ("Standing alone, the announcement of the departure of an officer, without explanation, would not alert investors to any improprieties so as to allege loss causation."). Accordingly, the Court will grant Defendants' motion on the damages Lead Plaintiff seeks connected to the announcement of Zier's departure from Tivity.

### 2. Section 20(a) Claim

Lead Plaintiff has also made allegations against Defendants under Section 20(a) of the Securities Exchange Act. (Doc. No. 105 ¶¶ 207–11). Section 20(a) establishes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable" for a violation of securities fraud. 15 U.S.C. § 78t(a). By its plain terms, a defendant may only be liable under Section 20(a) if there is liability derived from an underlying securities violation. ACA Financial Guaranty Corp. v. Advest, Inc., 512 F.3d 46, 67 (1st Cir. 2008); see Dougherty, 905 F.3d at 984 (Section 20(a) claim is derivative of Section 10(b) claim). Based on this, Defendants assert they are entitled to summary judgment on Lead Plaintiff's Section 20(a) claims because they "cannot survive without a Section 10(b) claim." (Doc. No. 214 at 24). Because the Court has found there are genuine disputes of material fact on Lead Plaintiff's Nutrisystem and Goodwill Claims, Defendants' argument fails here. See supra, Section III.1.A.

### 3. Scheme Claim

Finally, Lead Plaintiff brings a scheme liability claim against Defendants. Rule 10b-5 provides for scheme liability claims against any person who "employ[s] any device, scheme, or artifice to defraud" or "engage[s] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(a), (c). "A scheme-liability claim is [] different and separate from a nondisclosure claim[,]" Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc., 83 F.4th 514, 525 (6th Cir. 2023) (citations omitted), as it "encompass[es] conduct beyond disclosure violations." Benzon v. Morgan Stanley Distribs., Inc., 420 F.3d 598, 610 (6th Cir. 2005). Defendants argue they are entitled to summary judgment on Lead Plaintiff's scheme liability claim for four reasons: (1) the scheme claim is based on the same facts as Lead Plaintiff's

claim for alleged misstatements and omissions; (2) Lead Plaintiff has not identified a public disclosure of the alleged "scheme"; (3) there is no evidence of any "intentional or willful conduct" as necessary for this claim; and (4) to the extent the "scheme" claim is based on the same challenged statements, summary judgment on those statements "would likewise preclude 'scheme' liability as to those statements." (Doc. No. 214 at 24–25).

The Court need not dwell on these arguments, as none of them satisfy the test for summary judgment. Defendants' first argument about Lead Plaintiff's *allegations*, rather than its lack of *evidence* in support of its scheme claim, is far from sufficient to satisfy their burden at the summary judgment stage. Rodgers, 344 F.3d at 595. The Court also easily disposes of Defendants' second argument, as Defendants' mere citation to Stoneridge Inv. Partners, LLC v. Sci-Atlanta, 552 U.S. 148 (2008) in support of their argument is again insufficient to carry their burden. See Indiana Pub. Ret. Sys. v. AAC Holdings, Inc., 2023 WL 2592134, at *18 (M.D. Tenn. Feb. 24, 2023) (Stoneridge has "created confusion among the lower courts"); Rodgers, 344 F.3d at 595. On Defendants' third and fourth arguments, these fail because Lead Plaintiff raises a genuine dispute of material fact on both issues. See supra, Sections III.1.A, B.

### 4. Request to Shorten Class Period

Defendants' last argument is that "at a minimum, the Court should grant Defendants summary judgment on (i) the Goodwill Claim on any class member acquiring Tivity stock prior to August 8, 2019 . . . and (ii) on the Nutrisystem Claim on any class member (a) acquiring Tivity stock before May 8, 2019 . . . and (b) acquiring Tivity stock after August 7, 2019[.]" (Doc. No. 214 at 25). The Court shares Lead Plaintiff's confusion on whether Defendants seek to "shorten the class period" for the purposes of judgment, or to be granted partial summary judgment on the portions of Lead Plaintiff's claims presented. (See Doc. No. 226 at 24–25). To the extent

Defendants want the Court to reconsider its decision on class certification, they have not properly raised or briefed that issue. To the extent Defendants seek partial summary judgment on these bases, they have not pointed to a single portion of the record demonstrating there is no genuine dispute of material fact on these issues. (See Doc. No. 214 at 25). In failing to do so, Defendants do not carry their burden. Rodgers, 344 F.3d at 595. Accordingly, the Court will deny Defendants' motion on this argument.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. No. 213) will be granted on Lead Plaintiff's requested damages pertaining to Zier's departure and will be denied in all other respects. Because the Court has considered the authority cited in Lead Plaintiff's Motion to Supplement Status Conference (Doc. No. 284), Lead Plaintiff's motion will be granted.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE