# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| ROBERT STROUGO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>TIVITY HEALTH, INC., DONATO TRAMUTO, ADAM C. HOLLAND, and DAWN ZIER,<br><br>Defendants. | Civil Action No. 3:20-CV-00165 |

**EXPERT REPORT OF PAUL A. GOMPERS, PH.D.**

**February 7, 2023**

# Table of Contents


I. Qualifications ..... 1

II. Assignment and Compensation ..... 2

III. Summary of Opinions ..... 3

IV. Background and Summary of Allegations ..... 6

A. Tivity and the Nutrisystem, Inc. Acquisition ..... 6

B. Summary of Plaintiff's Allegations ..... 8

1. Alleged Misrepresentations Regarding the Nutrisystem Claim ..... 8

2. Alleged Misrepresentations Regarding the Goodwill Claim ..... 9

3. Plaintiff's Alleged Corrective Disclosure: Tivity's 4Q 2019 and Fiscal Year 2019 Earnings Release on February 19, 2020 ..... 10

C. Mr. Dalrymple's Opinions ..... 11

V. Market Efficiency and Valuation ..... 15

VI. Mr. Dalrymple Fails to Reliably Establish That Investor Losses (If Any) Were Caused by the Alleged Misrepresentations ..... 17

A. Economic Analysis of Loss Causation and Damages ..... 18

B. Mr. Dalrymple Has Not Reliably Demonstrated That Any Losses Were Caused by Alleged Misrepresentations for the Nutrisystem Claim ..... 19

1. Tivity Disclosed Nutrisystem's 1Q 2019 Financial Performance Prior to the Alleged Corrective Disclosures ..... 21

2. Tivity's Internal Projections Were Consistent with its Disclosed Guidance ..... 33

3. Mr. Dalrymple Does Not Reliably Demonstrate That Any Investor Losses on December 9, 2019 or February 20, 2020 Were Caused by the Alleged Misrepresentations for the Nutrisystem Claim ..... 35

C. Mr. Dalrymple Has Not Reliably Demonstrated That Any Losses Were Caused by Alleged Misrepresentations for the Goodwill Claim ..... 51

D. Mr. Dalrymple Fails to Disentangle the Stock Price Decline on February 20, 2020 Attributable to the Nutrisystem Claim Compared to the Goodwill Claim ..... 55

VII. Mr. Dalrymple's Inflation and Damages Analysis is Flawed and Unreliable ..... 56

A. Economic Analysis of Inflation and Damages ..... 56

B. Mr. Dalrymple Has Not Reliably Measured Damages (If Any) in This Matter ..... 57

1. Overview of Mr. Dalrymple's Purported Per-Share Damages Methodology ..... 58

2. Mr. Dalrymple's "Zone of Risk" Assertion Is Unsupported and Provides No Reliable Basis for Measuring Economic Damages........................................ 59

3. Mr. Dalrymple's Estimates of Inflation Dissipation Are Flawed and Unreliable........................................................................................................ 61

4. Mr. Dalrymple Does Not Reliably Demonstrate That Tivity's Stock Price Was Inflated at the Start of the Class Period ....................................................... 62

5. Mr. Dalrymple Fails to Reliably Establish That the Back-Casting Methodology is Appropriate in This Matter ........................................................ 63

VIII. Damages Are No More than $1.67 Per Share.................................................................. 64

## I. Qualifications

1. I am the Eugene Holman Professor of Business Administration at the Harvard Business School. I teach courses and conduct research in corporate finance, the structure and governance of public and private companies, valuation of companies, and the behavior of institutional investors, as well as entrepreneurial finance and management, including the venture capital and private equity industry, young start-ups, and high-growth-potential firms. I teach these courses to Ph.D., M.B.A., Executive Education, and undergraduate students. Before joining the Harvard faculty in 1995, I was a member of the faculty at the University of Chicago Graduate School of Business, where I taught entrepreneurial finance from 1993 to 1995. I received an A.B. in Biology from Harvard College in 1987, an M.Sc. in Economics from Oxford University in 1989, and a Ph.D. in Business Economics from Harvard University in 1993.

2. In my career as an academic, I have written numerous case studies and technical notes, and published numerous articles in peer-reviewed finance and economics journals on valuation, venture capital and private equity industries, and entrepreneurial finance. Many of these case studies, notes, and research articles have directly examined financial and valuation issues of companies. I am the coauthor of seven books: *The Venture Capital Cycle* (editions 1 and 2), published by MIT Press; *The Money of Invention*, published by Harvard Business School Press; *Entrepreneurial Finance: A Casebook*, published by John Wiley & Sons, Inc.; *Private Equity: A Casebook*, published by Anthem Press, *Advanced Introduction to Private Equity*, published by Edward Elgar Publishing, and *Financing the Entrepreneurial Venture*, forthcoming by Anthem Press. I am or have been an Associate Editor of *The Journal of Finance*, *Small Business Economics*, and the *Journal of Private Equity*, and a referee for a number of academic journals, including the *Journal of Financial Economics*, the *Journal of Political Economy*, the *Quarterly Journal of Economics*, the *Review of Financial Studies*, and the *Journal of Law and Economics*. I have also served on the boards of directors or advisory boards of several companies and investment firms, including ZEFER, Mercanteo, OnTheFrontier.com, Spur Capital Partners, Knightsbridge Advisers, Khosla Ventures, Highland Capital Consumer Fund, and New Capital Partners. My CV is attached as **Appendix A** to this report.

3. I have served as an expert on the valuation of public and private companies, factors affecting public company security prices, whether securities markets were efficient, and the custom and practice of private equity and venture capital organizations. I have been qualified to serve as an expert witness in matters pertaining to valuation, securities, and the private equity and venture capital industry, and in matters in which I provided testimony regarding alleged damages in a variety of industries. **Appendix B** contains a list of my testimony over the last four years.

## II. Assignment and Compensation

4. I have been retained by counsel for Tivity Health, Inc. ("Tivity" or the "Company"), Donato Tramuto, Adam Holland, and Dawn Zier (collectively with Tivity, the "Defendants"), to review and respond to the Expert Report of W. Scott Dalrymple, CFA, dated January 10, 2023 ("Dalrymple Report").[1] Specifically, I have been asked to evaluate Mr. Dalrymple's opinions regarding loss causation and damages.

5. In forming the conclusions and opinions set forth in this report, I have relied on my knowledge of finance, economics, and business valuation, my prior experience, and my academic research. In performing my analysis in this matter, I have examined a variety of materials, including, but not limited to, the Dalrymple Report, the Expert Report of W. Scott Dalrymple, CFA, dated October 26, 2021 ("Dalrymple Class Certification Report"), the Expert Report of W. Scott Dalrymple, CFA, dated January 21, 2022 ("Dalrymple Class Certification Rebuttal Report"), legal pleadings, documents produced through discovery in this case, depositions, academic literature, analyst reports, public press, Securities and Exchange Commission ("SEC") filings, and various public data. A list of the documents and data that I have considered in forming my opinions is attached hereto as **Appendix C**.

6. I am being compensated for this matter at an hourly rate of $1,250. In addition, under my direction, Cornerstone Research has performed research and other support work for me on this matter. My analyses, opinions, and conclusions are based solely on the work performed by me and those under my direction. I have received compensation, and anticipate that I may receive

[1] I previously submitted an expert report in this matter addressing class certification issues (Expert Report of Paul A. Gompers, Ph.D., dated November 30, 2021, "Gompers Class Certification Report").

future compensation, from Cornerstone Research that reflects, among other things, my relationship with that firm as an expert on this and other corporate and client matters. My compensation is not contingent upon the conclusions I reach or on the outcome of this matter or any other matter. My work is ongoing, and I reserve the right to modify or supplement my opinions in the event further information becomes available.

## III. Summary of Opinions

7. Mr. Dalrymple fails to reliably establish that investor losses (if any) were caused by the alleged misrepresentations for either the Nutrisystem Claim or the Goodwill Claim.

**Nutrisystem Claim**

8. I understand that Plaintiff's alleged misrepresentations for the Nutrisystem Claim are centered around Nutrisystem's performance between January 1, 2019 and March 7, 2019—prior to the closing of Tivity's acquisition of Nutrisystem (the "Transaction")—and specifically include the lack of a disclosure of Nutrisystem's adjusted EBITDA[2] during that period ("Pre-Transaction 1Q 2019 Adjusted EBITDA") and allegedly misleading FY 2019 financial guidance for the Nutrition segment (*see* Section IV.B.1). Tivity disclosed Pre-Transaction 1Q 2019 Adjusted EBITDA by August 7, 2019. Given that Nutrisystem's adjusted EBITDA between January 1, 2019 and March 7, 2019 was already publicly disclosed by August 7, 2019, in an efficient market, repeated disclosure of the Pre-Transaction 1Q 2019 Adjusted EBITDA would not have caused Tivity's stock price decline on February 20, 2020. Mr. Dalrymple fails to link other elements of the February 19, 2020 disclosure (4Q 2019 financial results, fiscal year 2020 guidance, impairment charges, and executive departures) to the alleged misrepresentations for the Nutrisystem Claim. He does not reliably establish that any, let alone all, of the Nutrition segment financial information was anything other than timely disclosed, or link it to specific alleged misrepresentations earlier in the alleged class period (the "Class Period"). He fails to acknowledge that the fiscal year 2019 ("FY 2019") guidance Tivity disclosed in connection with its quarterly earnings releases prior to the end of the Class Period—specifically, on May 8, 2019,

[2] Tivity defines adjusted EBITDA as "earnings before interest, taxes, depreciation and amortization ('EBITDA') excluding acquisition and integration costs and restructuring and related charges. *See*, Tivity Form 10-Q for Quarterly Period Ended March 31, 2019, filed on May 9, 2019 ("Tivity 1Q 2019 10-Q"), p. 26.

August 7, 2019, and November 12, 2019—was generally consistent with Tivity's contemporaneous internal forecasts. To the extent that some portion of the allegedly corrective information for the Nutrisystem Claim disclosed on February 19, 2020 was not disclosed in a timely manner, Mr. Dalrymple has not attempted to disentangle Tivity's stock price reaction caused by the information disclosed in a timely manner from that not disclosed in a timely manner. This analysis is needed to determine whether the untimely information caused any portion of Tivity's stock price decline on February 20, 2020.

9. For December 9, 2019, Mr. Dalrymple fails to reliably establish that the stock price reaction to Ms. Zier's departure reflects anything but the materialization of a disclosed risk, does not link the resignation of Ms. Zier to the alleged misrepresentations, and does not reliably establish that the resignation would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented). He simply assumes loss causation.

10. In conclusion, Mr. Dalrymple has not proven that any investor losses on December 9, 2019 or February 20, 2020 were caused by alleged misrepresentations for the Nutrisystem Claim.

**<u>Goodwill Claim</u>**

11. I understand that Plaintiff alleges that Tivity should have announced an impairment charge as part of its 2Q 2019 earnings release on August 7, 2019 (*see* Section IV.B.2). However, Mr. Dalrymple provides no analysis to support that any impairment charge could have been or should have been announced on August 7, 2019 or on any other date prior to February 19, 2020, let alone the amount of any such charge. Notably, I understand that Tivity evaluated whether any impairment charges were needed to be taken in connection with both Tivity's 2Q 2019 and 3Q 2019 financial statements and concluded that there was no impairment of Nutrisystem's tradename or its goodwill in connection with the Transaction as part of its 2Q 2019 and 3Q 2019 financial statements. These conclusions were reviewed by PricewaterhouseCoopers ("PwC"),

the Company's external auditor, who "[did] not deem management's position unreasonable."[3] Mr. Dalrymple does not mention these findings and does not reliably establish that the February 19, 2020 impairment charge represented a revelation of the relevant truth regarding earlier alleged misrepresentations for the Goodwill Claim rather than a timely disclosure of an impairment.

12. To the extent some portion of the allegedly corrective information for the Goodwill Claim disclosed on February 19, 2020 was not disclosed in a timely manner, Mr. Dalrymple has not attempted to disentangle Tivity's stock price reaction caused by the information disclosed in a timely manner from that not disclosed in a timely manner. This analysis is needed to determine whether the untimely information caused any portion of Tivity's stock price decline on February 20, 2020.

13. In addition, the "impairment triggers"[4] that Mr. Dalrymple mentions were publicly disclosed by August 7, 2019, and thus, in an efficient market, would not have caused Tivity's stock price decline on February 20, 2020.

14. Mr. Dalrymple has not reliably demonstrated that there are any damages in this matter. Even assuming Mr. Dalrymple had reliably measured the losses caused by the purportedly corrective information, which he has not, he fails to reliably measure inflation (if any) in Tivity's stock price due to the alleged misrepresentations on each day during the Class Period, and, therefore, his analysis of damages is flawed and unreliable, for at least the following reasons. *First*, Mr. Dalrymple's "zone of risk" assertion is unsupported and provides no reliable basis for measuring economic damages. *Second*, Mr. Dalrymple's estimates of inflation dissipation on December 9, 2019 and February 20, 2020 are flawed and unreliable. *Third*, Mr. Dalrymple fails to support his conclusion that Tivity's stock price was inflated at the start of the Class Period. *Fourth*, Mr. Dalrymple fails to reliably establish that the back-casting methodology he uses is appropriate in this matter.

---

[3] Tivity Audit Committee Meeting materials, August 1, 2019, TVTY_STROUGO0017544–631 at 557, 587; Tivity Audit Committee Meeting package, November 4, 2019, TVTY_STROUGO0018844–9008 at 8939. I also understand that Mr. Michael Maloney in this matter has examined the Company's analyses and concluded that, in both 2Q 2019 and 3Q 2019, "the analyses Tivity performed and the conclusions it reached regarding whether the Nutrisystem goodwill and tradename assets required an impairment charge… were reasonable and complied with GAAP" and that "PwC's review of Tivity's analyses and conclusions provided additional independent corroboration supporting Tivity's conclusions." Expert Report of Michael F. Maloney, CPA, CFF, CFE dated January 10, 2023 ("Maloney Report"), ¶¶ 12, 14.

[4] Dalrymple Report, ¶ 46.

15. Notwithstanding that Mr. Dalrymple has neither reliably established loss causation nor reliably measured damages in this matter, assuming that the finder of fact determines that Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA as part of the Company's earnings release on May 8, 2019 and that failing to disclose this information misled investors by depriving them of information required to accurately forecast the Nutrition segment's FY 2019 performance—as Plaintiff alleges—damages are no more than $1.67 per share for purchases between May 8, 2019 and August 7, 2019.

## IV. Background and Summary of Allegations

### A. Tivity and the Nutrisystem, Inc. Acquisition

16. Tivity is a health and fitness company founded and incorporated in Delaware in 1981, with its headquarters located in Franklin, Tennessee.[5] During the Class Period,[6] Tivity's common stock traded on the Nasdaq stock exchange under the symbol TVTY.[7]

17. Prior to the Class Period, Tivity had three programs that led to 2018 revenue of $606 million: SilverSneakers, Prime Fitness, and WholeHealth Living.[8] SilverSneakers senior fitness program is offered to members of Medicare Advantage and Medicare Supplement plans, and accounted for approximately 80% of total revenues in FY 2018.[9] Prime Fitness is a fitness facility access program that is offered "through contracts with commercial health plans, employers, and other sponsoring organizations that allow their members to individually purchase

[5] Tivity Form 10-K for Fiscal Year ("FY") Ended December 31, 2018, filed on February 26, 2019 ("Tivity 2018 10-K"), p. 4. Tivity was formerly known as Healthways prior to rebranding in January 2017. *See*, "Healthways, Inc. is now Tivity Health, Inc.," Tivity Press Release, January 10, 2017.

[6] I understand that the class has not yet been certified in this matter. For the purposes of this report, I assume that the class will be certified and the Class Period is March 8, 2019 to February 19, 2020.

[7] Tivity 2018 10-K, p. 20.

[8] Tivity 2018 10-K, pp. 4, 22; "Our Company," Tivity, https://www.tivityhealth.com/about/our-company/, accessed on February 6, 2023.

[9] Tivity 2018 10-K, p. 27. SilverSneakers program "promotes greater health engagement and accountability by providing members with regular exercise (strength training, aerobics, flexibility) and social opportunities at up to 22,000 locations nationwide—all at no additional cost to them." *See*, "SilverSneakers–Empowering Active Aging," Tivity, https://www.tivityhealth.com/brands/silversneakers/, accessed on February 6, 2023.

the program," and accounted for approximately 17% of total revenues in FY 2018.[10] WholeHealth Living program is sold primarily to health plans, and offers "a continuum of services related to complementary, alternative, and physical medicine," and accounted for 3% of total revenues in FY 2018.[11]

18. Tivity's customers for these programs include health insurance companies that sell insurance plans with access to these programs to their members. In 2018, Humana, Inc., United Healthcare, Inc., and Blue Cross Blue Shield Association were Tivity's largest customers, accounting for approximately 45% of revenues from continuing operations.[12]

19. On December 10, 2018, Tivity announced that it had entered into a definitive agreement to acquire Nutrisystem Inc. ("Nutrisystem"), a provider of health, wellness, and weight management products and services, in a cash and stock transaction.[13] The Transaction had a $1.3 billion enterprise value.[14] According to the press release, Nutrisystem's stockholders would receive $38.75 per share in cash and 0.2141 Tivity shares for each share of Nutrisystem common stock.[15] The implied Transaction consideration of $47 per share represented a 30% premium based on the volume-weighted average price for Nutrisystem over the prior five trading days.[16] On March 5, 2019, Nutrisystem stockholders voted to approve the acquisition,[17] and on March 8, 2019, the acquisition was completed.[18]

---

[10] Tivity 2018 10-K, p. 27. Prime Fitness offers "an affordable, flexible and convenient fitness solution, free of gym contracts, designed to help members overcome excuses and get moving toward better health. Through a nationwide network of thousands of fitness locations, Prime offers basic multi-access to a wide range of gyms, sports facilities, specialty studios and more near home, work and where they travel." *See*, "Prime Fitness–Supporting Regular Exercise," Tivity, https://www.tivityhealth.com/brands/prime-fitness, accessed on February 6, 2023.

[11] Tivity 2018 10-K, pp. 4, 24, 27 ("WholeHealth Living network includes relationships with approximately 80,000 complementary, alternative, and physical medicine practitioners to serve individuals through health plans and employers who seek health services such as chiropractic care, acupuncture, physical therapy, occupational therapy, speech therapy, and more.").

[12] Tivity 2018 10-K, p. 5.

[13] "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," PR Newswire, December 10, 2018.

[14] "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," PR Newswire, December 10, 2018.

[15] "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," PR Newswire, December 10, 2018.

[16] "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," PR Newswire, December 10, 2018.

[17] "Tivity Health Completes Acquisition of Nutrisystem," PR Newswire, March 8, 2019, p. 2.

[18] "Tivity Health Completes Acquisition of Nutrisystem," PR Newswire, March 8, 2019; Tivity Form 8-K, filed on March 8, 2019, Ex. 99.1, p. 2 ("In connection with the Merger, Tivity Health issued approximately 6.3 million Tivity Health Shares and paid an aggregate of approximately (a) $1.1 billion in cash to former Nutrisystem stockholders in exchange for Nutrisystem Shares and (b) $5.8 million in connection with the cash settlement of options to purchase Nutrisystem Shares. Additionally, in connection with Tivity Health's assumption of equity awards of Nutrisystem, Tivity Health issued approximately 260,000 time-vesting restricted Tivity Health Shares to former holders of awards of restricted Nutrisystem Shares and approximately 920,000 time-vesting restricted stock units to former holders of awards of Nutrisystem performance-based restricted stock units.").

20. Following the Transaction, Tivity had two reportable business segments: Healthcare and Nutrition.[19] The Healthcare segment was comprised of Tivity's legacy business, which included SilverSneakers, Prime Fitness and WholeHealth Living.[20] The Nutrition segment was comprised of Nutrisystem's legacy business, which included Nutrisystem and the South Beach Diet.[21]

## B. Summary of Plaintiff's Allegations

21. I understand that Plaintiff in this matter alleges that Tivity made false and misleading statements and omissions during the Class Period regarding the success of the Nutrisystem acquisition. Plaintiff claims that the Company's alleged misrepresentations[22] inflated Tivity's stock price during the Class Period, and that said inflation was allegedly removed "[w]hen the circumstances concealed by Defendants' prior misrepresentations and omissions began to come out."[23]

22. Plaintiff alleges two categories of misrepresentations made by Tivity: "(1) the Nutrisystem Claim, where Tivity's executives allegedly misled investors about the success of the Nutrisystem acquisition; and (2) the Goodwill Claim, where Tivity allegedly impaired its goodwill by carrying a goodwill value that exceeded its implied fair value."[24]

### 1. Alleged Misrepresentations Regarding the Nutrisystem Claim

23. For the Nutrisystem Claim, Plaintiff alleges misrepresentations on several dates during the Class Period.[25]

24. Plaintiff alleges certain statements made by Tivity regarding 1Q 2019, 2Q 2019, and 3Q 2019 were "materially false and misleading for the following reasons:"

---

[19] Tivity Form 10-K for Fiscal Year Ended December 31, 2019, filed on February 27, 2020 ("Tivity 2019 10-K"), p. 4.

[20] Tivity 2019 10-K, p. 4.

[21] Tivity 2019 10-K, p. 4.

[22] I use alleged misrepresentations in this report to encompass both alleged misstatements and alleged omissions.

[23] Consolidated Class Action Complaint for the Violation of the Federal Securities Laws, *Robert Strougo, et al. v. Tivity Health, Inc., et al.*, Case No. 3:20-cv-00165, November 13, 2020 ("Complaint"), ¶ 171.

[24] Memorandum Opinion, *Robert Strougo, et al. v. Tivity Health, Inc., et al.*, Case No. 3:20-cv-00165, July 29, 2021 ("Memorandum Opinion, July 29, 2021"), p. 4.

[25] Complaint, Section V.

a. "[A]djusted EBITDA for the Nutrition segment intentionally obscured ***$8.3 million in losses*** in the first quarter, making the [2019 Nutrition segment results to date] appear [] more profitable than it actually was."[26]

b. Defendants were not confident or did not believe that the Company could achieve its Nutrition segment's adjusted EBITDA guidance, "rather Defendants knew that, after a failed 2019 diet season, and after accounting for the unreported $8.3 million in losses in the first quarter, guidance for the remainder of the year was no longer achievable."[27, 28]

c. For Plaintiff's alleged "False and Misleading Statement and Omissions Regarding 3Q19"[29] specifically, "Defendants knew that during the first three quarters of 2019 the Nutrition segment was $8.3 million less profitable than reported, Defendants had suffered a poor 2019 diet season, increased competition, declining customers, lack of innovation and ongoing operational missteps, and the Nutrition segment was experiencing insurmountable headwinds due to the Company's historical declining profitability in the back half of the year. Further, the Nutrition segment was offering unprecedented discounts, which ultimately reduced revenues and margins in 4Q19, as well as negatively impacting the Company ability to execute a successful FY20 diet season."[30]

### 2. Alleged Misrepresentations Regarding the Goodwill Claim

25. For its Goodwill Claim, Plaintiff alleges that Tivity "impaired goodwill by the second quarter of 2019 by inflating its assets and carrying a goodwill value that exceeded its implied fair value."[31] Specifically, Plaintiff alleges that Tivity:

---

[26] Complaint, ¶ 98 (internal citations omitted, emphasis in original). *See also*, Complaint, ¶¶ 107, 119.
[27] Complaint, ¶¶ 98, 107. *See also*, Complaint, ¶ 119.
[28] The diet season refers to the first quarter of the calendar year. *See*, Tivity Form 10-Q for Quarterly Period Ended June 30, 2019 ("Tivity 2Q 2019 10-Q"), filed on August 8, 2019, p. 52 ("The business of our Nutrition segment is seasonal, with revenue generally greatest (and advertising expenses generally highest) in the first calendar quarter, also known as diet season."); "Tivity Health Inc to Acquire Nutrisystem Inc," Tivity Form 425 Conference Call, December 10, 2018. ("When you are in the weight loss business, we have a season we refer to [as] diet season, which is that January to March period and every year, we always offer new things to new consumers to excite them about getting ready, the new year's resolutions and losing weight.").
[29] Complaint, Section V.C (emphasis removed).
[30] Complaint, ¶ 119 (internal citations omitted).
[31] Memorandum Opinion, July 29, 2021, p. 9.

> Failed to timely write down the value of the Nutrisystem tradename and Nutrition segment goodwill, in violation of GAAP. As a result, Defendants overstated Tivity's intangible assets, goodwill, operating income, net income and EPS in the Company's public financial statements for the quarters ended June 30 [filed on August 8, 2019] and September 30, 2019 [filed on November 12, 2019].[32]

### 3. Plaintiff's Alleged Corrective Disclosure: Tivity's 4Q 2019 and Fiscal Year 2019 Earnings Release on February 19, 2020

26. Plaintiff alleges that the relevant truth regarding the alleged misrepresentations was revealed through one corrective disclosure after market close on Wednesday, February 19, 2020, when Tivity announced its 4Q 2019 and FY 2019 financial results and held its analyst conference call. In particular:

> Tivity disclosed that its "Nutrition segment had a disappointing end to 2019," and that 4Q19 Nutrition segment revenues came in at $113.7 million, a 12.2% decrease compared to the same quarter last year, and 4Q19 Nutrition segment adjusted EBITDA totaled $13.9 million, which missed analysts' expectations. The February 19, 2020, release also announced that [CEO] Tramuto had been summarily fired and resigned from the board and that the President of the Nutrition Business Unit, Krausz, had resigned, effective February 18, 2020.[33]
>
> The release also finally disclosed the 2019 Stub Period results for the Nutrition segment, and for the first time disclosed the $8.3 million Nutrition segment adjusted EBITDA losses in the pre-merger portion of 1Q19.[34]
>
> In addition, the release admitted that Tivity had taken an impairment charge of $377 million, contributing to a net loss for the Company of $272 million in 4Q19. The $377 million charge consisted of an impairment charge to lower the Nutrisystem tradename by $240 million and a $137 million goodwill impairment charge relating to the Nutrisystem acquisition.[35]
>
> On February 19, 2020, Tivity also hosted a conference call to discuss its 4Q19 and FY19 results. During the call, Tivity's interim CEO, Greczyn, admitted that, "the nutrition business has not worked out as well as planned since the completion of the acquisition in March 2019." Lewis, Tivity's Interim President of the Nutrition Business Unit, admitted that "last year was a step backward" and that

---

[32] Complaint, ¶ 121.
[33] Complaint, ¶ 172.
[34] Complaint, ¶ 80 (emphasis removed).
[35] Complaint, ¶ 173.

"after experiencing a year of decline in new customers, industry history shows it's a tremendous challenge to reverse the trend for the next diet season."[36]

27. Tivity's stock price declined from a closing price of $22.93 on February 19, 2020 to a closing price of $12.50 on February 20, 2020.[37]

### C. Mr. Dalrymple's Opinions

28. Plaintiff's expert, Mr. Dalrymple,[38] asserts that he has "measured the loss caused by Tivity's alleged scheme to defraud and false and misleading statements and omissions by reference to the share price reactions corresponding to corrective disclosures on December 9, 2019 and February 19, 2020, adjusting for the impact of unrelated factors"[39] and "[b]ased on this analysis…estimated share price inflation over the Class Period."[40]

29. In addition to the February 19, 2020 alleged corrective disclosure identified in the Complaint, Mr. Dalrymple also identifies the announcement of the departure of Dawn Zier (Nutrisystem's President and CEO prior to the Transaction and then-current President and Chief Operating Officer ("COO") of Tivity) on December 9, 2019 ("December 2019 Disclosure") as a purported corrective disclosure.[41] Mr. Dalrymple asserts that Ms. Zier's departure "adversely affected investors' confidence in Tivity's ability to stabilize and improve the Nutrition segment, especially in light of Ms. Zier's critical role in the Nutrition segment."[42] He also asserts that "[w]hile Ms. Zier's termination did not reveal the extent of the Nutrition segment's underperformance in 2019 and going into the 2020 diet season, it provided investors some indication that the Nutrition segment was underperforming, which translated to an increase in perceived risk associated with the stock."[43] He further states that he "understand[s] Plaintiff

---

[36] Complaint, ¶ 174.
[37] Center for Research in Security Prices ("*CRSP*"). *See also*, **Exhibit 1**.
[38] Mr. Dalrymple also previously submitted two reports in support of Plaintiff's motion for class certification: the Dalrymple Class Certification Report and the Dalrymple Class Certification Rebuttal Report.
[39] Dalrymple Report, ¶ 10.
[40] Dalrymple Report, ¶ 10.
[41] The Complaint alleges that the relevant truth regarding the alleged misrepresentations was revealed through one corrective disclosure after market close on Wednesday February 19, 2020, when Tivity announced its 4Q 2019 and FY 2019 financial results and held its analyst conference call. *See*, Complaint, ¶¶ 172–175. The Complaint does mention December 9, 2019 and Ms. Zier's departure, but not as an alleged misrepresentation or an alleged corrective disclosure. Complaint, ¶¶ 13, 77, 183.
[42] Dalrymple Report, ¶ 87.
[43] Dalrymple Report, ¶ 87.

alleges that Ms. Zier's departure was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme" and that "Ms. Zier's departure raised the perceived likelihood that the upcoming diet season would be a failure and adversely affect the prospects of the Nutrition segment."[44]

30. Mr. Dalrymple also identifies February 19, 2020 as a corrective disclosure ("February 2020 Disclosure"). He states that after market close that day, Tivity "announced its fourth quarter and full year 2019 financial results, in conjunction with the announcement that Mr. Tramuto was departing as CEO and resigning from the Tivity board of directors and Ms. Krausz had resigned as President of Tivity's Nutrition segment effective the day prior;" and that Tivity "stated that it would record a non-cash impairment charge of $377.1 million related to the Nutrisystem trade name and acquisition[, and] disclosed to investors for the first time that the Nutrition segment had lost $8.3 million in adjusted EBITDA during the pre-acquisition portion of the first quarter of 2019."[45] He further states that "[t]he steep decline in Tivity's share price [on February 20, 2020] reflected market participants' significant revisions to earnings expectations and perceived risk associated with the company."[46] Mr. Dalrymple also states that the February 2020 Disclosure contained "new value-relevant information related to the Nutrition segment that [he] understand[s] Plaintiff alleges was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[47] For simplicity, throughout this report I refer to the December 2019 Disclosure and the February 2020 Disclosure collectively as the "Alleged Corrective Disclosures" even though only the February 2020 Disclosure is alleged in the Complaint.

31. As part of his loss causation and damages analysis, Mr. Dalrymple uses an event study.[48] He states that "[t]he abnormal returns as measured by [his] event study may be used to assess the impact the corrective disclosures had on the value of Tivity's share price."[49] Mr. Dalrymple also purports to review news and analyst coverage on December 9, 2019 and February 20, 2020 to

---

[44] Dalrymple Report, ¶ 88.
[45] Dalrymple Report, ¶ 90.
[46] Dalrymple Report, ¶ 92.
[47] Dalrymple Report, ¶ 94.
[48] Mr. Dalrymple relies on the same regression model that he used to test for market efficiency in the Dalrymple Class Certification Report. *See*, Dalrymple Report, ¶¶ 76–83.
[49] Dalrymple Report, ¶ 85.

disentangle the impact of confounding information from that of information purportedly corrective of the alleged misrepresentations on Tivity's stock price.

a. For the December 2019 Disclosure, he contends that "no other new value-relevant information about Tivity became known on December 9, 2019 [, so] [i]t is therefore reasonable to conclude that the abnormal return of $2.23 per share reflects the impact of the company-specific information contained in the December 2019 Disclosure."[50]

b. For the February 2020 Disclosure, Mr. Dalrymple contends that "[a]s analysts explained, revisions to expectations were driven primarily by a reduction in the expected earnings of the Nutrition segment based on lower projected revenues, decreased margins, and the continued underperformance of the segment."[51] He further contends that "no other new company-specific and value-relevant information became known on February 20, 2020 (the day after the February 2020 Disclosure) [, so] [i]t is therefore reasonable to conclude that the abnormal return of $10.39 per share reflects the impact of the company-specific information contained in the February 2020 Disclosure."[52]

32. Mr. Dalrymple uses the results of his event study, along with other analyses, to estimate price inflation during the Class Period.[53]

a. Mr. Dalrymple asserts that $2.23 of inflation dissipated following the December 2019 Disclosure. He states that "[t]he impact of Ms. Zier's termination on December 9, 2019…was $2.23 per share based on [his] event study."[54] He further states that he has "not found any potential confounding information that could explain the abnormal return on December 9, 2019," and that "analyst commentary indicates that investors generally reacted negatively to Ms. Zier's termination, such that a significant negative abnormal return is consistent with the information that became known on that day."[55]

---

[50] Dalrymple Report, ¶ 89.
[51] Dalrymple Report, ¶ 93.
[52] Dalrymple Report, ¶ 94.
[53] Dalrymple Report, ¶¶ 82–83, Exhibit 1.
[54] Dalrymple Report, ¶ 97.
[55] Dalrymple Report, ¶ 97.

b. Mr. Dalrymple asserts that $8.19 of inflation dissipated following the February 2020 Disclosure. He arrives at this amount by removing "the impact of the lower-than-expected [2020] guidance for the Healthcare segment [that] could have accounted for no more than $2.20 of Tivity's share price decline on February 20, 2020 [and] [s]ubtracting this amount from the total abnormal return of $10.39 per share."[56]

c. Based on the above calculations of inflation dissipation, Mr. Dalrymple asserts that from the beginning of the Class Period through December 8, 2019, Tivity's stock price was artificially inflated by $10.42 ($2.23 + $8.19), and from December 9, 2019 through the end of the Class Period on February 19, 2020, Tivity's stock price was artificially inflated by $8.19.[57]

33. Mr. Dalrymple also estimates separately share price inflation over the Class Period for both the Nutrisystem and Goodwill Claims as shown in Table 1 of the Dalrymple Report (copied below).

**Table 1. Class Period Inflation: March 8, 2019 to February 19, 2020**

| | Mar. 8, 2019 to Aug. 7, 2019 | Aug. 8, 2019 to Dec. 8, 2019 | Dec. 9, 2019 to Feb. 19, 2020 |
|---|---|---|---|
| *Nutrisystem Claim** | | | |
| Zier Termination | $2.23 | $2.23 | $ - |
| February 2020 Disclosure | $8.19 | $8.19 | $8.19 |
| | $10.42 | $10.42 | $8.19 |
| *Goodwill Claim*** | | | |
| February 2020 Disclosure | $ - | $8.19 | $8.19 |

* Nutrisystem Claim with or without Goodwill Claim

** Goodwill Claim without Nutrisystem Claim

Mr. Dalrymple contends that for the Nutrisystem Claim, Tivity's stock price was artificially inflated by $10.42 from March 8, 2019 to December 8, 2019 and by $8.19 from December 9,

[56] Dalrymple Report, ¶ 106.
[57] Dalrymple Report, ¶¶ 10, 111; Tables 1, 3–4.

2019 through February 19, 2020, and for the Goodwill Claim, inflation of $8.19 affected Tivity's stock price from August 8, 2019 through February 19, 2020.[58] However, he states that "the above estimates are additive and separable with respect to the Zier Termination and the remainder of the Nutrisystem Claim, and separable but not additive with respect to the Nutrisystem Claim and Goodwill Claim, such that the impacts of each corrective disclosure may be considered jointly or individually at any time during the Class Period."[59]

34. Mr. Dalrymple states that his estimated share price inflation figures "would apply as of the date that the trier-of-fact determines that information revealed through the corrective disclosure was within the zone of risk concealed through Defendants' alleged fraud."[60]

## V. Market Efficiency and Valuation

35. As detailed above, Mr. Dalrymple's analysis of loss causation and damages are based, at least in part, on Tivity's stock price movements. Therefore, before specifically addressing Mr. Dalrymple's opinions, this section provides an overview of market efficiency and valuation. Additional details on valuation and valuation methods can be found in **Appendix D**.

36. Eugene Fama, a Professor at The University of Chicago Booth School of Business,[61] and a principal developer of the Efficient Market Hypothesis, states:

> An efficient capital market is a market that is efficient in processing information. The prices of securities observed at any time are based on "correct" evaluation of all information available at that time. In an efficient market, prices "fully reflect" available information.[62]

37. The theory behind the efficient market hypothesis is that the competition among investors to identify profitable investment opportunities in the quest for arbitrage profits ultimately eliminates opportunities to trade and profit on information, because such opportunities are rapidly taken advantage of. In such a market, the arbitrage mechanism works to "discipline"

---

[58] Dalrymple Report, Tables 1, 3–4.
[59] Dalrymple Report, ¶ 121.
[60] Dalrymple Report, ¶ 11.
[61] "Faculty & Research: Eugene F. Fama," The University of Chicago Booth School of Business, https://www.chicagobooth.edu/faculty/directory/f/eugene-f-fama, accessed on February 6, 2023.
[62] Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices*, Basic Books, 1976, p. 133.

prices and ensure that they always reflect all available information, thereby ensuring that the market is efficient.[63] Plaintiff and Mr. Dalrymple assert that the market for Tivity stock was semi-strong form efficient during the Class Period.[64]

38. One of the central tenets of modern finance is that, in an efficient market, the price of an asset, such as a share in a company, is equal to the present value of the asset's expected future after-tax cash flows.[65] Therefore, when the market price of a stock changes, it is due to changes in the market consensus assessment of expected *future* cash flows, the *riskiness* of the *future* cash flows, or both.[66] The generally accepted methodology for accounting for the riskiness of the future cash flows is to determine the appropriate discount rate, which is known as the cost of capital.[67] In addition to accounting for the riskiness of the cash flows, the discount rate also accounts for the time value of money—*i.e.*, cash flows to be received in the future are less valuable than cash flows to be received today, all else equal. The higher the riskiness of future cash flows and the more distant these future cash flows are, the lower the resulting value.

---

[63] Arbitrage is a term financial economists and market practitioners use to describe taking advantage of a mispricing by trading in such a manner as to generate a virtually guaranteed profit. In an informationally efficient market, rational investors will engage in arbitrage trades in sufficient size as to quickly correct any perceived mispricing and therefore, as a general matter, consistent arbitrage profits should not be possible.

[64] Complaint, ¶ 189; Dalrymple Report, ¶ 75. Dalrymple Class Certification Report, ¶ 10. Semi-strong form efficiency asserts that market prices of securities reflect all publicly available information, but not private information. There are two other definitions of market efficiency. First, strong form efficiency asserts that market prices of securities reflect all available information, whether public or private. Second, weak form efficiency asserts that prices reflect all past information related to the trading history (*i.e.*, prices and dividends) of securities. Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417 ("Fama (1970)"), p. 388; Fama, Eugene F., "Efficient Capital Markets: II." *The Journal of Finance* 46, no. 5 (1991): 1575–1617 ("Fama (1991)"), p. 1576.

[65] For example, Cochrane (2005) states that "the asset's price should equal the expected discounted value of the asset's payoff, using the investor's marginal utility to discount the payoff." Cochrane, John H., *Asset Pricing: Revised Edition*, Princeton University Press, 2005, p. 3. Moreover, "[i]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows ($C_t$) and the opportunity cost of capital (r)…." Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017 ("Brealey, Myers, and Allen (2017)"), p. 336.

[66] A company's expected future cash flows are affected by market, industry, and company-specific factors.

[67] *See,* Brealey, Myers, and Allen (2017), pp. 21–24.

39. In particular, any downward revision of the market consensus regarding expected *future* cash flows and/or an upward revision of the market consensus regarding the riskiness of the *future* cash flows will negatively affect a company's stock price and value.[68]

40. If information released on a given day was not new and instead only repeated information that was publicly available, then in an efficient market it would not be expected to change a stock price. This is because prices respond quickly to new, value-relevant information, and stale news, even if value-relevant, would have already been incorporated into the stock price when it first became publicly available.[69]

## VI. Mr. Dalrymple Fails to Reliably Establish That Investor Losses (If Any) Were Caused by the Alleged Misrepresentations

41. If inflation enters and is then removed from the stock price, I understand that per-share recoverable damages for a plaintiff purchasing on a given day and selling on another day (or retaining throughout the relevant period) are the lesser of:

- Out-of-pocket damages, that is, share price inflation on the date of purchase less share price inflation on the date of sale (where share price inflation is defined as the difference between the actual share price and the "but-for price" that would have prevailed absent the alleged material misstatements or omissions);
- Losses caused by correction of the alleged misstatements or omissions, that is, the actual share price declines attributable to revelation of the relevant truth regarding the alleged misstatements or omissions, as opposed to share price declines resulting from non-fraud-related factors; and

---

[68] Investors consider two types of risks. First, systematic risk which measures the extent to which a security is affected by movements in the overall market. Second, security-specific risk (also known as idiosyncratic risk) which measures the risk that is unique to the specific company as opposed to the overall market. Finance theory assumes that the security-specific risk can be diversified away by holding many different stocks in an investment portfolio, and thus, investors are not compensated with a higher return for bearing this idiosyncratic risk. *See*, for example, Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset,* John Wiley & Sons, 2012, pp. 58–77.

[69] *See*, for example, Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010, p. 440 ("According to the efficient-market hypothesis, a stock's abnormal return at time t, ARt, should reflect the release of information at the same time, t. Any information released before then, though, should have no effect on abnormal returns in this period, because all of its influence should have been felt before. In other words, an efficient market would already have incorporated previous information into prices.").

- The “bounce-back” calculation.[70]

42. Thus, the analysis of recoverable damages requires an economic analysis of both loss causation and inflation. As explained below, Mr. Dalrymple fails to reliably establish that investor losses (if any) were caused by the alleged misrepresentations for either the Nutrisystem Claim or the Goodwill Claim. Further, as explained in Section VII, even assuming Mr. Dalrymple had reliably measured the losses caused by the purportedly corrective information, which he has not, he fails to reliably measure inflation (if any) in Tivity’s stock price due to the alleged misrepresentations on each day during the Class Period, and, therefore, his analysis of damages is flawed and unreliable.

### A. Economic Analysis of Loss Causation and Damages

43. I understand that showing loss causation in Rule 10b-5 securities cases such as this one requires establishing a causal connection between defendants’ alleged misrepresentations and plaintiffs’ economic loss.[71] A financial economist must perform multiple steps of analysis to establish loss causation and measure the losses, if any, caused by the correction of alleged misrepresentations.

---

[70] The Private Securities Litigation Reform Act (“PSLRA”) provides: “[I]n any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.” *See*, 15 U.S.C. § 78u-4(e)(1). In essence, this “bounce-back” provision caps damages to the per-share price an investor pays less the relevant average per-share price during the 90-day period after “the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.”

[71] While I understand that out-of-pocket damages is the primary measure of damages in a Section 10(b) matter such as this, I also understand that simply establishing an inflated purchase price is insufficient to establish recoverable damages. The Supreme Court in *Dura* stated (*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005)):

> An inflated purchase price will not by itself constitute or proximately cause the relevant economic loss needed to allege and prove “loss causation”…if the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price might mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.

This distinction between inflation and loss causation makes sense from a financial economic perspective.

a. Identify the alleged misrepresentations and omissions made by defendants.

b. Determine the information that could and should have been disclosed instead of or in addition to the alleged misstatements or omissions (*i.e.*, the "but-for disclosures").

c. Analyze the alleged misstatements or omissions and determine whether they were a substantial cause of the stock price decline on the alleged corrective event days. Absent this connection, the economist would fail to show that an economic loss was caused by the alleged misstatements or omissions.

d. Even assuming a causal connection is established, one must estimate the stock price impact, if any, of the alleged misstatements and omissions—and only from the alleged misstatements or omissions, separating the stock price impact of confounding information.

44. Notably, if there is confounding information (such as factors unrelated to the alleged fraud, materialization of risks previously known to the market, and other timely disclosures), then it is necessary to parse out the potential stock price effect associated with the alleged misstatements or omissions to isolate the price effect of the alleged corrective information (*i.e.*, information causally connected to the alleged misrepresentations). An event study analysis using daily stock price returns, like the one employed by Mr. Dalrymple in this matter, is typically used to parse out the price effect of market and industry factors and seeks to account for the normal volatility of the company's stock returns. Such an event study *cannot*, however, separately measure the impact of different pieces of company-specific information (*i.e.*, it cannot separately measure the effects of corrective and company-specific confounding information) arriving on the same trading day. Therefore, if there is both allegedly corrective and company-specific confounding information disclosed during the same trading day, an economist must rely on other valuation tools to perform the requisite parsing, separately identifying the economic value of corrective and confounding information.

### B. Mr. Dalrymple Has Not Reliably Demonstrated That Any Losses Were Caused by Alleged Misrepresentations for the Nutrisystem Claim

45. As described in detail in this section, Mr. Dalrymple fails to reliably demonstrate that the alleged misrepresentations for the Nutrisystem Claim caused any investor losses. As discussed

above, I understand that the alleged misrepresentations for the Nutrisystem Claim are centered around Nutrisystem's performance between January 1, 2019 and March 7, 2019—prior to the closing of the Transaction—and specifically include the lack of a disclosure of Nutrisystem's adjusted EBITDA during that period and allegedly misleading FY 2019 financial guidance for the Nutrition segment (*see* Section IV.B.1). Tivity disclosed other financial metrics for Nutrisystem that included performance for all of 1Q 2019 on its 1Q 2019 earnings call on May 8, 2019 and in its Form 10-Q on May 9, 2019, but did not disclose Pre-Transaction 1Q 2019 Adjusted EBITDA at that time. While Mr. Dalrymple does not identify what information he assumes could and should have been disclosed at any point during the Class Period (the "but-for" disclosure(s)), Plaintiff's allegations suggest that the "but-for" disclosures are the disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA and FY 2019 guidance incorporating that information. However, this adjusted EBITDA was disclosed by Tivity well before the Alleged Corrective Disclosures—no later than August 7, 2019. Given that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was already publicly disclosed by August 7, 2019, in an efficient market, the repeated disclosure of the Pre-Transaction 1Q 2019 Adjusted EBITDA would not have caused Tivity's stock price decline on February 20, 2020. Mr. Dalrymple also fails to link other elements of the February 19, 2020 disclosure (4Q 2019 financial results, FY 2020 guidance, and executive departures) to the alleged misrepresentations.

46. Mr. Dalrymple does not reliably establish that any, let alone all, of the Nutrition segment financial information was anything other than timely disclosed, or link it to specific alleged misrepresentations earlier in the Class Period. He fails to acknowledge that FY 2019 guidance Tivity disclosed in connection with its quarterly earnings releases prior to the end of the Class Period—specifically, on May 8, 2019, August 7, 2019, and November 12, 2019—was generally consistent with Tivity's contemporaneous internal forecasts. To the extent that some portion of the allegedly corrective information for the Nutrisystem Claim disclosed on February 19, 2020 was not disclosed in a timely manner, Mr. Dalrymple has not attempted to disentangle Tivity's stock price reaction caused by the information disclosed in a timely manner from that not disclosed in a timely manner. This analysis is needed to determine whether the untimely information caused any portion of Tivity's stock price decline on February 20, 2020.

47. For December 9, 2019, Mr. Dalrymple opines that "the abnormal return of $2.23 per share reflects the impact of the company-specific information contained in the December 2019 Disclosure,"[72] asserts that the disclosure was "within the zone of risk concealed by Defendants' alleged misrepresentations and scheme,"[73] and that as a result, "inflation that was attributable to management's assurances that the Nutrition segment was on track partially dissipated on December 9, 2019."[74] However, Mr. Dalrymple fails to reliably establish that the stock price reaction to Ms. Zier's departure reflects anything but the materialization of a disclosed risk, does not link the resignation of Ms. Zier to the alleged misrepresentations, and does not reliably establish that the resignation would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented). He simply assumes loss causation.

48. Hence, Mr. Dalrymple has not proven any investor losses on December 9, 2019 or February 20, 2020 were caused by the alleged misrepresentations for the Nutrisystem Claim.

49. The rest of the section is organized as follows. Section VI.B.1 establishes that Tivity disclosed Nutrisystem's 1Q 2019 financial performance prior to the Alleged Corrective Disclosures. Section VI.B.2 demonstrates that Tivity's internal projections were generally consistent with its disclosed guidance on May 8, 2019, August 7, 2019, and November 12, 2019. Section VI.B.3 shows that Mr. Dalrymple has not proven any investor losses on December 9, 2019 and February 20, 2020 were caused by the alleged misrepresentations for the Nutrisystem Claim.

#### 1. Tivity Disclosed Nutrisystem's 1Q 2019 Financial Performance Prior to the Alleged Corrective Disclosures

50. As detailed in Section IV.B.1, I understand that Plaintiff's allegations regarding the Nutrisystem Claim include disclosure, or lack thereof, of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA. As discussed below, Nutrisystem's financial performance for 1Q 2019 was disclosed on Tivity's 1Q 2019 earnings call on May 8, 2019 and in its Form 10-Q on May 9,

---

[72] Dalrymple Report, ¶ 89.
[73] Dalrymple Report, ¶¶ 58, 88.
[74] Dalrymple Report, ¶ 88.

2019, and the specific metric Plaintiff focuses on, the Pre-Transaction 1Q 2019 Adjusted EBITDA, was disclosed by August 7, 2019 as part of Tivity's 2Q 2019 earnings information.

### a) February 19, 2019

51. After market close on Tuesday, February 19, 2019, before the Transaction closed and the start of the Class Period, Tivity announced its 4Q 2018 and FY 2018 financial results and held an earnings conference call jointly with executives from Nutrisystem.[75] During the conference call, Ms. Zier noted the slow start to 2019:

> I'd now like to give a quick update on our 2019 projections based on the first 7 weeks of our diet season. At this point, we're expecting slight revenue and adjusted EBITDA growth year-over-year based on the midpoint of our guidance. This does not reflect any revenue or cost synergies, which we believe can be realized from the combination of Nutrisystem and Tivity Health. **To provide some color around the start of 2019, our early diet season trends indicate mixed results**.
>
> **Regarding our customer acquisition campaigns, response in January started out softer than anticipated**, which led us to proactively pull back media spend versus last January as we assessed an initial spike in competition, which was driving up short-term cost, and we reevaluated our initial media plan taking into consideration these new inputs. The good news is that towards the end of January and February, we've seen sequential week-over-week improvements as we refined our marketing strategy, optimized our media mix and layered back in some additional spend.[76]

52. On this day, Tivity also disclosed, with its earnings release for 4Q 2018 and FY 2018, the first combined FY 2019 management guidance that included Nutrisystem on a pro-rata basis for the period from March 8, 2019 through December 31, 2019.[77] Tivity announced that FY 2019 adjusted EBITDA for Nutrisystem from the closing of the Transaction through the end of the

---

[75] Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1; Tivity 4Q 2018 and FY 2018 Earnings Call Transcript, February 19, 2019.

[76] Tivity 4Q 2018 and FY 2018 Earnings Call Transcript, February 19, 2019 (emphasis added).

[77] Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 5 ("This combined financial guidance for 2019 includes the full year 2019 expected results for Tivity Health and the expected results of Nutrisystem from the date immediately following the anticipated closing date of the proposed transaction (such closing date currently expected to be March 8, 2019) through December 31, 2019.").

year was expected to fall in the range of $100 and $113 million.[78] This financial guidance for Nutrisystem as part of Tivity was based on "standalone financial guidance for 2019" announced by Nutrisystem on the same day.[79] Nutrisystem initiated guidance for full FY 2019 and for full 1Q 2019, with FY 2019 adjusted EBITDA expected to fall in the range of $100 and $110 million excluding non-cash compensation, and 1Q 2019 adjusted EBITDA expected to represent 5–6% of that value (*i.e.*, between $5 million and $6.6 million).[80] Tivity was clear that its guidance did not include the period prior to March 8, 2019 for Nutrisystem and instead was "from the date immediately following the anticipated closing date of the proposed transaction (such closing date currently expected to be March 8, 2019) through December 31, 2019."[81]

53. Securities analysts noted a weak start to the diet season, including through implications from revenue guidance. For example:[82]

> TVTY also provided 2019 guidance inclusive of NTRI (on pro-rata basis, assuming an early March close). **The range implies NTRI revenue may be flat in 2019, due to a mixed start to diet season**. NTRI had focused more on digital marketing in January and less on TV. That was a mistake and it has now shifted more marketing spend to TV, which positively affected recent trends.[83] (Cantor Fitzgerald, February 19, 2019)

> Disappointing Nutrisystem Revenue Guidance; Is it Low Enough? Nutrisystem (NTRI) essentially guided to flat revenue in 2019, which was well below the 8% growth consensus was modeling.[84] (Jefferies, February 19, 2019)

> **[M]anagement noted a slower-than-anticipated start to the important 2019 diet season** (due to new competition spending heavily on digital spending and some volatility regarding returns on various media spending).[85] (William Blair, February 20, 2019)

---

[78] Tivity announced 2019 adjusted EBITDA guidance of $140 million to $145 million for standalone legacy Healthcare and combined 2019 adjusted EBITDA guidance of $240 million to $258 million for both legacy Healthcare and Nutrisystem segments. *See*, Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 5.
[79] Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 5.
[80] Nutrisystem Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 2.
[81] Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 5.
[82] *See*, **Exhibit 2** for additional analyst commentary.
[83] "Lower-Than-Expected 2019 Outlook; Reducing Price Target; Maintain Overweight," Cantor Fitzgerald, February 19, 2019 (emphasis added).
[84] "4 Key Insights from TVTY's 4Q18," Jefferies, February 19, 2019.
[85] "Results in Line with Prerelease; First Look at Combined Company Guidance Shows In-Line EBITDA, Lower Sales Than Anticipated," William Blair, February 20, 2019 (emphasis added).

### b) May 8, 2019

54. More details regarding Nutrisystem's 1Q 2019 performance pre-Transaction closing and the Nutrition segment's 1Q 2019 performance post-Transaction closing were released after market close on Wednesday May 8, 2019 in Tivity's 1Q 2019 financial earnings release and on its earnings conference call, and in its 1Q 2019 Form 10-Q filed on May 9, 2019.[86] In its earnings release, Tivity announced better than expected results as revenue, adjusted EBTIDA, and adjusted EPS exceeded prior consensus analyst estimates.[87] During the earnings conference call, management noted that "positive results [for the Healthcare segment] were partially offset by a decrease in total eligible SilverSneakers lives, including the loss of UnitedHealthcare lives [the Company] previously discussed."[88] Management also noted that higher marketing expenses in 1Q 2019 and an increase in cost per visit both impacted adjusted EBITDA for the Healthcare segment.[89]

55. For the Nutrition segment performance post-Transaction closing, Tivity stated in the May 8, 2019 earnings press release that "[r]evenue was $57.6 million, and **[a]djusted EBITDA was $13.3 million for the 24-day period March 8, 2019 through March 31, 2019**."[90] Management also disclosed information about Nutrisystem's pre-Transaction closing performance for the first quarter of 2019 during Tivity's 1Q 2019 earnings conference call. For example, Ms. Zier stated:

---

[86] Tivity Form 8-K, filed on May 8, 2019, Ex. 99.1, p. 1; Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019; Tivity 1Q 2019 10-Q.

[87] *See*, for example, "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019; "Upside Performance as Nutrisystem Integration off to Good Start; Positive Early Feedback from Key Constituents," William Blair, May 8, 2019; "Healthcare Strength and Stabilizing Nutrition Segment Should Improve Sentiment," Oppenheimer, May 9, 2019; "Early Signs That the Consumer Marketing Is Working," Piper Jaffray, May 9, 2019.

[88] Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019.

[89] Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019. *See also*, for example, "Upside Performance as Nutrisystem Integration off to Good Start; Positive Early Feedback from Key Constituents," William Blair, May 8, 2019; "4 Key Insights from TVTY's 1Q19," Jefferies, May 9, 2019.

[90] Tivity Form 8-K, filed on May 8, 2019, Ex. 99.1, p. 3 (emphasis added).

**[W]hat happened, January and February did start off a little weaker than expected for many different reasons**. But what we ended up doing was we revamped our offerings and advertisements based on the macro environment factors that we were seeing, both for television and digital and saw improvement in customer acquisition trends in March. **So the cadence of our business is shifting slightly for this year**. And that March starts came in very strong and we're confident as we go ahead in the guidance that we provided. I feel the business is definitely back on track.[91]

56. On the same call, Mr. Holland (CFO) disclosed the full 1Q 2019 revenue figure for Nutrisystem—as opposed to the amount for just March 8, 2019 through March 31, 2019—and it was in-line with the expectation of at least one analyst.

DAVID ANTHONY STYBLO, EQUITY ANALYST, JEFFERIES LLC, RESEARCH DIVISION: Maybe a question for Dawn or Adam to start out with. I'm wondering if you could give us what the full year Nutrisystem contribution was, I know, obviously, it was just 20 days or so on the P&L on a combined unit, but just so we have a better sense of how that business compared to the initial guidance? And Dawn, I guess, from your comments it sounds like things really did tick up better especially in March. […]

ADAM C. HOLLAND: [….] **The full first quarter revenue for the legacy nutrition business, I believe, is right at $191 million[**…].

DAVID ANTHONY STYBLO: Okay**. Yes. That sounds like that was spot on with what I would have expected for the first full quarter**.

ADAM C. HOLLAND: **And that was also in range with what we had put out in February**.[92]

57. Nutrisystem's 1Q 2019 revenue of $191 million compared to $211 million in 1Q 2018.[93] Therefore, not only did Tivity and Nutrisystem comment on the slow start to the year by May 8, 2019, but the decrease in revenue from the prior year further made the point.[94]

---

[91] Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019 (emphasis added).

[92] Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019 (emphasis added).

[93] Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019; Nutrisystem Form 8-K, filed on April 30, 2018, Ex. 99.1, p. 1.

[94] Moreover, Nutrisystem's 1Q 2019 revenue was on the lower end of Nutrisystem's 1Q 2019 guidance prior to the Transaction. Specifically, on February 19, 2019, Nutrisystem announced with its earnings release for 4Q 2018 and FY 2018 the first financial guidance for 2019. Nutrisystem expected FY 2019 revenue to be in the range of $682 and $702 million, with 1Q 2019 representing approximately 28% of full FY 2019 revenue (*i.e.*, between $191 and $197 million). *See*, Nutrisystem Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 2.

58. In addition to disclosing Nutrisystem full 1Q 2019 revenue, Tivity provided pro forma revenue and earnings (net loss) for 1Q 2019 adjusted to include operating results of Nutrisystem from January 1, 2019 to March 7, 2019 in its Form 10-Q for 1Q 2019 filed after market close on May 9, 2019.[95, 96] The pro forma results were for all of Tivity and, therefore, included both the Nutrition segment and the Healthcare segment. Tivity reported revenue of $348 million and net loss of $4.6 million based on pro forma results.[97] The 1Q 2019 pro forma net loss of $4.6 million was $8.8 million lower than the actual reported net income of $4.2 million for 1Q 2019 that included a partial Nutrisystem contribution from March 8, 2019 through March 31, 2019.[98]

59. Analysts commented on the results Tivity disclosed as well as the weak start to the diet season. For example:[99]

> March program starts were much stronger than those of January and February, after the company adjusted its marketing spend. On a pro-forma basis, Nutrisystem revenue would have declined 10%. However, given the strong March starts, 2Q19 revenue will be stronger than expected.[100] (Cantor Fitzgerald, May 8, 2019)

> [W]e think the Street is too high for 2020 EBITDA and EPS. We don't think consensus is appreciating the Nutrition headwind from closing intra-quarter 1Q19 where the 1Q19 P&L benefits from not incurring marketing costs that are heavy earlier in the quarter and revenue that is backend loaded.[101] (Jefferies, May 9, 2019)

> Investors have been concerned about Nutrition segment top-line drivers and meeting 1Q expectations. A slow start in January and early February from intense competition of the usual suspects as well as new competitors heightened concerns.

---

[95] Tivity 1Q 2019 10-Q, pp. 10–11 ("The pro forma results include adjustments related to purchase accounting, acquisition and integration costs, financing, and amortization of intangible assets. Material non-recurring pro forma adjustments reflected in the pro forma results for the three months ended March 31, 2019 include: (1) the operating results of Nutrisystem from January 1, 2019 to March 7, 2019, (2) acquisition, integration, and restructuring costs decrease of $33.4 million, and (3) income tax expense decrease of $2.7 million.").

[96] According to Mr. Dalrymple's event study analysis, Tivity's residual return on May 10, 2019 was negative and statistically significant. *See*, Dalrymple Report backup material.

[97] Tivity 1Q 2019 10-Q, pp. 10–11.

[98] Tivity 1Q 2019 10-Q, pp. 5, 10. Net income and EBITDA are two commonly used financial metrics to assess a company's profitability. EBITDA can be calculated from net income by adding to it interest, taxes, depreciation, and amortization expenses. Tivity's adjusted EBITDA is measured as EBITDA minus acquisition and integration costs and restructuring and related charges. Tivity 1Q 2019 10-Q, p. 26.

[99] *See*, **Exhibit 2** for additional analyst commentary.

[100] "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019.

[101] "4 Key Insights from TVTY's 1Q19," Jefferies, May 9, 2019.

> That intensity eased around mid-February as aggressive competitive marketing spend waned. Not only did Nutrisystem's new customer starts inflect up in the back half of 1Q, particularly in March, but persistency is also trending better than expected. Mgmt disclosed 1Q revenue was $191mm, right on track with its previous seasonality guidance.[102] (Jefferies, May 9, 2019)

60. Tivity's stock price declined from a closing price of $22.60 on May 8, 2019 to a closing price of $20.14 on May 9, 2019 (-10.88%),[103] and the residual return was negative and statistically significant at the 95% confidence level according to Mr. Dalrymple's event study.[104]

#### c) August 7, 2019

61. On August 7, 2019, after market close, Tivity released its 2Q 2019 earnings, which included a 14-page "Supplemental Material" presentation.[105] In this presentation, Tivity provided comparisons of "2019 Guidance Updated" and "2019 Guidance Original" for revenue and adjusted EBITDA.[106] These figures were provided for the entire company, as well as for the Healthcare segment and Nutrition segment separately. The table below includes adjusted EBITDA 2019 guidance for the Nutrition segment from the presentation.[107]

---

[102] "4 Key Insights from TVTY's 1Q19," Jefferies, May 9, 2019.
[103] *CRSP*. *See also*, **Exhibit 1**.
[104] Dalrymple Report, footnote 230; Exhibit 1.
[105] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1; Tivity Form 8-K, filed on August 7, 2019, Ex. 99.2.
[106] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.2, pp. 10, 14.
[107] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.2, pp. 10, 14.

| Metric | 2019 Guidance Updated | 2019 Guidance Original |
|---|---|---|
| **Consolidated Revenues** | **$1,127 - $1,142** | **$1,146 - $1,177** |
| Healthcare Segment Revenues | $625 - $630 | $612 - $627 |
| Nutrition Segment Revenues Stub Period (3/8 – 12/31) | $502 - $512 | $534 - $550 ** |
| **Consolidated Adjusted EBITDA [1,2]** | **$229 - $239 *** | **$240 - $258** |
| Healthcare Segment Adjusted EBITDA [1,2] | $140 - $143 | $140 - $145 |
| Nutrition Segment Adjusted EBITDA Stub Period (3/8 – 12/31) [1,2] | $80 - $84 * | $91 - $101 ** |
| Anticipated Cost Synergies | $9 - $12 | $9 - $12 |
| **Consolidated Earnings Per Diluted Share** | **$1.11 – $1.32** | **$1.35 - $1.67** |
| **Consolidated Adjusted Earnings Per Diluted Share [1,2]** | **$2.14 - $2.32** | **$2.24 - $2.52** |

*$ in millions except per share amounts*

*Footnotes shown on following page*

* *Includes approximately $3 million in investments associated with the two pronged "O-E" strategy that were not contemplated in the 2019 original guidance.*

** *Nutrition revenues and adjusted EBITDA ranges are implied based on February 19, 2019 guidance*

## Footnotes

1. Adjusted EBITDA and Adjusted Earnings per Diluted Share are forward-looking non-GAAP financial measures. A reconciliation of Adjusted Earnings per Diluted Share guidance for the year ending December 31, 2019 to the comparable GAAP financial measure is included as an exhibit to Tivity Health's Current Report on Form 8-K filed with the Securities and Exchange Commission on August 7, 2019. The Company does not provide a reconciliation of Adjusted EBITDA guidance to the most directly comparable GAAP financial measure because it is unable to provide such reconciliations without unreasonable effort due to the uncertainty and inherent difficulty of predicting the financial impact of certain items.

2. We believe Adjusted EBITDA and Adjusted Earnings per Diluted Share are useful measures of performance. You should not consider Adjusted EBITDA and Adjusted Earnings per Diluted Share in isolation or as a substitute for net income or Earnings per Diluted Share, respectively, in each case, determined in accordance with GAAP. Additionally, because Adjusted EBITDA and Adjusted Earnings per Diluted Share may be defined differently by other companies in the Company's industry, the non-GAAP financial measures presented here may not be comparable to similarly titled measures of other companies.

*$ in millions*

| Metric | 2019 Guidance Updated | 2019 Guidance Original |
|---|---|---|
| Nutrition Segment Revenues (1/1 - 12/31) [4] | $635 - $645 | $682 - $702 |
| Nutrition Segment Adjusted EBITDA (1/1 – 12/31) [1, 2, 3, 4] | $71 - $75 * | $90 - $100 |

* *Includes approximately $3 million in investments associated with the two pronged "O-E" strategy that were not contemplated in the 2019 original guidance.*

1. Adjusted EBITDA and Adjusted Earnings per Diluted Share are forward-looking non-GAAP financial measures. A reconciliation of Adjusted Earnings per Diluted Share guidance for the year ending December 31, 2019 to the comparable GAAP financial measure is included as an exhibit to Tivity Health's Current Report on Form 8-K filed with the Securities and Exchange Commission on August 7, 2019. The Company does not provide a reconciliation of Adjusted EBITDA guidance to the most directly comparable GAAP financial measure because it is unable to provide such reconciliations without unreasonable effort due to the uncertainty and inherent difficulty of predicting the financial impact of certain items.
2. We believe Adjusted EBITDA and Adjusted Earnings per Diluted Share are useful measures of performance. You should not consider Adjusted EBITDA and Adjusted Earnings per Diluted Share in isolation or as a substitute for net income or Earnings per Diluted Share, respectively, in each case, determined in accordance with GAAP. Additionally, because Adjusted EBITDA and Adjusted Earnings per Diluted Share may be defined differently by other companies in the Company's industry, the non-GAAP financial measures presented here may not be comparable to similarly titled measures of other companies.
3. In order to conform to Tivity Health's historical reporting methodology, Adjusted EBITDA guidance for the Nutrition segment as presented includes non-cash share-based compensation expense. Nutrisystem removed this expense from Adjusted EBITDA as reported in its Current Report on Form 8-K filed with the Securities and Exchange Commission on February 19, 2019.
4. Nutrition segment Revenues and Adjusted EBITDA on a stand-alone full year basis include Nutrisystem actual results from 1/1/19 to 3/7/19. These figures are being provided for comparison purposes to the original 2019 stand-alone guidance and to prior year results.

62. As the tables above show, the Nutrition segment's actual adjusted EBITDA from January 1, 2019 to March 7, 2019 was approximately -$9 million (*i.e.*, either $71 million minus $80 million or $75 million minus $84 million). Hence, Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by Tivity in its 2Q 2019 supplemental materials presentation.

63. While Mr. Dalrymple attempts to rebut the above conclusion and claims the -$8.3 million in adjusted EBITDA was not revealed, his argument ignores the information that had been disclosed to the market. Mr. Dalrymple states:

> In its Form 8-K accompanying the Q2 2019 Earnings Announcement, Tivity provided supplemental materials that included original and updated revenue and adjusted EBITDA guidance for the Nutrition segment (formerly Nutrisystem). Comparing the 2019 Stub Period and full-year adjusted EBITDA guidance, however, revealed different implications for adjusted EBITDA in the period from January 1, 2019 to March 7, 2019, neither of which corresponded to the actual adjusted EBITDA loss of $8.3 million.[108]

64. I agree that subtracting the full year and "stub period" 2019 Guidance Update and 2019 Guidance Original lead to different numbers. However, as discussed above, the 2019 Guidance Original was disclosed by Tivity on February 19, 2019. This means that the 2019 Guidance

[108] Dalrymple Report, ¶ 47.

Original cannot possibly include actual performance through March 7, 2019, as it was disclosed prior to that date. In fact, on page 10 of the "Supplemental Material" presentation there is a note that the 2019 Guidance Original "Nutrition revenues and adjusted EBITDA ranges are implied based on February 19, 2019 guidance."[109] In addition, at least one of the analysts (Jefferies) referenced Nutrisystem's approximate Pre-Transaction 1Q 2019 Adjusted EBITDA from Tivity's August 7, 2019 disclosures,[110] stating:

> [W]e note core Nutrition EBITDA has a $9mm EBITDA headwind due to timing of the NTRI close (recall this business lost money in the 2 months before the March '19 close). We don't think that has been fully appreciated by investors. The $9mm drag should be more than offset by an incremental $13mm of cost synergies.[111]

65. Therefore, in addition to disclosing information regarding Nutrisystem's full 1Q 2019 performance as part of its 1Q 2019 earnings, Tivity disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA on August 7, 2019. Tivity's stock price increased from a closing price of $16.54 on August 7, 2019 to a closing price of $18.31 on August 8, 2019 (10.70%),[112] and the

---

[109] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.2, p. 10.

[110] Importantly, not all investors need to know or recognize a specific piece of information for the value impact of that information to be reflected in a company's stock price. As I discussed above and in the Gompers Class Certification Report, in an efficient market, well-informed investors compete to seek out profitable investment opportunities and, by quickly trading on these opportunities, ensure that prices reflect all publicly available information. Accordingly, in such a market, these "arbitrageurs" work to discipline prices and ensure that they reflect all publicly available information. *See*, Gompers Class Certification Report, ¶ 27. Mr. Dalrymple appears to agree that well-informed, well-resourced investors both have the incentives and the means to trade on—and thereby eliminate—perceived mispricings. In the Dalrymple Class Certification Report, he noted that "[i]nstitutional investors are presumed to be well-informed about the securities they hold and able to interpret and act upon new information" because they "have the capital, information, and resources required to take advantage of even relatively small arbitrage opportunities, ensuring that share prices reflect value-relevant information" (Dalrymple Class Certification Report, ¶ 43). In addition to "sell-side" analysts, who provide research to investment banks' and brokerage firms' clients, institutional investors also employ "buy-side" analysts who provide non-public recommendations to fund managers for use in their investment strategies (Rebello, Michael, and Kelsey D. Wei, "A Glimpse Behind a Closed Door: The Long-Term Investment Value of Buy-Side Research and Its Effect on Fund Trades and Performance," *Journal of Accounting Research* 52 no. 3 (2014): 775–815). Hence, even the absence of explicit sell-side commentary does not imply that information has not been incorporated into institutional investors trading decisions, and hence asset prices.

[111] "4 Key Insights from TVTY's 2Q19," Jefferies, August 8, 2019. Another analyst referenced Pre-Transaction 1Q 2019 Adjusted EBITDA on January 27, 2020, prior to the February 2020 Disclosure. "Downgrading to Neutral; Reiterate $25 Price Target," Piper Sandler, January 27, 2020.

[112] *CRSP*. *See also*, **Exhibit 1**.

residual return was positive and statistically significant at the 95% confidence level according to Mr. Dalrymple's event study.[113]

d) **November 12, 2019**

66. On November 12, 2019 after market close, Tivity released its 3Q 2019 earnings.[114] As part of its release, and similar to 2Q 2019, Tivity included a presentation with "Supplemental Material."[115] In this 3Q 2019 presentation, Tivity once again included guidance for the Nutrition segment both for the period that Tivity owned Nutrisystem (March 8, 2019 through December 31, 2019), as well as for all of 2019.[116] This guidance was identical to the "2019 Guidance Updated" in Tivity's 2Q 2019 Supplemental Material presentation. However, unlike 2Q 2019, there was only one set of guidance included, meaning that Mr. Dalrymple cannot try to argue that there were "different implications for adjusted EBITDA in the period from January 1, 2019 to March 7, 2019"[117] in this presentation like he does for the 2Q 2019 presentation. Instead, the 3Q 2019 presentation makes it clear again that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was approximately -$9 million.

---

[113] Dalrymple Report, footnote 230; Exhibit 1. Mr. Dalrymple does not analyze Tivity's August 7, 2019 disclosure as a potential corrective disclosure in the Dalrymple Report. However, his analysis indicates that Tivity's stock price increased in a statistically significant manner following Tivity's 2Q 2019 earnings release that included Pre-Transaction 1Q 2019 Adjusted EBITDA.

[114] Tivity Form 8-K, filed on November 12, 2019, Ex. 99.1; Tivity 3Q 2019 Earnings Call Transcript, November 12, 2019.

[115] Tivity Form 8-K, filed on November 12, 2019, Ex. 99.2.

[116] Tivity Form 8-K, filed on November 12, 2019, Ex. 99.2, pp. 10, 14.

[117] Dalrymple Report, ¶ 47.

*$ in millions except per share amounts*

| Metric | 2019 Guidance |
|---|---|
| **Consolidated Revenues** | **$1,127 - $1,142** |
| • Healthcare Segment Revenues | $625 - $630 |
| • Nutrition Segment Revenues Stub Period (3/8 – 12/31) | $502 - $512 |
| **Consolidated Adjusted EBITDA [1, 2]** | **$229 - $239** |
| • Healthcare Segment Adjusted EBITDA [1, 2] | $140 - $143 |
| • Nutrition Segment Adjusted EBITDA Stub Period (3/8 – 12/31) [1, 2] | $80 - $84 |
| • Anticipated Cost Synergies | $9 - $12 |
| **Consolidated Earnings Per Diluted Share** | **$1.11 – $1.32** |
| **Consolidated Adjusted Earnings Per Diluted Share [1, 2]** | **$2.14 - $2.32** |

## Footnotes

1. Adjusted EBITDA and Adjusted Earnings per Diluted Share are forward-looking non-GAAP financial measures. A reconciliation of Adjusted Earnings per Diluted Share guidance for the year ending December 31, 2019 to the comparable GAAP financial measure is included as an exhibit to Tivity Health's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 12, 2019. The Company does not provide a reconciliation of Adjusted EBITDA guidance to the most directly comparable GAAP financial measure because it is unable to provide such reconciliations without unreasonable effort due to the uncertainty and inherent difficulty of predicting the financial impact of certain items.
2. We believe Adjusted EBITDA and Adjusted Earnings per Diluted Share are useful measures of performance. You should not consider Adjusted EBITDA and Adjusted Earnings per Diluted Share in isolation or as a substitute for net income or Earnings per Diluted Share, respectively, in each case, determined in accordance with GAAP. Additionally, because Adjusted EBITDA and Adjusted Earnings per Diluted Share may be defined differently by other companies in the Company's industry, the non-GAAP financial measures presented here may not be comparable to similarly titled measures of other companies.

*$ in millions*

| Metric | 2019 Guidance |
|---|---|
| **Nutrition Segment Revenues (1/1 - 12/31) [4]** | **$635 - $645** |
| **Nutrition Segment Adjusted EBITDA (1/1 – 12/31) [1, 2, 3, 4]** | **$71 - $75** |

1. Adjusted EBITDA and Adjusted Earnings per Diluted Share are forward-looking non-GAAP financial measures. A reconciliation of Adjusted Earnings per Diluted Share guidance for the year ending December 31, 2019 to the comparable GAAP financial measure is included as an exhibit to Tivity Health's Current Report on Form 8-K filed with the Securities and Exchange Commission on November 12, 2019. The Company does not provide a reconciliation of Adjusted EBITDA guidance to the most directly comparable GAAP financial measure because it is unable to provide such reconciliations without unreasonable effort due to the uncertainty and inherent difficulty of predicting the financial impact of certain items.
2. We believe Adjusted EBITDA and Adjusted Earnings per Diluted Share are useful measures of performance. You should not consider Adjusted EBITDA and Adjusted Earnings per Diluted Share in isolation or as a substitute for net income or Earnings per Diluted Share, respectively, in each case, determined in accordance with GAAP. Additionally, because Adjusted EBITDA and Adjusted Earnings per Diluted Share may be defined differently by other companies in the Company's industry, the non-GAAP financial measures presented here may not be comparable to similarly titled measures of other companies.
3. In order to conform to Tivity Health's historical reporting methodology, Adjusted EBITDA guidance for the Nutrition segment as presented includes non-cash share-based compensation expense. Nutrisystem removed this expense from Adjusted EBITDA as reported in its Current Report on Form 8-K filed with the Securities and Exchange Commission on February 19, 2019.
4. Nutrition segment Revenues and Adjusted EBITDA on a stand-alone full year basis include Nutrisystem actual results from 1/1/19 to 3/7/19. These figures are being provided for comparison purposes to the original 2019 stand-alone guidance and to prior year results.

67. Tivity's stock price increased from a closing price of $18.55 on November 12, 2019 to a closing price of $19.63 on November 13, 2019 (5.79%),[118] and the residual return was positive and statistically significant at the 95% confidence level according to Mr. Dalrymple's event study.[119]

68. Not only did Tivity disclose information regarding the January 1, 2019 through March 7, 2019 performance for Nutrisystem on May 8–9, 2019 with its 1Q 2019 earnings, it also disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA on both August 7, 2019 and November 12, 2019.

### 2. Tivity's Internal Projections Were Generally Consistent with its Disclosed Guidance

69. In addition to Plaintiff's contention that Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA, Plaintiff also alleges that "[a]s a result of the Nutrition segment's poor performance in 1Q19, Defendants knew that the Nutrition segment was not on track to meet the Company's FY19 adjusted EBITDA guidance, and Defendants had no reasonable basis, and did not in fact believe, that the Nutrition segment would achieve its projected guidance."[120] However, internal documents prior to and including Tivity's last earnings release during the Class Period—on November 12, 2019—that included guidance are generally consistent with Tivity's disclosed guidance.

70. In its 1Q 2019 earnings release on May 8, 2019, Tivity affirmed its FY 2019 guidance (originally issued on February 19, 2019) of $534–550 million in revenue and $91–101 million in adjusted EBITDA for the Nutrition segment.[121] An internal CEO Business Update prepared during the week of May 10, 2019 indicates that the Company's internal projections for FY 2019

---

[118] *CRSP*. *See also*, **Exhibit 1**.

[119] Dalrymple Report, footnote 238; Exhibit 1.

[120] Complaint, ¶ 9.

[121] The February guidance for the Nutrition segment is obtained by subtracting standalone Tivity guidance from combined company guidance. For revenue, standalone Tivity guidance of $612–627 million is subtracted from combined company guidance of $1,146–$1,177 million to yield $534–550 million. 1,146 – 612 = 534; 1,177 – 627 = 550. For adjusted EBITDA, standalone Tivity guidance of $140–$145 million and synergy guidance of $9–$12 million is subtracted from the combined company guidance of $240–$258 million. $240 – $140 – $9 = $91 million; $258 – $145 – $12 = $101 million. Tivity Form 8-K, filed on February 19, 2019, Ex. 99.1, p. 3; Tivity Form 8-K, filed on May 8, 2019, Ex. 99.1, p. 3.

Nutrition segment revenue and adjusted EBITDA were $559.7 and $108.8 million, respectively.[122] In other words, when Tivity affirmed its FY 2019 Nutrition segment guidance, the Company's internal projections indicated that 2019 performance was generally consistent with and would exceed even the high end of its disclosed guidance ranges for both revenue and adjusted EBITDA.

71. Plaintiff does not allege any misrepresentations between May 8, 2019 and August 7, 2019. During this time period, Tivity's internal projections for the Nutrition segment's FY 2019 adjusted EBITDA declined from $108.8 million to $84 million. The new FY 2019 guidance for the Nutrition segment of $502–512 million in revenue and $80–$84 million in adjusted EBITDA that Tivity provided on August 7, 2019 was generally consistent with Tivity's new contemporaneous internal projections.[123] Specifically, materials presented to Tivity's Audit Committee on August 1, 2019 showed projected 2019 Nutrition segment revenue of $517.0 million and adjusted EBITDA of $84.9 million.[124] Further, a CEO Business Update prepared during the week of August 12, 2019 indicates that Tivity's internal projections for FY 2019 Nutrition segment revenue was $505.5 million and the projected adjusted EBITDA was $84.0 million.[125]

72. Tivity's disclosure in its 3Q 2019 earnings release on November 12, 2019 maintaining the FY 2019 guidance was also generally consistent with the Company's internal projections of the Nutrition segment's expected performance. On November 12, 2019, Tivity reaffirmed the FY 2019 Nutrition segment guidance of $502–512 million in revenue and $80–84 million in adjusted EBITDA.[126] The Company's November 4, 2019 Audit Committee meeting materials included projections of $503.8 million in revenue and $79.7 million in adjusted EBITDA for the Nutrition segment.[127] Notably, an internal CEO Business Update prepared during the week of

---

[122] "CEO Business Update," Week of May 10, 2019, TVTY_STROUGO0069132–134 at 133.

[123] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1, p. 3.

[124] Tivity Audit Committee Meeting Materials, August 1, 2019, TVTY_STROUGO0017544–631 at 560.

[125] The document includes two sets of projections for 2019 Nutrition revenue and adjusted EBITDA. First, the document shows a projection of $505.5 million in revenue and $84.0 million in adjusted EBITDA that accounts for July 2019 performance, does not include synergies, and "is reduced for the $3.3M" related to "additional investments." The document also shows a second projection of $516.8 in revenue and $89.4 million in adjusted EBITDA that includes the impact of synergies (and thus is not comparable to the public guidance, which projects synergies separately from segment adjusted EBITDA guidance), was not updated to reflect July performance, and did not include the $3.3 million reduction related to "additional investments." "CEO Business Update," Week of August 12, 2019, TVTY_STROUGO 0191758–764 at 758, 763.

[126] Tivity Form 8-K, filed on November 12, 2019, Ex. 99.1, p. 3.

[127] Tivity Audit Committee Materials, November 4, 2019, TVTY_STROUGO0018844–9008 at 8859.

October 27, 2019 stated that "we still see a path to the low end of the [2019 guidance] ranges, $502M revenue and $83M in adjusted EBITDA."[128]

### 3. Mr. Dalrymple Does Not Reliably Demonstrate That Any Investor Losses on December 9, 2019 or February 20, 2020 Were Caused by the Alleged Misrepresentations for the Nutrisystem Claim

73. As discussed above, I understand that Plaintiff's alleged misrepresentations for the Nutrisystem Claim are centered around Nutrisystem's performance between January 1, 2019 and March 7, 2019—prior to the closing of the Transaction—and specifically include the lack of a disclosure of Nutrisystem's adjusted EBITDA during that period. Plaintiff also alleges that the Company provided misleading FY 2019 financial guidance for the Nutrition segment. Instead of considering the actual disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA on August 7, 2019 or whether the Company's guidance provided to investors was generally consistent with its internal projections, Mr. Dalrymple appears to simply assume that information released on December 9, 2019 and February 20, 2020 was corrective or "within the zone of risk concealed by the alleged fraud."[129]

74. In his report, Mr. Dalrymple states:

> I understand that the Plaintiff alleges, *inter alia*, that information contained in the December 2019 Disclosure and February 2020 Disclosure revealed to the market value-relevant information that had either been previously withheld or was within the zone of the risk concealed by the alleged fraud. Through these disclosures, Plaintiff alleges that market participants learned of Tivity's true business condition and the extent of the risks concealed from investors. As a result, according to Plaintiff, Tivity's share price was artificially inflated during the Class Period, and the inflation dissipated following each of the corrective disclosures.[130]

75. He then analyzes the Alleged Corrective Disclosures. For the December 2019 Disclosure, he concludes that "[w]hile Ms. Zier's termination did not reveal the extent of the

---

[128] "CEO Business Update," Week of October 27, 2019, TVTY_STROUGO0323335–340 at 339. The CEO Business Update prepared during the week of November 18, 2019 contained similar language, noting "the Nutrition division remains on target and committed to hitting the lower end of the guidance ranges for both revenue and EBITDA." *See*, "CEO Business Update," Week of November 18, 2019, TVTY_STROUGO0325280–285 at 284.
[129] Dalrymple Report, ¶ 84.
[130] Dalrymple Report, ¶ 84.

Nutrition segment's underperformance in 2019 and going into the 2020 diet season, it provided investors some indication that the Nutrition segment was underperforming, which translated to an increase in perceived risk associated with the stock."[131] He further states that he "understand[s] Plaintiff alleges that the inflation that was attributable to management's assurances that the Nutrition segment was on track partially dissipated on December 9, 2019, when Ms. Zier, the former CEO of Nutrisystem and then-current President and COO of Tivity, was terminated ahead of the impending diet season, as Ms. Zier's departure raised the perceived likelihood that the upcoming diet season would be a failure and adversely affect the prospects of the Nutrition segment."[132]

76. For the February 2020 Disclosure, Mr. Dalrymple states "[i]t is… reasonable to conclude that the abnormal return of $10.39 per share reflects the impact of the company-specific information contained in the February 2020 Disclosure, including new value-relevant information related to the Nutrition segment that I understand Plaintiff alleges was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[133]

77. As explained in the following sections, Mr. Dalrymple's conclusion that at least a portion of Tivity's stock price declines on each of these two dates were caused by the alleged misrepresentations for the Nutrisystem Claim is flawed and unreliable.

#### a) Mr. Dalrymple Does Not Support His "Zone of Risk" Assertion

78. Mr. Dalrymple asserts that Plaintiff alleges information disclosed in the December 2019 Disclosure and the February 2020 Disclosure was "within the zone of risk" concealed by Defendants' alleged misrepresentations. Specifically, he states: "It is my understanding from counsel that Plaintiff alleges Ms. Zier's departure [the December 2019 Disclosure], without warning and without having articulated a plan for succession to investors, was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[134] Similarly for the February 2020 Disclosure he states: "According to Plaintiff's allegations, '[t]he decline in the price of Tivity common stock after the corrective disclosures came to light was a direct result of

[131] Dalrymple Report, ¶ 87.
[132] Dalrymple Report, ¶ 88.
[133] Dalrymple Report, ¶ 94.
[134] Dalrymple Report, ¶ 58.

the revelation of the nature and extent of Defendants' scheme and fraudulent misrepresentations and omissions to investors and the market, and such corrective disclosures were within the zone of risk concealed by Defendants' fraud.'"[135] For neither the December 2019 Disclosure nor the February 2020 Disclosure does Mr. Dalrymple perform any economic analysis to support Plaintiff's allegation, and instead, he simply assumes that information disclosed was "within the zone of risk" concealed by Defendants' alleged misrepresentations. Mr. Dalrymple fails to reliably establish what (if any) portion of the information disclosed on December 9, 2019 and February 19, 2020 (and any resulting price declines) can be attributed to publicly known risks, as opposed to any that can be attributed to risks purportedly concealed by the alleged misrepresentations. Thus, as a matter of economics, his "zone of risk" assertion cannot be used to reliably demonstrate that the alleged misrepresentations caused any investor losses

#### b) Mr. Dalrymple Fails to Reliably Demonstrate that Tivity's Stock Price Decline after the Announcement of Ms. Zier's Departure Was Caused by the Alleged Misrepresentations

79. On December 9, 2019, Tivity announced that "[e]ffective December 4, 2019, the employment relationship between Tivity Health, Inc. (the 'Company') and Dawn M. Zier, the President and Chief Operating Officer of the Company, was mutually terminated."[136] Tivity's stock price declined from a closing price of $22.64 on December 6, 2019 to a closing price of $20.23 on December 9, 2019, 2019 (-10.64%),[137] and the residual return was negative and statistically significant at the 95% confidence level according to Mr. Dalrymple's event study.[138] Mr. Dalrymple asserts that Plaintiff alleges that Ms. Zier's departure announced on December 9, 2019 was "within the zone of risk concealed by Defendants' alleged misrepresentations and scheme,"[139] and that as a result, "inflation that was attributable to management's assurances that

---

[135] Dalrymple Report, ¶ 70.
[136] Tivity Form 8-K, filed on December 9, 2019, p. 2. Furthermore, Tivity noted that "in accordance with her employment agreement, Ms. Zier resigned as a director of the Company effective December 4, 2019. Ms. Zier's decision to step down from the Company's board of directors is not related to any disagreement between Ms. Zier and the Company with respect to the Company's operations, policies or practices. The Company's board of directors determined to reduce the size of the board to eleven directors upon the effectiveness of Ms. Zier's resignation."
[137] *CRSP*. *See also*, **Exhibit 1**.
[138] Dalrymple Report, Exhibit 1.
[139] Dalrymple Report, ¶¶ 58, 88.

the Nutrition segment was on track partially dissipated on December 9, 2019."[140] However, Mr. Dalrymple fails to reliably establish that the stock price reaction to Ms. Zier's departure reflects anything but the materialization of a disclosed risk, does not link the resignation to the alleged misrepresentations, and does not reliably establish that the resignation would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented). He simply assumes loss causation.

80. Mr. Dalrymple fails to acknowledge that when companies are acquired or merged, there is a risk of executive departures.[141] In this case, Tivity disclosed risks associated with acquiring and integrating a new company, which included the potential for management turnover, in the Company's 2018 10-K filed on February 26, 2019, prior to the Class Period. Specifically, the filing noted:

> [W]e cannot provide assurances that our and Nutrisystem's businesses can be integrated successfully. It is possible that the integration process **could result in the loss of key employees**, the disruption of either company's, or both companies' ongoing businesses or in unexpected integration issues, higher than expected integration costs and an overall post-completion integration process that takes longer than originally anticipated.[142]

Similar language appeared in Tivity's Form 10-Q filings for 1Q 2019, 2Q 2019, and 3Q 2019.[143]

81. Further, academic literature has documented that stock prices react to the announcement of the departure of an executive.[144] Mr. Dalrymple has not reliably demonstrated that Tivity's

---

[140] Dalrymple Report, ¶ 88. Note that the Complaint alleges that the relevant truth regarding the alleged misrepresentations was revealed through one corrective disclosure after market close on Wednesday February 19, 2020, when Tivity announced its 4Q 2019 and FY 2019 financial results and held its analyst conference call. *See*, Complaint, ¶¶ 172–175. The Complaint does mention December 9, 2019 and Ms. Zier's departure, but not as an alleged misrepresentation or an alleged corrective disclosure. Complaint, ¶¶ 13, 77, 183.

[141] *See*, for example, Cannella, Albert A. Jr., Donald C. Hambrick, "Effects of Executive Departures on the Performance of Acquired Firms," *Strategic Management Journal* 14 (1993): 137–152.

[142] Tivity 2018 10-K, p. 14 (emphasis added).

[143] Tivity 1Q 2019 10-Q, p. 39; Tivity 2Q 2019 10-Q, p. 43; Tivity Form 10-Q for Quarterly Period Ended September 30, 2019, Filed on November 12, 2019 ("Tivity 3Q 2019 10-Q"), p. 44.

[144] For example, Dedman and Lin (2002) and Marshall et al. (2014) show that stock prices decline in the wake of CEO departure announcements. *See*, Dedman, Elizabeth and Stephen W-J Lin, "Shareholder Wealth Effects of CEO Departures: Evidence from the UK," *Journal of Corporate Finance* 8, no. 1 (2002): 81–104; Marshall, Andrew, Laura McCann, Patrick McColgan, "Do Banks Really Monitor? Evidence from CEO Succession Decision," *Journal of Banking and Finance* 46 (2014): 118–131 at 126. Moreover, Johnson et al. (1985) and Worrell et al. (1986) document abnormal stock returns after CEO and/or corporate chairman deaths. *See*, Johnson, W. Bruce, et al., "An Analysis of the Stock Price Reaction to Sudden Executive Deaths," *Journal of Accounting and Economics* 7 (1984): 151–174; Worrell, Dan L., et al., "Management Turnover through Deaths of Key Executives: Effects on Investor Wealth," *The Academy of Management Journal* 29, no. 4 (1986): 674–694.

stock price would have reacted differently to Ms. Zier's departure had Tivity's prior public disclosures been what Plaintiff alleges should have been disclosed. Thus, he has not reliably demonstrated that any investor losses on December 9, 2019 were caused by the alleged misrepresentations rather than by the materialization of a disclosed risk.

82. Additionally, Mr. Dalrymple does not link the news about Ms. Zier's resignation to the alleged misrepresentations. Mr. Dalrymple states that "Ms. Zier's departure… adversely affected investors' confidence in Tivity's ability to stabilize and improve the Nutrition segment,"[145] but admits that "**Ms. Zier's termination did not reveal the extent of the Nutrition segment's underperformance in 2019** [which I understand is the subject of alleged misrepresentations for the Nutrisystem Claim] and going into the 2020 diet season, [but] provided investors some indication that the Nutrition segment was underperforming, which translated to an increased risk associated with the stock."[146] Mr. Dalrymple also asserts without support that "Ms. Zier's departure raised the perceived likelihood that the upcoming diet season would be a failure and adversely affect the prospects of the Nutrition segment."[147] Even if it were true (and at least some analyst commentary suggests otherwise),[148] Mr. Dalrymple fails to explain how fears about performance during the *upcoming* diet season in 2020 corrected alleged misrepresentations about performance during the *previous* diet season in 2019—what I understand is the subject of the Nutrisystem Claim. As I discuss in Section V and **Appendix D**, stock prices in an efficient market are a function of expected *future* cash flows and the *riskiness* of the *future* cash flows. In addition, information about the 2019 diet season performance was previously disclosed (*see* Section VI.B.1) and, in an efficient market, repeated disclosure of that information would not be expected to cause a stock price reaction.

---

[145] Dalrymple Report, ¶ 87.
[146] Dalrymple Report, ¶ 87 (emphasis added).
[147] Dalrymple Report, ¶ 88.
[148] Analysts at Cantor Fitzgerald noted on December 9, 2019 after speaking with Tivity's CFO Mr. Holland that "[w]hile Ms. Zier was serving as President and COO of TVTY, the company's 2020 diet season strategies were directly overseen by Keira Krausz (President of the Nutrition segment), who remains with the company," and that they "are not too concerned about the departure." *See*, "Update After our Call with CFO; Reiterate Overweight," Cantor Fitzgerald, December 9, 2019.) Similarly, analysts at SunTrust Robinson Humphrey noted that they "do not necessarily view the announcement as a red flag and with the 2019 challenges the company has experienced in the nutrition business/TVTY's commitment to further integrating the nutrition offering into its Healthcare segment platform, [they] welcome fresh eyes." *See*, "Comments On Management Change," SunTrust Robinson Humphrey, December 9, 2019. Mr. Dalrymple acknowledges this analyst commentary. Dalrymple Report, ¶ 156 and footnote 146.

83. Further, as discussed in Section VI.B.1, Tivity's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed on August 7, 2019. If Tivity's stock price traded in an efficient market as Plaintiff and Mr. Dalrymple assert, Tivity's stock price would have incorporated this adjusted EBITDA and its expected value implication by August 8, 2019. Therefore, none of the stock price decline on December 9, 2019 could be caused by the alleged misrepresentation regarding Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA in an efficient market.

84. Moreover, Mr. Dalrymple does not reliably establish that Ms. Zier's resignation would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented). As discussed in Section VI.B.2, Tivity's FY 2019 guidance on May 8, 2019, August 7, 2019, and November 12, 2019 was generally consistent with internal projections. If Mr. Dalrymple contends that Ms. Zier departed because internal projections declined between the start of the Class Period and November 12, 2019, then he fails to reliably establish that her departure revealed any new value-relevant information to shareholders about the evolution of internal projections over this period that had not already been publicly disclosed. For example, he has not provided evidence that analysts would have changed their forecasts had Tivity disclosed on November 12, 2019 its internal projections of Nutrition segment performance (which is more information than I understand it was required to disclose), let alone how analyst forecasts would have changed. Specifically, while Tivity had not released FY 2020 guidance as of November 12, 2019, its most recent internal projection for Nutrition segment revenue was $655.3 million.[149] This figure was higher than the average and median forecasts in analyst reports that included FY 2020 Nutrition segment revenue in their reports after Tivity's 3Q 2019 earnings announcement.[150] If Mr. Dalrymple contends that Ms. Zier departed because internal

---

[149] *See*, "Impairment Assessment at September 30, 2019," November 5, 2019, PwC007100–106 at 102. I understand that this document included the most up-to-date projections for the Nutrition segment at the time of the November 12, 2019 earnings release.

[150] Of the analyst reports I had access to published in the week following the November 12, 2019 earnings release, five included FY 2020 revenue forecasts for the Nutrition segment. These forecasts ranged from $592.8 million to $693.5 million with an average of $650.4 million and a median of $644.1 million. None of the analyst reports contained projections of Nutrition segment EBITDA. *See*, "3Q19 Review; EBITDA Was Light but Guidance Reaffirmed; Reiterate Overweight," Cantor Fitzgerald, November 12, 2019; "2019 Guidance Reiterated. Nutrition Innovations For Diet Season As Well As New Older American Offering Provide Strong Catalysts For 2020. Reiterate BUY Rating And $30 Price Target," Craig-Hallum, November 13, 2019; "3Q19 Better-Than-Feared," Piper Jaffray, November 13, 2019; "Mixed 3Q With EBITDA Below, Guidance Reiterated And Some Strategic Progress – Trimming Estimates," SunTrust Robinson Humphrey, November 13, 2019; "Q3 Results Mixed; Top Line Beats; Profitability Falls Short; Reducing PT to $38 from $40, but Upside Still Very Big," Barrington Research, November 14, 2019.

projections declined between November 12, 2019 and December 9, 2019 (for which he provides no support), then he fails to reliably establish that the news about the departure revealed anything but timely disclosed information.[151]

85. In conclusion, for all the reasons above, Mr. Dalrymple inappropriately assumes rather than establishes loss causation on December 9, 2019.

#### c) Mr. Dalrymple Fails to Reliably Establish that the February 20, 2020 Price Decline Was Caused by the Alleged Misrepresentations for the Nutrisystem Claim

86. After market close on February 19, 2020, Tivity announced its 4Q 2019 and FY 2019 financial results, FY 2020 financial guidance, and impairment charges related to the Transaction. As part of its 4Q 2019 and FY 2019 earnings release, Tivity included financial information for Nutrisystem from January 1, 2019 through March 7, 2019, before the Transaction closed, including its Pre-Transaction 1Q 2019 Adjusted EBITDA of -$8.3 million as shown below.[152]

**Nutrition Segment**
*Dollars in millions*

| | Three Months Ended December 31, 2019 | Fiscal Year 2019 (3/8/19 – 12/31/19) | Nutrisystem, Inc. 2019 Prior to Acquisition (1/1/19 – 3/7/19) (2) |
|---|---|---|---|
| Nutrition Revenues | $113.7 | $498.1 | $134.0 |
| Nutrition Adjusted EBITDA | $13.9 | $79.6 | ($8.3) |
| Nutrition Adjusted EBITDA Margin | 12.2% | 16.0% | (6.2%) |

On the same day, Tivity also announced the departure of its CEO, who also resigned from the board of directors, and the resignation of the President of the Nutrition Business Unit.[153]

87. Tivity's stock price declined from a closing price of $22.93 on February 19, 2020 to a closing price of $12.50 on February 20, 2020 (-45.49%),[154] and the residual return was negative and statistically significant at the 95% confidence level according to Mr. Dalrymple's event

[151] Mr. Dalrymple appears to attribute the stock price decline on December 9, 2019 to "raised investors' concerns over the upcoming diet season and *current* performance of the nutrition segment." Dalrymple Report, ¶ 110 (emphasis added).
[152] Tivity Form 8-K, filed on February 19, 2020, Ex. 99.1, p. 3.
[153] Tivity Form 8-K, filed on February 19, 2020, Ex. 99.2, p. 1.
[154] *CRSP*. *See also*, **Exhibit 1**.

study.[155] Mr. Dalrymple attributes Tivity's February 19, 2020 residual stock price decline to "company-specific information contained in the February 2020 Disclosure, including new value-relevant information related to the Nutrition segment that I understand Plaintiff alleges was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[156] Specifically, Mr. Dalrymple states that he "found that the information in the February 2020 Disclosure corresponded to a significant abnormal share price decline of $10.39, which was primarily attributable to the following factors:

a. Lower-than-expected financial results for the current quarter ending December 31, 2019, which was driven by the underperformance in the Nutrition segment;
b. Lower-than-expected management guidance for the fiscal year ending December 31, 2020, which was mostly attributable to the underperformance in the Nutrition segment;
c. Impairment charge of $377.1 million related to the Nutrisystem trade name and goodwill due to the Company's reduced long-term forecast for the Nutrition segment;
d. Management changes associated with the departures of Mr. Tramuto and Ms. Krausz;
e. [Une]xpected EBITDA margin compression of approximately 190 basis points in FY20 within the Healthcare segment."[157]

88. The following sections discuss each of the five factors to which Mr. Dalrymple asserts Tivity's February 20, 2020 stock price decline "was primarily attributable."[158] While Mr. Dalrymple mentions these factors, he does not link any of them to the alleged misrepresentations for the Nutrisystem Claim. Hence, he fails to reliably establish that any investor losses on February 20, 2020 were caused by the alleged misrepresentations for the Nutrisystem Claim.

---

155 Dalrymple Report, Exhibit 1.
156 Dalrymple Report, ¶ 94.
157 Dalrymple Report, ¶ 99. *See also*, Dalrymple Report, ¶ 105.
158 Dalrymple Report, ¶ 99.

#### (1) Mr. Dalrymple Does Not Reliably Establish that Any Investor Losses on February 20, 2020 Were Caused by the Disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA

89. Mr. Dalrymple states that "the abnormal return of $10.39 per share reflects the impact of the company-specific information contained in the February 2020 Disclosure, including new value-relevant information related to the Nutrition segment that I understand Plaintiff alleges was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[159] However, Mr. Dalrymple does not reliably establish that the February 2020 Disclosure revealed any new information about the alleged misrepresentation regarding the Pre-Transaction 1Q 2019 Adjusted EBITDA.

90. As discussed in Section VI.B.1, the Pre-Transaction 1Q 2019 Adjusted EBITDA was already publicly available during the Class Period as it was disclosed on August 7, 2019 as part of Tivity's 2Q 2019 earnings information, and on November 12, 2019 as part of Tivity's 3Q 2019 earnings information.[160] If Tivity's stock traded in an efficient market during the Class Period as Mr. Dalrymple contends, the Pre-Transaction 1Q 2019 Adjusted EBITDA would have been incorporated into Tivity's stock price by August 8, 2019. Thus, Mr. Dalrymple has no reliable basis to conclude that any portion of the stock price decline on this day was caused by

[159] Dalrymple Report, ¶ 94.
[160] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.2, pp. 10, 14; Tivity Form 8-K, filed on November 12, 2019, Ex. 99.2, pp. 10, 14. Moreover, Nutrisystem's revenue from January 1, 2019 to March 7, 2019 was also already publicly available during the Class Period: Tivity disclosed Nutrisystem's revenue of $57.6M for the period from March 8, 2019 through March 31, 2019 in its 1Q 2019 financial results on May 8, 2019, and Nutrisystem's full 1Q 2019 revenue of $191 million in the 1Q 2019 earnings conference call. *See*, Tivity Form 8-K, filed on May 8, 2019, Ex. 99.1, p. 3; Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019.

the alleged misrepresentations of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA in an efficient market.[161, 162]

**(2) Mr. Dalrymple Fails to Reliably Establish the Information in Tivity's FY 2019 Financial Results and FY 2020 Financial Guidance Was Not Timely, or Tie the Information to the Alleged Misrepresentations for the Nutrisystem Claim**

91. The Pre-Transaction 1Q 2019 Adjusted EBITDA of -$8.3M for the Nutrition segment is just one piece of information disclosed as part of Tivity's 4Q 2019 and FY 2019 earnings release (which as discussed above, was already disclosed on August 7, 2019). As noted above, Mr. Dalrymple states that the residual price decline on February 20, 2020 was "primarily attributable to [several factors including] [l]ower-than-expected financial results for the current quarter ending December 31, 2019, [and] [l]ower-than-expected management guidance for the fiscal year ending December 31, 2020."[163] He further states that "[b]ased on [his] review of the information disclosed in the February 2020 Disclosure and associated analyst coverage, it is

[161] Analysts did not comment on or mention Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA. Specifically, none of the nine analyst reports published between February 19, 2020 and February 21, 2020 that I had access to mention the -$8.3 million in adjusted EBITDA or a surprise in the 1Q 2019 adjusted EBITDA for the Nutrition segment. The lack of analyst commentary discussing the $8.3 million adjusted EBITDA loss in 1Q 2019 following the February 2020 Disclosure is consistent with the information regarding Nutrisystem's performance for 1Q 2019 prior to Transaction closing, including the Pre-Transaction 1Q 2019 Adjusted EBITDA, being incorporated in Tivity's stock price before the alleged corrective disclosure on February 19, 2020. *See*, "When It Rains, It Pours," Credit Suisse, February 19, 2020; "Downgrade to Hold: Too Many Uncertainties," Jefferies, February 19, 2020; "Q4 Results, FY/20 Guidance Disappoint; CEO Terminated; Nutrition Business Still a Mess; No Quick Fixes; Reducing PT to $24 from $38," Barrington Research, February 20, 2020; "Not Much ProducTIVITY Here; Downgrading to Neutral and Lowering Price Target," Cantor Fitzgerald, February 20, 2020; "Weak 2020 Guidance Driven by Retail Segment Weakness. Downgrading from BUY to HOLD in View of Lower Estimates and Management Turnover. Reducing Price Target to $18," Craig-Hallum, February 20, 2020; "Q4 2019: Crisis in Nashville," Piper Sandler, February 20, 2020; "Nutrition Challenges Continue - Downgrading to Hold, Cutting Estimates and Target," SunTrust Robinson Humphrey, February 20, 2020; "CEO Departure Signals Botched Strategy for Nutrition Acquisition; Downgrading to Market Perform," William Blair, February 20, 2020; "Q&A Our Way: In Search of Nutritional Growth," Credit Suisse, February 21, 2020.

[162] To the extent that Mr. Dalrymple argues that the disclosure was not sufficient because the -$9 million Pre-Transaction 1Q 2019 Adjusted EBITDA indicated by the supplemental materials on August 7 ,2019 and November 12, 2019 did not "correspond[] to the actual adjusted EBITDA loss of $8.3 million" (Dalrymple Report, ¶ 47), he does not reliably establish that the market would have changed its expectations for future cash flows for the Nutrition Segment in FY 2019 had the more precise adjusted EBITDA been disclosed after August 8, 2019 but prior to February 19, 2020. Moreover, since the approximate number disclosed (an adjusted EBITDA loss of $9 million) was more negative than the more precise $8.3 million loss, if anything, Tivity's stock price on February 20, 2020 would be expected to react in a *positive* manner to the less negative precise adjusted EBITDA. However, for all the reasons discussed in this report and the Gompers Class Certification Report, I would not expect any reaction to the adjusted EBITDA disclosure of $8.3 million on February 20, 2020.

[163] Dalrymple Report, ¶ 99.

apparent that the financial performance of the Nutrition segment was the predominant cause of the significant share price decline on February 20, 2020."[164] However, Mr. Dalrymple's analysis of the purported losses on February 20, 2020 caused by the alleged misrepresentations for the Nutrisystem Claim is flawed and unreliable, because he performs no analysis to: (1) establish any causal connection between the information about Nutrition segment's FY 2020 guidance and the alleged misrepresentations for the Nutrisystem Claim; (2) establish what (if any) information about Nutrition segment's 4Q 2019 and FY 2019 performance or FY 2020 guidance was not disclosed in a timely manner; (3) isolate the price effect of any news that was not timely disclosed; and (4) account for prior market knowledge of risks associated with the Transaction.

92. *First*, Mr. Dalrymple performs no analysis to reliably establish a causal connection between the information about Nutrisystem's FY 2019 financial results and FY 2020 guidance (the "[l]ower-than-expected financial results for the current quarter ending December 31, 2019, [and] [l]ower-than-expected management guidance for the fiscal year ending December 31, 2020"[165]) and the alleged misrepresentations for the Nutrisystem Claim.

93. *Second*, Mr. Dalrymple does not reliably establish what (if any) information about Nutrisystem's 4Q 2019 and FY 2019 performance or FY 2020 guidance released on February 19, 2020 was not disclosed in a timely manner (*i.e.*, was information that could and should have been disclosed to the market earlier). He fails to acknowledge that the FY 2019 guidance Tivity disclosed in connection with its quarterly earnings releases prior to the end of the Class Period—specifically, on May 8, 2019, August 7, 2019, and November 12, 2019—was generally consistent with Tivity's contemporaneous internal forecasts (*see* Section VI.B.2).

94. In addition, Tivity initiated FY 2020 guidance for the first time on February 19, 2020. While Mr. Dalrymple states that the "steep decline in Tivity's share price reflected market participants' significant revisions to earnings expectations and perceived risk associated with the company,"[166] and that "revisions to expectations were driven primarily by a reduction in the expected earnings of the Nutrition segment based on lower projected revenues, decreased margins, and the continued underperformance of the segment,"[167] he did not undertake any

---

[164] Dalrymple Report, ¶ 100.
[165] Dalrymple Report, ¶ 99.
[166] Dalrymple Report, ¶ 92.
[167] Dalrymple Report, ¶ 93.

analysis in his report to determine whether the disclosed FY 2020 guidance represented an untimely disclosure.

95. *Third*, to the extent some portion of the allegedly corrective information disclosed on February 19, 2020 was not disclosed in a timely manner, Mr. Dalrymple has not attempted to disentangle the portion of Tivity's stock price decline caused by information disclosed in a timely manner from information that was not disclosed in a timely manner, which is needed to determine whether the purportedly untimely information caused any portion of Tivity's stock price decline on February 20, 2020.

96. *Fourth*, as I explained in the Gompers Class Certification Report, when a risk materializes, a company's stock price will generally decline even if that risk was fully understood by market participants.[168] I understand that only losses due to materialization of concealed risks (as opposed to losses due to the materialization of publicly disclosed risks) can be attributed to the alleged misrepresentations.

97. Plaintiff alleges that Tivity "misled investors about…the acquisition's impact on Tivity's new 'nutrition segment.'"[169] Tivity disclosed risks associated with acquiring and integrating Nutrisystem in its SEC filings prior to the Class Period. For example, Tivity's 2018 10-K filed on February 26, 2019 specifically highlighted risks associated with Tivity's "ability to combine successfully the business of Nutrisystem with our business" and "whether the combined businesses perform as expected."[170] Specifically:

> [W]e cannot provide assurances that our and Nutrisystem's businesses can be integrated successfully. It is possible that the integration process could result in the loss of key employees, the disruption of either company's, or both companies' ongoing businesses or in unexpected integration issues, higher than expected integration costs and an overall post-completion integration process that takes longer than originally anticipated.[171]

Similar language appeared in Tivity's Form 10-Q filings for 1Q 2019, 2Q 2019, and 3Q 2019.[172]

---

[168] Gompers Class Certification Report, ¶ 85.
[169] Memorandum Opinion, July 29, 2021, p. 2.
[170] Tivity 2018 10-K, p. 14.
[171] Tivity 2018 10-K, p. 14.
[172] Tivity 1Q 2019 10-Q, p. 39; Tivity 2Q 2019 10-Q, p. 43; Tivity 3Q 2019 10-Q, p. 44.

98. Tivity's 1Q 2019, 2Q 2019, and 3Q 2019 earnings releases also disclosed risks associated with the Nutrisystem business's expected performance. For example, Tivity's May 8, 2019 earnings release stated:

> Many risks and uncertainties could affect actual results and cause them to vary materially from the forward-looking statements. These risks and uncertainties include, among other things: … the risk that expected benefits, synergies and growth opportunities of the Company's acquisition of Nutrisystem may not be achieved in a timely manner or at all, including that the acquisition may not be accretive within the expected timeframe or to the extent anticipated; the Company's ability to successfully integrate Nutrisystem's business or any other new or acquired businesses, services, technologies, solutions or products into the Company's business and to accurately forecast the related costs; … the impact of any impairment of the Company's goodwill, intangible assets, or other long-term assets; … competition from other weight management methods; loss of any of the Company's Nutrition segment third-party retailer agreements and any obligations associated with such loss; the Company's ability to continue to develop innovative weight loss programs and enhance its existing programs, or the failure of the Company's programs to continue to appeal to the market.[173]

Similar disclosures were provided in Tivity's August 7, 2019 and November 12, 2019 earnings releases.[174]

99. Analysts also commented on publicly disclosed risks prior to and during the Class Period. For example, a Barrington Research report on February 20, 2019 stated that "there is also material risk that attends this transaction and much skepticism among investors."[175] Similarly, a Cantor Fitzgerald report on May 8, 2019 noted that "[t]he shares' valuation could be negatively affected if the company does not integrate Nutrisystem on a timely basis and/or does not achieve our cost-savings estimates."[176]

---

[173] Tivity Form 8-K, Ex. 99.1, filed on May 8, 2019, p. 5–6.

[174] Tivity Form 8-K, Ex. 99.1, filed on August 7, 2019, pp. 5–6; Tivity Form 8-K, Ex. 99.1, filed on November 12, 2019, pp. 4–6.

[175] "Q4 Results In-Line with Late-January Guide; FY/19 Outlook Below Expectations; NTRI Deal Weighs on Valuation; PT is now $40," Barrington Research, February 20, 2019.

[176] "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019. *See also*, "Q1 Results Solid as Nutrition Achieves Significant March Rebound. We Continue to See Meaningful Long-Term Revenue Synergies. Reiterate BUY Rating and $30 Price Target," Craig-Hallum, May 9, 2019 ("Risks. Acquisition risk related to the Nutrisystem transaction."); "Healthcare Strength and Stabilizing Nutrition Segment Should Improve Sentiment," Oppenheimer, May 9, 2019 ("NTRI acquisition integration risk for Mar'19 deal.").

100. The materialization of these publicly disclosed risks could cause losses that are separate from any that could be caused by the alleged misrepresentations for the Nutrisystem Claim. Yet, Mr. Dalrymple fails to reliably establish what portion of the information disclosed on February 19, 2020 resulted from the materialization of these publicly disclosed risks. Without undertaking this analysis, Mr. Dalrymple cannot conclude that any portion of Tivity's stock price decline on February 20, 2020 was caused by factors other than the materialization of publicly disclosed risks.

**(3) Mr. Dalrymple Fails to Reliably Establish that Any Losses Attributable to the Impairment Charge Were Caused by the Alleged Misrepresentations for the Nutrisystem Claim**

101. I understand that, according to Plaintiff, the goodwill and trademark impairment charges revealed the relevant truth regarding the alleged misrepresentations for the Goodwill Claim, not the Nutrisystem Claim.[177] In order to conclude that the impairment charge was caused by the alleged misrepresentations for the Nutrisystem Claim, Mr. Dalrymple would need to link the impairment charges to FY 2019 performance of the Nutrition segment, which I understand is the subject of the Nutrisystem Claim. He does not do this and, in fact, Tivity's February 19, 2020 disclosure explained that the impairment charges were due to expectations about the segment's *future* performance (*See* Section VI.C below), not FY 2019 performance. Thus, Mr. Dalrymple fails to causally link losses (if any) on February 20, 2020 due to the impairment charges to the alleged misrepresentations for the Nutrisystem Claim.[178]

**(4) Mr. Dalrymple Fails to Reliably Establish that Any Losses from the Announcement of the Departures of Mr. Tramuto and Ms. Krausz Were Caused by the Alleged Misrepresentations**

102. Mr. Dalrymple contends that "securities analysts linked terminations of Mr. Tramuto and Ms. Krausz directly with the underperformance of the Nutrition segment,"[179] and that "[t]he

---

[177] Complaint, ¶ 173. *See also*, Dalrymple Report, ¶ 17.
[178] As I show in Section VI.C below, Mr. Dalrymple fails to reliably establish that any portion of Tivity's stock price decline on February 20, 2020 was caused by the alleged misrepresentations for the Goodwill Claim.
[179] Dalrymple Report, ¶ 101.

view that the failures related to the Nutrisystem acquisition caused Mr. Tramuto's termination was also shared internally at Tivity."[180] He concludes that "Tivity's leadership change announcements did not materially affect the company's share price in any way that was unrelated to the alleged corrective information in the February 2020 Disclosure."[181]

103. Just as with the analysis of Mr. Zier's departure (*see* Section VI.B.3.b), Mr. Dalrymple fails to reliably establish that the stock price reaction to departures of Mr. Tramuto and Ms. Krausz reflects anything but the materialization of a disclosed risk. He does not link the departures to the alleged misrepresentations and does not reliably establish that the departures would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented). Mr. Dalrymple inappropriately assumes rather than establishes loss causation in his discussion of price effects of the executive departures.

#### (5) Confounding Information for the Healthcare Segment

104. Mr. Dalrymple states that "although the Healthcare segment performed as expected for the current quarter, Tivity's FY20 guidance revealed higher expected revenues but lower expected margins (relative to its FY19 guidance), with adjusted EBITDA for the Healthcare segment expected to remain flat in FY20."[182] He further states that "the unexpected EBITDA margin compression of approximately 190 basis points for the Healthcare segment in FY20 is negative confounding information," and that "it is appropriate to remove the effect of this confounding information in order to isolate the share price reaction to information pertaining to Defendants' alleged fraud."[183] Mr. Dalrymple contends that this is the only information in the February 2020 Disclosure that is not connected to the alleged misrepresentations and states that the "estimate of the impact [of the Healthcare segment]…is that it could have accounted for no

---

[180] Dalrymple Report, ¶ 102.
[181] Dalrymple Report, ¶ 104.
[182] Dalrymple Report, ¶ 91.
[183] Dalrymple Report, ¶ 105.

more than $2.20 of Tivity's share price decline on February 20, 2020."[184] Mr. Dalrymple then concludes that "no less than $8.19 of Tivity's share price decline on February 20, 2020, was attributable to the information related to Defendants' alleged fraud."[185]

105. Securities analysts commented on the Healthcare segment's FY 2019 results and FY 2020 guidance. For example:

> Nutrition segment outlook remains problematic… [and] Healthcare EBITDA guidance appears soft as well.[186] (Cantor Fitzgerald, February 20, 2020)
>
> Healthcare reported an in-line Q4, but 2020 guide shows signs of pressure.[187] (Piper Sandler, February 20, 2020)
>
> Healthcare margins face stiffer pressure from gym networks raising the rates they charge TVTY. Additionally, the CEO and head of Nutrition have exited the company, further complicating NT visibility.[188] (Jefferies, February 19, 2020)
>
> We are downgrading shares of TVTY from Buy to Hold on the heels of a 4Q miss, continued deterioration in the Nutrition business, some margin pressure in Healthcare, management departures and disappointing 2020 guidance.[189] (SunTrust Robinson Humphrey, February 20, 2020)

106. While I agree that the information for the Healthcare segment was confounding and the value impact of that information needs to be disentangled from other information, Mr. Dalrymple fails to account for other potential negative confounding information (*e.g.*, the Nutrition

---

[184] Dalrymple Report, ¶ 106. Mr. Dalrymple estimates the per-share impact of Tivity's FY 2020 guidance announcement for the Healthcare segment. First, he compares the adjusted EBITDA margin from the midpoint of Tivity's FY 2020 adjusted EBITDA guidance range for the Healthcare segment announced on February 19, 2020 to the adjusted EBITDA margin from the midpoint of the FY 2019 guidance range as of the 3Q 2019 earnings release on November 12, 2019. He finds that the change in adjusted EBITDA margin ("margin compression") is -1.87%. Second, he estimates a per-share impact of the "margin compression" on earnings equal to -$0.20 by multiplying the -1.9% margin compression by the midpoint of the FY 2020 Healthcare segment revenue guidance, computes an after-tax impact based on the midpoint of Tivity's "guidance for an effective tax rate for FY20 between 26 percent and 27 percent," and divides by shares outstanding as of February 20, 2020. Last, he multiplies the -$0.20 FY 2020 after-tax per-share adjusted EBITDA impact by a forward-looking price-to-earnings-per-share multiple of 11.0x obtained from analyst reports to arrive at the $2.20 impact on Tivity's share price on February 20, 2020. Dalrymple Report, Appendix C.

[185] Dalrymple Report, ¶ 106.

[186] "Not Much ProducTIVITY Here; Downgrading to Neutral and Lowering Price Target," Cantor Fitzgerald, February 20, 2020.

[187] "Q4 2019: Crisis in Nashville," Piper Sandler, February 20, 2020.

[188] "Downgrade to Hold: Too Many Uncertainties," Jefferies, February 19, 2020.

[189] "Nutrition Challenges Continue - Downgrading to Hold, Cutting Estimates and Target," SunTrust Robinson Humphrey, February 20, 2020.

segment's 4Q 2019 performance and FY 2020 guidance and executive departures as discussed above), which renders his analysis flawed and unreliable.

### C. Mr. Dalrymple Has Not Reliably Demonstrated That Any Losses Were Caused by Alleged Misrepresentations for the Goodwill Claim

107. For the Goodwill Claim, Plaintiff alleges that Tivity should have announced an impairment charge as part of its 2Q 2019 earnings release on August 7, 2019 (*see* Section IV.B.2). As described in detail in this section, Mr. Dalrymple fails to reliably demonstrate that the alleged misrepresentations for the Goodwill Claim caused any investor losses.[190] As noted in Section VI.B.3.c), Mr. Dalrymple states that the residual price decline on February 20, 2020 was "primarily attributable to [several factors including the] [i]mpairment charge of $377.1 million related to the Nutrisystem trade name and goodwill due to the Company's reduced 'long-term forecast for the Nutrition segment.'"[191] However, Mr. Dalrymple's conclusion that purported losses on February 20, 2020 were caused by the alleged misrepresentations for the Goodwill Claim is flawed and unreliable. This is because he performs no analysis to: (1) support that the impairment charge could have been or should have been announced prior to the February 2020 Disclosure;[192] (2) establish what information, if any, about the impairment was not disclosed in a timely manner; (3) isolate the price effect of any news that was not timely disclosed; (4) establish that the "impairment triggers" were not already publicly available prior to the February 2020 Disclosure; and (5) account for prior market knowledge of risks associated with the Transaction.

108. <u>*First*</u>, I understand that, in connection with the Company's 2Q 2019 and 3Q 2019 financials, Tivity analyzed whether it needed to test for impairment for Nutrisystem's tradename or its goodwill in connection with the Transaction and, if so, whether an impairment charge was necessary and concluded that no test for impairment was necessary in 2Q 2019 and that no impairment charge was necessary in 3Q 2019.[193] I also understand that these analyses were

---

[190] Mr. Dalrymple does not claim that the December 2019 Disclosure corrected the Goodwill Claim. *See*, Dalrymple Report, ¶ 111.
[191] Dalrymple Report, ¶ 99.
[192] Mr. Dalrymple points out that Plaintiff alleges that such a charge should have been taken. *See*, Dalrymple Report, ¶ 118 ("With respect to the Goodwill Claim, I understand Plaintiff alleges that the impairment should have been recognized as of August 7, 2019 (after market close), when Tivity released its Q2 2019 financial results.").
[193] "Intangibles Assessment – Q2 2019," July 22, 2019, PWC007072–075; "Impairment Assessment at September 30, 2019," November 5, 2019, PwC007100–106.

reviewed by Tivity's external auditor, PwC, and that PwC concluded that "we do not deem management's position unreasonable."[194] However, Mr. Dalrymple does not acknowledge this information, and instead appears to base his opinion entirely on Plaintiff's allegations.[195]

109. *Second*, Mr. Dalrymple does not account for evidence that Tivity's updated long-range forecasts that formed the basis for the February 19, 2020 impairment charges were informed by unanticipated events that occurred in 4Q 2019 and January 2020. When Tivity disclosed the February 19, 2020 impairment charges, the Company explained that the charges were not due to past financial performance, but to expectations about the segment's future performance. Specifically, Tivity's 4Q 2019 earnings release stated that "[t]hese impairment losses primarily resulted from a reduction in the Company's long-term forecast for the Nutrition segment."[196] Consistent with this, in a memo prepared to "document the events and circumstances that changed in Q4 that led [Tivity] to conclude an impairment charge existed," Tivity's Senior Director of Accounting noted that the following events were factored into the projections used in the impairment analysis:[197]

a. COO Zier's departure was announced on December 9, 2019, and Nutrition division president Keira Krausz resigned in Q1 2020.[198]

b. 4Q 2019 revenue and adjusted EBITDA missed their targets.[199]

c. "[P]reliminary 2020 diet season results including number of orders and average sale prices…were lower than forecasted in the Q3 [long-range forecast.]"[200]

---

[194] Tivity Audit Committee Meeting materials, August 1, 2019, TVTY_STROUGO0017544–631 at 557, 587; Tivity Audit Committee Meeting package, November 4, 2019, TVTY_STROUGO0018844–9008 at 8939. I also understand that Mr. Michael Maloney in this matter has examined the Company's analyses and concluded that, in both 2Q 2019 and 3Q 2019, "the analyses Tivity performed and the conclusions it reached regarding whether the Nutrisystem goodwill and tradename assets required an impairment charge… were reasonable and complied with GAAP" and that "PwC's review of Tivity's analyses and conclusions provided additional independent corroboration supporting Tivity's conclusions." Maloney Report, ¶¶ 12, 14.

[195] "With respect to the Goodwill Claim, I understand Plaintiff alleges that the impairment should have been recognized as of August 7, 2019." Dalrymple Report, ¶ 118.

[196] Tivity Form 8-K, Ex. 99.1, filed on February 19, 2020, p. 2.

[197] Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 775.

[198] The memo specifically tied Ms. Zier's departure to Tivity's future financial performance, noting that "[w]ithout Dawn's experience and leadership in the diet industry, management believed some of our short-term actions to increase revenue and profitability would be hindered." Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 775.

[199] Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 775.

[200] Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 776.

d. "[S]ome of [Tivity's] competitors lowered full year guidance in Q4 [2019] indicating the market growth was lower than initially expected."[201]

110. Tivity's updated projections for the Nutrition segment as of January 2020 reduced projected 2020 revenue relative to the prior internal projections used to analyze impairment as of September 30, 2019 from $655 million to $590 million and projected 2020 adjusted EBITDA from $111 million to $64 million.[202] Mr. Dalrymple does not explain how Tivity could have disclosed these events or their impact on subsequent financial performance before they occurred. He therefore has not reliably established what (if any) information was not disclosed in a timely manner.

111. *Third*, to the extent some portion of the impairment was disclosed in an untimely manner, one would need to disentangle the impact of the untimely disclosure from that of the timely disclosure to determine whether the untimely disclosure caused any investor losses. Mr. Dalrymple failed to perform this analysis.

112. *Fourth*, while Mr. Dalrymple notes that "Plaintiff alleges that Defendants failed to impair Tivity's goodwill balance despite impairment triggers," he ignores that these purported "triggers" were public knowledge. Mr. Dalrymple specifically references the following "impairment triggers":

a. "Sustained underperformance of the Nutrition segment, including a failed 2019 diet season, which generated 9.2% less revenue than the prior year and only $5 million in adjusted EBITDA, compounding the woes of the previously poor 2018 diet season and creating a shortfall that Defendants only belatedly admitted would 'result in lower performance for the remainder of the year.'"[203]

b. "A reduction in Nutrition segment guidance in 2Q19 that continued to conceal the full 1Q19 adjusted EBITDA loss of $8.3 million, making even updated guidance unachievable."[204]

---

[201] Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 775.

[202] Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 776–777.

[203] Dalrymple Report, ¶ 46.a (quoting Memorandum Opinion, p. 10).

[204] Dalrymple Report, ¶ 46.b (quoting Memorandum Opinion, p. 10).

113. However, as discussed in Section VI.B.1, Tivity previously disclosed Nutrition segment revenue for both the full 1Q 2019 period as well as the period starting March 8, 2019. The Nutrition segment's adjusted EBITDA loss for the pre-Transaction 1Q 2019 period was disclosed by August 7, 2019, and thus the full 1Q 2019 adjusted EBITDA results for the Nutrition segment were also disclosed by then.[205]

114. If Tivity's stock traded in an efficient market during the Class Period, the stock price should reflect this publicly available information, including the potential valuation implications. Mr. Dalrymple fails to acknowledge that, if these factors did indeed indicate that Nutrisystem's tradename and the Nutrition segment goodwill were impaired by August 8, 2019, that information would have been reflected in Tivity's stock price prior to the February 19, 2020 alleged corrective disclosure.[206]

115. *Fifth*, as discussed in Section VI.B.3.c)(2), Tivity disclosed risks associated with acquiring and integrating Nutrisystem in its SEC filings prior to the Class Period,[207] and analysts

---

[205] Plaintiff also describes the increased competitive environment for Nutrisystem as an impairment trigger. *See*, Complaint, § VI.B.1.c. As discussed in the Gompers Class Certification report, Tivity discussed increased competition for Nutrisystem on its February 19, 2019 earnings call, and securities analysts discussed the increased competition. *See*, Gompers Class Certification Report, ¶¶ 42, 50–52; Tivity 4Q 2018 and FY 2018 Earnings Call Transcript, February 19, 2019; "Results in Line with Prerelease; First Look at Combined Company Guidance Shows In-Line EBITDA, Lower Sales Than Anticipated," William Blair, February 20, 2019; "The March Monthly Short (and Retort) Report: Healthcare Services and Technology," William Blair, March 12, 2019; "4 Key Insights from TVTY's 1Q19," Jefferies, May 9, 2019.

[206] Notably, securities analysts generally did not emphasize the impairment in reports following the alleged corrective disclosure on February 19, 2020 and attributed the decline to other financial metrics besides the impairment announcement. Of the seven analysts who asked questions during the Q&A segment of the earnings conference call on February 19, 2020, none mentioned Tivity's goodwill and tradename impairment charges. *See*, Tivity 4Q 2019 and FY 2019 Earnings Call Transcript, February 19, 2020. Moreover, only two analyst reports—Barrington Research and SunTrust Robinson Humphrey–published between February 19, 2020 and February 21, 2020 that I had access to mentioned factually the non-cash impairment charge to the Nutrition segment, with Barrington Research including commentary. *See*, "Q4 Results, FY/20 Guidance Disappoint; CEO Terminated; Nutrition Business Still a Mess; No Quick Fixes; Reducing PT to $24 from $38," Barrington Research, February 20, 2020 ("The company was forced to take a $137 million non-cash impairment charge to lower the carrying amount of goodwill for the nutrition business unit and a $240 million non-cash impairment charge to lower the carrying value of the Nutrisystem tradename. Not that we had needed this confirmation, but the acquisition of the Nutrisystem asset has been a value-destroyer for TVTY shareholders since it was first announced on a very snowy day (on the East Coast) in December 2018. We specifically recall disliking the transaction the moment we read the first paragraph of the news release that day, but in retrospect, we clearly did not dislike the deal (that brought over $1 billion in debt to Tivity's balance sheet) nearly as much as we should have."); "Nutrition Challenges Continue - Downgrading to Hold, Cutting Estimates and Target," SunTrust Robinson Humphrey, February 20, 2020 ("The company also took a $377M non-cash impairment charge in the Nutrition segment to reflect the lower long-term outlook for the segment.").

[207] *See*, for example, Tivity 2018 10-K, p. 14; Tivity 1Q 2019 10-Q, p. 39; Tivity 2Q 2019 10-Q, p. 43; Tivity 3Q 2019 10-Q, p. 44.

also commented on these publicly disclosed risks prior to and during the Class Period.[208] The materialization of these publicly disclosed risks could cause losses that are separate from any that could be caused by the alleged misrepresentations for the Goodwill Claim. Yet, Mr. Dalrymple fails to reliably establish what portion of the information disclosed on February 19, 2020 resulted from the materialization of these publicly disclosed risks. Without undertaking this analysis, Mr. Dalrymple cannot conclude that any portion of Tivity's stock price decline on February 20, 2020 was caused by factors other than the materialization of publicly disclosed risks.

116. In sum, Mr. Dalrymple fails to reliably establish that any portion of Tivity's stock price decline on February 20, 2020 was caused by the alleged misrepresentations for the Goodwill Claim.

### D. Mr. Dalrymple Fails to Disentangle the Stock Price Decline on February 20, 2020 Attributable to the Nutrisystem Claim Compared to the Goodwill Claim

117. In addition to the flaws in Mr. Dalrymple's analysis of whether the alleged misrepresentations for the Nutrisystem Claim caused investor losses discussed above, Mr. Dalrymple also performs no analysis to disentangle any price effect attributable to the alleged misrepresentations for the Nutrisystem Claim from those for the Goodwill Claim. Mr. Dalrymple's failure to disaggregate any losses attributable to the Nutrisystem Claim from any losses attributable to the Goodwill Claim precludes reliably establishing the losses (if any) attributable to either category of claims.

118. Mr. Dalrymple contends that part of Tivity's residual price decline on February 20, 2020 was caused by the alleged misrepresentations of either the "Nutrisystem Claim with or without [the] Goodwill Claim" or the "Goodwill Claim without [the] Nutrisystem Claim."[209] Instead of linking the price decline or a portion of the price decline to alleged misrepresentations for the Nutrisystem Claim, or to the Goodwill Claim, he assumes that the *same* loss was caused by both the alleged misrepresentations for the Nutrisystem Claim and the Goodwill Claim. This is

---

[208] *See*, for example, "Q4 Results In-Line with Late-January Guide; FY/19 Outlook Below Expectations; NTRI Deal Weighs on Valuation; PT is now $40," Barrington Research, February 20, 2019; "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019; "Q1 Results Solid as Nutrition Achieves Significant March Rebound. We Continue to See Meaningful Long-Term Revenue Synergies. Reiterate BUY Rating and $30 Price Target," Craig-Hallum, May 9; "Healthcare Strength and Stabilizing Nutrition Segment Should Improve Sentiment," Oppenheimer, May 9, 2019.
[209] Dalrymple Report, Table 1.

illogical from an economic perspective. As mentioned above, I understand the Nutrisystem Claim is centered around the disclosure of past financial performance (specifically, the Pre-Transaction 1Q 2019 Adjusted EBITDA for the Nutrition segment) and allegedly misleading FY 2019 financial guidance for the Nutrition segment (*See* Section IV.B.1) , whereas I understand the Goodwill Claim is driven by "a reduction in the Company's long-term forecast for the Nutrition segment."[210] Therefore, Mr. Dalrymple's contention that whether the alleged misrepresentations that caused Tivity's stock price decline are for the Nutrisystem Claim or the Goodwill Claim does not matter undermines his conclusion that the alleged misrepresentations for the Nutrisystem Claim caused investor losses on February 20, 2020. It also undermines his conclusion that the alleged misrepresentations for the Goodwill Claim caused investor losses on February 20, 2020.

## VII. Mr. Dalrymple's Inflation and Damages Analysis is Flawed and Unreliable

119. Even assuming Mr. Dalrymple had reliably measured the losses caused by the purportedly corrective information, (which he has not as discussed in Section VI), as detailed below, he fails to reliably estimate inflation on each day of the Class Period, and thus fails to reliably estimate damages, if any.

### A. Economic Analysis of Inflation and Damages

120. To assess whether class members were damaged by the alleged fraud and by how much, it is my understanding that plaintiffs have to establish on each day during the class period the level of stock price inflation (if any)—that is, the difference between the price an investor paid for the stock and the stock's "true" value, which is what that price would have been without the alleged concealed information (also referred to as the "but-for price"). Inflation should reflect only the effect of the alleged misstatements and omissions on the stock price. It is a function of both what information could have and should have been disclosed at any point during the class period and the value implications, if any, of that information at the time it could have and should have been released.

[210] Tivity Form 8-K, filed on February 19, 2020, Ex. 99.1, p. 2.

121. Given the information that defendants allegedly could and should have disclosed can change over time, any estimate of stock price inflation needs to be updated as a class period progresses to reflect changes in that information. Moreover, the impact of that information on the company's stock price can also change over time. The impact of that information can change based on various factors, including the company's operating and financial characteristics as well as market and industry conditions, all of which can vary over time. Notably, because the information that defendants allegedly could and should have disclosed, as well as the impact of that information, can change over time, stock price inflation earlier during the class period cannot always be reliably measured using the price decline following an alleged corrective disclosure.

122. Ultimately, determining economic damages arising from alleged misrepresentations of material information requires an in-depth analysis of, among other things, the information that drives the company's valuation and stock price; how changes in that information change that valuation and stock price; what information was allegedly concealed; when such information was allegedly known and should have been disclosed; and what impact the concealed information would have had on the stock price at the time it should have been, but was not, disclosed. Mr. Dalrymple has not analyzed these factors and, therefore, his analysis cannot reliably estimate damages, if any, in this matter.

### B. Mr. Dalrymple Has Not Reliably Measured Damages (If Any) in This Matter

123. Mr. Dalrymple has not reliably demonstrated that there are any damages in this matter. Even assuming Mr. Dalrymple had reliably measured the losses caused by the allegedly corrective information, which he has not, he fails to reliably estimate inflation on each day of the Class Period, and thus fails to reliably estimate damages, if any. For at least the reasons discussed below, Mr. Dalrymple's methodology cannot reliably measure purported per-share damages in this matter. *First*, Mr. Dalrymple's "zone of risk" assertion is unsupported and provides no reliable basis for measuring economic damages. *Second*, Mr. Dalrymple's estimates of inflation dissipation on December 9, 2019 and February 20, 2020 are flawed and unreliable. *Third*, Mr. Dalrymple does not reliably demonstrate that Tivity's stock price was inflated at the

start of the Class Period. *Fourth*, Mr. Dalrymple fails to reliably establish that the back-casting methodology is appropriate.

### 1. Overview of Mr. Dalrymple's Purported Per-Share Damages Methodology

124. Mr. Dalrymple's analysis of per-share damages is based on Tivity's stock price reactions to the Alleged Corrective Disclosures. As discussed above, Mr. Dalrymple's event study finds statistically significant residual stock price declines following the Alleged Corrective Disclosures, December 9, 2019 and February 20, 2020.[211] He attributes the company-specific declines to the announcement of Ms. Zier's departure on December 9, 2019 and Tivity's February 19, 2020 earnings release,[212] both of which purportedly conveyed information that was "within the zone of risk concealed by Defendants' alleged misrepresentations and scheme."[213] He argues that the full residual stock price decline of $2.23 on December 9, 2019 is explained by Ms. Zier's departure, and hence the full amount represents the dissipation of inflation due to the alleged misrepresentations for the Nutrisystem Claim.[214] For February 20, 2019, after purportedly analyzing confounding information, Mr. Dalrymple attributes $8.19 of the $10.39 residual stock price decline to the dissipation of inflation due to the alleged misrepresentations for both the Nutrisystem and Goodwill Claims.[215] He contends that the "inflation amounts associated with the Nutrisystem Claim and Goodwill Claim are not additive, such that the sum of the inflationary impacts of each claim individually exceeds the total inflation associated with both claims"[216] and attributes the $8.19 stock price reaction to both Nutrisystem-related and Goodwill-related inflation.[217]

125. After analyzing the stock price reactions to the Alleged Corrective Disclosures, Mr. Dalrymple applies the "constant dollar method" to extend the level of inflation purportedly dissipated by the Alleged Corrective Disclosures to previous days in the Class Period. This

[211] Dalrymple Report, ¶ 85.
[212] Dalrymple Report, ¶¶ 89, 94.
[213] Dalrymple Report, ¶¶ 88, 94.
[214] Dalrymple Report, ¶ 98.
[215] Dalrymple Report, ¶ 106.
[216] Dalrymple Report, ¶ 119. Mr. Dalrymple further states that "the share price inflation figures… [are] separable but not additive with respect to the Nutrisystem Claim and Goodwill Claim, such that the impacts of each corrective disclosure may be considered jointly or individually at any time during the Class Period." Dalrymple Report, ¶ 121.
[217] Dalrymple Report, ¶¶ 111, 119, 121.

method implicitly assumes that after inflation enters Tivity's stock price, the amount of inflation only changes following the Alleged Corrective Disclosures.[218] Mr. Dalrymple concludes that inflation attributable to the Nutrisystem Claim entered Tivity's stock price when the Transaction closed on March 8, 2019 and that inflation attributable to the Goodwill Claim entered Tivity's stock price when Tivity allegedly failed to announce an impairment during the Company's August 7, 2019 earnings release.[219]

### 2. Mr. Dalrymple's "Zone of Risk" Assertion Is Unsupported and Provides No Reliable Basis for Measuring Economic Damages

126. Mr. Dalrymple describes his analysis of inflation during the Class Period as follows:

> If the trier-of-fact finds that the information revealed through the corrective disclosures fell within the zone of risk concealed through Defendants' alleged fraud, the following inflation would have been present in Tivity's shares beginning at the time that the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk until the inflation was removed through the corrective disclosures:
> a. December 2019 Disclosure (Nutrisystem Claim): $2.23;
> b. February 2020 Disclosure (Nutrisystem Claim and/or Goodwill Claim): $8.19.[220]

127. This purported methodology leads Mr. Dalrymple to conclude that the stock price reactions he attributes to the purportedly corrective information released on December 9, 2019 and February 19, 2020 serve as a measure of inflation throughout the entire period during which "the information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' misstatements, omissions, and scheme."[221] He notes that Plaintiff alleges that the Nutrisystem Claim entered the "zone of risk" at the beginning of the Class Period, and that the Goodwill Claim entered the "zone of risk" with the release of Tivity's 2Q 2019 financial results after market hours on August 7, 2019, and that therefore the stock price

[218] Dalrymple Report, ¶ 120.
[219] Dalrymple Report, ¶¶ 117–118.
[220] Dalrymple Report, ¶ 111.
[221] Dalrymple Report, ¶ 117.

reactions to the purportedly corrective information measure inflation on these earlier dates as well.[222]

128. However, simply noting that allegedly concealed information was "within the zone of risk" at certain points in time does not reliably demonstrate that the stock price impact of a "but-for" disclosure would have been identical at these points—let alone all points in between—as Mr. Dalrymple concludes.[223] As discussed in the Gompers Class Certification Report, there is an important distinction between the market's reaction to a risk—that is, the reaction to the knowledge that a negative outcome could occur—and the reaction to the materialization of that risk.[224] When a risk materializes, a company's stock price will generally decline even if that risk was fully understood by market participants. As an example, suppose a new pharmaceutical company is developing a new treatment for a disease, which is pending review by the Food and Drug Administration ("FDA"). The company's stock price would reflect the market's assessment of how likely the drug was to be approved.

129. This understanding of the risk would be included in the market's estimate of the company's stock price. If the present value of the company's future profits from the drug would be $4 per share should the approval be sustained (and $2 per share if approval were denied), and the market expected that there was a 50% chance that the drug would be approved based on the drug's profile and historical approval rates, the market's value of the company would be $3 per share. Even though the market already understood that there was substantial risk that the drug would not be approved, if the news were to break that the FDA denied approval for the treatment, the share price would fall by $1, from the expected value of $3 per share to $2 per share, which is the level reflecting the materialization of the risk. Thus, even though the market fully understood the risk and the share price incorporated that risk, the materialization of this risk would result in a decline of the share price if the market is efficient.

130. Moreover, even if the company did withhold material, non-public information regarding the drug's likelihood of approval from the market, any determination of damages due to the

[222] Dalrymple Report, ¶¶ 117–118.

[223] In order for the stock price reaction to a "but-for" disclosure to be identical to the stock price reaction on an alleged corrective disclosure date, the information conveyed by the "but-for" disclosure must change the markets estimate of expected future cash flows and/or the riskiness of those cash flows by the same amount as what occurred on the alleged corrective disclosure date.

[224] Gompers Class Certification Report, ¶ 85.

investors would still have to account for the materialization of the risk. Suppose, for example, that the company had access to information that would lower its chance of approval to 20%, instead of 50%. With full information, the market's valuation of the company would be $2.40.[225] If the company concealed this information, the price of the shares would remain at $3, and upon rejection of the drug, would fall to $2, for a loss of $1, just as before. However, because the company should have been priced at $2.40, based on the omitted information, the stock's price would still have fallen by $0.40 when the FDA announced its decision. Because damages should only include losses caused by the alleged misrepresentations, damages should be only $0.60 per share (for an investor who purchased the stock before the FDA's decision and held the stock through that decision).[226]

131. Hence, an analysis of Tivity's stock price reaction to information that is the materialization of a risk or information revealed by the corrective disclosures that was "within the zone of risk" is not the same as an analysis of inflation. As a result, Mr. Dalrymple's "zone of risk" assertion fails to reliably determine how certain information would have impacted Tivity's stock price in a hypothetical "but-for" world, rendering his inflation analysis flawed and unreliable.

### 3. Mr. Dalrymple's Estimates of Inflation Dissipation Are Flawed and Unreliable

132. Mr. Dalrymple's estimates of inflation are based on the residual stock price declines on December 9, 2019 and February 20, 2020. As detailed in Section VI above, Mr. Dalrymple fails to reliably establish that any investor losses following the Alleged Corrective Disclosures were caused by the alleged misrepresentations. Given that his flawed and unreliable analysis of loss

---

[225] The calculation is $4 * 20% + $2 * 80%.

[226] Indeed, awarding all investors the full stock price decline would effectively compensate those investors based on a presumption that, had investors known the true risk that the FDA would not approve the drug, they would have chosen to avoid the company's stock entirely, *i.e.*, they would have chosen to hold no shares of the company. However, there is no basis in financial economics for such a presumption. On the contrary, it is widely accepted that this type of risk is company-specific and therefore diversifiable in the context of an overall portfolio of investments, and it does not affect the volatility of a diversified portfolio. *See*, Zvi Bodie, Alex Kane, and Alan J. Marcus, Investments, (McGraw-Hill Irwin, 2011), 9th ed. ("Bodie, Kane, and Marcus (2011)"), p. 197. Portfolio theory shows that the optimal portfolio for most investors is a combination of a risk-free asset and a well-diversified portfolio of different investments. Investors who follow this strategy will generally not sell an individual stock due solely to higher company-specific risk because that risk will not affect the overall risk position of an investor's entire portfolio. *See*, Bodie, Kane, and Marcus (2011), pp. 206–209, 217–220.

causation forms the basis of his analysis of inflation (and damages), his inflation analysis is similarly flawed and unreliable. Therefore, he has no basis to conclude that the $2.23 residual stock price decline on December 9, 2019 that he calculates represents dissipation of inflation caused by the alleged misrepresentations for the Nutrisystem Claim or that $8.19 out of the $10.39 residual stock price decline on February 20, 2020 represents dissipation of inflation caused by the alleged misrepresentations for both/either the Nutrisystem Claim or the Goodwill Claim.[227]

### 4. Mr. Dalrymple Does Not Reliably Demonstrate That Tivity's Stock Price Was Inflated at the Start of the Class Period

133. Mr. Dalrymple contends that share price inflation begins on March 8, 2019 due to the allegations for the Nutrisystem Claim and that inflation due to the Goodwill Claim entered Tivity's stock price on August 8, 2019.[228] Even if Mr. Dalrymple had reliably measured inflation dissipation following the Alleged Corrective Disclosures, he has not reliably demonstrated that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA could and should have been disclosed at the start of the Class Period. Thus, his analysis is unreliable because he assumes that Tivity could have and should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA the day the Transaction closed. This is akin to him assuming that a company can disclose its quarterly financial results the day after the quarter closes, and he does not support this assumption. For example, the table below shows the reporting period, earnings announcement date, and SEC filing date for Form 10-Q or Form 10-K for Tivity's earnings announcements during the Class Period.[229]

| Reporting Period | Fiscal Quarter End | Earnings Announcement Date | SEC Filing Date (Form 10-Q/Form 10-K) |
|---|---|---|---|
| 1Q 2019 | 3/31/2019 | 5/8/2019 | 5/9/2019 |
| 2Q 2019 | 6/30/2019 | 8/7/2019 | 8/8/2019 |
| 3Q 2019 | 9/30/2019 | 11/12/2019 | 11/12/2019 |
| 4Q 2019 & FY 2019 | 12/31/2019 | 2/19/2020 | 2/27/2020 |

Source: SEC Filings

[227] Dalrymple Report, ¶ 106.
[228] Dalrymple Report, Table 1.
[229] Tivity 1Q 2019 10-Q; Tivity 2Q 2019 10-Q; Tivity 3Q 2019 10-Q; Tivity 2019 10-K.

As shown in the table, Tivity announced its quarterly earnings and filed its financial statements with the SEC more than a month after the quarter ends.[230]

134. In order for Mr. Dalrymple to conclude that there was inflation in Tivity's stock price from alleged misrepresentations for the Nutrisystem Claim on the first day of the Class Period, Mr. Dalrymple would need to reliably demonstrate that Tivity could have and should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA at that time. He has not done this and, thus, fails to prove that Tivity's stock price was inflated at the start of the Class Period on March 8, 2019.

### 5. Mr. Dalrymple Fails to Reliably Establish That the Back-Casting Methodology is Appropriate in This Matter

135. Mr. Dalrymple states that his "share price inflation estimates are based on a finding that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme, such that the extent of share price inflation remains constant from the time that the trier-of-fact makes such a finding until inflation is eliminated through the corrective disclosures."[231] He states that "[t]his methodology is based on an approach known as the constant dollar method, in which the dollar value of inflation is held constant during the Class Period,"[232] and he asserts that this approach should be used to measure damages in this matter.[233]

136. Mr. Dalrymple uses this approach, often referred to as "back-casting," to estimate the "but-for" price and the level of alleged inflation throughout the Class Period. Specifically, he estimates alleged inflation at the beginning of the Class Period by cumulating the entirety of the company-specific stock price declines based on his event study analysis of the Alleged Corrective Disclosures. A fundamental assumption of Mr. Dalrymple's back-casting methodology is that the stock price decline associated with each alleged corrective disclosure is a

[230] According to the SEC, public companies are required to file Forms 10-Q within 40 days after the quarter-end and to file Forms 10-K within 60 days after the fiscal year-end (for large accelerated filers) to allow for time to prepare the financial information. *See*, "Financial Reporting Manual," U.S. Securities and Exchange Commission, https://www.sec.gov/corpfin/cf-manual/topic-1, accessed on February 6, 2023.
[231] Dalrymple Report, ¶ 120.
[232] Dalrymple Report, ¶ 120.
[233] Dalrymple Report, ¶ 120.

reliable measure of the inflation created by the alleged misrepresentations on each day of a class period prior to the alleged corrective disclosure. Under certain circumstances, it may be possible to measure alleged inflation earlier in a class period using a stock price reaction on alleged corrective disclosure dates. In order for the type of back-casting employed by Mr. Dalrymple to reliably estimate earlier inflation, certain conditions must hold. At a minimum, the information that was ultimately disclosed on the alleged corrective event days must reflect the allegedly misrepresented information—and only that information (*i.e.*, the "but-for" disclosure). Without such a correspondence, there is simply no economic justification for equating the price effect on the alleged corrective event day with the earlier alleged inflation. However, Mr. Dalrymple fails to reliably demonstrate that this fundamental assumption holds in this matter, which renders his damages model flawed and unreliable.

137. One example of a mismatch that makes back-casting inappropriate is where an alleged corrective disclosure represents materialization of risk, while an alleged misstatement represents a misrepresentation about the degree of risk. Section VI includes other examples of how the Alleged Corrective Disclosures do not match the alleged misrepresentations in Section IV. Given these mismatches, Mr. Dalrymple has not established that back-casting is appropriate in this matter. In addition, I understand that another of Plaintiff's experts analyzed potential impairment at different points in time and found lower impairment in 2Q 2019 than was ultimately announced in February 2020.[234] This implies that the value impact of the "but-for" impairment would also have varied over time, contrary to Mr. Dalrymple's "constant dollar method."

## VIII. Damages Are No More than $1.67 Per Share

138. For the reasons discussed in detail in Sections VI and VII, Mr. Dalrymple has neither reliably established that any losses were caused by the alleged misrepresentations nor reliably measured damages in this matter. However, I have been asked to analyze potential stock price inflation under the assumption that the finder of fact determines that (1) Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA earlier than it did, and (2)

---

[234] Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA dated January 10, 2023, ¶ 7; Tivity Form 8-K, filed on February 19, 2020, Ex. 99.1, p. 2.

that Tivity could have and should have announced FY 2019 adjusted EBITDA guidance of $80–84 million on May 8, 2019,[235] consistent with the updated guidance the Company announced on August 7, 2019 (the "Assumed Misrepresentation"). It should be noted that the Assumed Misrepresentation is contradicted by Tivity's internal projections as of May 2019, which forecasted 2019 revenue and adjusted EBITDA above the guidance announced on that date (as discussed in Section VI.B.2). In the counterfactual scenario, however, the Assumed Misrepresentation would have been corrected by August 7, 2019, when Tivity disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA and reduced guidance for the Nutrition segment's FY 2019 adjusted EBITDA to an amount that was generally consistent with its contemporaneous internal projections. In addition, I was asked to assume that any inflation due to the Assumed Misrepresentation would have been introduced into Tivity's stock price on May 8, 2019 after market close.[236] Under these assumptions and using different approaches described below, I find that Tivity's stock price would have been inflated by $0.26–$1.67 between May 9, 2019 and August 7, 2019.

139. As described in Section V, a company's stock price reflects the present value of expected future cash flows in an efficient market. Thus, past performance is only relevant in so far as it changes expectations of future cash flows. Therefore, I analyzed changes in analyst forecasts between mid-May 2019, after the 1Q 2019 earnings announcement, and mid-August 2019, after the disclosure of Pre-Transaction 1Q 2019 Adjusted EBITDA on August 7, 2019 as part of the 2Q 2019 earnings announcement. No analyst reports published during these time periods reported forecasts of adjusted EBITDA for the Nutrition segment specifically. However, as shown in **Exhibit 3**, eight contributors published projections of FY 2019 adjusted EBITDA for Tivity as a whole.

140. The change in projected adjusted EBITDA for Tivity as a whole reflects revised expectations for both the Nutrition segment and the Healthcare segment. However, given Tivity's FY 2019 guidance reductions described below, it is reasonable to assume that the

---

[235] As discussed in Section VI.B.2, the guidance that Tivity announced on May 7, 2019 of $91–$101 million for 2019 Nutrition Adjusted EBITDA was conservative relative to the Company's internal projections. *See*, Tivity Form 8-K, filed on May 8, 2019, Ex. 99.1, p. 3; "CEO Business Update," Week of May 10, 2019, TVTY_STROUGO0069132–134 at 133.

[236] As noted in Section VII.B.4, Tivity announced its quarterly earnings and filed its financial statements with the SEC more than a month after the quarter ends.

revision of analyst forecasts for the overall company was equal to or greater than the contribution of the Nutrition segment alone. Hence, using the overall Company change in the average analyst FY 2019 adjusted EBITDA forecast to estimate the value impact of the disclosure is reasonable. Tivity reduced guidance for the Nutrition segment's 2019 adjusted EBITDA on August 7, 2019, dropping the guidance range from the previously announced $91–101 million range to $80–$84 million (a $14 million reduction using the midpoint of the ranges).[237] The Healthcare segment's adjusted EBITDA guidance was also reduced, though by a smaller amount, from $140–$145 million to $140–$143 million (a $1 million reduction at the midpoint).[238] Analyst commentary is also consistent with the assumption that revised 2019 adjusted EBITDA forecasts for the overall company reflected changes in expectations for the Nutrition segment.[239]

141. To be conservative, I also assumed that the entirety of the average revision in analyst forecasts of FY 2019 adjusted EBITDA was caused by the correction of the Assumed Misrepresentation, and not by unanticipated negative events related to the Nutrition segment's performance that occurred in the three months following the Assumed Misrepresentation. In particular, I note that analysts indicated that the guidance cut for the Nutrition segment was at least partially attributable to the Nutrition segment's weak 2Q 2019 performance, which was not known as of May 8, 2019 and not anticipated by Tivity (as evidenced by the fact that, as previously discussed, Tivity's May 8, 2019 guidance was conservative relative to the Company's contemporaneous internal projections). For example, SunTrust Robinson Humphrey described "[d]isappointing Nutrition [r]esults," adding that "[t]he diet business came in below expectations (lower DTC, fewer new customer starts) and full year EBITDA adjusted EBITDA guidance was

---

[237] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1, p. 3.
[238] Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1, p. 3.
[239] *See*, for example, "Q2 Results Mixed, Multiple Positive Developments Emerging To Drive Improved Earnings Results In 2020 And Beyond. Reiterate BUY Rating And $30 Price Target," Craig-Hallum, August 8, 2019 ("[T]he mid-point of full-year adjusted EBITDA guidance was lowered from $249M to $234M, reflecting softer expectations for Nutrisystem in the second half."). *See also*, "Nutrition Outlook Reduced, But Overall Outlook Positive for 2020; Overweight," Cantor Fitzgerald, August 7, 2019 ("Despite a decent quarter, Tivity reduced its 2019 consolidated guidance… [The Healthcare segment's] adjusted EBITDA remain [*sic*] essentially unchanged due to mix."); "4 Key Insights from TVTY's 2Q19," Jefferies, August 8, 2019 ("Nutrition is experiencing more pressure and is the source of the guidance cut and our lowered EPS projections.").

lowered $14M at the midpoint."[240] Oppenheimer added that "the core Nutrition segment's turnaround appears harder than anticipated, forcing TVTY to cut 2019 guidance."[241]

142. **Exhibit 3** summarizes the changes in analysts' forecasts of adjusted EBITDA in reports published in the period up to one week following the May 8, 2019 and August 7, 2019 earnings announcements. Averaging across all analysts, FY 2019 adjusted EBITDA forecasts decreased by $12.3 million. Of note, the magnitude of the reduction in analyst forecasts is comparable to the magnitude of the revision to 2019 adjusted EBITDA guidance for the Nutrition segment ($14 million, as discussed above).[242] Under the simplifying assumption that a change in forecasted adjusted EBITDA is comparable to a change in expected cash flows,[243] this $12.3 million reduction in FY 2019 guidance would result in a reduction in Tivity's share price of $0.26.[244]

143. The Assumed Misrepresentation that I have been asked to analyze includes only the FY 2019 expected performance of the Nutrition segment. However, I also calculated share price inflation under the assumption that Plaintiff can demonstrate that changes in analysts' forecasts for FY 2020 were also in response to the correction of the Assumed Misrepresentation. Unlike FY 2019 adjusted EBITDA forecasts, changes in analysts' FY 2020 adjusted EBITDA forecasts for Tivity as a whole may not provide reasonable measures of changes in forecasts for the Nutrition segment only.[245] While analysts did not publish forecasts of FY 2020 Nutrition

---

240 "HC Solid, Nutrition Soft - Still Well Positioned For SD Of Health But Execution Key; Estimates Cut," SunTrust Robinson Humphrey, August 8, 2019.

241 "Healthcare Gaining Momentum But Nutrition Segment Turnaround Likely Takes Longer," Oppenheimer, August 8, 2019.

242 Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1, p. 3.

243 As explained in **Appendix D**, free cash flow is equal to EBITDA less taxes, capital expenditures, and changes in net working capital. Adjusted EBITDA as reported by Tivity also does not include acquisition and integration charges or restructuring charges. Hence, changes in adjusted EBITDA can be used for changes in free cash flow when, all else equal, the source of the changes would not be expected to change taxes, capital expenditures, net working capital, acquisition and integration charges, or restructuring charges. Finally, because the value of the firm's debt is subtracted from the value of the firm to estimate the value of the firm's equity, the share price calculations described in this section also assume no changes in the value of Tivity's debt. Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1, p. 12.

244 Tivity reported 47.8 million shares outstanding as of July 31, 2019. *See*, Tivity Form 10-Q, filed on August 8, 2019, p. 1. $12.3 million / 47.8 million shares outstanding = $0.26 / share.

245 In its 2Q 2019 earnings release, Tivity announced preliminary projections for FY 2020 Healthcare segment revenue growth "between high single digit to low double digits," which analysts said exceeded their expectations. As a result, while analysts did not publish explicit forecasts of Healthcare segment adjusted EBITDA, their expectations of 2020 Healthcare segment adjusted EBITDA would likely also have increased, implying that the total Company change in FY 2020 adjusted EBITDA forecasts may be less than the change in Nutrition segment adjusted EBITDA forecasts. *See*, Tivity Form 8-K, filed on August 7, 2019, Ex. 99.1; "4 Key Insights from TVTY's 2Q19," Jefferies, August 8, 2019 ("TVTY's initial 2020 revenue growth guidance of high single digits to low double digits was much better than the Street's +5%.").

segment adjusted EBITDA, they did publish forecasts of FY 2020 Nutrition segment revenue. I therefore use the change in Nutrition segment revenue forecasts, combined with an assumption about the expected FY 2020 adjusted EBITDA margin for the Nutrition segment, to measure the change in expected adjusted EBITDA forecasts for the Nutrition segment. I use the implied expected FY 2020 adjusted EBITDA margin for the Nutrition segment from Tivity's most recent long-range projections prior to the August 7, 2019 earnings announcement. The implied FY 2020 adjusted EBITDA margin was 14.0%.[246] Applying this margin to the average reduction in FY 2020 Nutrition revenue forecasts of $44.5 million (*see* **Exhibit 3**) results in a reduction of $6.2 million in FY 2020 Nutrition segment adjusted EBITDA (14.0% * $44.5 million).

144. Because I am now determining the per share impact of the change in projections for both the current year and the next year, a discount rate is also necessary to convert future values into present values. I reviewed analyst reports published between May 8, 2019 and August 15, 2019, as well as a valuation performed by KPMG for the Nutrisystem purchase price allocation, Tivity's 3Q 2019 impairment analysis, and KPMG's annual impairment analysis for 2019 and found that discount rates used for Tivity's cash flows from these sources ranged from 9.5% to 10.5%.[247] In addition, I have been asked by counsel to also evaluate the impact using a discount rate of 8.5%. Assuming that changes in adjusted EBITDA expectations are comparable to changes in cash flow expectations, share price inflation attributable to the Assumed Misrepresentation is $0.38.[248]

145. Finally, even though, as previously discussed, the Assumed Misrepresentation includes only FY 2019 expected financial performance, I also calculated share price inflation under the assumption that Plaintiffs are able to demonstrate that the disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA caused analysts to change their expectations about the

---

[246] The most recent long-range projections available at the time was developed in February 2019. *See*, Tivity Board of Directors Materials, September 4, 2019, TVTY_STROUGO0001994–2018 at 1996, 2015.

[247] *See*, for example, "Impairment Assessment at September 30, 2019," November 5, 2019, PwC007100–106 at 104; "Valuation of Certain Acquired Tangible and Intangible Assets of Nutrisystem, Inc.," April 23, 2019, PwC008297–353 at 341; "ASC 350 – Intangibles – Goodwill and Other," February 25, 2020, PwC004501–569 at 556; "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019, p. 7; "Nutrition Outlook Reduced, But Overall Outlook Positive for 2020; Overweight," Cantor Fitzgerald, August 7, 2019, p. 7.

[248] Discount rates of 8.5% and 10.5% all yield estimated inflation of $0.38 per share when rounded to the nearest cent. $12.32 million + $6.24 million / (1 + 8.5%) = $18.07 million. $18.07 million / 47.8 million shares outstanding = $0.38 / share. $12.32 million + $6.24 million / (1 + 10.5%) = $17.96 million. $17.96 million / 47.8 million shares outstanding = $0.38 / share. Tivity Form 10-Q, filed on August 8, 2019, p. 1.

Nutrition segment's performance in perpetuity. In this scenario, I measure stock price inflation based on changes in analysts' forecasts for both FY 2019 *and* FY 2020 Nutrition segment performance, and *also* assume that expectations of Nutrition segment adjusted EBITDA in all future years were reduced by $6.2 million, the same amount as the change estimated for FY 2020. Again, using discount rates ranging from 8.5% to 10.5% and assuming that changes in adjusted EBITDA expectations are comparable to changes in cash flow expectations, share price inflation attributable to the Assumed Misrepresentation is $1.38 to $1.67.[249]

Executed this 7th day of February, 2023

Paul A. Gompers, Ph.D.

[249] Capitalizing the $6.24 million in reduced 2020 adjusted EBITDA expectations at an 8.5% discount rate results in a present value of $6.24 million / 8.5% = $73.38 million. 12.32 million + $73.38 million / (1 + 8.5%) = $79.95 million. $79.95 million / 47.8 million shares outstanding = $1.67 / share. Capitalizing the $6.24 million in reduced 2020 adjusted EBITDA expectations at a 10.5% discount rate results in a present value of $6.24 million / 10.5% = $59.40 million. 12.32 million + $59.40 million / (1 + 10.5%) = $66.08 million. $66.08 million / 47.8 million shares outstanding = $1.38 / share. Tivity Form 10-Q, filed on August 8, 2019, p. 1.

# Paul A. Gompers CV

Baker Library 263
Graduate School of Business Administration
Harvard University
Boston, MA 02163

(617) 495-6297 (ph)
(617) 496-8443 (fax)
pgompers@hbs.edu
http://www.people.hbs.edu/pgompers

## ACADEMIC POSITIONS

2000–present HARVARD BUSINESS SCHOOL BOSTON, MA
Eugene Holman Professor of Business Administration. Research interests include venture capital, private equity, entrepreneurial finance, institutional investors, corporate governance, optimal security design, dynamic capital structure, long-run performance of firms, and sources of financing for start-up businesses.

1998–2000 HARVARD BUSINESS SCHOOL BOSTON, MA
Associate Professor of Business Administration.

1995–1998 HARVARD BUSINESS SCHOOL BOSTON, MA
Assistant Professor of Business Administration.

1993–1995 UNIVERSITY OF CHICAGO CHICAGO, IL
Assistant Professor of Finance and Policy at the Graduate School of Business. Created new course on the financing of start-up companies.

1995–present NATIONAL BUREAU OF ECONOMIC RESEARCH CAMBRIDGE, MA
Research Associate. Appointed as an NBER affiliate in corporate finance.

## EDUCATION

1989–1993 HARVARD UNIVERSITY CAMBRIDGE, MA
Received Ph.D. in Business Economics, June 1993.

1987–1989 OXFORD UNIVERSITY OXFORD, UK
Graduated *summa cum laude* with a M.Sc. in economics, July 1989.

1982–1987 HARVARD COLLEGE CAMBRIDGE, MA
Graduated *summa cum laude* with an A.B. in biology.


Case 3:20-cv-00165 Document 335-1 Filed 04/28/25 Page 74 of 117 PageID #: 9468

## PUBLICATIONS

**Books**

The Venture Capital Cycle, (MIT Press, Cambridge) October 1999. (Joint with Josh Lerner.) First Edition.

The Money of Invention, (Harvard Business School Press, Boston) November 2001. (Joint with Josh Lerner.)

Entrepreneurial Finance: A Casebook, (John Wiley, New York) December 2001. (Joint with William Sahlman.)

The Venture Capital Cycle, (MIT Press, Cambridge) Second Edition. 2004. (Joint with Josh Lerner.)

Private Equity Finance, (Anthem Press, London). March 2019. (Joint with Victoria Ivashina and Richard Ruback.)

Private Equity, (Edward Elgar Publishing, London). August 2022. (Joint with Steven Kaplan.)

Financing the Entrepreneurial Venture, (Anthem Press, London). Forthcoming.

**Articles in Refereed Journals**

"Optimal Investment, Monitoring, and the Staging of Venture Capital," *Journal of Finance* 50, 1461-1489. December 1995. Reprinted in Michael Wright and Ken Robbie, editors, Venture Capital (International Library of Management) (Aldershot: Dartmouth Publishing, 1997.)

"Grandstanding in the Venture Capital Industry," *Journal of Financial Economics* 42, 133–156. July 1996.

"The Rise and Fall of Venture Capital," Business and Economic History 23, 1–24. Winter 1994. Awarded Newcomen Prize essay for best paper in business history.

"The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements," *Journal of Law and Economics* 39, 463–498. October 1996. (with Josh Lerner.)

"Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure Capital-backed Companies." *Journal of Finance* 52, 1791–1821. December 1997. (with Alon Brav.) Awarded the Smith-Breeden Distinguished Paper Award.

"Venture Capital Growing Pains: Should the Market Diet?" *Journal of Banking and Finance* 22, 1089–1104. August 1998.

"An Analysis of Compensation in the US Venture Capital Partnership," *Journal of Financial Economics* 51, 3–44. January 1999. (with Josh Lerner.)

"Venture Capital Distributions: Short-Run and Long-Run Reactions," *Journal of Finance* 53, 2161–2184. December 1998. (with Josh Lerner.)

"Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital," *Journal of Law and Economics* 42, 1-28. April 1999. (with Josh Lerner.)

"What Drives Venture Capital Fundraising?" *Brookings Proceedings on Microeconomic Activity*, 149-192. August 1998. (with Josh Lerner.)

"Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations," *Journal of Financial Economics* 55, 281-325. February 2000. (with Josh Lerner.)

"Is the Abnormal Return Following Equity Issuances Anomalous?" *Journal of Financial Economics* 56, 209–250. May 2000. (with Alon Brav and Chris Geczy.)

"Institutional Investors and Equity Prices," *Quarterly Journal of Economics* 114, 229–260. 2001. (with Andrew Metrick.)

"The Venture Capital Revolution," *Journal of Economic Perspectives* 15, 145–168. Spring 2001. (with Josh Lerner.)

"Who Underreacts to Cash Flow News?" *Journal of Financial Economics* 66, 409–462. 2002. (with Randy Cohen and Tuomo Vuolteenaho.)

"The Role of Lock-ups in Initial Public Offerings Provisions," *Review of Financial Studies* 16, 1–29. Spring 2003. (with Alon Brav.)

"Corporate Governance and Equity Prices," *Quarterly Journal of Economics* 118, 107-156. February 2003. (with Joy Ishii and Andrew Metrick.)

"The Really Long-Run Performance of Initial Public Offerings: Evidence from the Pre-Nasdaq Period, 1933–1972," *Journal of Finance* 56, 1355–1392. August 2003. (with Josh Lerner.)

"The Determinants of Board Structure and Function in Entrepreneurial Firms," *Journal of Law and Economics* 46, 569–598. October 2003. (with Malcolm Baker.)

"Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999," *Journal of Finance* 60, 577-614. April 2005. (with Josh Lerner and David Scharfstein.)

"Large Blocks of Stock: Prevalence, Size, and Measurement," *Journal of Corporate Finance* 12, 594-618. June 2006. (with Rudiger Fahlenbrach, Jennifer Dlugosz, and Andrew Metrick.)

"Venture Capital Investment Cycles: The Impact of Public Markets," *Journal of Financial Economics*, 1–23. 2008. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Specialization and Success: Evidence from Venture Capital," *Journal of Economic and Management Strategy* 18, 817–845. 2009. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Extreme Governance: An Analysis of Dual-Class Firms in the United States," *Review of Financial Studies* 23, 1051–1088. 2010. (with Joy Ishii and Andrew Metrick.)

"Performance Persistence in Entrepreneurship and Venture Capital," *Journal of Financial Economics* 96, 18–32. 2010. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"Buy Local? The Geography of Successful Venture Capital Expansion," *Journal of Urban Economics* 67, 90–102. 2010. (with Henry Chen, Anna Kovner, and Josh Lerner.)

"The Cost of Friendship," *Journal of Financial Economics* 119, 626–644. March 2016. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"What Do Private Equity Firms Say They Do?" *Journal of Financial Economics* 121, 449–476. September 2016. (with Steven N. Kaplan and Vladimir Mukharlyamov.)

"The Other Diversity Dividend," *Harvard Business Review.* July 2018. (with Silpa Kovvali.)

"More than Money: Venture Capitalists on Boards." *Journal of Law, Economics, and Organizations* 35, 513-543. 2019. (with Natee Amornsiripanitch and Yuhai Xuan.)

"How Do Venture Capitalists Make Decisions," *Journal of Financial Economics* 135, 169-190. January 2020. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.) Winner of Jensen Prize for best paper in corporate finance in the *Journal of Financial Economics.*

"How Venture Capitalists Make Decisions," March-April 2021. *Harvard Business Review*. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)

"And the Children Shall Lead: Gender Diversity and Performance in Venture Capital," *Journal of Financial* 142, 1-22. October 2021. (with Sophie Calder-Wang.)

"Venture Capital and Covid-19," *Journal of Financial and Quantitative Analysis* 56, 2474-2499. November 2021. (with Will Gornall, Steve Kaplan, and Ilya Strebulaev.)

"Gender Gaps in Venture Capital," *Journal of Financial and Quantitative Analysis* 57, 485-513. March 2022. (with Vladimir Muhkarlyamov, Emily Weisburst, and Yuhai Xuan.)

"Private Equity and Covid-19," *Journal of Financial Intermediation* 51. April 2022. (with Steve Kaplan and Vladimir Muhkarlyamov.)

"Getting Schooled: The Role of Universities in Attracting Immigrant Entrepreneurs," forthcoming *Research Policy,* December 2022. (with Natee Amornsiripanitch, George Hu, and Kaushik Vasudevan.)

**<u>Other Articles</u>**

"Venture Capital and the Creation of Public Companies: Do Venture Capitalists Really Bring More than Money?" *Journal of Private Equity* 1, 15-32. Fall 1997. (with Josh Lerner.)

"Risk and Reward in Private Equity Investments: The Challenge of Performance Assessment," *Journal of Private Equity* 1, 5-12. Winter 1997. (with Josh Lerner.)

"Resource Allocation, Incentives, and Control: The Importance of Venture Capital in Financing Entrepreneurial Firms," *Entrepreneurship, SMEs, and the Macroeconomy* (Cambridge University Press, Cambridge), 206-238. February 1997.

"Venture Capital," *The Handbook of Technology Management* (Richard Dorf, Editor-in-Chief). January 1997. (with Josh Lerner.)

"The Determinants of Corporate Venture Capital Success: Organizational Structure, Incentives, and Complementarities," NBER Conference Volume on Concentrated Corporate Ownership, 17-54. September 1998.

"Capital Formation and Investment in Venture Markets: An Assessment of Market Imperfections," *The Economic Evaluation of Technological Change* (Richard Spivack, Editor). June 1998.

"Corporations and the Financing of Innovation: The Corporate Venturing Experience," *The Atlanta Federal Reserve Bank Conference Volume*, 1-17. 2002.

"Venture Capital and Private Equity," *The Handbook of Corporate Finance* (Espen Eckbo, Editor) (North-Holland Press, New York). 2002.

"Short-Term America Revisited? Boom and Bust in the Venture Capital Industry and the Impact on Innovation," *Innovation Policy and the Economy* 3, 1-28. March 2002. (with Josh Lerner.)

"Venture Capital," Chap. D5 of *The Handbook of Modern Finance* (Dennis Lougue, Editor). 2007. (with Josh Lerner.)

"Equity Financing," *Handbook of Entrepreneurship Research: An Interdisciplinary Survey and* introduction (Zoltan Acs and David B. Audretsch, Editor). 2010. (with Josh Lerner.)

"The Role of Venture Capitalists in the Acquisition of Private Companies." In *Research Handbook on International Banking and Governance*, edited by James Barth, Chen Lin, and Clas Wihlborg. Cheltenham, UK: Edward Elgar Publishing, 2012. (with Yuhai Xuan).

"Diversity in Venture Capital," In *The Palgrave Encyclopedia of Private Equity,* edited by Benjamin Hammer and Ulf Klebeck, forthcoming February 2023.

**<u>Working Papers</u>**

"Failing Just Fine: Assessing Careers of Venture Capital-backed Entrepreneurs Via a Non-Wage Measure," January 2023. (with Natee Amornsiripanitch, George Hu, Will Levinson, and Vladimir Mukharlyamov.)

"The Market For CEOs:Evidence From Private Equity," December 2022, (with Steven Kaplan and Vladimir Mukharlyamov.)

"Transferable Skills? Founders as Venture Capitalists," March 2022, (with Vladimir Mukharlyamov.)

"Venture Capital's #MeToo Moment," May 2022. (with Sophie Calder-Wang and Patrick Sweeney.)

"Diversity and Performance in Entrepreneurial Teams. May 2022. (with Sophie Calder-Wang and Kevin Huang.)

"Diversity in Innovation," January 2019. (with Sophie Calder-Wang.)

"Homophily in Entrepreneurial Team Formation," January 2019. (with Sophie Calder-Wang and Kevin Huang.)

"To Err is Human, To Forgive is a Mistake: Evidence from Venture Capital Hiring," December 2013. (with Vladimir Mukharlyamov and Yuhai Xuan.)

"Bridge Building in Venture Capital: Evidence from Acquisitions of Venture Capital-backed Companies," December 2011.

"Reputation and Contractual Flexibility: Evidence from Venture Capital Distribution Pricing Policies," August 2011. (with Timothy Dore and Andrew Metrick.)

"Why Experienced Venture Capitalists Leave Money on the Table: Evidence from Initial Public Offerings," July 2009. (with Alon Brav and Tim Dore.)

"Institutions, Capital Constraints and Entrepreneurial Firm Dynamics: Evidence from Europe," November 2006. (with Mihir Desai and Josh Lerner.)

"Skill vs. Luck in Entrepreneurship and Venture Capital: Evidence from Serial Entrepreneurs," December 2006. (with Anna Kovner, Josh Lerner, and David Scharfstein.)

"The Role of Venture Capitalists in the Acquisition of Private Companies," October 2005. (with Yuhai Xian.)

"Incentives vs. Control: An Analysis of U.S. Dual-class Companies," April 2004. (with Andrew Metrick and Joy Ishii.)

"Ownership and Control in Entrepreneurial Firms: An Examination of Convertible Securities in Venture Capital Investment," January 2000.

"An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms," May 2000. (with Malcolm Baker.)

**Opinion — Editorials**

"This Tax Cut Will Pay Dividends," *Wall Street Journal,* August 13, 2002. (with Andrew Metrick and Jeremy Siegel.)

**Projects in Process**

- "Intercollegiate Varsity Athletes and Career Outcomes." (with Vladimir Muhkarlyamov.)
- "Human Capital and Private Equity." (with Steven Kaplan and Vladimir Muhkarlyamov.)
- "Private Equity and CEO Labor Markets." (with Steven Kaplan and Vladimir Muhkarlyamov.)
- "Migration and Entrepreneurship." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "The Role of Immigrants in the Innovation Ecosystem." (with Natee Amornsiripanitch and Kaushik Vasudevan.)
- "Dual Class IPOs." (with Malcolm Baker.)
- "Shark Tank." (with Sophie Calder-Wang.)
- "Pre-public Financing in Entrepreneurial Ventures."
- "Institutional Ownership and Corporate Governance." (with Andrew Metrick and Joy Ishii.)
- "The Dynamics of Global Entrepreneurship." (with Mihir Desai and Josh Lerner.)
- "The Determinants of Entrepreneurial Success." (with Anna Kovner, Josh Lerner, and David Scharfstein.)
- "Risk and Return in Private Equity." (with Leslie Jeng, Josh Lerner, and Andrew Metrick.)
- "Corporate Governance through Time." (with Martijn Cremers, Allen Ferrell, and Andrew Metrick.)

**COURSE MATERIALS**

**Cases**

- "Abraaj Capital and Acibadem Healthcare Invesetment (A)." Harvard Business School Case 214-021.
- "Abraaj Capital and Acibadem Healthcare Invesetment (B)." Harvard Business School Case 214-022.
- "Advantage Partners: Dia Kanri (A)." Harvard Business School Case 214-016.
- "Advantage Partners: Dia Kanri (B)." Harvard Business School Case 214-017.
- "The Advent Israel Venture Capital Program." Harvard Business School Case 298–072.
- "ALWAYSi." Harvard Business School Case 201–075.
- "APV Technology Partners II, L.P." Harvard Business School Case 298–048.
- "Ardian: The Sale of Diana." Harvard Business School Case 215-033.
- "Aspect Ventures." Harvard Business School Case 217-046.
- "Bain Capital: Outback Steakhouse." Harvard Business School Case 212-087.
- "Bang Networks, Inc." Harvard Business School Case 201–074.
- "Beyond Meat." Harvard Business School Case 220-053.
- "BioTransplant, Inc.: Initial Public Offering, January 1996." Harvard Business School Case 297–095.
- "Blackstone's Julia Kahr at the Summit." Harvard Business School Case 218-002.
- "Cachet Technologies." Harvard Business School Case 200–031.
- "Cambridge Technology Partners: 1991 Start Up." Harvard Business School Case 298–044.
- "Cambridge Technology Partners: Corporate Venturing (August 1996)." Harvard Business School Case 297–033.
- "Car Wash Partners, Inc." Harvard Business School Case 299–034.
- "CashDrop (A)." Harvard Business School Case 221-051.
- "CashDrop: (B-1)." Harvard Business School Case 221-052.
- "CashDrop (B-2)." Harvard Business School Case 221-053.
- "Charles River Velocity." Harvard Business School Case 201–092.
- "Charter Communication Bankruptcy." Harvard Business School Case 211-035.
- "Clover Food Lab." Harvard Business School Case Study 818-073.
- "Dell Ventures." Harvard Business School Case 200–062.

- "Digital Everywhere, Inc." Harvard Business School Case 298–099.
- "edocs, Inc. (A)." Harvard Business School Case 200–015.
- "edocs, Inc. (B-1): Kevin Laracey." Harvard Business School Case 200–020.
- "edocs, Inc. (B-2): Jonathon Guerster." Harvard Business School Case 200–021.
- "Efficient Market Services: August 1993 (A)." Harvard Business School Case 298–009.
- "Efficient Market Services: August 1993 (B1), EMS Management." Harvard Business School Case 298–010.
- "Efficient Market Services: August 1993 (B2), Comdisco Ventures." Harvard Business School Case 298–011.
- "Elliot Lebowitz." Harvard Business School Case 297–094.
- "Endeca: New Growth Opportunities." Harvard Business School Case 206–041.
- "Entrepreneurial Finance Vignettes – 2020." Harvard Business School Case 220-049.
- "Entrepreneurial Finance Vignettes – 2021." Harvard Business School Case 221-055.
- "Entrepreneurial Finance Vignettes – 2022." Harvard Business School Case 222-056.
- "EyeControl: Inspiring Communication." Harvard Business School Case 820-078.
- "First Mark Capital." Harvard Business School Case 212-041.
- "Fitzpatrick Hotel Group (A)." Harvard Business School Case 298–002.
- "Fitzpatrick Hotel Group (B1): Niall Carroll." Harvard Business School Case 298–003.
- "Fitzpatrick Hotel Group (B2): Paddy Fitzpatrick." Harvard Business School Case 298–004.
- "Founders Fund." Harvard Business School Case 211-040.
- "Genset Initial Public Offering (A)." Harvard Business School Case 297–096.
- "Genset Initial Public Offering (B)." Harvard Business School Case 297–097.
- "Genset: 1989." Harvard Business School Case 298–070.
- "Ghia and Cleo Capital." Harvard Business School Case 221-067.
- "Ginkgo Bioworks: The Cell as a Factory." Harvard Business School Case 220-069.
- "Global Digital Utilities Corp." Harvard Business School Case 297–065.
- "Globant: Going Public." Harvard Business School Case 215-021.
- "Harrah's Entertainment LBO." Harvard Business School Case13-054.
- "HgCapital and the Visma Transaction: (A)." Harvard Business School Case 214-018.
- "HgCapital and the Visma Transaction: (B)." Harvard Business School Case 214-019.
- "HgCapital and the Visma Transaction: (C)." Harvard Business School Case 214-020.
- "Honest Tea." Harvard Business School Case 201–076.
- "Hudson Manufacturing." Harvard Business School Case 203–064.
- "ICSGroup." Harvard Business School Case 819-097.
- "Knightsbridge Advisers, Inc." Harvard Business School Case 296–054.
- "Knoll Furniture: Going Public." Harvard Business School Case 202–114.
- "Loma Vista Medical." Harvard Business School Case 819-050.
- "Luminar and the Rise of SPACs." Harvard Business School Case 221-099.
- "MSE, Inc. Privatization: August 1997." Harvard Business School Case 298–135.
- "MSE, Inc. Privatization: August 1997 (Abridged)." Harvard Business School Case 298–136.
- "New Oriental." Harvard Business School Case.
- "New York Bagel: Hungary, April 1994." Harvard Business School Case 297–078.
- "NSK Software Technologies Ltd." Harvard Business School Case 298–071.
- "Nykaa.com: A Passion for Beauty." Harvard Business School Case 218-049.
- "Ocular." Harvard Business School Case 202–118.
- "Pakistan Rising: Bazaar's Growth Story (A)." Harvard Business School Case 220-098.
- "Pakistan Rising: Bazaar's Growth Story (B)." Harvard Business School Case 220-099.
- "Panoramic Power." Harvard Business School Case 818-072.
- "Penelope's Personal Pocket Phone." Harvard Business School Case 299-004.
- "Pet Doctors: 1999." Harvard Business School Case 200–016 "The Prague Post." Harvard Business School Case 299–033.
- "Precise Software." Harvard Business School Case 204-157.
- "Private Equity Finance Vignettes: 2016." Harvard Business School Case 216-005.

- "Private Equity Vignettes: 2014." Harvard Business School Case 213-026.
- "Rapid7." Harvard Business School Case 817-077.
- "Sales Razor Technologies." Harvard Business School Case 217-040.
- "Sarvega." Harvard Business School Case 204–137.
- "Shenzhen Capital Group: A Pioneer in China's VC Industry" Harvard Business School Case 211-029.
- "Simplifyy." Harvard Business School Case 220-055.
- "Sky Air, Inc." Harvard Business School Case 297–110.
- "SRS and the Defense Innovation Unit: Rethinking Procurement." Harvard Business School Case 220-047."
- "TA Associates and SpeedCast." Harvard Business School Case 217-051.
- "TaskRabbit." Harvard Business School Case 217-047.
- "The Prague Post." Harvard Business School Case 299-033.
- "Torrent Systems." Harvard Business School Case 298–084.
- "Tutor Time (A)." Harvard Business School Case 297–064.
- "Tutor Time (B)." Harvard Business School Case 297–074.
- "United Capital Partners (A)." Harvard Business School Case 213-044.
- "United Capital Partners (B)." Harvard Business School Case 213-045.
- "Venture Capital Fund Restructuring Vigenettes (Abridged)." Harvard Business School Case 202-126.
- "Venture Capital in Ireland: Getting Their ACT Together." Harvard Business School Case 298–001.
- "Vueling Airlines." Havard Business School Case.
- "WeWork – November 2018." Harvard Business Schoo Case 220-075.
- "Xedia and Silicon Valley Bank (A)." Harvard Business School Case 298–119.
- "Xedia and Silicon Valley Bank (B1): The Bank's Perspective." Harvard Business School Case 298–120.
- "Xedia and Silicon Valley Bank (B2): The Company's Perspective." Harvard Business School Case 298–121.
- "Xedia and Silicon Valley Bank (C): The Final Agreement." Harvard Business School Case 298–122.
- "Yo-Yo Ma and Silkroad." Harvard Business School Case 818-110.
- "ZEFER: November 1998." Harvard Business School Case 299–032.

**<u>Course Notes and Teaching Notes</u>**

- "Advent Israel Venture Capital Program TN." Harvard Business School Teaching Note 299–054.
- "APV Technology Partners II, L.P. TN." Harvard Business School Teaching Note 299–053.
- "Beta Golf." Harvard Business School Teaching Note 202–062.
- "BioTransplant Inc.: Initial Public Offering, January 1996 TN." Harvard Business School Teaching Note 299–055.
- "Cachet Technologies." Harvard Business School Teaching Note 202–068.
- "Cambridge Technology Partners —1991 Start Up TN." Harvard Business School Teaching Note 299–057.
- "Cambridge Technology Partners: Corporate Venturing (August 1996) TN." Harvard Business School Teaching Note 299–056.
- "Carlton Polish Co." Harvard Business School Teaching Note 202–076.
- "Car Wash Partners, Inc. TN." Harvard Business School Teaching Note 299–058.
- "Contracting and Control in Venture Capital." Harvard Business School Note 298–067.
- "Dell Ventures." Harvard Business School Teaching Note 202–072.
- "Digital Everywhere, Inc. TN." Harvard Business School Teaching Note 299–059.
- "edocs, Inc. Series." Harvard Business School Teaching Note 202–064.
- "Efficient Market Services: August 1993 Series TN." Harvard Business School Teaching Note 299–061.
- "Elliot Lebowitz TN." Harvard Business School Teaching Note 299–060.

- "Emergence of Silicon Wadi." Harvard Business School Note 204–156.
- "Entrepreneurial Exits." Harvard Business School Note 220-077.
- "The Entrepreneurial Manager: Course Overview, Harvard Business School Case." 818-080
- "The Entrepreneurial Manager, Module I: Defining and Developing the Business Model." Harvard Business School Case 817-108.
- "The Entrepreneurial Manager, Module 2 Part 1: Resourcing the Business Model." Harvard Business School Case 817-109.
- "The Entrepreneurial Manager, Module 2 Part 2: Resourcing the Business Model." Harvard Business School Case 817-110.
- "Fenchel Lampshade Company." Harvard Business School Teaching Note 202–063.
- "Fitzpatrick Hotel Group Series TN." Harvard Business School Teaching Note 299–062.
- "Genset: 1989 TN." Harvard Business School Teaching Note 299–063.
- "Genset Initial Public Offering (A) & (B) TN." Harvard Business School Teaching Note 299–064.
- "Global Digital Utilities Corporation TN." Harvard Business School Teaching Note 299–065.
- "HIMSCORP, Inc." Harvard Business School Teaching Note 202–073.
- "Honest Tea." Harvard Business School Teaching Note 202–069.
- "Introduction to Entrepreneurial Finance." Harvard Business School Note 298–061.
- "Introduction to Entrepreneurial Finance – 2020." Harvard Business School Note 220-050.
- "Introduction to Private Equity Finance." Harvard Business School Note 213-026.
- "Knightsbridge Advisers, Inc. TN." Harvard Business School Teaching Note 299–066.
- "Knot, The." Harvard Business School Teaching Note 202–070.
- "MSE, Inc. Privatization: August 1997 & MSE, Inc. Privatization: August 1997 (Abridged) TN." Harvard Business School Teaching Note 299–067.
- "Nantucket Nectars." Harvard Business School Teaching Note 202–074.
- "New York Bagel: Hungary, April 1994 TN." Harvard Business School Teaching Note 299–068.
- "A Note on Angel Financing." Harvard Business School Note 298–083.
- "A Note on LBO Capital Structure." Harvard Business School Note 213-091.
- "A Note on Franchising." Harvard Business School Note 297–108.
- "A Note on Franchising." Harvard Business School Note 217-059.
- "A Note on Government Sources of Financing for Small Businesses." Harvard Business School Note 298–015.
- "Note on Strategic Alliances, A." Harvard Business School Note 298–047.
- "A Note on the Internet." Harvard Business School Note 297–109.
- "A Note on Private Equity Exits." Harvard Business School Note 213-112.
- "A Note on the Venture Capital Industry." Harvard Business School Note 295–065.
- "A Note on Valuation in Entrepreneurial Ventures." Harvard Business School Note 298–082.
- "A Note on Valuation in Private Equity." Harvard Business School Note 213-034.
- "NSK Software Technologies Ltd. TN." Harvard Business School Teaching Note 299–069.
- "Parenting Magazine TN." Harvard Business School Teaching Note 202–065.
- "Penelope's Personal Pocket Phones TN." Harvard Business School Teaching Note 299–070.
- "Prague Post, The TN." Harvard Business School Teaching Note 299–071.
- "Private Equity Valuation in Emerging Markets." Harvard Business School Note 213-043.
- "Record Masters." Harvard Business School Teaching Note 202–075.
- "Penelope's Personal Pocket Phones." Harvard Business School Case 299–004.
- "Sky Air, Inc. TN." Harvard Business School Teaching Note 299–072.
- "Torrent Systems TN." Harvard Business School Teaching Note 299–073.
- "Tutor Time (A) TN." Harvard Business School Teaching Note 299–074.
- "Tutor Time (B) TN." Harvard Business School Teaching Note 299–078.
- "Valuation in Entrepreneurial Settings." Harvard Business School Note 220-057.
- "Venture Capital in Ireland: Getting Their ACT Together TN." Harvard Business School Teaching Note 299–075.

- "Xedia and Silicon Valley Bank Series TN." Harvard Business School Teaching Note 299–076.
- "ZEFER: November 1998 TN." Harvard Business School Teaching Note 299–077.

**SEMINARS AND CONFERENCE PRESENTATIONS — Academic**

American Economic Association: Annual Meeting, January 1995, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

American Finance Association: Annual Meeting, January 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

American Finance Association: Annual Meeting, January 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

American Finance Association: Annual Meeting, January 1999, "What Drives Venture Capital Fundraising."

American Finance Association: Annual Meeting, January 2000, "An Analysis of Executive Compensation, Ownership, and Control in Entrepreneurial Firms."

American Finance Association: Annual Meeting, January 2004, "Incentives vs. Control: An Analysis of U.S. Dual-class companies."

American Finance Association: Annual Meeting, January 2015, "Cost of Friendship."

American Finance Association: Annual Meeting, January 2015, "What Do Private Equity Firms (Say) They Do?"

American Law and Economics Association: Annual Meeting, May 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Association of Financial Economists: Annual Meeting, January 2001, "The Determinants of Board Structure and Function in Entrepreneurial Firms."

Association of Financial Economists: Annual Meeting, January 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Arizona State University School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Boston University: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Brandeis University: Entrepreneurship Conference, April 2014, "The Next Big Question in Entrepreneurship Research."

Brookings Institute: Microeconomic Conference, June 1998, "What Drives Venture Fundraising?"

Business and Economic History: Annual Meeting, March 1994, "The Rise and Fall of Venture Capital."

Cambridge University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."

Center for Research on Security Prices: Biannual Meeting, March 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."

Center for Research on Security Prices: Biannual Meeting, November 1994, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

Center for Economic and Policy Research: European Finance Conference on Financing Innovation, November 1998, "What Drives Venture Capital Fundraising?"

Columbia Law School: Law and Economics Seminar, November 1995, "An Analysis of Compensation in the U.S. Venture Capital Partnership."

Columbia Law School: Law and Economics Seminar, November 1995, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."

Columbia Law School: Financing Innovation Conference, December 1997, "An Analysis of Covenants in Venture Capital Investments."

Columbia University School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Copenhagen Business School: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Cornell Business School: Finance Seminar, October 2001, "Corporate Governance and Equity Prices."
Federal Reserve Bank of Chicago: January 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Duke University Fuqua Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Georgetown Law School: April 2003, "Corporate Governance and Equity Prices."
Harvard Business School: Business History Seminar, December 2000, "The History of Silicon Valley."
Harvard Business School: Entrepreneurship Conference, December 2000, "The Really Long-run Performance of Initial Public Offerings."
Harvard Business School: Financial Decision and Control Workshop, July 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Harvard Business School: Financial Decision and Control Workshop, July 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure- backed Companies."
Harvard Business School: Financial Decision and Control Workshop, July 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Harvard Business School: Financial Decision and Control Workshop, July 1998, "How are Large Institutions Different From Other Investors? Why Do These Differences Matter for Equity Prices and Returns?"
Harvard Business School: Finance Seminar, February 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Harvard Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Harvard Business School: Finance Seminar, October 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Harvard Business School: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Harvard Business School: Finance Seminar, October 2011, "The Cost of Friendship."
Harvard Business School: Research Symposium, May 2018, "Diversity in the Innovation Sector."
Harvard Business School: Organizations and Markets Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Harvard Business School: Finance Seminar, November 2000, "The Venture Capital Revolution."
Harvard Business School: Finance Seminar, March 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
Harvard Business School: Finance Seminar, December 2008, "Bridge Building in Venture Capital: Evidence from Acquisitions."
Harvard Business School: Finance Seminar, December 2014, "More than Money: Venture Capitalists on Boards."
Harvard Business School: Finance Seminar, February 2015, "What do Private Equity Firms (Say) They Do?"
Harvard Business School: Organizational Behavior Seminar, February 2012, "The Role of Social Ties in Venture Capital."
Harvard Kennedy School: Gender Diversity Conference, June 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Harvard University Department of Economics: Workshop, December 1992, "Optimal Investment, Monitoring, and the Staging of Venture Capital."

Harvard University Department of Economics: Organizations Workshop, December 1996, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Harvard University Department of Economics: Organizations Workshop, December 2002, "Entrepreneurial Spawning."
Harvard University Department of Economics: Organizations Workshop, December 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
Harvard University Department of Economics: Organizations Workshop, September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Hebrew University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Hebrew University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Hebrew University School of Business: Distinguished Lecture: December 2014, "What Do Private Equity Firms (Say) They Do?"
IESE Business School, October 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
London School of Economics: Venture Capital Conference, October 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely Held Firms."
Manchester University, October 2020. , "Venture Capital and Covid-19," "Private Equity and Covid-19."
Massachusetts Institute of Technology: Organizations Workshop, March 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Massachusetts Institute of Technology and Harvard University: Public Finance Workshop, March 1998, "What Drives Venture Fundraising?"
National Bureau of Economic Research: Corporate Finance Group, April 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital
National Bureau of Economic Research: Entrepreneurship Group, July 2017, "How do Venture Capitalists Make Decisions."
National Bureau of Economic Research: Summer Institute, July 1994, "An Analysis of Compensation in the U.S. Venture Partnership Agreement."
National Bureau of Economic Research: Summer Institute, July 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
National Bureau of Economic Research: Summer Institute, July 1996, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
National Bureau of Economic Research: Finance Series, December 1997, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
National Bureau of Economic Research: Finance Series, November 1998, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
National Bureau of Economic Research: Summer Institute, July 2001, "Corporate Governance and Equity Prices."
National Bureau of Economic Research: Summer Institute, July 2021, "Diversity and Performance in Entrepreneurial Teams."
New York Federal Reserve Bank: May 2000, "The Determinants of Board Structure and Function in Entrepreneurial Firms."
New York University, Stern School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
New York University, Stern School of Business: Finance Seminar, February 1999, "How You Get There Matters: The Path Dependency of Executive Compensation in Closely-Held Firms."
New York University, Stern School of Business: Finance Seminar, October 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."

Northwestern University, Kellogg Business School: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
Northwestern University, Kellogg Business School: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Norwegian School of Management: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Ohio State University: Finance Seminar, October 1998, "How You Get There Matters: The Path Dependency of Corporate Governance in Closely Held Firms."
Oxford University: Graduate Student Seminar, May 1989.
Oxford University: Finance Seminar, May 1999, "An Analysis of Executive Compensation, Ownership, and Control in Closely Held Firms."
Oxford University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Peking University, Finance Seminar, May 2021, "Getting Schooled: The Role of Universities in Attracting Immigrant Entrepreneurs."
Queens University (Kingston, Ontario) School of Business: Finance Seminar, November 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Rutgers University: Finance Seminar, October 1997, "Money Chasing Deals? The Impact of Fund Inflows on Private Equity Valuations."
Securities and Exchange Commission, October 2020, "Venture Capital and Covid-19," "Private Equity and Covid-19."
Stanford University Graduate School of Business: Strategy Workshop, January 1993, "Grandstanding in the Venture Capital Industry."
Stanford University Graduate School of Business: Center for Economic and Political Research, March 1997, "The Valuation of Private Equity Investments."
Stanford University: Finance Seminar, October 2012, "The Cost of Friendship."
Stanford University: Financing Innovation Conference, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Stockholm Business School: September 2003, "Entrepreneurial Spawning: Corporations and the Genesis of New Ventures, 1986–1999."
Tel Aviv University School of Business: Finance Seminar, March 1994, "An Analysis of Compensation in the U.S. Venture Capital Partnership."
Tel Aviv University School of Business: Finance Seminar, March 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
Tel Aviv University School of Business: Finance Seminar, December 2014, "What Do Private Equity Firms (Say) They Do?"
University of Arizona School of Business: Finance Seminar, December 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of California, Davis: Diversity Conference, December 2017, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
University of California at Berkeley, Haas School of Business: Finance Seminar, April 1993, "Grandstanding in the Venture Capital Industry."
University of California at Los Angeles: Finance Seminar, May 1997, "The Valuation of Private Equity Investments."
University of California at Los Angeles: Behavioral Finance Conference, April 1998, "Are the Hundred-Million-Dollar Managers Just Like Everyone Else? An Analysis of the Stock Ownership of Large Institutions."
University of Chicago Graduate School of Business: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."
University of Chicago Graduate School of Business: Information and Uncertainty Seminar, April 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."

University of Chicago Graduate School of Business: Finance Seminar, May 2006, "Skill vs. Luck: An Analysis of Serial Entrepreneurs."
University of Chicago Economics Department: Economic and Legal Organization Workshop, February 1994, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
University of Chicago Economics Department: Economic and Legal Organization Workshop, October 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
University of Georgia School of Business: Finance Seminar, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Illinois School of Business: Finance Seminar, October 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
University of Michigan School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of North Carolina School of Business: Finance Seminar, November 1995, "Venture Capital Distributions: Short-Run and Long-Run Reactions."
University of Pennsylvania Wharton School: Finance Workshop, March 1998, "Money Chasing Deals? The Impact of Venture Inflows of Private Equity Prices."
University of Rochester Simon School of Business: Finance Seminar, December 1996, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
University of Rochester Simon School of Business: Organizations Seminar, February 1993, "Grandstanding in the Venture Capital Industry."
University of Washington: Finance Seminar, November 2018, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Virginia Tech University School of Business: Finance Seminar, October 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies."
Warwick University, Finance Seminar, May 2019, "And the Children Shall Lead: Gender Diversity and Performance in Venture Capital."
Western Finance Association: Annual Meeting, June 1994, "Optimal Investment, Monitoring, and the Staging of Venture Capital."
Western Finance Association: Annual Meeting, June 1995, "The Long-run Underperformance of Seasoned Equity Offerings Revisited."
Western Finance Association: Annual Meeting, June 1996, "The Use of Covenants: An Empirical Analysis of Venture Partnership Agreements."
Western Finance Association: Annual Meeting, June 1997, "Reputation and Conflict of Interest in the Issuance of Public Securities: Evidence from Venture Capital."
Western Finance Association: Annual Meeting, June 1998, "How are Large Institutions Different from Other Investors? Why These Differences Matter for Equity Prices and Returns?"
World Bank: Finance Seminar, May 1999, "An Analysis of CEO Compensation, Ownership, and Control in Closely Held Firms."
Yale University, School of Management: Finance Seminar, January 1993, "Grandstanding in the Venture Capital Industry."

**SPEECHES AND CONFERENCE PRESENTATIONS — Practitioner**

Advanced Technology Program, National Institute for Standards and Technology and NBER Conference on Financing Innovation, June 1998.
Amsterdam Institute of Finance, October 1994, "Venture Capital and the Finance of Emerging Companies."
American Friends of the Technion, October 1998, "The Development of High Technology and Venture Capital in Israel."

AT&T Small Business Conference, April 1994, "Venture Capital: The Road Ahead."
Center for Economic Policy Research, Venture Capital Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."
Deloitte and Touche, May 2003, "Entrepreneurial Leadership."
Ernst and Young Silicon Valley Venture Capital Conference, 2002, "The Future of Venture Capital."
Ernst and Young Buyout Roundtable, 2002, "Corporate Governance and Private Equity."
Greenwich Roundtable, 2015, "Skill in Private Equity."
Harvard Business School Venture Capital Conference, December 1995, "Myth or Reality? The Long-Run Underperformance of Initial Public Offerings: Evidence from Venture and Nonventure-backed Companies" and "Venture Capital Distributions: Short-run and Long-run Reactions."
Harvard Business School Alumni Series, May 2000 and May 2003, "The Future of Private Equity."
Harvard Business School European Conference, June 2003, "European Private Equity."
Harvard Business School Global Alumni Conference, June 1998, "Consolidation Buy-outs."
Harvard Business School Global Alumni Conference, May 2001, "Venture Capital 2001: Boom or Bust?"
Harvard Business School Centennial Celebration, February 2010, "Private Equity at the Crossroads."
Harvard Business School Global Alumni Venture Capital Conference, May 2012, "New Venture Capital Models"
Harvard Business School Global Alumni Venture Capital Conference, October 2014, "Lessons from the Trenches."

Hambrecht and Quist, Post-Venture Forum, March 1999, "Venture and Post-Venture Opportunities: Insightsfrom Research."

Iceland Pension Conference, May 2018, "The Opportunity in Venture Capital."

Institutional Limited Partner's Association, September 1997, "Risk and Return in Private Equity."

Institutional Limited Partner's Association, April 2002, "New Tools for Assessing Private Equity Valuation and Asset Allocation."

International Business Forum, June 1999, "Venture Capitalists and the Public Markets." Investors' Press Alpha Roundtable, October 1996, "The Future of Private Equity." Israel Business Forum, March 1994.

Israeli Venture Capital and High Technology Conference, 2002, "The Future of Venture Capital and Its Implication for Israel."

Japanese Private Equity Forum, July 1997, "Corporations and Venture Capital: Old and New Challenges."

Latin American Chamber of Commerce, February 1995, "Capital for Entrepreneurial Companies: A Look Ahead."

Massachusetts Public Pension Fund Investment Forum, October 1998, "Venture Capital: Investing in Start-up and Newly Public Firms."

National Venture Capital Association, March 2003, "The Future of Venture Capital." Nova Pharmaceuticals, September 2009, "Venture Capital after the Downturn."

OPAL Institutional Investors Conference, December 2000, "The Future of Private Equity." Rocky Mountain Venture Capital Association, March 2003, "Venture Capital: Challenges and

Opportunities."

Russell Capital Private Equity Conference, March 1997, "The Pricing of Private Equity Investments: A Window on the Returns of Tomorrow."

Russell Capital Private Equity Conference, November 1998, "Advent Israel Venture Capital Program."
Salomon Smith Barney Private Equity Conference, March 2000, "The Future of Private Equity."
Salomon Smith Barney Consulting Group, March 2001, "Risk and Return in Private Equity."
Samsung Venture Capital Group, October 1997, "Corporations and Venture Capital: Old and New Challenges."
Seeking Alpha, March 2015, "What's Hot in Venture Capital Fundraising?"
Silicon Valley Bank, May 2003, "Venture Capital: Challenges and Opportunity."

SuperReturn Conference US, May 2009, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference Europe, February 20011, "Insights from Private Equity Academic Research at the Harvard Business School."
SuperReturn Conference US, May 2013, "The Future of Private Equity."
University of Chicago Business Forum, May 1995, "The Next Ten Years in Venture Capital." (Organized and moderated panel.)
Venture Economics Venture Forum, November 1994, "The Venture Cycle." (Keynote Address.)
Venture Economics Venture Forum, November 1994, Panelist for IPO performance issues.
Venture Economics Venture Forum, November 1996, Plenary session speaker on venture capital returns.
VentureOne / Ernst and Young Venture Capital Conference, July 2002, "The Future of Venture Capital."
VentureOne / Ernst and Young Venture Capital Conference, July 2003, "The Future of European Venture Capital."
Young Presidents' Organization Conference, November 1998, "Entrepreneurial Opportunities in Crisis Situations."
Young Presidents' Organization Conference, January 2003, "The Future of Venture Capital."
Young Presidents' Organization Conference, January 2010, "New Models in Venture Capital."
Young Presidents' Organization Conference, January 2013, "Private Equity Trends."
In addition, made presentations of research findings for several institutional investors and investment managers who contributed data for the project on interactions between venture organizations and institutional investors.

## TEACHING

### University of Chicago

Developed and taught course "Entrepreneurial Finance and Management," a second-year MBA elective, 1993–1995.

### Harvard Business School

Taught "First-Year Finance," in Required Curriculum, 1995–1997.

Taught "Entrepreneurial Finance," in Elective Curriculum, 1997–2003. 2019-2022.

Taught "The Entrepreneurial Manager," in Required Curriculum, 2003–2008.

Taught "Venture Capital and Private Equity," in Elective Curriculum, 2009–2012.

Co-developed and taught, "Private Equity Finance," in Elective Curriculum, 2012-2017.

Developed and taught, "Private Equity Field," in Elective Curriculum, 2013-2014.

Developed and taught, "Immersive Field Couse: Israel. Startup Nation." 2017-2022.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2005–2008.

Course Head for "The Entrepreneurial Manager" in Required Curriculum 2016–2019.

Co-developed and co-taught Ph.D. course "Empirical Topics in Corporate Finance," 1999–2015. (with Josh Lerner.)

Co-developed and partially taught three-day executive courses on venture capital and private equity: "Conflict and Evolution in Private Equity" (1996), "Corporate Venture Capital: The Third Wave" (1997), "The Internationalization of Private Equity" (1998), "Structuring Effective Private Equity Organizations" (1999, 2000), "Optimizing Corporate Investments" (2000), "Doing Private Equity Deals" (2001, 2003), "Private Equity in a Downturn" (2002), "Private Equity Deals" (2004), "Private Equity and Corporate Governance" (2005), "Venture Capital and Private Equity" (2006), "Internationalization of Private Equity" (2007), "Private Equity and Venture Capital" (2008), and "Private Equity after the Downturn" (2009), "Venture Capital and Private Equity" (2010-2011). "Private Equity and Venture Capital: After the Financial Crisis" (2012), Private

Equity and Venture Capital: The Future" (2013). "Private Equity and Venture Capital: At the Crossroads" (2014). "Private Equity and Venture Capital: Changing Market Power." (2015), Private Equity and Venture Capital (2016-2022.) (all with Josh Lerner.)

Co-developed and taught "Economics of Markets," in Elective Curriculum, 1997.

Partially taught in a variety of programs including:

General Management Program / START, August 1996.
HBS / CIEBA Pension Workshop, April 1996.
YPO Conference, February 1997, February 2003, February 2006, February 2008.
Strategic Finance for Small Business, February 1998, March 1999, March 2000.
Entrepreneur's Toolkit, June 1997, June 1998, June 1999.

## PROFESSIONAL SERVICE AND EXPERIENCE

1985–1986 BAYER CHEMICAL CO. LEVERKUSEN, GERMANY
Researcher. Performed biochemical analysis on locust flight muscle metabolism.

1997–2020 Associate Editor for *Small Business Economics*.

1997–2020 Associate Editor for *Journal of Private Equity.*

1997–2016 Associate Editor for *Journal of Finance*.

1997–2018 Western Finance Association Meetings Program Committee.

1998 Program Committee, *Journal of Financial Economics* conference on research methodologies in finance.

2006–2014 Associate Editor for Journal of Economic Literature.

2010–2020 Associate Editor for Journal of Economics and Management Strategy.

Referee for the Journal of Financial Economics, Journal of Finance, Journal of Political Economy, Quarterly Journal of Economics, Journal of Economic Theory, Rand Journal of Economics, Review of Financial Studies, American Economic Review, Journal of Public Economics, Journal of Corporate Finance, Journal of Small Business Management, Economic Letter, Small Business Economics, Journal of Business Venturing, Journal of Small Business Finance, Journal of Business, Journal of Law, Economics, and Organizations, and Journal of Law and Economics, Review of Economic and Statistics.

Reviewer for reports and proposals for the National Science Foundation. Reviewer for reports and proposals for the Securities and Exchange Commission.

## COMMUNTY SERVICE

Board Member, Boston Sympony Orchestra, (2021-present.)
Board Member, Beth Israel Deaconess Hospital, (2014-present).
Board Member, USA Triathlon Foundation, (2015-present)
Beth Israel Deaconess Wellness Center Advisory Board (2013-2020)
Board member, Friends of Harvard Track, (2014-2018).
Vice President, Treasurer, and Executive Board Member, Harvard Hillel (1995–2010).
Board Member, Camp Yavneh (2007–2010).

Ivy League Eikeden Committee (1997–2010)
Young Israel of Brookline, Internet Advisory Board (2000–2001).
Technion Institute of Management: Boston Advisory Board (2000).
Board Member, Anshe Shalom B'nei Israel Congregation (1993–1995).

## CONSULTING PROJECTS

Apax Venture Partners, 2003.
Audax Private Equity, 2021.
Bain Capital, 2008-2010.
Battery Venture Partners, 2001.
Bessemer Venture Partners, 1998.
Deloitte and Touche, 2003.
Department of Energy, Idaho Falls National Laboratory, 1994–1995.
Department of Energy, Savannah River National Laboratory, 1995–1997.
Department of Energy, Butte, Montana National Laboratory, 1997–1998.
E.M. Warburg, Pincus, 1997.
Ernst and Young, 2002.
GTCR Golder Rauner, 1999.
Jerusalem Venture Partners, 2001.
Kleiner Perkins, 2014.
Montana Science and Engineering, Inc., 1997.
Patricoff & Co., 1995.
Phillip's Petroleum, 1998, 2000, 2001, 2002.
PriceWaterhouse Coopers, 2001.
RogersCasey Investment Advisors, 1994.
Salomon Smith Barney, 1999–2003.
TA Associates, 2015, 2019.
Thermo Electron Corporation, 1994–1997.
VentureOne, 1995.

## BOARDS OF DIRECTORS AND ADVISORY BOARDS

Spur Capital Partners, 2002–Present.
Xfund, 2019-present.
Highland Capital Consumer Fund, 2007–Present.
Khosla Ventures, 2009-Present.
Onpoint Technology Ventures, 2003–2017.
Evergreen Partners, 2005–2015.
Gemini Venture Capital, 2003–2015.
Knightsbridge Investment Advisers, 1995–2012.
New Capital Partners, 2000–2001.
OnTheFrontier.com, 2000–2001.
Triple Point Capital, 2003.
Mercanteo, 1999.
ZEFER, 1998.

## GRANTS AND AWARDS

Journal of Financial Economics, Jensen Price, First Prize, 2021.
Doriot Prize for Best Paper on Private Equity, First Prize, 2021.
Journal of Financial Economics, Fama-DFA Prize, Second Prize, 2008.
Rodney White Center for Financial Research, Best Paper Prize, 2002.National Institute of Standards and

National Science Foundation Grant, 2002–2005, "Corporate Governance and Firm Performance."
American Association of Individual Investors Award for Best Paper on Investments, at the Western Finance Association Meeting, 1998.
Journal of Finance, Smith Breeden Distinguished Paper Prize, 1998.
Technology, Advanced Technology Program, 1996–1997, "Venture Capital and the Financing of Emerging Technologies."
MBA Class of 1961 Fellow, 1997–1998.
National Science Foundation Grant, 1994–1997, "Financing New Business Formation."
Newcomen Business History Paper Prize, 1994.

## PATENTS GRANTED

Private Equity Investments, Patent Number US 7,426,488 B1, Issued September 16, 2008. (co-inventors Joshua Lerner, Andrew Metrick, and Leslie Jeng.)

## ATHLETICS

Alternate on the 1988 Olympic team in the marathon. Finished fourth in the Olympic trials. Qualified for 1984, 1988, 1992 Olympic marathon trials. Cross-Country All-American. Academic All-American. Set World Junior Record in the marathon (1983). Bronze medalist in 1985 World University Games in Japan (marathon). Qualified for two US cross-country teams and competed in the World Championships. Set Harvard Records in the indoor 5,000 meters, outdoor 5,000 meters, and outdoor 10,000 meters. Triathlon Age Group All- American 2007, 2009, 2010, 2013, 2014, 2015, 2016, 2017, 2018, 2019, 2020, 2021. Ranked second in the world by World Triathlon Corporation in Age Group at the Ironman 70.3 distance in 2014. Competed in ITU Age Group World Championships (2007, 2015). Competed in Ironman 70.3 World Championship (2007, 2016, 2017, 2019). Competed in Ironman World Championships in Kailua Kona (2009, 2010, 2018).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (March 15, 2019).

Deposition of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (April 24, 2019).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., plc, et al., on behalf of Perrigo Co., plc, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (May 16, 2019).

Hearing Testimony of Paul A. Gompers in Monroe County Employees' Retirement System and Roofers Local No. 149 Pension Fund, Individually and on Behalf of All Others Similarly Situated v. The Southern Company, et al., on behalf of The Southern Company, United States District Court for the Northern District of Georgia, Atlanta Division, Civil Action No. 1:17-cv-00241-MHC (May 21, 2019).

Testimony of Paul A. Gompers in Reynolds American, Inc. v. Third Motion Equities Master Fund Ltd, et al., on behalf of Reynolds American, Inc., State of North Carolina, Forsyth County, In the General Court of Justice, Superior Court Division, Case No. 17-CVS-7086 (June 13, 2019).

Deposition of Paul A. Gompers in United States Securities and Exchange Commission v. Daniel C. Ustian, on behalf of Daniel C. Ustian, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-03885 (July 10, 2019).

Deposition of Paul A. Gompers in In Re Twitter, Inc. Securities Litigation, on behalf of Twitter, Inc., Richard Costolo, and Anthony Noto, United States District Court for the Northern District of California, Case No. 3:16-cv-05314-JST (September 10, 2019).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (September 16, 2019).

Deposition of Paul A. Gompers in Eric Weiner, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469 (November 21, 2019).

Testimony of Paul A. Gompers in In the Matter of the Companies Law (2016 Revision) and In the Matter of Nord Anglia Education, Inc., on behalf of the respondents, In the Grand Court of the Cayman Islands, Financial Services Division, Cause No. FSD 235 of 2017 (IKJ) (December 12, 13, 16, and 17, 2019).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd. v. Kindred Healthcare, Inc., on behalf of Brigade Leveraged Capital Structures Fund Ltd., Brigade Cavalry Fund Ltd., and Brigade Distressed Value Master Fund Ltd., Court of Chancery of the State of Delaware, C.A. No. 2018-0566-KJSM (January 23, 2020).

Deposition of Paul A. Gompers in Plymouth County Retirement System v. Patterson Companies, Inc., Scott P. Anderson, Ann B. Gugino, R. Stephen Armstrong, and James W. Wiltz, on behalf of Patterson Companies, Inc. and Scott P. Anderson, United States District Court for the District of Minnesota, Case No. 0:18-cv-00871-MJD-SER (July 6, 2020).

Deposition of Paul A. Gompers in Michael Karsch v. Blink Health Ltd. (f/k/a/ Chaiken Holdings LLC and Vital Matters LLC), Geoffrey Chaiken and Matthew Chaiken, on behalf of Blink Health Ltd., United States District Court for the Southern District of New York, Case No. 17-cv-03880 (July 15, 2020).

Deposition of Paul A. Gompers in In Re Celgene Corporation Securities Litigation, on behalf of Celgene Corporation, Bristol-Myers Squibb, Scott A. Smith, Terrie Curran, and Phillippe Martin, United States District Court for the District of New Jersey, Civil Action No. 18-4772 (July 17, 2020).

Deposition of Paul A. Gompers in Kevin L. Dougherty, Individually and on Behalf of All Others Similarly Situated v. Esperion Therapeutics, Inc., et al., on behalf of Esperion Therapeutics, Inc. and Tim Mayleben, United States District Court for the Eastern District of Michigan, Civil Action No. 2:16-cv-10089-AJT-RSW (August 11, 2020).

Deposition of Paul A. Gompers in Callsome Solutions, Inc. v. Google, Inc., on behalf of Google, Inc., Supreme Court of the State of New York for the County of New York, Index No. 652386/2014 (September 21, 2020).

Deposition of Paul A. Gompers in In Re The Allstate Corporation Securities Litigation, on behalf of The Allstate Corporation, Thomas J. Wilson, and Matthew E. Winter, United States District Court for the Northern District of Illinois, Eastern Division, Case No. 16-cv-10510 (October 5, 2020).

Deposition of Paul A. Gompers in Symbiont.io, Inc. v. Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., on behalf of Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., Court of Chancery of the State of Delaware, C.A. No. 2019-0407-JTL (November 2, 2020).

Deposition of Paul A. Gompers in Eric Weiner, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:17-cv-01469 (November 5, 2020).

Testimony of Paul A. Gompers in Symbiont.io, Inc. v. Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., on behalf of Ipreo Holdings, LLC, Ipreo LTS LLC, IHS Markit Ltd., and Markit North America, Inc., Court of Chancery of the State of Delaware, C.A. No. 2019-0407-JTL (December 10, 2020).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Cross-Examination of Paul A. Gompers in Kevin Gowanlock v. Auxly Cannabis Group Inc., on behalf of Auxly Cannabis Group Inc., Ontario Superior Court of Justice, Court File No. CV-19-00617136 (January 19, 2021).

Deposition of Paul A. Gompers in Roofers' Pension Fund, Individually and on Behalf of All Others Similarly Situated v. Perrigo Co., plc, et al., on behalf of Perrigo Co., plc, United States District Court for the District of New Jersey, Case No. 2:16-cv-02805-MCA-LDW (January 21, 2021).

Deposition of Paul A. Gompers in Plymouth County Retirement System v. Patterson Companies, Inc. and Scott P. Anderson, on behalf of Patterson Companies, Inc. and Scott P. Anderson, United States District Court for the District of Minnesota, Case No. 0:18-cv-00871-MJD-HB (April 2, 2021).

Cross-Examination of Paul A. Gompers in Abram B. Dyck v. Tahoe Resources Inc. and Ronald Wayne Clayton, on behalf of Tahoe Resources Inc. and Ronald Wayne Clayton, Ontario Superior Court of Justice, Court File No. CV-18-00606411-00CP (May 10, 2021).

Deposition of Paul A. Gompers in Richard J. Tornetta v. Elon Musk, et al., on behalf of Elon Musk, et al., Court of Chancery of the State of Delaware, C.A. No. 2018-0408-JRS (September 10, 2021).

Arbitration Testimony of Paul A. Gompers in HP Inc. v. Xerox Corporation, on behalf of HP Inc., American Arbitration Association, Case No. 01-21-0000-1179 (October 13, 2021).

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in various matters v. Perrigo Company plc, et al., on behalf of Perrigo Company plc, United States District Court for the District of New Jersey (November 18, 2021).

- *Carmignac Gestion, S.A. v. Perrigo Company plc, et al.*, Case No. 17-cv-10467 (MCA) (LDW)
- *Mason Capital L.P., et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-1119 (MCA) (LDW)
- *Pentwater Equity Opportunities Master Fund Ltd., et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-1121 (MCA) (LDW)
- *Harel Insurance Company, Ltd., et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-2074 (MCA) (LDW)
- *First Manhattan Co. v. Perrigo Company plc, et al.*, Case No. 18-cv-2291 (MCA) (LDW)
- *TIAA-CREF Investment Management, LLC, et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-8175 (MCA) (LDW)
- *Nationwide Mutual Funds, on behalf of its series Nationwide Geneva Mid Cap Growth Fund and Nationwide S&P 500 Index Fund, et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-15382 (MCA) (LDW)
- *Schwab Capital Trust on behalf of its series Schwab S&P 500 Index Fund, et al. v. Perrigo Company plc, et al.*, Case No. 19-cv-3973 (MCA) (LDW)
- *Hudson Bay Master Fund Ltd., et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-16206 (MCA) (LDW)
- *WCM Alternatives: Event-Driven Fund, et al. v. Perrigo Company plc, et al.*, Case No. 18-cv-16204 (MCA) (LDW)
- *Discovery Global Citizens Master Fund Ltd., et al. v. Perrigo Company plc, et al.*, Case No. 19-cv-21502 (MCA) (LDW)
- *York Capital Management, L.P., et al. v. Perrigo Company plc, et al.*, Case No. 19-cv-21732 (MCA) (LDW)
- *Burlington Loan Management DAC (f/k/a Burlington Loan Management Limited) v. Perrigo Company plc, et al.*, Case No. 20-cv-1484 (MCA) (LDW)
- *Sculptor Master Fund, Ltd. (f/k/a Olmaster Fund, Ltd.), et al. v. Perrigo Company plc, et al.*, Case No. 19-cv-4900 (MCA) (LDW)
- *Aberdeen Canada Funds – Global Equity Fund, a series of Aberdeen Canada Funds, et al. v. Perrigo Company plc, et al.*, Case No. 19-cv-6560 (MCA) (LDW)
- *Universities Superannuation Scheme Ltd. v. Perrigo Company plc, et al.*, Case No. 20-cv-2262 (MCA) (LDW)
- *Principal Funds, Inc., et al. v. Perrigo Company plc, et al.*, Case No. 20-cv-2410 (MCA) (LDW)
- *Kuwait Investment Authority, et al. v. Perrigo Company plc, et al.*, Case No. 20-cv-3431 (MCA) (LDW)
- *BlackRock Global Allocation Fund, et al. v. Perrigo Company plc, et al.*, Case No. 20-cv-4748 (MCA) (LDW)

# Paul A. Gompers
# Expert Depositions and Testimony for Prior Four Years

Deposition of Paul A. Gompers in Robert Strougo, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:20-cv-00165 (December 14, 2021).

Evidentiary Hearing Testimony of Paul A. Gompers in Robert Strougo, Individually and on Behalf of All Others Similarly Situated v. Tivity Health, Inc., et al., on behalf of Tivity Health, Inc., United States District Court for the Middle District of Tennessee, Nashville Division, Case No. 3:20-cv-00165 (March 9, 2022).

Deposition of Paul A. Gompers in Intervet, Inc. v. Mileutis Ltd., on behalf of Intervet, Inc., United States District Court for the District of New Jersey, Civil Action No. 3:15-cv-01371-FLW-TJB (March 24, 2022).

Arbitration Testimony of Paul A. Gompers in BeiGene Switzerland GmbH and BeiGene, Ltd. v. Celgene Logistics Sàrl and Bristol-Myers Squibb Co., on behalf of Celgene Logistics Sàrl and Bristol-Myers Squibb Co., International Court of Arbitration of the International Chamber of Commerce, Case No. 25447/MK/PDP (June 17, 2022).

Deposition of Paul A. Gompers in Richard J. Tornetta v. Elon Musk, et al., on behalf of Elon Musk, et al., Court of Chancery of the State of Delaware, C.A. No. 2018-0408-KSJM (July 28, 2022).

Deposition of Paul A. Gompers in In Re Celgene Corporation Securities Litigation, on behalf of Celgene Corporation, Scott A. Smith, Terrie Curran, and Phillippe Martin, United States District Court for the District of New Jersey, Civil Action No. 18-4772 (September 29, 2022).

Testimony of Paul A. Gompers in Richard J. Tornetta v. Elon Musk, et al., on behalf of Elon Musk, et al., Court of Chancery of the State of Delaware, C.A. No. 2018-0408-KSJM (November 17, 2022).

Arbitration Testimony of Paul A. Gompers in David Duquette, et al. v. Lux Capital Management, LLC (f/k/a Lux Capital Group, LLC), et al., on behalf of Lux Capital Management, LLC, Peter J. Hébert, and Joshua H. Wolfe, American Arbitration Association, Case No. 01-20-0019-3259 (November 21, 2022).

# Documents Considered by Paul A. Gompers, Ph.D.

**Academic Articles**


- Cannella, Albert A. Jr., Donald C. Hambrick (1993), "Effects of Executive Departures on the Performance of Acquired Firms," *Strategic Management Journal* 14 (1993): 137–152
- Dedman, Elisabeth and Stephen W-J Lin, "Shareholder Wealth Effects of CEO Departures: Evidence from the UK," *Journal of Corporate Finance* 8, no. 1 (2002): 81–104
- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25, no. 2 (1970): 383–417
- Fama, Eugene F., "Efficient Capital Markets: II." *The Journal of Finance* 46, no. 5 (1991): 1575–1617
- Johnson, W. Bruce, et al., "An Analysis of the Stock Price Reaction to Sudden Executive Deaths," *Journal of Accounting and Economics* 7, no. 1–3 (1984): 151–174
- Marshall, Andrew, Laura McCann, Patrick McColgan, "Do Banks Really Monitor? Evidence from CEO Succession Decision," *Journal of Banking and Finance* 46 (2014): 118–131
- Rebello, Michael and Kelsey D. Wei, "A Glimpse Behind a Closed Door: The Long-Term Investment Value of Buy-Side Research and Its Effect on Fund Trades and Performance," *Journal of Accounting Research* 52, no. 3 (2014): 775–815
- Worrell, Dan L., et al., "Management Turnover through Deaths of Key Executives: Effects on Investor Wealth," *The Academy of Management Journal* 29, no. 4 (1986): 674–694


**Analyst Reports**


- "Attractive Entry Point on Acquisition of Nutrisystems," Piper Jaffray, December 10, 2018
- "Calories In, Calories Out; Tivity Health to Acquire Nutrisystem for $1.3 Billion," William Blair, December 10, 2018
- "Nutrisystem Acq. Raises Questions and Complicates Story, But We're Banking on Mgmt Credibility," Oppenheimer, December 10, 2018

- "Nutrisystem Bolsters Healthy Lifestyle Portfolio; Reiterate Overweight," Cantor Fitzgerald, December 10, 2018
- "Sell-off Overdone, in Our View; Reiterate Overweight," Cantor Fitzgerald, December 10, 2018
- "The Pros & Cons of Buying Nutrisystem," Jefferies, December 10, 2018
- "Tivity to Acquire Nutrisystem for Around $1.3 Billion in Cash/Stock; Elevates Risk Profile, but Massive Negative Market Reaction Seems Overdone," Barrington Research, December 11, 2018
- "Shares are Compelling at Current Levels; Raising Price Target; Reiterate Overweight," Cantor Fitzgerald, December 17, 2018
- "Food for Thought; Food as Medicine a Dominant Theme at 2019 Industry Conference," William Blair, January 10, 2019
- "Pre-Releases 4Q Rev. Miss; Adj. EBITDA, Net Beat; Weather Impact, Full EPS 2/19," Oppenheimer, January 28, 2019
- "Prereleases Largely In-Line Fourth Quarter Results; No Updates on NTRI Deal," William Blair, January 28, 2019
- "Provides Preliminary 4Q18 Results; Shares are Inexpensive; Overweight," Cantor Fitzgerald, January 28, 2019
- "TVTY Preliminary Q4 Results Could Create Buying Opportunity," Piper Jaffray, January 29, 2019
- "Proposed MA Benefits Support Nutrisystem Acquisition; Reiterate Overweight," Cantor Fitzgerald, January 30, 2019
- "4 Key Insights from TVTY's 4Q18," Jefferies, February 19, 2019
- "Comments On Mixed Results," SunTrust Robinson Humphrey, February 19, 2019
- "Lower-Than-Expected 2019 Outlook; Reducing Price Target; Maintain Overweight," Cantor Fitzgerald, February 19, 2019
- "Faster UNH Attrition Impacts CY19; Valuation Too Attractive to Ignore At These Levels," Oppenheimer, February 20, 2019
- "Lowers Outlook on Further Insourcing by United," Piper Jaffray, February 20, 2019
- "Q4 Results In-Line with Late-January Guide; FY/19 Outlook Below Expectations; NTRI Deal Weighs on Valuation; PT is now $40," Barrington Research, February 20, 2019

- "Results in Line With Prerelease; First Look at Combined Company Guidance Shows In-Line EBITDA, Lower Sales Than Anticipated," William Blair, February 20, 2019
- "Slight top-line miss, Guide. FY19, Reit Buy, PT to $33," Chardan, February 25, 2019
- "Health Plan Support for Meal Delivery Validates NTRI Merger; Overweight," Cantor Fitzgerald, March 4, 2019
- "Adjusting Estimates to Reflect Nutrisystem; Reiterate Overweight," Cantor Fitzgerald, March 11, 2019
- "DCF Model Adjustments; Reiterate Overweight Rating," Cantor Fitzgerald, April 1, 2019
- "Final MA Call Letter Includes Nutrition; Supports Deal Synergies; Overweight," Cantor Fitzgerald, April 2, 2019
- "Tivity's Acquisition of Nutrisystem Capitalizes On an Aging Population and Could Double or Triple EPS. Initiating Coverage With A BUY Rating And $30 Price Target.," Craig-Hallum, April 11, 2019
- "Highlights From Recent Travels With Management," William Blair, April 18, 2019
- "Nutrition & Weight Management Industry Overview; Reiterate Overweight on TVTY," Cantor Fitzgerald, April 22, 2019
- "Updating Earnings Model," William Blair, April 22, 2019
- "Health Plans' Increasing Focus and Rhetoric on Nutrition Give Legs to TVTY-NTRI Combination," Oppenheimer, April 25, 2019
- "1Q19 Preview; Focused on Merger Synergies; Reiterate Overweight," Cantor Fitzgerald, May 6, 2019
- "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," Cantor Fitzgerald, May 8, 2019
- "Upside Performance as Nutrisystem Integration off to Good Start; Positive Early Feedback from Key Constituents," William Blair, May 8, 2019
- "4 Key Insights from TVTY's 1Q19," Jefferies, May 9, 2019
- "Early Signs That the Consumer Marketing is Working," Piper Jaffray, May 9, 2019
- "Healthcare Strength and Stabilizing Nutrition Segment Should Improve Sentiment," Oppenheimer, May 9, 2019

- "Q1 Results Solid as Nutrition Achieves Significant March Rebound. We Continue to See Meaningful Long-Term Revenue Synergies. Reiterate BUY Rating and $30 Price Target," Craig-Hallum, May 9, 2019
- "Solid Start To The Year With Some Encouraging Green Shoots," SunTrust Robinson Humphrey, May 9, 2019
- "Tivity Reports Solid Q1; Result Includes 24 Days of NTRI Asset; More Detailed FY/19 Guidance Provided; Maintain OUTPERFORM; PT is $40," Barrington Research, May 10, 2019
- "Model Update," SunTrust Robinson Humphrey, May 14, 2019
- "Upbeat Management Meetings - Attractive Risk/Reward," SunTrust Robinson Humphrey, May 17, 2019
- "Quarterly Bull/Bear Report: A Deep Dive Into Tivity Health Post the Nutrisystem Transaction," William Blair, June 25, 2019
- "Analysis of Results; Health Segment on Plan, Nutrition Segment Modestly Lags; Early Look at 2020 Health Business Favorable," William Blair, August 7, 2019
- "Nutrition Outlook Reduced, But Overall Outlook Positive for 2020; Overweight," Cantor Fitzgerald, August 7, 2019
- "4 Key Insights from TVTY's 2Q19," Jefferies, August 8, 2019
- "HC Solid, Nutrition Soft - Still Well Positioned For SD Of Health But Execution Key; Estimates Cut," SunTrust Robinson Humphrey, August 8, 2019
- "Healthcare Delivers, Nutrition Lags," Piper Jaffray, August 8, 2019
- "Healthcare Gaining Momentum But Nutrition Segment Turnaround Likely Takes Longer," Oppenheimer, August 8, 2019
- "Q2 Results Largely In-Line; Reduces Nutrition Expectation, but Provides Bullish Outlook for Healthcare Business; Shares Seem Way Too Cheap; PT Remains $40 (Over 100% Upside Potential)," Barrington Research, August 8, 2019
- "Q2 Results Mixed, Multiple Positive Developments Emerging to Drive Improved Earnings Results in 2020 And Beyond. Reiterate BUY Rating And $30 Price Target," Craig-Hallum, August 8, 2019
- "NDR Confirms Constructive View of TVTY; Healthcare appears Very Solid; Uncertainty Regarding Nutrition Remains but Opportunities to Improve Abound; TVTY Likely Our Best Idea at Current Valuation," Barrington Research, August 19, 2019

- "Update From The Road - Strategic Positioning Remains Intriguing, Execution Is Key," SunTrust Robinson Humphrey, August 21, 2019
- "TVTY: Top-line Beat for 2Q19, Lowered FY19 Guidance., Reit Buy, PT to $24," Chardan, August 23, 2019
- "Looking Ahead to 2020; Shares Remain Inexpensive; Overweight," Cantor Fitzgerald, August 26, 2019
- "New Prime Relationship Announced; Reiterate Overweight," Cantor Fitzgerald, August 28, 2019
- "Quick Takeaways from Our Healthcare Conference Presentation with TVTY," Cantor Fitzgerald, October 3, 2019
- "3Q19 Review; EBITDA Was Light but Guidance Reaffirmed; Reiterate Overweight," Cantor Fitzgerald, November 12, 2019
- "4 Key Insights from TVTY's 3Q19," Jefferies, November 12, 2019
- "2019 Guidance Reiterated. Nutrition Innovations for Diet Season As Well As New Older American Offering Provide Strong Catalysts For 2020. Reiterate BUY Rating And $30 Price Target," Craig-Hallum, November 13, 2019
- "3Q19 Better-Than-Feared," Piper Jaffray, November 13, 2019
- "Fairly In-Line Revenue, Good Traction in Both Healthcare and Nutrition Initiatives," Oppenheimer, November 13, 2019
- "First Look at Third-Quarter Results: Revenue Beat, Adjusted EBITDA and Adjusted EPS Below Street, Guidance Maintained," William Blair, November 13, 2019
- "Mixed 3Q With EBITDA Below, Guidance Reiterated And Some Strategic Progress - Trimming Estimates," SunTrust Robinson Humphrey, November 13, 2019
- "Q3 Results Mixed; Top Line Beats; Profitability Falls Short; Reducing PT to $38 from $40, but Upside Still Very Big," Barrington Research, November 14, 2019
- "UNH Extends Group MA SilverSneakers Contract Through 2022," SunTrust Robinson Humphrey, November 21, 2019
- "Comments On Management Change," SunTrust Robinson Humphrey, December 9, 2019
- "Dawn Zier Departure is Surprising; Reiterate Overweight," Cantor Fitzgerald, December 9, 2019

- "Update After our Call with CFO; Reiterate Overweight," Cantor Fitzgerald, December 9, 2019
- "Updating Our Model and Modestly Refining Our Forward Estimates," William Blair, December 13, 2019
- "On Dawn's Departure, Nutrition and Healthcare Following NDR," Piper Jaffray, December 18, 2019
- "January Effect Candidate – Tivity Health," Barrington Research, December 23, 2019
- "2020 Nutrition Offerings Emphasize Personalization; Seems Logical; Overweight TVTY," Cantor Fitzgerald, December 26, 2019
- "Bullish on Healthcare Segment, but Nutrisystem Deal Yet to Prove Its Worth; Initiating with a Neutral Rating," Credit Suisse, January 3, 2020
- "Increasing Confidence for Nutrition Segment; Finetuning Estimates and PT; Overweight," Cantor Fitzgerald, January 21, 2020
- "Walmart Launches Walton Life Fitness Pass; Reiterate Overweight," Cantor Fitzgerald, January 23, 2020
- "Downgrading to Neutral; Reiterate $25 Price Target," Piper Jaffray, January 27, 2020
- "Tivity Health, Inc. Regional Investor Analysis," Credit Suisse, January 27, 2020
- "Encouraging Nutrisystem Website Traffic Data; Upside to 2020," Jefferies, February 18, 2020
- "Downgrade to Hold: Too Many Uncertainties," Jefferies, February 19, 2020
- "When It Rains, It Pours," Credit Suisse, February 19, 2020
- "CEO Departure Signals Botched Strategy for Nutrition Acquisition; Downgrading to Market Perform," William Blair, February 20, 2020
- "Not Much ProducTIVITY Here; Downgrading to Neutral and Lowering Price Target," Cantor Fitzgerald, February 20, 2020
- "Nutrition Challenges Continue - Downgrading to Hold, Cutting Estimates and Target," SunTrust Robinson Humphrey, February 20, 2020
- "Q4 2019: Crisis in Nashville," Piper Sandler, February 20, 2020

- "Q4 Results, FY/20 Guidance Disappoint; CEO Terminated; Nutrition Business Still a Mess; No Quick Fixes; Reducing PT to $24 from $38," Barrington Research, February 20, 2020
- "Weak 2020 Guidance Driven by Retail Segment Weakness. Downgrading from BUY to HOLD in View of Lower Estimates and Management Turnover. Reducing Price Target to $18," Craig-Hallum, February 20, 2020
- "Q&A Our Way: In Search of Nutritional Growth," Credit Suisse, February 21, 2020

**Bates-Numbered Documents**

- PwC002775–777
- PwC003359–360
- PwC004501–069
- PwC007072–075
- PwC007100–106
- PwC008297–353
- TVTY_STROUGO0017544–631
- TVTY_STROUGO0001994–2018
- TVTY_STROUGO0018844–9008
- TVTY_STROUGO0069132–134
- TVTY_STROUGO0142797–800
- TVTY_STROUGO0191758–764
- TVTY_STROUGO0323335–340
- TVTY_STROUGO0325280–285
- TVTY_STROUGO0365110–179

**Data**

- Bloomberg Law
- Center for Research in Security Prices (CRSP)

- Factiva

**Depositions**

- Deposition of Ryan Wagers (30(b)(6)), dated February 17, 2022
- Deposition of Marcus Heitor, dated October 14, 2022
- Deposition of Ryan Wagers, dated October 25, 2022
- Deposition of Adam Holland, dated November 11, 2022
- Deposition of Dawn Zier, dated November 18, 2022
- Deposition of Donato Tramuto, dated November 30, 2022
- Deposition of Donato Tramuto, dated December 1, 2022
- Deposition of Lee Shapiro, dated December 21, 2022

**Earnings Call Transcripts**

- Tivity Form 425 Conference Call, "Tivity Health Inc to Acquire Nutrisystem Inc," December 10, 2018
- Tivity 4Q 2018 and FY 2018 Earnings Call Transcript, February 19, 2019
- Tivity 1Q 2019 Earnings Call Transcript, May 8, 2019
- Tivity 2Q 2019 Earnings Call Transcript, August 7, 2019
- Tivity 3Q 2019 Earnings Call Transcript, November 12, 2019
- Tivity 4Q 2019 and FY 2019 Earnings Call Transcript, February 19, 2020

**Expert Reports**

- Expert Report of W. Scott Dalrymple, CFA, dated October 26, 2021, including all documents cited therein and backup materials
- Expert Report of Paul A. Gompers, Ph.D., dated November 30, 2021, including all documents cited therein and backup materials
- Expert Report of W. Scott Dalrymple, CFA, dated January 21, 2022
- Expert Report of Jason S. Flemmons, CPA, CFE, CFF, dated January 10, 2023

- Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA dated January 10, 2023
- Expert Report of Michael F. Maloney, CPA, CFF, CFE, dated January 10, 2023
- Expert Report of W. Scott Dalrymple, CFA, dated January 10, 2023, including all documents cited therein and backup materials

**Legal Documents and Pleadings**

- Consolidated Class Action Complaint for the Violation of the Federal Securities Laws, *Robert Strougo, et al. v. Tivity Health, Inc., et al.*, Case No. 3:20-cv-00165, November 13, 2020
- *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (U.S. 2005)
- Memorandum Opinion, *Robert Strougo, et al. v. Tivity Health, Inc., et al.*, Case No. 3:20-cv-00165, July 29, 2021
- Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4(e)

**Public Press**

- "Healthways, Inc. is now Tivity Health, Inc.," Tivity Press Release, January 10, 2017
- "Tivity Health Completes Acquisition of Nutrisystem," *PR Newswire*, March 8, 2019
- "Tivity Health to Acquire Nutrisystem for $1.3 Billion in Cash and Stock," *PR Newswire*, December 10, 2018
- Articles obtained from Bloomberg Law and Factiva

**SEC Filings**

- Nutrisystem Form 8-K, filed on April 30, 2018
- Nutrisystem Form 8-K, filed on February 19, 2019
- Tivity Form 8-K, filed on February 19, 2019

- Tivity Form 8-K, filed on March 8, 2019
- Tivity Form 8-K, filed on May 8, 2019
- Tivity Form 8-K, filed on August 7, 2019
- Tivity Form 8-K, filed on November 12, 2019
- Tivity Form 8-K, filed on December 9, 2019
- Tivity Form 8-K, filed on February 19, 2020
- Tivity Form 10-K for Fiscal Year Ended December 31, 2018, filed on February 26, 2019
- Tivity Form 10-K for Fiscal Year Ended December 31, 2019, filed on February 27, 2020
- Tivity Form 10-Q for Quarterly Period Ended March 31, 2019, filed on May 9, 2019
- Tivity Form 10-Q for Quarterly Period Ended June 30, 2019, filed on August 8, 2019
- Tivity Form 10-Q for Quarterly Period Ended September 30, 2019, filed on November 12, 2019

**Textbooks**


- Berk, Jonathan B., and Peter M. DeMarzo, *Corporate Finance*, Pearson Education, 2011
- Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments*, 9th ed., McGraw-Hill Irwin, 2011
- Brealey, Richard, Stewart Myers, and Franklin Allen, *Principles of Corporate Finance*, 12th ed., McGraw-Hill Education, 2017
- Cochrane, John H., *Asset Pricing: Revised Edition*, Princeton University Press, 2005
- Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 3rd ed., John Wiley & Sons, Inc., 2012

- Fama, Eugene F., *Foundations of Finance: Portfolio Decisions and Securities Prices,* Basic Books, 1976
- Gompers, Paul, Victoria Ivashina, and Richard Ruback, *Private Equity: A Casebook*, Anthem Press, 2019
- Koller, Tim, Marc Goedhardt, and David Wessels, *Valuation: Measuring and Managing the Value of Companies*, 6th ed., John Wiley & Sons, 2015
- Rosenbaum, Joshua and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers and Acquisitions*, John Wiley & Sons, 2013
- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 9th ed., McGraw-Hill/Irwin, 2010


**Websites**


- "Faculty & Research: Eugene F. Fama," The University of Chicago Booth School of Business, https://www.chicagobooth.edu/faculty/directory/f/eugene-f-fama, accessed on February 6, 2023
- "Financial Reporting Manual," U.S. Securities and Exchange Commission, https://www.sec.gov/corpfin/cf-manual/topic-1
- "Our Company," Tivity, https://www.tivityhealth.com/about/our-company, accessed on February 6, 2023
- "Prime Fitness–Supporting Regular Exercise," Tivity, https://www.tivityhealth.com/brands/prime-fitness, accessed on February 6, 2023
- "SilverSneakers–Empowering Active Aging," Tivity, https://www.tivityhealth.com/brands/silversneakers, accessed on February 6, 2023


**All documents cited and referenced in this report, appendices, and exhibits.**

## I. Generally Accepted Principles of Valuation

1. In this appendix, I discuss some of the generally accepted principles of valuation. These principles provide a framework for evaluating the damages analysis presented by Mr. Dalrymple. Generally speaking, academic research in financial economics suggests that (1) stock prices are a function of expected *future* cash flows and the *riskiness* of those cash flows, (2) in an efficient market, stock prices adjust quickly to new, value-relevant information, and (3) the market values of companies are based on their future cash flows and not their accounting earnings.

2. Valuation is the central concept in finance, and valuation methodologies can be widely applied to analyze many of the decisions that a company faces. One of the central tenets of modern finance is that, in an efficient market, the price of an asset, such as a share in a company, is equal to the present value of the asset's expected future after-tax cash flows.[1] Anything that might affect the size or the timing of a company's cash flow or changes its riskiness can affect the company's value. Therefore, when the market price of a stock changes, it is due to changes in the market consensus assessment of expected *future* cash flows, the *riskiness* of the *future* cash flows, or both.[2] Below I discuss various valuation techniques and circumstances under which their application is appropriate. Market participants and valuation professionals may employ these valuation methodologies (as well as others) for stock valuation.

3. The most widely accepted valuation approach is discounted cash flow ("DCF") valuation, as it is closest to the fundamental concept that value stems from expected future cash flows.[3] When appropriate assumptions are made, the DCF technique provides reasonable estimates of

---

[1] For example, Cochrane (2005) states that "the asset's price should equal the expected discounted value of the asset's payoff, using the investor's marginal utility to discount the payoff." Cochrane, John H, *Asset Pricing: Revised Edition*, Princeton University Press, 2005, p. 3. Moreover, "[i]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows ($C_t$) and the opportunity cost of capital (r)...." Brealey, Myers, and Allen (2017), p. 336.

[2] A company's expected future cash flows are affected by market, industry, and company-specific factors. An appropriate discount rate reduces the present value of these expected future cash flows when the cash flows are riskier, or when they are expected to occur in the more distant future.

[3] *See*, for example, Damodaran, Aswath, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset*, 3rd ed., John Wiley & Sons, 2012 ("Damodaran (2012)"), pp. 11–12.

the value of a company and, by extension, its shares. It is also the primary valuation methodology taught in finance courses and it is widely used in practice.[4]

4. To estimate the value of a single share of company stock using DCF, the following steps are typically taken:

a. Estimate expected future free cash flows ("FCF") during a projection period (potentially characterized by higher growth in cash flows if appropriate) and during a steady-state period after the projection period (characterized by constant, steady-state growth that is expected to be sustainable over the long-run).
b. Discount expected future cash flows during the projection period to the present value using a discount rate that reflects both the riskiness of the cash flows and the time value of money.
c. Compute the value of a firm's steady-state cash flows in perpetuity (*i.e.*, the "terminal value") and likewise discount this value to the present.
d. The present value of the sum of expected future cash flows is the operating asset value (the value of the operating assets of the company from the perspective of all claim holders, including both debt and equity holders). Next, add the value of non-operating assets to the operating asset value to calculate enterprise value.
e. Subtract the value of non-equity claims such as debt from enterprise value to calculate the equity value.
f. Divide the result by the number of shares to derive per share value.

5. The DCF valuation methodology typically starts by determining the FCF, where FCF is "the amount of cash that a firm can pay out to investors after paying for all investments necessary for growth."[5] Specifically, the equation below illustrates how FCFs are calculated:

---

[4] *See*, for example, Gompers, Paul, Victoria Ivashina, and Richard Ruback, *Private Equity: A Casebook*, Anthem Press, 2019 ("Gompers et al. (2019)"), pp. 36–44; Damodaran (2012), p. 11; Koller, Tim, Marc Goedhardt, and David Wessels, McKinsey & Company, *Valuation: Measuring and Managing the Value of Companies*, 6th ed., John Wiley & Sons, 2015 ("McKinsey (2015)"), pp. 135–136; Rosenbaum, Joshua, and Joshua Pearl, *Investment Banking: Valuation, Leveraged Buyouts, and Mergers & Acquisitions*, 2nd ed., John Wiley & Sons, 2013 ("Rosenbaum and Pearl (2013)"), p. 125.

[5] Brealey, Myers, and Allen (2017), p. 94.

$$FCF_t = EBIT_t - Taxes_t - CAPEX_t + DEPR_t - \Delta NWK_t$$

EBIT = earnings before interest and taxes

FCF = free cash flow

CAPEX = capital expenditure

DEPR = depreciation and amortization

ΔNWK = change in net working capital

6. Earnings before interest and taxes serves as the starting point because the intent is to value the entire company, meaning FCFs need to be based on cash available to pay both equity and debt holders (*i.e.*, before interest payments are made).[6] From this amount, the company typically needs to pay taxes, invest in working capital, and finance capital expenditures.[7] The remaining amount is available to pay claims from equity and debt holders. In order for a valuation to provide a reasonable assessment of value, it is important that the cash flow estimates represent the expected future cash flows, not the highest possible or lowest possible estimate.

7. Since expected free cash flows are estimated over a number of years and subject to uncertainty (or risk), they must be discounted to present value using a discount rate that reflects their riskiness (as well as time value of money) in order to calculate a value as of some valuation date. The higher the riskiness of future cash flows, the lower the resulting value. For example, consider two assets that are each expected to generate $1 million next year, with the expected cash flows from one of the assets being much riskier than those from the other. Even though the assets have the same expected payoff, the asset with less risky cash flows will be worth more than the asset with more risky cash flows.

---

[6] Because $EBIT_t = EBITDA_t - DEPR_t$, one can write the equation for FCF referenced above as $FCF_t = EBITDA_t - Taxes_t - CAPEX_t - \Delta NWK_t$. EBITDA can also be calculated by adding to net income the interest, taxes, depreciation, and amortization expenses.

[7] Earnings are not the only determinant of cash flow generated. In particular, since FCFs represent the amount of cash that a firm can pay out to investors after paying for all investments necessary for growth, depreciation and amortization (*i.e.*, non-cash expenses reflecting the fact that assets lose value over time) are added, cash capital expenditures (CAPEX) are subtracted, and increases/decreases to net working capital are subtracted or added, respectively. *See*, for example, Berk, Jonathan B., and Peter M. DeMarzo. *Corporate Finance*. Pearson Education, 2011, pp. 192–193; Brealey, Myers, and Allen (2017), p. 94. In addition, to this estimated value (which reflects the present value of free cash flows generated by the company's business operations) should be added the present value of any non-operating assets, such as the value of tax savings from deducting interest expense and other tax credits.

8. The generally accepted methodology for accounting for the riskiness of cash flows is to determine the appropriate discount rate, also known as the cost of capital.[8] A company's cost of capital is commonly measured by its weighted average cost of capital ("WACC"). The WACC is calculated as the after-tax weighted average of the company's cost of debt financing and cost of equity financing, each weighted by the percentage of the company's enterprise value that is financed by debt or equity.[9] The cost of debt represents creditors' opportunity cost of providing debt capital to the company and is commonly measured by the applicable interest rate. The cost of equity likewise represents shareholders' opportunity cost of providing equity capital to the company. It is commonly measured using a well-known and widely accepted methodology, the Capital Asset Pricing Model ("CAPM").

9. The DCF methodology assumes an asset will continue to exist and generate cash flows indefinitely, yet free cash flows are typically only projected out for a finite number of years. Therefore, DCF valuations incorporate a "terminal value" calculation that captures the value of the firm or asset after the projection period. Common practice is to project out cash flows until a company reaches steady state growth. There are two common approaches to estimating the terminal value.[10] A standard method for calculating the terminal value involves a perpetuity growth model, which assumes that free cash flows will continue to grow at a constant long-term growth rate. Estimation of the terminal value therefore requires assumptions about the long-term levels and growth of cash flows, as well as the levels of capital expenditures necessary to sustain that growth. This is captured in the formula below:

$$TV = FCF \div (r - g)$$

FCF = Free Cash Flow (steady-state)

r = Discount Rate

g = Long-Term Growth Rate

[8] *See*, for example, Brealey, Myers, and Allen (2017), pp. 21–22.

[9] WACC is calculated as the after-tax weighted average cost of debt and equity. The tax rate is relevant for computing the WACC, because the WACC takes into account the tax benefit of interest-bearing debt to the extent that interest payments are tax deductible.

[10] Rosenbaum and Pearl (2013), pp. 148–149.

Another approach calculates the terminal value as a multiple of future earnings (expected after the projection period).[11] Implicit in this second method are assumptions about risk and long-term growth.

10. To the extent that appropriate comparable companies or transactions ("comparables") can be identified, the comparable company and comparable transaction approaches are other commonly used approaches to estimate the value of a company. These approaches involve applying market multiples from comparable publicly traded companies or comparable transactions to determine a company's value. Generally speaking, these valuation methods are based on the assumption that similar securities or businesses that share key business and financial characteristics, value drivers, and risks should be valued similarly.[12] If there are meaningful differences in risk and expected growth rates, a comparison may not be valid. These approaches can serve as a reasonableness check on a DCF valuation if appropriate comparables can be identified.

11. Once comparables are identified, appropriate multiples must be selected and calculated for the comparable companies or transactions. Commonly used multiples, for example, include the ratio of stock price-to-earnings-per-share or enterprise value-to-EBITDA. The calculated multiples are then multiplied by the appropriate performance measure for the company being valued in order to derive a valuation of that company. This performance measure can be revenues, EBITDA, earnings-per-share, etc.

---

[11] *See*, McKinsey (2015), p. 264.

[12] *See*, for example, Damodaran (2012), p. 20; McKinsey (2015), p. 264.

**Exhibit 1**

# Tivity Health, Inc.
# Closing Stock Price and Volume
## 1/2/19 – 6/1/20




Source: *CRSP*; Complaint; SEC Filings

# Tivity Health, Inc.
# Analyst Reports During the Week Following the 4Q 2018 and 1Q 2019 Earnings Announcements[1]

## Sample Commentary Related to Nutrisystem's Pre-Transaction 1Q 2019 Performance

| Date | Contributor | Analyst Report Excerpt[2] |
|---|---|---|
| 2/19/19 | Cantor Fitzgerald | TVTY also provided 2019 guidance inclusive of NTRI (on pro-rata basis, assuming an early March close). **The range implies NTRI revenue may be flat in 2019, due to a mixed start to diet season**. NTRI had focused more on digital marketing in January and less on TV. That was a mistake and it has now shifted more marketing spend to TV, which positively affected recent trends. |
| 2/19/19 | Jefferies | Disappointing Nutrisystem Revenue Guidance; Is it Low Enough?<br>Nutrisystem (NTRI) essentially guided to flat revenue in 2019, which was well below the 8% growth consensus was modeling… **Intense competition in the first couple weeks of January caused disruption and it sounds like NTRI cut back too much on TV advertising**. The good news is the competition eased in late January/early February and NTRI has increased spend to capture business. Guidance implies 1Q19 revenue growth will decline 8%, which means 2Q-4Q19 will need to increase 4% YoY. NTRI's delayed spending could explain the change in seasonal growth, but admittedly visibility isn't as clear as we would like it to be. |
| 2/19/19 | SunTrust Robinson Humphrey | We are lowering estimates and our target on the heels of solid 4Q results but soft '19 guidance. While we continue to see several potential benefits of the pending NTRI deal, core TVTY trends remain solid, the WalMart agreement (WMT, $102.20, not rated) is a clear positive and we like the cap ex light model, **soft guidance from both legacy TVTY (faster UNH attrition) and NTRI (mixed early diet season) is disappointing**. While we maintain our Buy, we have cut our PT ($28 vs. $34) to reflect lower estimates and await tangible signs of benefits from NTRI which we expect to close near-term.<br><br>In addition, NTRI laid out disappointing 2019 guidance (revenue of $682M-$702M; adjusted EBITDA of $100M-$110M) **tied to mixed early diet season trends**. |
| 2/20/19 | Barrington Research | The guidance for the combined companies (both in terms of revenue and EBITDA) is currently materially lower than what had been assumed initially. The loss of more UNH business than was expected (by about $20 million) in FY/19 on the TVTY side, **along with a somewhat disappointing start to the 2019 diet season for NTRI**, are the primary reasons for the reduced outlook. |

# Tivity Health, Inc.
# Analyst Reports During the Week Following
# the 4Q 2018 and 1Q 2019 Earnings Announcements[1]
## Sample Commentary Related to Nutrisystem's Pre-Transaction 1Q 2019 Performance

| Date | Contributor | Analyst Report Excerpt[2] |
|---|---|---|
| 2/20/19 | Oppenheimer | NTRI CY18 Results, CY19 Guide, **Softer January**... In CY19, NTRI expects slight rev and EBITDA growth y/y (midpoint), excluding any TVTY synergies. However, **January campaign responses started softer than expected**, so NTRI pulled back media spend vs. last year, amid more competition. Positively, in late-Jan/ early-Feb, NTRI seeing w/w improvements with adjustments. NTRI also cut back TV too much in January, but is now seeing improved response and efficiency. |
| 2/20/19 | William Blair | **Management noted a slower-than-anticipated start to the important 2019 diet season** (due to new competition spending heavily on digital spending and some volatility regarding returns on various media spending); however, midquarter adjustments already have improved the company's yield following the slower start to the year. |
| 5/8/19 | Cantor Fitzgerald | March program starts were much stronger than those of January and February, after the company adjusted its marketing spend. On a pro-forma basis, Nutrisystem revenue would have declined 10%. However, given the strong March starts, 2Q19 revenue will be stronger than expected. |
| 5/8/19 | William Blair | On the nutrition front, better-than-anticipated March program starts (which increased year-over-year), an improvement in customer length of stay, and favorable timing of marketing spending all contributed to the sales/EBITDA upside. In sum, we believe the quarter represented a strong start to the year—**especially for the nutrition segment, which started the year slow** but experienced a nice rebound at the end of the quarter (contrary to what bears anticipated). |
| 5/9/19 | Craig-Hallum | **While the post-New Year's Diet Season was disappointing for Nutrisystem**, results improved substantially throughout the quarter with the company adding more new customers in March than it did in January, which is pretty much unheard of for a diet company. The weak January was due in large part to a self-inflicted error—cutting back too much on TV advertising. If the recent momentum can be sustained and advertising levels are more optimal for Diet Season 2020, Nutrisystem could easily beat our 2020 estimate of 5% revenue growth.<br>…<br>While Nutrition revenue was down ~9% y/y on full quarter y/y basis, results improved dramatically in March with new customer starts finishing higher than January, which is very unusual for diet companies which typically generate the most new customers in January. Management noted previous corrections made to its marketing message and strategy were key factors in the intra quarter turnaround, with strong adds and better than expected length of stay |

# Tivity Health, Inc.
# Analyst Reports During the Week Following the 4Q 2018 and 1Q 2019 Earnings Announcements[1]

## Sample Commentary Related to Nutrisystem's Pre-Transaction 1Q 2019 Performance

| Date | Contributor | Analyst Report Excerpt[2] |
|---|---|---|
| 5/9/19 | Jefferies | Investors have been concerned about Nutrition segment top-line drivers and meeting 1Q expectations. **A slow start in January and early February from intense competition of the usual suspects as well as new competitors heightened concerns**. That intensity eased around mid-February as aggressive competitive marketing spend waned. Not only did Nutrisystem's new customer starts inflect up in the back half of 1Q, particularly in March, but persistency is also trending better than expected. Mgmt disclosed 1Q revenue was $191mm, right on track with its previous seasonality guidance. |
| 5/9/19 | Oppenheimer | Nutrisystem posted much better than expected results **after the slow start to the year** with 2H of the quarter seeing lift in activations due to the timed media spend. Positive results in the quarter, stabilizing Nutrisystem segment and increasing confidence in the cross-sell into health plans should improve investor sentiment.<br><br>**NTRI saw the first 6 weeks of diet season come in softer**, but momentum started mid-Feb after adjustments to marketing (adding more TV spend). Consequently, NTRI saw a strong close to 1Q, with net new subscriptions higher and cancellations lower, and March new starts above January levels, with lower costs, a first in Dawn's tenure. |
| 5/10/19 | Barrington Research | The Nutrisystem business generated $57.6 million in revenue for the 24 days in March that it was a part of TVTY. For the full quarter, the business generated around $191 million. **The quarter was described as having a relatively slow start**, but a very strong performance in March allowed the company to come in reasonably close to our original expectation of about $200 million in revenue. |

Source: Analyst Reports

Note:
[1] Analyst reports published for the period up to one week following the 4Q 2018 earnings announcement on 2/19/19 and the 1Q 2019 earnings announcement on 5/8/19 were reviewed.
[2] Emphasis added.

Exhibit 3

# Tivity Health, Inc.
## Analyst Forecasts Following 1Q 2019 and 2Q 2019 Earnings Announcements
## FY 2019 Tivity Adjusted EBITDA and FY 2020 Nutrition Segment Revenue

*($ in millions)*

| | Forecast Dates[2] | | FY 2019 Tivity Adjusted EBITDA | | | FY 2020 Nutrition Segment Revenue | | |
|---|---|---|---|---|---|---|---|---|
| **Contributor[1]** | **1Q 2019** | **2Q 2019** | **1Q 2019** | **2Q 2019** | **Forecast Revision** | **1Q 2019** | **2Q 2019** | **Forecast Revision** |
| | | | *(a)* | *(b)* | *(b) - (a)* | *(a)* | *(b)* | *(b) - (a)* |
| Barrington Research | 5/10/19 | 8/8/19 | $240.2 | $232.5 | -$7.7 | $692.6 | $643.8 | -$48.7 |
| Cantor Fitzgerald | 5/8/19 | 8/7/19 | $251.6 | $237.6 | -$14.0 | $729.2 | $699.1 | -$30.1 |
| Craig-Hallum | 5/9/19 | 8/8/19 | $243.4 | $230.5 | -$13.0 | $726.2 | $689.0 | -$37.2 |
| Jefferies | 5/9/19 | 8/8/19 | $249.4 | $231.7 | -$17.6 | – | – | – |
| Oppenheimer | 5/9/19 | 8/8/19 | $243.0 | $236.6 | -$6.4 | – | – | – |
| Piper Jaffray | 5/9/19 | 8/8/19 | $250.7 | $232.1 | -$18.6 | $705.4 | $638.9 | -$66.5 |
| SunTrust Robinson Humphrey | 5/14/19 | 8/8/19 | $245.0 | $232.0 | -$13.0 | $698.0 | $658.0 | -$40.0 |
| William Blair | 5/8/19 | 8/7/19 | $244.8 | $236.6 | -$8.2 | – | – | – |
| **Average** | | | **$246.0** | **$233.7** | **-$12.3** | **$710.3** | **$665.8** | **-$44.5** |

Source: Analyst Reports

Note:
[1] Analyst forecasts are presented for all contributors who included 2019 adjusted EBITDA forecasts or 2020 Nutrition segment revenue forecasts in reports published in the period up to one week following May 8, 2019 and August 7, 2019 earnings announcements.
[2] The first set of forecasts published by each contributor after May 8, 2019 and August 7, 2019 are reported.