**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ROBERT STROUGO, Individually and on Behalf of All Others Similarly Situated,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 3:20-cv-00165** |
| | ) | |
| **TIVITY HEALTH, INC., DONATO TRAMUTO, ADAM C. HOLLAND, and DAWN ZIER,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

**EXPERT REPLY REPORT OF**
**W. SCOTT DALRYMPLE, CFA**
**MARCH 7, 2023**

---

**CONFIDENTIAL**

bvagroup® Valuation. Disputes. Advisory.

## TABLE OF CONTENTS

**Page**


I. Introduction and Summary of Opinions ..... 1

II. Analysis of the Gompers Report ..... 8

A. Prof. Gompers ignores Plaintiff's theory of liability and my analysis of Plaintiff's claims ..... 9

1) Prof. Gompers' contention that Plaintiff's "zone of risk" allegations cannot be used to establish damages ignores Plaintiff's theory of liability and is irrelevant to my opinions ..... 11

2) Prof. Gompers' assertion that the loss caused by Defendants' alleged fraud must be allocated to alleged fraudulent actions within the Nutrisystem and Goodwill Claims is inapt ..... 15

B. Prof. Gompers' critiques of my analysis of the Nutrisystem Claim ignore Plaintiff's allegations and evidence in the case ..... 16

1) Prof. Gompers incorrectly claims that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed no later than August 7, 2019 ..... 20

2) Prof. Gompers' assertion that internal projections from Tivity were consistent with its disclosed guidance does not support his conclusion that Tivity's guidance was not false or misleading ..... 28

3) Prof. Gompers fails to recognize that executive departures were within the zone of risk concealed by Defendants' alleged fraud ..... 32

4) Prof. Gompers' assertions that I do not account for potential negative confounding information and the materialization of previously disclosed risks are inapt ..... 39

5) Prof. Gompers' contention that the Nutrisystem and Goodwill Claims are mutually exclusive and cannot cause the same loss is inapt ..... 42

C. Prof. Gompers' critiques of my analysis of the Goodwill Claim ignore Plaintiff's allegations and evidence in the case ..... 45

1) Prof. Gompers' assertion that I do not opine on when an impairment charge could have been or should have been announced is invalid and ignores Plaintiff's allegations ..... 46

2) Prof. Gompers' assertions that the impairment charges were informed by unanticipated events are irrelevant ..... 47

3) Prof. Gompers' assertion that I have failed to disentangle the impact of the untimely disclosure from that of the timely disclosure is inapt ..... 49

4) Prof. Gompers' assertion that impairment triggers were public knowledge prior to the February 2020 Disclosure is irrelevant to my inflation calculations ..... 50

5) Prof. Gompers' assertion that I do not account for "prior market knowledge of risks associated with the Transaction" is inapt and irrelevant to my opinions ..... 51

D. Prof. Gompers' opinions about share price inflation during the Class Period are inapt and ignore Plaintiff's allegations ..... 52

E. Prof. Gompers' opinion that damages are no more than $1.67 per share is unreliable and ignores Plaintiff's claims ..... 55

III. Further Work ..... 58

bvagroup® | Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 1150
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

## I. Introduction and Summary of Opinions

1. I previously submitted a report in this matter dated January 10, 2023 (the "Dalrymple Report")[1] in which I estimated the share price inflation caused by Tivity's alleged scheme to defraud and false and misleading statements and omissions over the Class Period, as set forth in the following table:[2]

**Table 1. Class Period Inflation: March 8, 2019 to February 19, 2020**

| | Mar. 8, 2019 to Aug. 7, 2019 | Aug. 8, 2019 to Dec. 8, 2019 | Dec. 9, 2019 to Feb. 19, 2020 |
|---|---|---|---|
| ***Nutrisystem Claim**** | | | |
| **Zier Termination** | **$2.23** | **$2.23** | **$ -** |
| **February 2020 Disclosure** | **$8.19** | **$8.19** | **$8.19** |
| | **$10.42** | **$10.42** | **$8.19** |
| ***Goodwill Claim***** | | | |
| **February 2020 Disclosure** | **$ -** | **$8.19** | **$8.19** |

* Nutrisystem Claim with or without Goodwill Claim

** Goodwill Claim without Nutrisystem Claim

2. As noted in the Dalrymple Report, it is my opinion that the above share price inflation figures would apply as of the date that the trier-of-fact determines that information revealed

1 Defined terms in this report have the same meanings as used in the Dalrymple Report unless otherwise noted.

2 Dalrymple Report, ¶ 10. As discussed in the Dalrymple Report and in this report, I understand that Defendants have characterized Plaintiff's claim as separate theories of liability related to a Nutrisystem Claim and a Goodwill Claim (*see, e.g.*, Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint, December 4, 2020, p. 5). I understand that Plaintiff disputes this characterization. For ease of reference, I adopt this terminology but do not express an opinion on this issue.

through the corrective disclosure was within the zone of risk concealed through Defendant's alleged fraud.[3] Subject to these findings of fact and statutory limitations, one may compute damages for any member of the Class who acquired Tivity's stock during the Class Period based on the share price inflation corresponding to the above purchase dates for shares sold or held after one or both of the alleged corrective disclosures.[4]

3. On February 7, 2023, Professor Paul Gompers issued an expert report in this matter (the "Gompers Report").[5] I have been asked by counsel for the Plaintiff to evaluate Prof. Gompers' opinions regarding my loss causation and damages analyses.

4. As an initial matter, Prof. Gompers does not express disagreement with (1) my conclusion that Tivity's stock traded in an efficient market during the Class Period,[6] (2) my estimation of the abnormal returns on the alleged corrective disclosure dates based on my event study,[7] (3) my disaggregation of confounding information related to the Healthcare segment on

---

3 Dalrymple Report, ¶ 11. References to alleged fraud in this report encompass Defendants' alleged scheme and fraudulent misrepresentations and omissions to investors. References to misrepresentations and misstatements in this report may refer generally to Plaintiff's allegations, including omissions and Defendants' alleged scheme. My assessment of the impact of certain information on Tivity's share price is not dependent on findings as to which of these or other legal definitions would apply to the information allegedly withheld.

4 Dalrymple Report, ¶ 11. I note the Dalrymple Report referred to shares "sold or held on or after February 19, 2020" (¶ 11) and "sold or held … after February 19, 2020" (¶ 121), rather than "sold or held after one or both of the alleged corrective disclosures." Notwithstanding these typographical errors, the dates on which inflation would apply are clear from the Dalrymple Report.

5 Prof. Gompers also previously submitted a report dated November 30, 2021 (the "Gompers Class Certification Report") and testified at deposition in this matter on December 14, 2021.

6 *See* Dalrymple Class Certification Report, ¶ 10 and footnote 32; Dalrymple Report, ¶ 75 and footnote 179. *See also* Gompers Class Certification Report, ¶ 30 ("For purposes of my opinions and analysis in this report, I have assumed that Plaintiff prevails in proving that Tivity's stock is semi-strong form efficient during the Putative Class Period.") Prof. Gompers' criticisms of my analyses are premised on Tivity's stock trading in an efficient market during the Class Period.

7 Prof. Gompers has presented no alternative event study model in the Gompers Report. Prof. Gompers has also relied on the residual returns from my event study in his discussion of the events during the Class Period. *See, e.g.*, Gompers Report ¶¶ 60, 65, 67, 79, and 124, citing to the event study results from the Dalrymple Report.

the February 2020 Disclosure date,[8] (4) my finding that revelations about the Nutrisystem acquisition and the Nutrition segment's performance caused the remainder of Tivity's share price decline following the February 2020 Disclosure, and (5) my finding that Ms. Zier's termination caused Tivity's share price decline following the December 2019 Disclosure.

5. Prof. Gompers offers two primary opinions in his report: (1) that I have failed to "reliably establish that investor losses (if any) were caused by the alleged misrepresentations for either the Nutrisystem Claim or the Goodwill Claim"[9] and (2) "assuming that the finder of fact determines that Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA as part of the Company's earnings release on May 8, 2019 and that failing to disclose this information misled investors by depriving them of information required to accurately forecast the Nutrition segment's FY 2019 performance–as Plaintiff alleges–damages are no more than $1.67 per share for purchases between May 8, 2019 and August 7, 2019."[10] He also raises purported critiques of my application of inflation during the Class Period.[11]

6. Prof. Gompers arrives at both opinions based on a flawed and incomplete interpretation of Plaintiff's allegations. Prof. Gompers argues that "as a matter of economics, [my] 'zone of risk' assertion cannot be used to reliably demonstrate that the alleged misrepresentations caused any investor losses."[12] Prof. Gompers fails to recognize that the allegation that "the information revealed through the corrective disclosures fell within the zone of risk concealed by Defendants'

---

8 Gompers Report ¶¶ 104-106. Prof. Gompers contends that I have failed to account for other purportedly "potential negative confounding information (*e.g.*, the Nutrition segment's 4Q 2019 performance and FY 2019 guidance and executive departures)."

9 Gompers Report, ¶ 7. Prof. Gompers also notes that references to "alleged misrepresentations in [his] report [] encompass both alleged misstatements and alleged omissions." Gompers Report, footnote 22.

10 Gompers Report, ¶ 15. Specifically, Prof. Gompers opines that "Tivity's stock price would have been inflated by $0.26–$1.67 between May 9, 2019 and August 7, 2019" based on his assumptions and using different approaches. *See* Gompers Report, ¶ 138. Prof. Gompers refers to Nutrisystem's adjusted EBITDA between January 1, 2019 and March 7, 2019 as the "Pre-Transaction 1Q 2019 Adjusted EBITDA" (*See* Gompers Report, ¶ 8). For ease of reference, I adopt this terminology for the purpose of responding to Prof. Gompers' opinions.

11 Gompers Report, Sections VII.B.4 and VII.B.5.

12 Gompers Report, ¶ 78.

alleged fraud"[13] is not an "assertion" I have made; rather, it is the theory of liability that Plaintiff alleges.[14] Prof. Gompers refuses to accept Plaintiff's theory and, as a result, is unable to critique my opinions, which address Plaintiff's theory of liability.

7. Although Prof. Gompers performs no independent analysis of the alleged corrective disclosures and appears to have reviewed only a limited set of documents and testimony from the record, he dismisses any investor losses on the alleged corrective disclosure dates as unrelated to the alleged fraud.[15] It is my understanding, however, that such determinations are before the trier-of-fact. Nevertheless, Prof. Gompers attempts to preempt such findings by offering purported critiques of my opinions based on a selective and incomplete review of the record, rather than engage in an economic assessment of my analysis.

8. For the Nutrisystem Claim, Prof. Gompers arrives at his opinions based on a series of untenable assertions.

a. Prof. Gompers claims that I do not reliably establish that any investor losses on February 20, 2020 were caused by the disclosure of Nutrisystem Claim based on his erroneous conclusion that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by August 7, 2019. He ignores evidence that contradicts his findings and fails to consider Plaintiff's broader allegations regarding Tivity's

---

13 Gompers Report, ¶ 34.

14 Consolidated Complaint, ¶ 176, stating that "[t]he decline in the price of Tivity common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of Defendants' scheme and fraudulent misrepresentations and omissions to investors and the market, and such corrective disclosures were within the zone of risk concealed by Defendants' fraud."

15 Gompers Report, ¶ 44, stating that "if there is confounding information (such as factors unrelated to the alleged fraud, materialization of risks previously known to the market, and other timely disclosures), then it is necessary to parse out the potential stock price effect associated with the alleged misstatements or omissions to isolate the price effect of the alleged corrective information (*i.e.*, information casually connected to the alleged misstatements)." *See also*, Gompers Report, ¶ 106, asserting that all other information in the February 2020 Disclosure should be considered "potential negative confounding information (*e.g.*, the Nutrition segment's 4Q 2019 performance and FY 2020 guidance and executive departures;" Gompers Report, ¶ 8, asserting "Tivity disclosed Pre-Transaction 1Q 2019 Adjusted EBITDA by August 7, 2019."

alleged scheme and false and misleading statements and omissions regarding the acquisition, integration and performance of Nutrisystem during the Class Period.

b. Prof. Gompers asserts that I do not reliably establish that Tivity's FY 2019 financial results and FY 2020 financial guidance were not untimely or tie the information to the alleged misrepresentations for the Nutrisystem Claim. In support of this opinion, he performs a limited and selective review of Tivity's internal projections in comparison with its disclosed guidance, while ignoring evidence from Tivity's internal communications that raises questions about the internal projections that Prof. Gompers takes at face value. Prof. Gompers performs no independent analysis that would allow him to opine that Tivity's internal projections and disclosed guidance were not untimely, materially false, and/or misleading, which I understand is before the trier-of-fact.

c. Prof. Gompers contends that I do not reliably establish that any losses from the announcement of the departures of Ms. Zier, Mr. Tramuto, and Ms. Krausz were caused by the alleged misrepresentations. In arriving at this opinion, Prof. Gompers fails to recognize that the executive departures were within the zone of risk allegedly concealed by Defendants' alleged misrepresentations and scheme, ignoring evidence that suggests that their terminations were driven by poor performance in the Nutrition segment and failures to successfully integrate the Nutrisystem business.

d. Prof. Gompers asserts that I do not account for potential negative confounding information and the materialization of previously disclosed risks. He fails to recognize Plaintiff's allegations that information he contends to be "confounding" was within the zone of risk concealed by Defendants' alleged fraud and, in addition, relies on nothing more than Tivity's generalized risk disclosures in support of his opinions that information in the corrective disclosures reflected the materialization of previously disclosed risks.

e. Prof. Gompers claims that I do not reliably establish that any losses attributable to the impairment charge were caused by the alleged misrepresentations for the

Nutrisystem Claim. In reaching this opinion, Prof. Gompers erroneously opines that the Nutrisystem and Goodwill Claims cannot cause the same loss, failing to recognize that both claims relate to Tivity's alleged scheme and false and misleading statements and omissions regarding the acquisition, integration, and performance of Nutrisystem, and that the same information may be concealed by multiple fraudulent misrepresentations.

9. Prof. Gompers' opinions in relation to the Goodwill Claim are based on similarly flawed reasoning and mischaracterizations of Plaintiff's claims.

a. Prof. Gompers asserts that I perform no analysis to support that the impairment charge could or should have been announced prior to the February 2020 Disclosure. In support of his opinion, he relies on Tivity's internal analyses that no impairment charge was required and PwC's review of these analyses. Prof. Gompers provides no independent analysis that would allow him to opine that Tivity's impairment charge was not untimely, materially false, and/or misleading, which I understand is before the trier-of-fact.

b. Prof. Gompers claims that I do not consider that the impairment charges were informed by unanticipated events. He fails to address Plaintiff's allegations and any evidence that the impairment charges were untimely, resorting to his own speculation about findings of fact.

c. Prof. Gompers claims that I perform no analysis to isolate the price effect of any news that was not timely disclosed, failing to recognize that revelations about the Nutrition segment's true performance and Tivity's failure to successfully integrate the Nutrisystem business, are within the zone of risk allegedly concealed by Defendants' alleged fraud.

d. Prof. Gompers asserts that impairment triggers were public knowledge prior to the February 2020 Disclosure. He fails to distinguish between impairment triggers and actual impairments, while dismissing Plaintiff's allegations and any

evidence that impairment charges were untimely, which I understand is before the trier-of-fact.

e. Prof. Gompers suggests that the February 2020 Disclosure reflected the materialization of a disclosed risk based on generalized risk disclosures in Tivity's SEC filings and analyst commentary that discussed generalized risks. He fails to recognize that Plaintiff alleges this information was within the zone of risk concealed by Defendants' alleged fraud.

10. In addition to purported issues related to my measurement of inflation, Prof. Gompers also takes issue with my application of inflation during the Class Period, claiming that I do not establish that (i) "back-casting" is appropriate and (ii) Tivity's shares were inflated at the beginning of the Class Period. As I explain in the Dalrymple Report, however, I have measured the loss caused by Tivity's alleged scheme to defraud and false and misleading statements and omissions by reference to the share price reactions corresponding to corrective disclosures on December 9, 2019 and February 19, 2020, adjusting for the impact of unrelated factors. Inflation in Tivity's stock would apply as of the date that the trier-of-fact determines that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud. This approach is consistent with Plaintiff's theory and appropriately allows the trier-of-fact to determine when, if at all, information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud.

11. Finally, Prof. Gompers' opinion that damages are no more than $1.67 per share between May 8, 2019 and August 7, 2019 (assuming that Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA in the Company's earnings release on May 8, 2019) is incompatible with Plaintiff's allegations in this matter. His inflation estimates rest on a flawed interpretation of Plaintiff's allegations, namely that Plaintiff's allegations are limited to Defendants' concealment of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA loss, coupled with his erroneous conclusion that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by August 7, 2019. As I explain herein, the basis for the limitations Prof. Gompers places on Plaintiff's claims and his assertions about the purported disclosure of

Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA loss are unsupportable and contradicted by evidence in the case.

12. None of the issues or purported critiques of my analysis that Prof. Gompers raises affect the opinions I set forth in the Dalrymple Report.

13. My credentials and qualifications are provided in the Dalrymple Report. A list of additional materials I have considered in my work for this matter as of the date of this report is contained in **Supplemental Appendix B**, as well as in the citations and footnotes to the text presented in this report.

14. I will review, evaluate, and analyze additional data, facts, or information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me. The analyses and opinions described herein may, therefore, change based upon additional information that becomes available or other developments that occur.

## II. Analysis of the Gompers Report

15. Prof. Gompers does not contest my measurement of the share price reactions following the December 2019 and February 2020 Disclosures. He also does not dispute my calculation of the portion of these share price declines that were attributable to revelations about the Nutrition segment, specifically:

a. $2.23 was attributable to the announcement of Ms. Zier's termination in the December 2019 Disclosure; and

b. $8.19 was attributable to information about the Nutrition segment contained in the February 2020 Disclosure.

16. Prof. Gompers' critiques of my opinions rest on his contentions that the information in the corrective disclosures were either: 1) information or risks that had been previously disclosed; or 2) unrelated to Plaintiff's allegations based on a flawed interpretation of the claims. These are not economic critiques but, rather, assertions about findings of fact and law based on Prof. Gompers' incomplete review of the record, from which he draws sweeping, unsupported, and

premature conclusions. As he is unable to offer a substantiative economic assessment of my analysis, Prof. Gompers relies on mischaracterizations and strawman arguments about opinions that I do not present and findings that I do not make.[16]

17. Prof. Gompers' alternative calculation, that damages are no more than $1.67 per share based on his assumption that any alleged misrepresentations were revealed on August 7, 2019 (rather than through the alleged corrective disclosures in this matter on December 9, 2019 and February 19, 2020), underscores his failure to analyze Plaintiff's allegations at all. Instead, he bases his opinions on assertions that none of the information revealed through the corrective disclosures fell within the zone of risk allegedly concealed by Defendants; in other words, Prof. Gompers' opinions are predicated on the trier-of-fact finding that Defendants are not liable for any alleged wrongful conduct under Plaintiff's theory of liability. Should the trier-of-fact find, however, that the information revealed through the corrective disclosures fell within the zone of risk allegedly concealed by Defendants, Prof. Gompers has presented no damages calculation consistent with such a finding.

18. In the remainder of this section, I address Prof. Gompers' purported critiques in detail, noting that Prof. Gompers does not directly dispute the economic substance of my inflation calculations.

## A. Prof. Gompers ignores Plaintiff's theory of liability and my analysis of Plaintiff's claims

19. Prof. Gompers enumerates a series of critiques based on factual and legal predicates that he claims I have not "reliably established" as part of my opinions, claiming that I "fail[] to

---

[16] The Gompers Report also contains mischaracterizations of my opinions and inaccurate statements, which are plainly contradicted by even a cursory review of the Dalrymple Report. For example, Prof. Gompers asserts that "[my] analysis of the purported losses on February 20, 2020 caused by the alleged misrepresentations for the Nutrisystem Claim is flawed and unreliable," in part, because I perform "no analysis" to establish any causal connection between the information revealed about Nutrition segment and Nutrisystem acquisition and the alleged misrepresentations for the Nutrisystem Claim. Gompers Report, ¶ 91. But as discussed in the Dalrymple Report, I examine each element of the information revealed in the February 2020 Disclosure and explain which of those are causally related to the Nutrisystem Claim. *See* Dalrymple Report, ¶¶ 99-105.

reliably establish that investor losses (if any) were caused by the alleged misrepresentations for either the Nutrisystem Claim or the Goodwill Claim."[17] He contends that, in order "to establish loss causation and measure the losses,"[18] a financial economist must "[d]etermine the information that could and should have been disclosed."[19]

20. Under Prof. Gompers' reasoning, a damages analysis would need to rest on the expert's independent findings of fact and/or law about what information "could and should have been disclosed."[20] I understand that such determinations, however, fall within the purview of the trier-of-fact and/or law. That I do not opine on such matters is not a valid critique of my analysis, but a strawman argument that my inflation calculations are somehow deficient because they are predicated on certain findings about which I do not present an affirmative view and, in fact, were instructed to assume.

21. That Prof. Gompers does not agree with Plaintiff's allegations and/or theory of liability is irrelevant to my opinions. Similarly, Prof. Gompers' disagreement with Plaintiff's theory does not support his attempts to frame purported critiques of my analysis based on his mischaracterizations of Plaintiff's claims, namely his contention that the only wrongful act that could have caused Tivity's share price to be inflated is Defendants' allegedly improper concealment of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA. In doing so, he sidesteps the broader allegations, such as that "Defendants engaged in a scheme to defraud and made misrepresentations and omissions in public statements, financial releases and conference

---

[17] Gompers Report, ¶ 42. Throughout the Gompers Report, Prof. Gompers makes claims that I have "not reliably" established or demonstrated various findings. Notwithstanding the erroneous and irrelevant nature of these purported critiques, which I address herein, Prof. Gompers does not define what it means to "reliably establish" something and, therefore, cannot provide any objective standard against which to evaluate my analysis. To the extent his purported critiques are premised on his flawed and incomplete interpretation of Plaintiff's allegations, he conflates reliability with a finding that falls within the purview of the trier-of-fact. Nevertheless, his reliance on this undefined terminology throughout his report renders Prof. Gompers' opinions unscientific and hollow, since many of his purported critiques are untethered to any established or objective set of criteria.

[18] Gompers Report, ¶ 43. *See also* Gompers Report, ¶ 122.

[19] Gompers Report, ¶ 43b.

[20] Gompers Report, ¶ 43b.

calls regarding the financial success of the Nutrisystem product and service lines."[21] Prof. Gompers' mis-specified framework also fails to address allegations that "Defendants failed to timely and appropriately perform impairment testing and write down the value of the Nutrisystem tradename and Nutrition segment goodwill."[22] Remarkably, Prof. Gompers' approach is also inconsistent with what he purports to be his understanding of the allegations, which confirm their scope extends well beyond the alleged concealment of Nutrisystem's Pre Transaction 1Q 2019 Adjusted EBITDA loss.[23]

**1) Prof. Gompers' contention that Plaintiff's "zone of risk" allegations cannot be used to establish damages ignores Plaintiff's theory of liability and is irrelevant to my opinions**

22. As I explain in the Dalrymple Report, I understand Plaintiff alleges that information in the December 2019 and February 2020 Disclosures fell within the zone of risk concealed through Defendants' alleged misrepresentations and scheme. Prof. Gompers misleadingly states that my inflation estimates are based on "Mr. Dalrymple's 'zone of risk' assertion," which he contends "is unsupported and provides no reliable basis for measuring economic damages."[24] According to Prof. Gompers:

> [A]n analysis of Tivity's stock price reaction to information that is the materialization of a risk or information revealed by the corrective disclosures that was "within the zone of risk" is not the same as an analysis of inflation. As a result, Mr. Dalrymple's "zone of risk" assertion fails to reliably determine how certain information would have impacted Tivity's stock price in a hypothetical "but-for" world, rendering his inflation analysis flawed and unreliable.[25]

23. Contrary to Prof. Gompers' mischaracterization, the allegation that "the information revealed through the corrective disclosures fell within the zone of risk concealed through

---

[21] Dalrymple Report, ¶ 17, citing Consolidated Complaint, ¶¶ 41-119, and Memorandum Opinion, p. 2.
[22] Dalrymple Report, ¶ 17, citing Consolidated Complaint, ¶¶ 120-170, and Memorandum Opinion, p. 2.
[23] Gompers Report, ¶¶ 24-25. *See also*, Gompers Class Certification Report, ¶¶ 17-18.
[24] Gompers Report, ¶¶ 14, 78, and 126-131.
[25] Gompers Report, ¶ 131.

Defendants' alleged fraud" is not an "assertion" that I have made;[26] rather, it is what Plaintiff alleges.[27] As Prof. Gompers states, a finding that "information revealed by the corrective disclosures that was 'within the zone of risk'" concealed by the alleged fraud is not the same as "an analysis of inflation;" the former is a finding before the trier-of-fact that I was instructed to assume, while the latter is an estimate of inflation based on this assumption. But Prof. Gompers is wrong to assert that the "zone of risk" theory fails because damages are measured by reference to the loss caused by the revelation of alleged fraud rather than on what he describes as "a hypothetical 'but-for' world" (which I have not been asked to assume).

24. Having improperly attributed Plaintiff's theory of liability to an "assertion" that I have made, Prof. Gompers offers further unsupported and inapt critiques. For instance:

> [S]imply noting that allegedly concealed information was "within the zone of risk" at certain points in time does not reliably demonstrate that the stock price impact of a "but-for" disclosure would have been identical at these points—let alone all points in between—as Mr. Dalrymple concludes.[28]
>
> …
>
> In order for the stock price reaction to a "but-for" disclosure to be identical to the stock price reaction on an alleged corrective disclosure date, the information conveyed by the "but-for" disclosure must change the markets estimate of expected

---

[26] Dalrymple Report, ¶ 11.

[27] Consolidated Complaint, ¶ 176. As the Sixth Circuit stated:

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). It partakes of the traditional elements of loss and proximate causation. See *Dura Pharm.*, 544 U.S. at 346, 125 S.Ct. 1627. Any analogy to the common law tort concept, however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the "underlying circumstance that is concealed or misstated." *Lentell*, 396 F.3d at 173. Thus, in the securities fraud context, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (emphasis in original). *See, Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, 830 F.3d 376 (2016), at 384.

[28] Gompers Report, ¶ 128.

future cash flows and/or the riskiness of those cash flows by the same amount as what occurred on the alleged corrective disclosure date.[29]

25. This is nothing more than a strawman argument. I do not contend that "allegedly concealed information was 'within the zone of risk' at certain points in time" nor are my opinions dependent on such a finding at any particular point in time.[30] Furthermore, I have not opined that Tivity's "stock price reaction to a 'but-for' disclosure" would be "identical to" Tivity's stock price reaction following the corrective disclosures in this matter, nor is it my understanding that such a finding is appropriate under Plaintiff's theory of liability. As I explain in the Dalrymple Report, "I have measured the loss caused by Tivity's alleged scheme to defraud and false and misleading statements and omissions by reference to the share price reactions corresponding to corrective disclosures on December 9, 2019 and February 19, 2020, adjusting for the impact of unrelated factors."[31]

26. Prof. Gompers attempts to re-frame the issue as akin to a hypothetical pharmaceutical company overstating the likelihood of a drug's approval, claiming that damages "should" be limited to the incremental risk that Defendants would have disclosed in the counterfactual.[32] More generally, he states that "when a risk materializes, a company's stock price will generally decline even if that risk was fully understood by market participants," contending that "losses due to the

---

29 Gompers Report, footnote 223.

30 For example, Prof. Gompers asserts that "[t]o the extent that some portion of the allegedly corrective information for the Nutrisystem Claim disclosed on February 19, 2020 was not disclosed in a timely manner, Mr. Dalrymple has not attempted to disentangle Tivity's stock price reaction caused by the information disclosed in a timely manner from that not disclosed in a timely manner. This analysis is needed to determine whether the untimely information caused any portion of Tivity's stock price decline on February 20, 2020." *See* Gompers Report, ¶ 46. Under Plaintiff's theory, however, the information revealed through the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud. Even if Prof. Gompers were to contend, for instance, that the disclosure of the Nutrition segment's Q4 2019 results was "timely," this does not mean that such information was not within the zone of risk concealed by Defendant's alleged fraud. Regardless, Prof. Gompers has performed no independent analysis to determine what information, if any, was "disclosed in a timely manner" or quantify the extent to which such information had an impact on Tivity's share price.

31 Dalrymple Report, ¶ 10.

32 Gompers Report, ¶ 130.

materialization of publicly disclosed risks" cannot be attributable to the alleged misrepresentations.[33] According to Prof. Gompers, I do not "reliably establish what portion of the information" in the alleged corrective disclosures was attributable to "the materialization of … publicly disclosed risks,"[34] pointing to generalized risk disclosures in Tivity's SEC filings indicating that management could not, for instance, "provide assurances that our and Nutrisystem's businesses can be integrated successfully."[35]

27. Plaintiff's allegations that information revealed through the corrective disclosures fell within the zone of risk concealed by Defendants' alleged fraud does not mean that Defendants concealed a particular risk that later materialized; rather, Defendants allegedly concealed facts and circumstances that, if known to investors, would have revealed the true prospects of the investment. Prof. Gompers' assertions that purportedly disclosed risks or information "disclosed in a timely manner" should be removed from inflation is wrong and inconsistent with Plaintiff's theory of liability.

28. Prof. Gompers' comparison of this case to a hypothetical pharmaceutical company overstating the likelihood of a drug's approval is similarly inapt. Prof. Gompers postulates a scenario in which some discrete external event caused a concealed risk to materialize.[36] In this

---

33 Gompers Report, ¶¶ 96 and 115.

34 Gompers Report, ¶¶ 100 and 115.

35 Gompers Report, ¶ 97, citing Tivity 2018 10-K, p. 14.

36 Prof. Gompers contends that "awarding all investors the full stock price decline would effectively compensate those investors based on a presumption that, had investors known the true risk that the FDA would not approve the drug, they would have chosen to avoid the company's stock entirely, *i.e.*, they would have chosen to hold no shares of the company." Gompers Report, footnote 226. Again, Prof. Gompers' analogy is incorrect. Plaintiff does not seek rescissory damages that would allow shareholders to recoup losses had they not purchased the shares; rather, Plaintiff seeks to recover the loss attributable to the alleged fraud. Prof. Gompers goes on to claim that "there is no basis in financial economics for such a presumption" and that "it is widely accepted that this type of risk is company-specific and therefore diversifiable in the context of an overall portfolio of investments, and it does not affect the volatility of a diversified portfolio." *Id*. Prof. Gompers seems to suggest that, because investors can choose to diversify their portfolio investments, shareholders are not entitled to compensation arising from any company-specific risk, irrespective of whether risks were concealed by an alleged fraud. Whatever Prof. Gompers' views on this issue may be, they are wholly irrelevant to the issues in this case.

case, however, there is no external event akin to a failed drug approval. Plaintiff alleges that Defendants knew about or recklessly disregarded the Nutrition segment's underperformance, including facts and circumstances allegedly withheld from investors during the Class Period.

29. Notwithstanding the lack of support Prof. Gompers provides in relation to his critiques of Plaintiff's liability theory, and setting aside that the appropriateness of Plaintiff's theory is a question of law, Prof. Gompers' critiques are irrelevant to my opinions.

### 2) Prof. Gompers' assertion that the loss caused by Defendants' alleged fraud must be allocated to alleged fraudulent actions within the Nutrisystem and Goodwill Claims is inapt

30. Prof. Gompers asserts that I do not link elements of the corrective disclosures to the alleged misrepresentations and that I have failed to establish loss causation for the Nutrisystem Claim and the Goodwill Claim.[37] Such assertions appear to be tethered, in part, to his view that the claims are mutually exclusive from one another. As Prof. Gompers states, "[I] assume[] that the *same* loss was caused by both the alleged misrepresentations for the Nutrisystem Claim and the Goodwill Claim," which he contends "is illogical from an economic perspective."[38]

31. Prof. Gompers' suggestion that multiple alleged frauds cannot cause the same loss is wrong, from both an economic and common sense perspective.[39] In this case, he fails to recognize the economic substance behind the Nutrisystem Claim and the Goodwill Claim. Both claims relate to Tivity's alleged scheme and false and misleading statements and omissions regarding the acquisition, integration and performance of Nutrisystem.[40] In addition, both claims are grounded in allegations that Defendants misled investors about the Nutrition segment's performance and

---

[37] *See e.g.*, Gompers Report, ¶ 8 and 15.

[38] Gompers Report, ¶ 118.

[39] Moreover, as I explain in the Dalrymple Report, "I understand that Defendants have characterized Plaintiff's claim as separate theories of liability related to a Nutrisystem Claim and a Goodwill Claim" and that "Plaintiff disputes this characterization." Dalrymple Report, footnote 6.

[40] While the economic substance underlying inflation arising from the two claims may be common, I understand the legal and factual findings required to prove each claim may be distinct. I express no opinion on such legal and factual findings.

future prospects. That Defendants allegedly concealed the truth about the Nutrition segment through multiple mechanisms, such as by "paint[ing] a deceitfully rosy picture of the Nutrisystem acquisition" and "fail[ing] to impair and write down both the goodwill and Nutrisystem trade name," does not mean that the economic impacts of each alleged fraudulent action are mutually exclusive.[41]

32. Whether the information was concealed by Defendants' alleged misrepresentations of performance, or by Tivity's failure to impair goodwill and the Nutrisystem trade name, does not change the nature of the economic correspondence between Plaintiff's claims and the loss caused by the revelation of the corrective information in the February 2020 Disclosure.[42] Prof. Gompers' attempt to introduce a dichotomy between losses arising from the two claims is inapt and at odds with Plaintiff's theory of liability.

**B. Prof. Gompers' critiques of my analysis of the Nutrisystem Claim ignore Plaintiff's allegations and evidence in the case**

33. With respect to the Nutrisystem Claim, Prof. Gompers asserts that I have not: (1) reliably established that any investor losses on February 20, 2020 were caused by the disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA,[43] which he contends was disclosed by August 7, 2019;[44] (2) reliably established that the information in Tivity's FY 2019 financial results and FY 2020 financial guidance was not timely, or tie to the information to the alleged misrepresentations for the Nutrisystem Claim;[45] (3) reliably established that any losses from the announcement of the departures of Ms. Zier, Mr. Tramuto, and Ms. Krausz were caused by the alleged misrepresentations;[46] (4) accounted for other potential negative confounding information and the materialization of previously disclosed risks;[47] and (5) reliably established that any losses

---

41 Memorandum Opinion, pp. 2 and 9.
42 *See also, infra* Section II(B)(5).
43 Gompers Report, ¶¶ 89-90.
44 Gompers Report, ¶¶ 50 and 61-68.
45 Gompers Report, ¶¶ 69-72 and 91-100.
46 Gompers Report, ¶¶ 79-85 and 102-103.
47 Gompers Report, ¶¶ 86-88, 91-100, and 104-106.

attributable to the impairment charge were caused by the alleged misrepresentations for the Nutrisystem Claim.[48]

34. Many of Prof. Gompers' purported critiques are nothing more than unsupported commentary about findings that are clearly outside the scope of my analysis, such as "reliably establish[ing] the information in Tivity's FY 2019 financial results and FY 2020 financial guidance was not timely."[49] As is clear from the Dalrymple Report, my inflation estimates are based on Plaintiff's allegations that Tivity's share price declines following the December 2019 and February 2020 Disclosures were "a direct result of the revelation of the nature and extent of Defendants' scheme and fraudulent misrepresentations and omissions to investors and the market, and such corrective disclosures were within the zone of risk concealed by Defendants' fraud."[50] Prof. Gompers has not performed any independent analysis that would allow him to opine on whether or not Tivity's disclosures were untimely, false, and/or misleading. Regardless, I understand that such findings are before the trier-of-fact.[51]

35. Prof. Gompers' purported critiques of my analysis of the Nutrisystem Claim are largely predicated on his assumption that there were no misrepresentations with respect to Tivity's financial guidance, based on his assertion that guidance figures were consistent with Tivity's internal projections. Because he has found (or simply assumed) that there were no misrepresentations with respect to guidance,[52] Prof. Gompers effectively assumes the share price impact resulting from what he characterizes as "timely" disclosures (Nutrition segment's 4Q 2019 performance and FY 2020 guidance) to be the materialization of previously disclosed risks.[53] Prof.

---

48 Gompers Report, ¶ 101.
49 Gompers Report, Section VI.B.3(c)(2).
50 Consolidated Complaint, ¶ 176.
51 I understand the subject of the impairment charges on the February 2020 Disclosure is addressed by other experts in this matter. *See e.g.*, Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA. dated January 10, 2023 and Rebuttal Expert Report of Michael F. Maloney. CPA, CFF, CFE dated February 7, 2023.
52 It is unclear whether Prof. Gompers' findings of fact are assumptions with which he was provided or conclusions based on his own incomplete review of the record.
53 Prof. Gompers similarly dismisses the December 2019 Disclosure entirely because I purportedly failed to "explain how fears about performance during the *upcoming* diet season in 2020 corrected alleged misrepresentations about performance during the *previous* diet

Gompers then argues that I "cannot conclude that any portion of Tivity's stock price decline on February 20, 2020 was caused by factors other than the materialization of publicly disclosed risks."[54] As a result, he erroneously asserts that information that he claims was disclosed in a "timely" manner is a source of "potential negative confounding information" that needs to be "disentangled" from my inflation estimates, even though this information is within the zone of risk that Plaintiff alleges was concealed.[55]

36. Having assumed that the allegedly false statements, through which Plaintiff contends "Tivity painted a deceitfully rosy picture of the Nutrisystem acquisition,"[56] were not actually false, Prof. Gompers focuses his discussion of the Nutrisystem Claim on the Pre-Transaction 1Q 2019 Adjusted EBITDA. He then attempts to diminish the economic significance of this remaining element of the Nutrisystem Claim as related to "past financial performance," which he distinguishes from "expectations about the [Nutrition] segment's future performance."[57] According to Prof. Gompers, the February 2020 Disclosure "explained that the impairment charges were due to expectations about the [Nutrition] segment's *future* performance … not FY 2019 performance."[58] Again, he considers neither the allegations nor the evidence that investors would

---

season in 2019–what I understand is the subject of the Nutrisystem Claim." *See* Gompers Report, ¶ 82.

54 Gompers Report, ¶ 100. *See also*, Gompers Report, ¶¶ 80 and 96-99, discussing generalized risk disclosures in Tivity's 10-Q and 10-K filings, and ¶¶ 81 and 100, suggesting that the stock price declines following the December 2019 and February 2020 Disclosures were caused by the materialization of disclosed risks.

55 Gompers Report, ¶ 106.

56 Memorandum Opinion, p. 2.

57 Gompers Report, ¶ 118. *See also*, ¶¶ 109 and 139.

58 Gompers Report, ¶ 101. Emphasis in original. Prof. Gompers' characterization of the Nutrisystem Claim as related to "past financial performance" is inconsistent with discussions of the Nutrisystem Claim elsewhere in his report, in which he acknowledges it *includes* allegedly misleading financial guidance for the Nutrition segment (*i.e.*, *forward* looking forecasts). *See* Gompers Report, ¶ 45. *See also*, Gompers Report, ¶ 24, acknowledging Plaintiff's allegations that "Defendants were not confident or did not believe that the Company could achieve its Nutrition segment's adjusted EBITDA guidance, 'rather Defendants knew that, after a failed 2019 diet season, and after accounting for the unreported $8.3 million in losses in the first quarter, guidance for the remainder of the year was no longer achievable" and "Defendants had suffered a poor 2019 diet season, increased competition, declining customers, lack of innovation and ongoing operational missteps, and the Nutrition segment

have revised expectations about "*future* performance" at an earlier time had the Pre-Transaction 1Q 2019 Adjusted EBITDA been disclosed.[59] Such an approach is incongruent with economic and valuation principles, which recognize that past and current performance convey information valuable to investors to estimate future performance.[60]

37. Prof. Gompers' opinions about the Nutrisystem Claim are plainly at odds with the allegations in this matter and Plaintiff's theory of liability. In addition, Prof. Gompers' opinions rest on assumptions and findings based on what appears to be, at most, nothing more than his own incomplete and selective review of the record.[61]

---

was experiencing insurmountable headwinds due to the Company's historical declining profitability in the back half of the year. Further, the Nutrition segment was offering unprecedented discounts, which ultimately reduced revenues and margins in 4Q19, as well as negatively impacting the Company [*sic*] ability to execute a successful FY20 diet season." Emphasis added.

59 *See e.g.,* Dalrymple Report, ¶¶ 37-41, referring to analysts discussing the recent acquisition and first quarter trends for the Nutrition segment. *See also*, Jefferies, "4 Key Insights from TVTY's 1Q19," May 9, 2019, p. 1, Cantor Fitzgerald, "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," May 8, 2019, p. 1, William Blair, "Upside Performance as Nutrisystem Integration off to Good Start; Positive Early Feedback From Key Constituents," May 8, 2019, p. 1, SunTrust Robinson Humphrey, "Solid Start To The Year With Some Encouraging Green Shoots," May 9, 2019, p. 1, and Barrington Research, "Tivity Reports Solid Q1; Result Includes 24 Days of NTRI Asset; More Detailed FY/19 Guidance Provided; Maintain OUTPERFORM; PT is $40," May 10, 2019, p. 1, discussing the Nutrition segment's performance.

60 *See, e.g.,* Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (3rd ed. 2012), p. 272 ("When estimating the expected growth for a firm, we generally begin by looking at the firm's history. How rapidly have the firm's operations, as measured by revenues or earnings, growth in the recent past? While past growth is not always a good indicator of future growth, it does convey information that can be valuable while making estimates for the future.") I note that this is one of the books that Prof. Gompers references in Appendix C of the Gompers Report.

61 Prof. Gompers' review also appears to be selective and fails to consider other evidence in this matter that he purportedly considered. For example, Prof. Gompers provides no acknowledgement that at least one securities analyst (Craig-Hallum) believed incorrectly that "January and February are roughly breakeven in EBITDA for Nutrisystem" even after the November 12, 2019 earnings other than to list it in footnote 150 and Appendix C (Documents Considered) of his report. *See* Craig-Hallum, "2019 Guidance Reiterated. Nutrition Innovations For Diet Season As Well As New Older American Offering Provide Strong Catalysts For 2020. Reiterate BUY Rating And $30 Price Target.," November 13, 2019, p. 2.

**1) Prof. Gompers incorrectly claims that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed no later than August 7, 2019**

38. Prof. Gompers' opinions are based largely on his assertions that the allegedly false statements, through which Plaintiff contends "Tivity painted a deceitfully rosy picture of the Nutrisystem acquisition" were not actually false.[62] Having artificially limited the Nutrisystem Claim to Defendants' alleged failure to disclose the Pre-Transaction 1Q 2019 Adjusted EBITDA, Prof. Gompers then contends that this figure: 1) was of limited economic significance since it related to Tivity's past performance;[63] and 2) was disclosed by no later than August 7, 2019.[64]

39. *First*, as previously discussed, past and current performance convey information valuable to investors to estimate future performance.[65] Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA, while a historical performance metric, would have conveyed valuable information to market participants and enabled them to reassess the future growth prospects for the Nutrition segment.

40. Moreover, Prof. Gompers mischaracterizes the Nutrisystem Claim as "centered around the disclosure of past financial performance (specifically, the Pre-Transaction 1Q 2019 Adjusted EBITDA for the Nutrition segment) and allegedly misleading FY 2019 financial guidance for the Nutrition segment."[66] As a result, he fails to consider the economic significance of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA in the context of other alleged false statements and omissions alleged in the Nutrisystem Claim, such as how concealing or obfuscating Nutrisystem's performance at the beginning of the year could have corroborated Defendants' other alleged false

---

62 Memorandum Opinion, p. 2.

63 Gompers Report, ¶ 45, emphasizing his understanding that the alleged misrepresentations for the Nutrisystem Claim are centered around Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA. While Prof. Gompers also states that his understanding includes the "allegedly misleading FY 2019 financial guidance for the Nutrition segment," he does not address it as part of the Nutrisystem Claim because he concludes that "Tivity's internal projections were generally consistent with its disclosed guidance." *See* Gompers Report, ¶¶ 69-72.

64 Gompers Report, ¶¶ 50-68, discussing Tivity's disclosures prior to the alleged corrective disclosure dates.

65 *Supra* footnote 60.

66 Gompers Report, ¶ 118.

statements.[67] By confining his view of the Nutrisystem Claim in this way, Prof. Gompers fails to consider the context of Plaintiff's broader allegations regarding Tivity's scheme and false and misleading statements and omissions regarding the acquisition, integration and performance of Nutrisystem.

41. *Second*, Prof. Gompers contends that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by August 7, 2019 and that "in an efficient market, repeated disclosure of the Pre-Transaction 1Q 2019 Adjusted EBITDA would not have caused Tivity's stock price decline on February 20, 2019."[68] This conclusion, however, is based on a selective and incomplete reading of the information provided by Tivity.[69] According to Prof. Gompers:

> On August 7, 2019, after market close, Tivity released its 2Q 2019 earnings, which included a 14-page "Supplemental Material" presentation. In this presentation, Tivity provided comparisons of "2019 Guidance Updated" and "2019 Guidance Original" for revenue and adjusted EBITDA. The figures were provided for the entire company, as well as for the Healthcare segment and Nutrition segment separately.[70]

42. From this, Prof. Gompers concludes that "the Nutrition segment's actual adjusted EBTIDA from January 1, 2019 to March 7, 2019 was approximately -$9 million (*i.e.*, either $71 million minus $80 million or $75 million minus $84 million)" and that "[h]ence, Nutrisystem's

---

[67] For instance, as discussed in the Dalrymple Report, the diet season is critical to the performance for the Nutrition segment and an "unsuccessful 'diet season', in which Nutrisystem failed to attract a significant number of new customers, would be expected to result in decreased revenues and profits for the rest of the year." Dalrymple Report, ¶¶ 19 and 39. *See also*, Dalrymple Report, ¶¶ 32-54.

[68] Gompers Report, ¶ 8.

[69] Prof. Gompers also discusses disclosures on February 19, 2019 and May 8, 2019, along with certain associated analyst commentary. Gompers Report, ¶¶ 50-60. He selectively emphasizes certain disclosures that Tivity made in support of his assertion that Tivity disclosed its 1Q 2019 financial performance before the alleged corrective disclosures, while failing to address the alleged scheme and false and misleading statements and omissions regarding the acquisition, integration, and performance of Nutrisystem and Nutrition segment. As I explain herein, Prof. Gompers' views on whether Tivity's disclosures were timely or adequate are irrelevant to my opinions, as I understand it is before the trier-of-fact (not Prof. Gompers) to determine whether the information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud.

[70] Gompers Report, ¶ 61.

Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by Tivity in its 2Q 2019 supplemental materials presentation."[71]

43. Contrary to Prof. Gompers' suggestion, Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was not disclosed unambiguously. As I explain in the Dalrymple Report, the two sets of guidance figures presented in the Supplemental Materials "revealed different implications for adjusted EBITDA in the period from January 1, 2019 to March 7, 2019, neither of which corresponded to the actual adjusted EBITDA loss of $8.3 million, as set forth in the following table:"[72]

**Table 2. Pre-Acquisition Loss based on Original and Updated Guidance**

| Nutrition Segment Adjusted EBITDA | 2019 Guidance Updated | 2019 Guidance Original |
|---|---|---|
| 2019 Stub Period: March 8, 2019 to December 31, 2019 | $80m - $84m | $91m - $101m[73] |
| Full Year: January 1, 2019 to December 31, 2019 | $71m - $75m | $90m - $100m[74] |
| **Difference** | **≈ ($9 million)** | **≈ ($1 million)** |

44. Prof. Gompers concedes that the *approximately* -$9 million amount differs from the -$8.3 million *actual* Pre-Transaction 1Q 2019 Adjusted EBITDA amount that was subsequently disclosed on February 19, 2020.[75] He also concedes that using the "2019 Guidance Original"

71 Gompers Report, ¶ 62.
72 Dalrymple Report, ¶ 47 and Table 2.
73 Tivity Form 8-K filed August 7, 2019, Exhibit 99.2: Tivity Health – Q2 2019 Earnings Release Supplemental Material, p. 10.
74 Tivity Form 8-K filed August 7, 2019, Exhibit 99.2: Tivity Health – Q2 2019 Earnings Release Supplemental Material, p. 14.
75 Gompers Report, footnote 162. Prof. Gompers notes that "since the approximate number disclosed (an adjusted EBITDA loss of $9 million) was more negative than the more precise

figures would "lead to different numbers" (although he presents no calculation for what the "2019 Guidance Original" figures would reveal).[76] Nevertheless, Prof. Gompers seems to suggest there was no ambiguity based on his observation that "there is a note that the 2019 Guidance Original 'Nutrition revenues and adjusted EBITDA ranges are implied based on February 19, 2019 guidance,'" which was disclosed in February 2019 (before the end of the Pre-Transaction 1Q 2019 period).[77]

45. Prof. Gompers fails to note that all of this information was disclosed only as part of Tivity's "Supplemental Material" to its 8-K. Furthermore, the note to which Prof. Gompers refers is in the form of a double asterisk on page 10 of the Supplemental Material presentation for the line items "Nutrition Segment Revenues Stub Period (3/8 – 12/31)" and "Nutrition Segment Adjusted EBITDA Stub Period (3/8 – 12/31)" under the header "2019 Guidance Original" for the stub period between March 8, 2019 and December 31, 2019.[78] This is in contrast to the line item "Nutrition Segment Adjusted EBITDA (1/1 – 12/31)" under the header "2019 Guidance Original" for the full year 2019 on page 14 of the Supplemental Material presentation, which *does not* include a similar note.[79] Prof. Gompers does not acknowledge, nor does he explain, why that same note *does not* appear on the page with the purportedly disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA. Prof. Gompers also does not explain how "well-informed investors" would be able to understand the discrepancy between the "2019 Guidance Original" and the "2019 Guidance Updated" figures.

46. Indeed, I understand that earlier drafts of Tivity's 8-K for its Q2 2019 earnings release included tables in the body of the earnings release itself and would have provided comparatively

---

$8.3 million loss, if anything, Tivity's stock price on February 20, 2020 would be expected to react in a *positive* manner to the less negative precise adjusted EBITDA. However, for all the reasons discussed in this report and the Gompers Class Certification Report, I would not expect any reaction to the adjusted EBITDA disclosure of $8.3 million on February 20, 2020."

76 Gompers Report, ¶ 64.

77 Gompers Report, ¶ 64.

78 Tivity Form 8-K filed August 7, 2019, Exhibit 99.2: Tivity Health – Q2 2019 Earnings Release Supplemental Material, p. 10.

79 Tivity Form 8-K filed August 7, 2019, Exhibit 99.2: Tivity Health – Q2 2019 Earnings Release Supplemental Material, p. 14.

greater transparency to investors. For example, I understand Tivity prepared a draft 8-K that provided a side-by-side comparison of the guidance figures within the body of the 8-K just two days before Tivity's Q2 2019 Earnings Announcement:[80]

In conjunction with the updated guidance above, Tivity Health is also updating the Nutrition segment's financial guidance ~~originally~~ previously provided on February 19, 2019 ~~for the stand-alone Nutrition segment~~ for the entire calendar year 2019, as follows:

| | **Updated 2019 Guidance – March 8, 2019 through December 31, 2019 (per above)** | **Updated 2019 ~~Full Year Standalone Guidance - Updated~~Full Year Nutrition Guidance** | **~~2019 Full Year Standalone Guidance - Original~~Previous 2019 Full Year Nutrition Guidance** |
|---|---|---|---|
| Nutrition Segment Revenues | $502 million to $512 million | $635 million to $645 million | $682 million to $702 million |
| Nutrition Segment Adjusted EBITDA | $80 million to $84 million* | $72 million to $76 million | $90 million to $100 million |

*The updated 2019 adjusted EBITDA range for the March 8, 2019 through December 31, 2019 period is higher than the updated 2019 full year adjusted EBITDA range due to the seasonality of the nutrition segment's profits which are lower at the beginning of the year.

47. Rather than provide this comparison in its 8-K, however, Tivity ultimately included this information on separate pages toward the end of a "Supplemental Materials" section and corresponding appendix to its 8-K, as previously discussed.[81] Prof. Gompers does not consider this or, more generally, the context in which he contends that "Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by Tivity in its 2Q 2019 supplemental materials presentation."[82]

48. Prof. Gompers also asserts that "at least one of the analysts (Jefferies) referenced Nutrisystem's approximately Pre-Transaction 1Q 2019 Adjusted EBITDA from Tivity's August 7, 2019 disclosures" to support his assertion that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed and understood by market participants:[83]

---

80 Email from Adam Holland to Jay Butt and Ryan Wagers on August 5, 2019 and draft Tivity 2Q19 Earnings Release, TVTY_STROUGO0043232-50, at 40.

81 Tivity Form 8-K filed August 7, 2019, Exhibit 99.2: Tivity Health – Q2 2019 Earnings Release Supplemental Material, pp. 10, 14.

82 Gompers Report, ¶ 62.

83 Gompers Report, ¶ 64.

> [W]e note core Nutrition EBITDA has a $9mm EBITDA headwind due to timing of the NTRI close (recall this business lost money in the 2 months before the March '19 close). We don't think that has been fully appreciated by investors. The $9mm drag should be more than offset by an incremental $13mm of cost synergies.[84]

49. The headwind that Jefferies noted was not discussed by any of the other analysts, who instead echoed the company's statements that management was taking the necessary steps to improve the Nutrition segment.[85] Indeed, even the Jefferies analyst states that "[w]e don't think that has been fully appreciated by investors."[86] Moreover, Prof. Gompers ignores the evidence that at least one other analyst, Craig-Hallum, continued to expect Nutrisystem's Pre-Transaction 1Q 2019 EBITDA to be "roughly breakeven" even *after* the Q2 2019 Earnings Announcement:

> It's important to note that due to the NTRI acquisition (and debt financing) closing on March 3rd, EPS for FY19 is slightly inflated as January and February are roughly breakeven in EBITDA for Nutrisystem, with the bulk of profits occurring later in the quarter.[87]

50. This directly contradicts Prof. Gompers' position that Tivity had disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA loss in a way that market participants understood.[88] Prof. Gompers does not even address this analyst report;[89] he simply asserts that

---

[84] Jefferies, "4 Key Insights from TVTY's 2Q19," August 8, 2019, p. 1.

[85] Dalrymple Report, ¶ 49, citing Cantor Fitzgerald, "Nutrition Outlook Reduced, But Overall Outlook Positive for 2020; Overweight," August 7, 2019; Cantor Fitzgerald, "Looking Ahead to 2020; Shares Remain Inexpensive; Overweight," August 26, 2019; Chardan, "TVTY: Top-line Beat for 2Q19, Lowered FY19 Guidance., Reit Buy, PT to $24," August 23, 2019, p. 1; Craig-Hallum, "Q2 Results Mixed, Multiple Positive Developments Emerging To Drive Improved Earnings Results In 2020 And Beyond. Reiterate BUY Rating And $30 Price Target," August 8, 2019; SunTrust, "Update From The Road – Strategic Positioning Remains Intriguing, Execution Is Key," August 21, 2019.

[86] Jefferies, "4 Key Insights from TVTY's 2Q19," August 8, 2019, p. 1.

[87] Craig-Hallum, "Q2 Results Mixed, Multiple Positive Developments Emerging To Drive Improved Earnings Results In 2020 And Beyond. Reiterate BUY Rating And $30 Price Target," August 8, 2019, p. 2. Emphasis added.

[88] Notably, the remark that "January and February are roughly breakeven in EBITDA for Nutrisystem" is consistent with the approximately $1 million adjusted EBITDA loss based on the "2019 Guidance Original" figures in the Supplemental Material.

[89] *See also infra* footnote 92.

Nutrisystem's Pre-Transaction 1Q 2019 EBITDA was disclosed on August 7, 2019, while ignoring evidence to the contrary.[90]

51. Prof. Gompers then claims, because the same information was also repeated in a "Supplemental Material" presentation when Tivity released its 3Q 2019 earnings on November 12, 2019 with "only one set of guidance included", that "Mr. Dalrymple cannot try to argue that there were 'different implications for adjusted EBITDA in the period from January 1, 2019 to March 7, 2019' in this presentation like he does for the 2Q 2019 presentation."[91] He fails to recognize that the repeated information provided in the "Supplemental Material" presentation in 3Q 2019, without the "2019 Original Guidance" figures, does not clarify the ambiguity introduced in the prior "Supplemental Material" presentation.

52. Again, the evidence suggests that by repeating the same information without clarifying its prior disclosures, market participants continued to be misled, as evidenced by the same analyst (Craig-Hallum) who continued to remark, *after* the Q3 2019 Earnings Announcement, that

---

90 In an apparent attempt to explain away the evidence that not all analysts understood Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA, Prof. Gompers claims that "not all investors need to know or recognize a specific piece of information for the value impact of that information to be reflected in a company's stock price" and that "in an efficient market, well-informed investors compete to seek out profitable investment opportunities and, by quickly trading on these opportunities, ensure that prices reflect all publicly available information." Gompers Report, footnote 110. He fails to recognize that this means that prices also reflect all publicly available inaccurate information (in addition to accurate information). Thus, while one analyst may have perceived "a $9mm EBITDA headwind" (Jefferies), another analyst perceived that "January and February are roughly breakeven in EBITDA for Nutrisystem" (Craig-Hallum), as Tivity had presented information that could support either conclusion. In an efficient market, both views would be reflected in the share price, along with Defendants' other alleged misrepresentations. To the extent there was negative information revealed on August 7, 2019 that was not fully understood by all market participants due to the ambiguity of Tivity's financial disclosures, such information would be akin to an additional partial corrective disclosure, which would be additive to my inflation estimates. That I do not include the impact of such a partial corrective disclosure underscores why my inflation estimates are conservative. *See,* Dalrymple Report, ¶¶ 114-115.

91 Gompers Report, ¶ 66.

"January and February are roughly breakeven in EBITDA for Nutrisystem."[92] Once again, Prof. Gompers does not even address this analyst's comments, nor does he address other commentary suggesting that analysts did not fully understand the implications of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA loss with respect to expectations about Tivity's full year results and upcoming diet season.[93]

53. Furthermore, Prof. Gompers also ignores evidence that, by December 2019, "Tivity management had grown concerned that analysts' expectations about the Nutrition segment's 2019 performance were overstated."[94] As I explain in the Dalrymple Report, "Tommy Lewis, Tivity's head of investor relations, sent an email to Bob East at Westwicke, an investor relations consultancy, asking for assistance with 'coaching' analysts about their expectations" on December 11, 2019:[95]

> We could use your help in assisting us with coaching the sell-side analysts related to their Q120 modeling. When we closed the transaction on March 8, we were benefited by most of the diet season orders costs being absorbed in the financials prior to close. You may recall that acquisition costs are applied to the first order. That said, <u>our EBITDA for the stub period was more generous than would be the case for a full quarter. Our Q1 NTRI EBITDA was higher than a complete quarter would have been</u>. The other difference would be that NTRI added back stock-based comp and we don't so there are comparability differences that need to be considered. What's the right approach to get out in front of this? <u>I'd like to get those</u>

---

92 Craig-Hallum, "2019 Guidance Reiterated. Nutrition Innovations For Diet Season As Well As New Older American Offering Provide Strong Catalysts For 2020. Reiterate BUY Rating And $30 Price Target.," November 13, 2019, p. 2. Emphasis added.

93 Dalrymple Report, ¶ 53, citing Craig-Hallum, "2019 Guidance Reiterated. Nutrition Innovations For Diet Season As Well As New Older American Offering Provide Strong Catalysts For 2020. Reiterate BUY Rating And $30 Price Target.," November 13, 2019; Piper Jaffray, "3Q19 Better-Than-Feared," November 13, 2019; Jefferies, "4 Key Insights from TVTY's 3Q19," November 12, 2019; Barrington Research, "Q3 Results Mixed; Top Line Beats; Profitability Falls Short; Reducing PT to $38 from $40, but Upside Still Very Big," November 14, 2019; Cantor Fitzgerald, "3Q19 Review; EBITDA Was Light But Guidance Reaffirmed," November 12, 2019.

94 Dalrymple Report, ¶ 60.

95 Dalrymple Report, ¶¶ 60-61, citing Lewis Tr. 132:21-139:17.

Q1 and/or 2020 models adjusted sooner rather than later even though we won't issue guidance until the Q4 call.[96]

54. Mr. East replied, "No easy way to do this. Probably messaging at the [JP Morgan conference]."[97] As I discuss in the Dalrymple Report, I understand that Tivity did not provide messaging at the JP Morgan conference concerning the Nutrition segment.[98] As is the case for other evidence that Nutrisystem's "$9mm EBITDA headwind … [had not] been fully appreciated by investors," Prof. Gompers simply ignores this, relying instead on his *ex post* reading of selective excerpts from the supplemental materials in Tivity's 8-Ks.[99]

### 2) Prof. Gompers' assertion that internal projections from Tivity were consistent with its disclosed guidance does not support his conclusion that Tivity's guidance was not false or misleading

55. Prof. Gompers acknowledges that "[i]n addition to Plaintiff's contention that Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA, Plaintiff also alleges that '[a]s a result of the Nutrition segment's poor performance in 1Q19, Defendants knew that the Nutrition segment was not on track to meet the Company's FY19 adjusted EBITDA guidance, and Defendants had no reasonable basis, and did not in fact believe, that the Nutrition segment would achieve its projected guidance."[100] Prof. Gompers, however, categorically dismisses these allegations by asserting that Tivity's internal projections were generally consistent with its disclosed guidance.[101] For instance, Prof. Gompers asserts that "internal documents prior to and including Tivity's last earnings release during the Class Period–on November 12, 2019–

---

96 Lewis Tr. Exhibit 135. Emphasis added.
97 Lewis Tr. Exhibit 135.
98 Dalrymple Report, ¶ 60, citing Lewis Tr. 136:18-21; 137:23-138:2; draft internal JP Morgan presentation outlines (ICR_0002405 and TVTY_STROUGO0155749) with the line item "Message Q1 NTRI EBITDA – stub period" referenced as a topic to discuss in the presentation and Tivity JP Morgan Healthcare Conference Transcript dated January 15, 2020.
99 Jefferies, "4 Key Insights from TVTY's 2Q19," August 8, 2019, p. 1.
100 Gompers Report, ¶ 69.
101 Gompers Report, ¶¶ 69-72.

that included guidance are generally consistent with Tivity's disclosed guidance," suggesting that Tivity's disclosed guidance was not materially false and/or misleading.[102]

56. Here, Prof. Gompers fails to address Plaintiff's allegations by assuming away the alleged fraud based on his misconception that the allegations turn on the timeliness of Tivity's disclosures in relation to its internal projections. The relevant issue is not whether the Tivity's financial results and guidance were "timely" relative to its internal financial models, but whether information revealed through the corrective disclosures was within the zone of risk allegedly concealed through Defendants' alleged fraud, including Defendants' alleged misstatements about how the Nutrition segment was performing and was expected to perform.[103] I understand that Plaintiff intends to show, *inter alia*, that Tivity's guidance and related statements were false and/or misleading; whether the trier-of-fact agrees is therefore a finding that has yet to be made. Prof. Gompers' attempt to preempt such a finding based on his own conclusions (and on nothing more than a selective and incomplete review of the evidence) is irrelevant to my opinions.

57. Even if the trier-of-fact were to agree with Prof. Gompers with respect to purported consistencies between internal projections and guidance, the trier-of-fact could also find that the guidance was false and/or misleading (*e.g.*, that both the internal projections and external guidance were unsupported by Tivity's actual performance during the Class Period). Indeed, I understand Plaintiff intends to show that Defendants did not expect that Tivity's internal projections for the

---

[102] Gompers Report, ¶ 69. *See also*, Gompers Report, ¶ 46, asserting that I did not "reliably establish that any, let alone all, of the Nutrition segment financial information was anything other than timely disclosed, or link it to specific alleged misrepresentations earlier in the Class Period" and that I have failed to "acknowledge that FY 2019 guidance disclosed in connection with its quarterly earnings releases prior to the end of the Class Period–specifically, on May 8, 2019, August 7, 2019, and November 2019–was generally consistent with Tivity's contemporaneous internal forecasts." Prof. Gompers also claims that I "do[] not reliably demonstrate that any investor losses on December 9, 2019 or February 20, 2020 were caused by the alleged misrepresentations for the Nutrisystem Claim" Gompers Report, Section VI.B.3. In addition, he asserts that "[i]n the counterfactual scenario…the Assumed Misrepresentation would have been corrected by August 7, 2019, when Tivity disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA and reduced guidance for the Nutrition segment's FY 2019 adjusted EBITDA to an amount that was generally consistent with its contemporaneous internal projections" Gompers Report, ¶ 138.

[103] *See, e.g.*, Consolidated Complaint, ¶¶ 87-119, at 94, 110, and 112.

Nutrition segment were achievable. Prof. Gompers ignores Plaintiff's allegations and does not consider evidence from Tivity's internal communications that raises questions about the internal projections that Prof. Gompers takes at face value. For instance:

> [Y]esterday's end of day conversation was concerning to me amidst the reality that winning shareholder's confidence immediately will be very much correlated to how well NTRI delivers on the LTR forecast and <u>it appears from our dialogue yesterday meeting the 2019 revenue will not happen</u>. The important question now is: By how much will NTRI miss the $761mm number?[104]

> I agree albeit this may need an outside advisor to help us understand why if they can send men and women to the moon, <u>NTRI is unable to tender up some basic forecasts of numbers</u>.[105]

> In closing, if we do not address the above quickly and successfully, then you can bet your bottom dollar we will have outsiders tearing apart our thesis, strategy and acquisition rationale. **The time for action is now** – <u>we have gone from a LRF of $763mm to $735mm (acquisition forecast) to $685 – 700mm (Feb guidance) and now to $680mm and the message to me is clear</u>…[106]

> There has been a consistent miss in delivering on the budgeted numbers. This fact coupled with the in-depth analysis of last week, brings me to the conclusion that <u>the issues with the Nutrition Division extends far beyond not having the right "shining object" in the January diet season. We can no longer say to the outside market that this business does not have problems. Additionally, missing another edited guidance report will not bode well for any of us.</u> Keira pointed out last week that she knew in January this year would be a challenge and as such, <u>we should have entered into this year with a much lower number positioning ourselves to beat that number</u>.[107]

> Thank you and as shared, <u>it begs the question as to what else is going on in the business. The constant misses just do not align with the optimism you and others had for the business last December. …This continued downward trend is not good</u>

[104] Email from Donato Tramuto to Dawn Zier on January 26, 2019, TVTY_STROUGO0081293-95, at 94. Emphasis added.

[105] Email from Adam Holland to Donato Tramuto and Tommy Lewis on June 2, 2019, TVTY_STROUGO0075631-34, at 31. Emphasis added.

[106] Email from Donato Tramuto to Dawn Zier and Adam Holland on June 5, 2019, TVTY_STROUGO0151662-64, at 62. Emphasis in original (bold) and added (underline).

[107] Email from Donato Tramuto to Dawn Zier on July 17, 2019, TVTY_STROUGO0330828-79, at 28-29. Emphasis added.

> and seems to tell me there is more issues with the business than a bad diet season. As an FYI, would expect the Board to probe deep into why have we not seen some form of a recovery.[108]

> Per our discussion this morning, I created the attached workbook that compares the final NTRI November 2018 LRF to our latest TVTY September 2019 LRF. As a reminder, the November 2018 LRF is what was first delivered to the TVTY management team by Dawn and Mike and later published in TVTY's January 2019 Form S-4 (and is generally considered by the Street the starting point for our purchase price of the company). I focus the analysis **on fiscal 2019 old vs. new** [forecast] to highlight the changes over the last 9 months: • 2019 revenue down $127 million: • New Customer Revenue down $89 million: • New customers down from 473k to 381k, or 20% • Revenue per new customer slightly down • Reactivation Revenue down $24 million: • Reactivated customers down from 292k to 257k, or 12% • Revenue per reactivated customer up 3% • QVC Revenue down $3 million • Retail Revenue down $12 million • 2019 gross profit down $72 million: • Gross profit margin down 50 bps from November model • 2019 marketing expenses lower in dollars by $16 million but 327 bps higher as % of revenue • First Time Order Customer Acquisition Costs up from $411 to $471, or 14 higher • 2019 EBITDA was **originally estimated to be $110 million** (on a full year basis and is now estimated to be (adjusted for transaction costs) **$69 million** - so a $41 million miss or 37%.[109]

> We have been "asked for" about $12m in [E]BITDA [because] they never guided the street down from a very high ebitda despite multiple communications from me – two face to face – that would tell you where we are. There is no possible way to get an extra $12m. And it's my belief they have to come off that ebitda number publicly. … Do I email firmly today to Donato and Adam laying out the issues [with] their approach and their process (why didn't they do this exercise a month ago…answer…I was told not to submit a budget [because] they knew it was lower than they hoped and didn't want to affect the [United Healthcare] deal valuation.). Now everything is last minute, a mess, and just not possible.[110]

58. Similarly, Prof. Gompers fails to consider evidence that Tivity's management had questioned Ms. Zier's "integrity and openness" with respect to her guidance around the Nutrition

---

[108] Email from Donato Tramuto to various recipients on September 3, 2019, TVTY_STROUGO0216744-51 at 46 and 47-48. Emphasis added.

[109] Email from Adam Holland to Donato Tramuto on September 4, 2019, TVTY_STROUGO0075442-43. Emphasis in original (bold) and added (underline).

[110] Email from Keira Krausz to Brad Thomas on February 1, 2020, TTY_STROUGO0083249-52, at 49. Emphasis added.

segment's performance, which I understand Plaintiff alleges was fraudulently concealed from investors.[111] This further undermines Prof. Gompers' superficial reasoning that Tivity's guidance was not false and/or misleading simply because it aligned with the company's internal forecasts.

59. Prof. Gompers provides no independent analysis in support of his position that Tivity's internal forecasts invalidate Plaintiff's claims that the Nutrition segment guidance was false and/or misleading. Nor does he apply any level of skepticism to the internal forecasts on which he relies or investigate related materials that provide context which might contradict his findings. As a result, his categorical dismissal of this aspect of the Nutrisystem Claim, which I understand is before the trier-of-fact, is unsupportable.

#### 3) Prof. Gompers fails to recognize that executive departures were within the zone of risk concealed by Defendants' alleged fraud

60. Prof. Gompers asserts that I "fail[] to reliably establish that the stock price reaction to" departures of Ms. Zier, Mr. Tramuto, and Ms. Krausz "reflects anything but the materialization of a disclosed risk" and that I do not link the departures to the alleged misrepresentations and do not reliably establish that the departures "would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been as publicly represented)."[112]

61. Prof. Gompers contends that the risk of executive departures when companies are acquired or merged has been previously disclosed in Tivity's public filings. For example, he cites generalized risk disclosures from Tivity's 2018 10-K filed on February 26, 2019, prior to the Class Period:

> [W]e cannot provide assurances that our and Nutrisystem's businesses can be integrated successfully. It is possible that the integration process **could result in the loss of key employees**, the disruption of either company's, or both companies' ongoing businesses or in unexpected integration issues, higher than expected

---

[111] *Infra* Section II(B)(3).
[112] Gompers Report, ¶¶ 79 and 103.

> integration costs and an overall post-completion integration process that takes longer than originally expected.[113]

62. Again, Prof. Gompers ignores Plaintiff's allegations and theory of liability.[114] Generalized statements such as management "*cannot provide assurances* that [Nutrisystem] can be integrated successfully" do not reveal to investors that Nutrisystem was not being integrated successfully and that the integration could not have been expected to succeed.[115] Nor do such statements reveal the reasons for the executive departures, which the evidence suggests were driven by poor performance in the Nutrition segment and failures to successfully integrate the Nutrisystem business.[116] For instance, Prof. Gompers ignores evidence that Tivity's management had questioned Ms. Zier's "integrity and openness" with respect to her guidance around the Nutrition segment's performance:[117]

> Dawn finally confirmed what Keira shared with me the day prior. Namely, the 5+7 forecast will most likely have NTRI at around $672mm (this could possibly fall as low as $660mm) and not at the low end of the guidance of $685mm. Needless to say, this is disappointing on multiple levels. First, she has been touting a strong March leading all of us to believe (internally and externally) that NTRI had turned the corner and secondly, it seems each time we try to get a forecast number out of her she tends to hide behind the notion "it's not easy to forecast because we don't know whether the new tv campaign will generate starts". Last but not least, it's difficult for any of us to believe she understands the serious impact this will have in the market place.[118]

---

[113] Gompers Report, ¶ 80. Emphasis in original. *See also*, Tivity Form 10-K for period ending December 31, 2018.

[114] As I note in the Dalrymple Report, my inflation estimates "are additive and separable with respect to the Zier Termination and the remainder of the Nutrisystem Claim, and separable but not additive with respect to the Nutrisystem Claim and Goodwill Claim, such that the impacts of each corrective disclosure may be considered jointly or individually at any time during the Class Period." *See* Dalrymple Report, ¶ 121.

[115] Gompers Report, ¶ 80 citing Tivity 2018 10-K, p. 14. Emphasis added. *See also, e.g.*, Consolidated Complaint, ¶¶ 87-94.

[116] *See, e.g.*, Dalrymple Report, ¶¶ 86-89, 97-98, and 101-104.

[117] Email from Donato Tramuto to Amy Saddington and Kevin Wills (and others) on June 11, 2019, TVTY_STROUGO0136054-55, at 54.

[118] Email from Donato Tramuto to Kevin G. Wills and Robert J. Greczyn on June 7, 2019, TVTY_STROUGO0010384-86, at 85. Emphasis added.

[Dawn] was not immediately transparent about the downturn in the Nutrisystem numbers; creating some question among references about her integrity and openness.[119]

You should keep in mind the following[:]

- issued long range forecast to TVTY in December with revenue projections of $761mm
- January of 2019 – held back for many weeks the reality the $761mm would not be achieved. Provided feedback we are not a "blame culture" and one that supports leadership to navigate through the challenges
- Feb 2019 – finally presented a revised [] guidance of $685-700mm. TVTY finance team cautiously accepted the numbers with the caveat they did not believe they would be achieved
- In April and as we were approaching the May 1st quarter earnings call, there was a feeling that Dawn was using the unusual good month of March to forecast the year while her current CFO Mike Monahan was pushing back. She snapped at him several times in preparation for the earnings call – this observed behavior was not viewed positively by the TVTY finance team
- June and as we suspected, the guidance for the year is now below the February numbers and the trust of Dawn from the TVTY finance team has deteriorated
- I have provided the feedback to [D]awn of the need for greater transparency and to be upfront and to get ahead of her numbers. She continues to argue that her business is based on daily information. I continue to challenge this premise.[120]

There appears to be consistency around avoidance of sharing tough information and/or flying under the radar screen (i.e: LRF, January diet season, 2018 miss was related to not changing the marketing strategy; unable to predict or forecast the business)[121]

As you peruse the report, you will quickly see the HealthCare Division is executing flawlessly on what was presented to the Board last month a key reason why we have been able to deliver on our quarterly numbers. As you scroll down – you will see the Nutrition Division update and to the surprise of many of us is how much they missed the May budgeted numbers ($7 million or 10%). As you recall from the Board Meeting, the messaging from Keira and Dawn was "Month of May will

---

119 Email from Donato Tramuto to Amy Saddington and Kevin Wills (and others) on June 11, 2019, TVTY_STROUGO0136054-55, at 54. Emphasis added.

120 *Id*. Emphasis added.

121 Email from Donato Tramuto to Kevin Wills on June 16, 2019, TVTY_STROUGO0321523-24, at 23. Emphasis added.

> be slightly off" – From my perspective, 10% is not a small miss…There appears to be consistency around avoidance of sharing tough information and/or flying under the radar screen (i.e: LRF, January diet season, 2018 miss was related to not changing the marketing strategy; unable to predict or forecast the business).[122]
>
> Interesting in that the[y] are landing at the revenue level called out by me during the June 5th Keira meeting – why they just did not come clean at that point of time i[s] mindboggling.[123]
>
> My tummy read tells me Dawn recognizes she has [sic] was over zealous in her representation of both the LRF and the 2019 Feb guidance approach and has created a credibility factor for her across the company. She will not tell anyone this albeit you have to be in her company to observe how nervous she gets when we approach the LRF and her leadership specific to the 2019 numbers she tendered up to us in late February prior to the March 8th close. …The business continues to decline which confirms for me there are more issues than just leadership challenges. The trust between Dawn (i.e.: Mary, Adam, Tommy, Steve and others) and other executives is at an all time low …[124]
>
> The problem with the Nutrition Business is Dawn's hope became her facts and the trust in her forward thinking assessment of the business is subject to scrutiny given the experience of the last 7 months.[125]

63. Prof. Gompers ignores this evidence, which I understand Plaintiff alleges was fraudulently concealed. Instead, he points to "academic literature [that] has documented that stock prices react to the announcement of the departure of an executive," claiming that I have "not reliably demonstrated that Tivity's stock price would have reacted differently to Ms. Zier's

[122] Email from Donato Tramuto to Kevin Wills and Bob Greczyn on June 16, 2019, TVTY_STROUGO0321523-24, at 23. Emphasis added.

[123] Email from Donato Tramuto to Adam Holland on June 21, 2019, TVTY-STROUGO0087786-87, at 86, responding to a prior email from Ms. Zier who provided new estimates for the Nutrition segment ("Here is the estimate which includes Jan through May actuals, June month to date and the rest of the year forecasted off Q2 trends rather than the March rebound which we had expected would hold. The reforecast is a range of $655M-$660M in revenue and $83M-$85M in ebitda including NCC." Email from Donato Tramuto to Adam Holland on June 21, 2019, TVTY-STROUGO0087786-87, at 87.) Emphasis added.

[124] Email from Donato Tramuto to various recipients on September 3, 2019, TVTY_STROUGO0216744-51, at 45 and 46.

[125] Email from Donato Tramuto to Adam Holland on September 9, 2019, TVTY_STROUGO0078108-12, at 10.

departure had Tivity's prior public disclosures been what Plaintiff alleges should have been disclosed."[126] Again, Prof. Gompers misconstrues Plaintiff's allegations that information revealed about the Nutrition segment's performance through Ms. Zier's departure was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme.[127]

64. As I explain in the Dalrymple Report, "Ms. Zier's departure, without warning and without Tivity having communicated a plan for her succession to investors, adversely affected investors' confidence in Tivity's ability to stabilize and improve the Nutrition segment, especially in light of Ms. Zier's critical role in the Nutrition segment (which Tivity had previously assured investors was an asset)."[128] I also explain in the Dalrymple Report that securities analysts raised concerns about the cause of Ms. Zier's termination and its implications for the Nutrition segment.[129] For instance:

> We suspect the poor performance lead [*sic*] to the departure of former Nutrisystem CEO, Dawn Zier in December 2019.[130]
>
> [W]here there's smoke there's fire. As CEO of NTRI, Dawn Zier inherited a business in decline and turned it around, driving sales at a 14% CAGR from 2013-2018. Her termination on 12/4/19, three weeks before diet season, was the smoke.[131]

65. Internally, Tivity also understood that the negative share price reaction following Ms. Zier's termination was due to investors' perception that "[t]his must be related to an upcoming bad diet season" in light of the abrupt departure.[132] For instance, as Mr. Tramuto noted to Tivity

---

[126] Gompers Report, ¶ 81. *See also*, Gompers Report, ¶¶ 47 and 84. ("Mr. Dalrymple does not reliably establish that Ms. Zier's resignation would not have occurred in the absence of the alleged misrepresentations (i.e., if the truth had been as publicly represented).") Again, this is a strawman argument that is disjoined from Plaintiff's allegations.
[127] Dalrymple Report, ¶ 98.
[128] Dalrymple Report, ¶ 87, citing Cantor Fitzgerald, "Dawn Zier Departure is Surprising; Reiterate Overweight," December 9, 2019. *See also,* Dalrymple Report, ¶¶ 55-62 and 86-89.
[129] Dalrymple Report, ¶¶ 56-57.
[130] Cantor Fitzgerald, "Increasing Confidence for Nutrition Segment," January 21, 2020, p. 1.
[131] Piper Sandler, "Downgrading to Neutral," January 27, 2020, p. 1.
[132] Dalrymple Report, footnote 145.

management, investors were concerned that Ms. Zier's departure portended "an upcoming bad diet season":

> As you have observed, the stock has been reacting to DZ announcement. Two themes:
> 1. <u>This must be related to an upcoming bad diet season</u>.
> 2. <u>Why did you not wait until after the diet season to transition her out / it seems very abrupt</u>
> We have managed both of the above albeit they continue to go back to concern number 1.[133]
>
> <u>Mindful of the market jitters specific to DZ transition must mean a bad diet season is approaching</u>, my recommendation was to issue a PR this morning reinforcing our commitment to executing on the OE strategy.[134]

66. Ignoring my analysis in the Dalrymple Report, Prof. Gompers erroneously asserts that I have failed to provide support that "Ms. Zier's departure raised the perceived likelihood that the upcoming diet season would be a failure and adversely affect the prospects of the Nutrition segment."[135] Furthermore, he presents no alternative cause for the share price decline on December 9, 2019.[136] Instead, he resorts to his flawed and incomplete interpretation of Plaintiff's allegations, claiming that the *upcoming* diet season in 2020 could not have possibly corrected

---

[133] Tramuto Tr. 233:21-235:4 and Exhibit 446.

[134] Email from Donato Tramuto to Kevin Wills on December 10, 2019, TVTY_STROUGO0136332. Emphasis added.

[135] Gompers Report, ¶ 82.

[136] Prof. Gompers contends that I assert "without support that 'Ms Zier's departure raised the perceived likelihood that the upcoming diet season would be a failure and adversely affect the prospects of the Nutrition segment'" and that "[e]ven if it were true" that "at least some analyst commentary suggests otherwise." *See* Gompers Report, ¶ 82 and footnote 148. However, Prof. Gompers, who has relied on my event study and my estimation of the residual returns on the alleged corrective disclosure dates, is unable to cite to any other information disclosed on December 9, 2019 other than Ms. Zier's termination and the associated implications of a bad upcoming diet season that would have caused Tivity's share price to decline. While Prof. Gompers also asserts that some analyst commentary suggests otherwise, he still does not address why Tivity's share price would have declined in an efficient market if not for the negative implications to the Nutrition segment. *See* Gompers Report, ¶ 82. I note that I discuss the securities analyst reports to which Prof. Gompers cites in the Dalrymple Report. *See* Gompers Report, footnote 148 and Dalrymple Report, ¶ 56 and footnote 146.

alleged misrepresentations about performance during the *previous* diet season in 2019–based on "what [he] understand[s] is the subject of the Nutrisystem Claim."[137] Prof. Gompers states that "Ms. Zier's termination did not reveal the extent of the Nutrition segment's underperformance in 2019," which he interprets to relate only to Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA; therefore, according to his flawed logic, I do "not link the news about Ms. Zier's resignation to the alleged misrepresentations."[138] As previously discussed, this assertion is based on Prof. Gompers' flawed and incomplete interpretation of Plaintiff's allegations and mischaracterization of the Nutrisystem Claim.[139]

67. As I also explain in the Dalrymple Report, securities analysts linked the terminations of Mr. Tramuto and Ms. Krausz following the February 2020 Disclosure directly to the underperformance of the Nutrition segment.[140] Furthermore, "[t]he view that the failures related to the Nutrisystem acquisition caused Mr. Tramuto's termination was also shared internally at Tivity," as reflected in Tivity's internal correspondence, notes from calls, and emails with investors and securities analysts following the February 2020 Disclosure.[141] I also note in the Dalrymple Report that Mr. Tramuto's eventual departure from the company may have been anticipated and, regardless, that the evidence suggests the announcement of the executive

---

137 Gompers Report, ¶ 82. Emphasis in original.

138 Gompers Report, ¶ 82. Emphasis removed. Similarly, Prof. Gompers states that "none of the stock price decline on December 9, 2019 could be caused by the alleged misrepresentation regarding Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA in an efficient market." Gompers Report, ¶ 83. This reasoning is similarly flawed since it rests on a mischaracterization of the Nutrisystem Claim.

139 *Supra* Section II(B)(1). Prof. Gompers claims Mr. Dalrymple "*admits* that 'Ms. Zier's termination did not reveal the extent of the Nutrition segment's underperformance in 2019 [which I understand is the subject of alleged misrepresentations for the Nutrisystem Claim] and going into the 2020 diet season, [but] provided investors some indication that the Nutrition segment was underperforming, which translated to an increased risk associated with the stock.'" Gompers Report, ¶ 82. Emphasis added. This is not an *admission* but a statement of my findings. Prof. Gompers falsely states that I "assert[] without support" even though I clearly present evidence from securities analysts and internal documents that support my findings. *See, e.g.*, Dalrymple Report, ¶¶ 55-62 and 86-89.

140 Dalrymple Report, ¶ 101.

141 Dalrymple Report, ¶ 102, citing Lewis Tr. Exhibit 136; 143:6-144:3 and email from Tommy Lewis to Bob Greczyn (and others) on February 20, 2020 (TVTY_STROUGO0000150-155).

leadership changes following the February 2020 Disclosure "did not materially affect the company's share price in any way that was unrelated to the alleged corrective information in the February 2020 Disclosure (*i.e.,* I did not find evidence of confounding information unrelated to the alleged fraud)."[142]

68. Prof. Gompers does not directly dispute my findings with respect to the evidence surrounding the terminations of Mr. Tramuto and Ms. Krausz. Rather, he retreats to the same flawed logic that I "fail[] to reliably establish that the stock price reaction to departures of Mr. Tramuto and Ms. Krausz reflects anything but the materialization of a disclosed risk" and that I do "not link the departures to the alleged misrepresentations and [do] not reliably establish that the departures would not have occurred in the absence of the alleged misrepresentations (*i.e.*, if the truth had been publicly represented)."[143] Once again, Prof. Gompers does not address evidence that ties the executive departures to Defendants' alleged fraud, and instead improperly attributes any share price impact to the materialization of a previously disclosed risk, ignoring Plaintiff's allegations and the analysis set forth in the Dalrymple Report.[144]

#### 4) Prof. Gompers' assertions that I do not account for potential negative confounding information and the materialization of previously disclosed risks are inapt

69. In the Dalrymple Report, I explain that four of the five factors to which the share price decline following the February 2020 Disclosure was attributed are *causally* connected to the alleged fraud alleged by Plaintiff.[145] I also explain why the fifth factor, "the unexpected EBITDA margin compression of approximately 190 basis points for the Healthcare segment in FY20 is negative confounding information" (unrelated to the alleged scheme in this matter) and remove the impact of this factor on Tivity's share price decline for the purpose of estimating inflation.[146]

---

[142] Dalrymple Report, ¶ 104 and footnotes 225-226.
[143] Gompers Report, ¶ 103.
[144] *See also infra* Section II(B)(4), explaining why the generalized risk disclosures on which Prof. Gompers relies are of no relevance to estimating inflation under Plaintiff's theory of liability.
[145] Dalrymple Report, ¶¶ 99-104.
[146] Dalrymple Report, ¶¶ 105-106 and Appendix C.

70. Prof. Gompers does not dispute my finding that negative information concerning the Healthcare segment margin compression was confounding information, nor does he raise any disagreement with my computations to disaggregate the impact of this confounding information from the share price reaction on February 20, 2020.[147] He does, however, contend that I do not account for "other potential negative confounding information (*e.g.*, the Nutrition segment's 4Q 2019 performance and FY 2020 guidance and executive departures … )," which he asserts "renders [my] analysis flawed and unreliable."[148] In addition, Prof. Gompers contends that the "materialization of risks previously known to the market … and other timely disclosures" also represent confounding information, which he claims that I do not remove from my inflation estimates,[149] citing to risk disclosures in Tivity's SEC filings and analyst reports.[150]

71. As previously discussed, Prof. Gompers' opinions are based on a flawed and incomplete interpretation of Plaintiff's allegations.[151] Prof. Gompers improperly dismisses Plaintiff's allegations, such as those concerning Tivity's allegedly misleading financial guidance, and thus considers any actual or projected financial metrics after the Nutrisystem acquisition (*e.g.*, the Nutrition segment's 4Q 2019 performance and FY 2020 guidance) to constitute confounding information unrelated to the alleged fraud in this matter. He also ignores evidence and Plaintiff's allegations that the executive departures that corresponded to the corrective disclosures were within the zone of risk concealed by Defendants' alleged misrepresentations and scheme. Prof.

---

[147] Gompers Report, ¶ 106. Prof. Gompers "[agrees] that the information for the Healthcare segment was confounding and the value impact of that information needs to be disaggregated from other information."

[148] Gompers Report, ¶ 106.

[149] Gompers Report, ¶ 44.

[150] Gompers Report, Section VI.B.3(c)(2). For example, Prof. Gompers cites to generalized risk disclosures that Tivity "cannot provide assurances that [its] and Nutrisystem's businesses can be integrated successfully" or that "[m]any risks and uncertainties could affect actual results and cause them to vary materially from the forward-looking statements." Gompers Report, ¶¶ 97-98. He also cites to generalized risk disclosures in analyst reports, such as Cantor Fitzgerald's statements that "[t]he shares' valuation could be negatively affected if the company does not integrate Nutrisystem on a timely basis and/or does not achieve our cost savings estimates." Gompers Report, ¶ 99, citing to Cantor Fitzgerald, "Nutrisystem Off to a Good Start; Increasing Estimates and Price Target; Overweight," May 8, 2019.

[151] *See, e.g.*, *supra* Sections II(B)(1) and II(B)(2).

Gompers' assertion that these revelations constitute confounding information is based exclusively on his mischaracterization of Plaintiff's claims.

72. With respect to information that Prof. Gompers purports to be timely or the materialization of previously disclosed risks, this information is not confounding based on Plaintiff's allegations. As previously discussed, Plaintiff alleges that this information was within the zone of risk concealed by Defendants' alleged fraud.[152] Prof. Gompers does not explain how generalized risk disclosures revealed the information allegedly concealed by Defendants such as, for example, that the Nutrition segment was not "on track" to meet its disclosed guidance during the Class Period.[153] Prof. Gompers' characterization of information that fell within the zone of risk concealed by Defendants' alleged fraud as "confounding" ignores Plaintiff's theory of liability and is another example of Prof. Gompers' attempt to preempt findings of fact by assuming away the alleged fraud.

73. Prof. Gompers also fails to consider Plaintiff's allegations that the risks he references had already materialized but were allegedly concealed by Defendants. For example, Tivity's previous risk disclosures do not reveal that "Nutrisystem had incurred a massive $8.3 million in *losses* during the pre-merger weeks of 1Q19, resulting in adjusted EBITDA of just $5 million for 1Q19, or 62% *lower* than the results reported by Defendants."[154] Nor do they reveal, as Plaintiff alleges, that "Defendants had no reasonable basis, and did not in fact believe, that the Nutrition segment would achieve its projected guidance."[155] Under Prof. Gompers' reasoning, virtually any investor losses attributable to a corrective disclosure revealing the truth about previous false statements could be described as the "materialization of a previously disclosed risk," so long as the false statements regarding expected performance were accompanied by a generalized disclosure of risk. Prof. Gompers provides no support for such reasoning.

74. Rather than directly address my economic opinions, Prof. Gompers relies on mischaracterizations of Plaintiff's allegations and his own assertions that information Plaintiff

---

152 *See supra* Section II(A)(1).
153 Gompers Report, ¶¶ 97-98.
154 Consolidated Complaint, ¶ 9.
155 Consolidated Complaint, ¶ 9.

alleges was concealed had been disclosed based on a limited and selective review of the record. Again, Prof. Gompers' purported critiques are irrelevant to my opinions.

**5) Prof. Gompers' contention that the Nutrisystem and Goodwill Claims are mutually exclusive and cannot cause the same loss is inapt**

75. Prof. Gompers asserts that "[he understands that], according to Plaintiff, the goodwill and trademark impairment charges revealed the relevant truth regarding the alleged misrepresentations for the Goodwill Claim, not the Nutrisystem Claim."[156] Prof. Gompers also claims that I have failed to disentangle the stock price decline on February 20, 2020 attributable to the Nutrisystem Claim compared to the Goodwill Claim.[157] As previously discussed, Prof. Gompers' assertion that the loss caused by Defendants' alleged fraud must be allocated to alleged fraudulent actions within the Nutrisystem and Goodwill Claims is flawed and illogical.[158]

76. As an initial matter, Prof. Gompers ignores the distinction I make between the claims with respect to the December 2019 Disclosure. As I explain in the Dalrymple Report, "inflation removed through the December 2019 Disclosure, when Ms. Zier's termination was announced, has limited economic correspondence to allegations that Defendants failed to impair the goodwill and Nutrisystem trade name," such that my inflation estimates for the Goodwill Claim are not derived from the December 2019 Disclosure.[159] Thus, Prof. Gompers' assertion that I "perform[] no analysis to disentangle any price effect attributable to the alleged misrepresentations for the Nutrisystem Claim from those for the Goodwill Claim" is simply wrong.[160]

77. With respect to the February 2020 Disclosure, as previously discussed, Prof. Gompers fails to recognize the economic substance behind the Nutrisystem Claim and the Goodwill Claim–

---

156 Gompers Report, ¶ 101.

157 Gompers Report, ¶¶ 117-118. Prof. Gompers asserts that "[i]nstead of linking the price decline or a portion of the price decline to alleged misrepresentations for the Nutrisystem Claim, or the Goodwill Claim, [Mr. Dalrymple] assumes that the *same* loss was caused by both the alleged misrepresentations for the Nutrisystem Claim and the Goodwill Claim."

158 *Supra* Section II(A)(2).

159 Dalrymple Report, ¶ 110.

160 Gompers Report, ¶ 117.

both claims relate to Tivity's alleged scheme and false and/or misleading statements and omissions regarding the acquisition, integration and performance of Nutrisystem.[161] Prof. Gompers's assertion that losses from the claims are mutually exclusive is simply wrong and has no basis in economics.[162]

78. Moreover, as I explain in the Dalrymple Report, "I understand that *Defendants* have characterized Plaintiff's claim as separate theories of liability related to a Nutrisystem Claim and a Goodwill Claim" and that "*Plaintiff disputes this characterization*."[163] This further undermines Prof. Gompers' assertion that both claims cannot cause the same loss, which he asserts "is illogical from an economic perspective."[164] Contrary to Prof. Gompers' conjecture, there is no economic reason why, under Plaintiff's theory of liability, information revealed through the February 2020 Disclosure could not have been within the zone of risk concealed through Defendants' alleged fraud with respect to both the Nutrisystem and the Goodwill Claims.

79. Rather than rely on economic principles, Prof. Gompers grounds his opinions in mischaracterizations of Plaintiff's claims. He purports to "understand the Nutrisystem Claim is

---

161 *Supra* Section II(A)(2).

162 I understand there is evidence that Tivity management also viewed the reduced guidance and impairment charges to have the same economic substance. *See e.g.*, Deposition Transcript of Lee Shapiro dated December 21, 2022 ("Shapiro Tr."), at 107:13-15 and 109:16-110:20, citing to a voicemail on July 31, 2019 from Mr. Shapiro to Mr. Holland, suggesting an impairment charge if Tivity would be reducing guidance. ("Adam, Hi, Lee Shapiro. Just finished speaking to Blake Stinnette. And there was no new news to report. We talked a little bit about the change with regard to customer risk. And he and I had a discussion with regard to goodwill impairment. And the real question in my mind, as well as his, is what are -- are we going to learn between now and next quarter with regard to this business that would tell us that that is a better time to write down goodwill than today. And if we are taking down guidance, which I know we're going to discuss tomorrow and I want to pressure-test with you, then my sense is, is that if we're taking down guidance, we might as well take all our lumps now as opposed to taking some lumps now, taking down guidance, and in the next quarter we open the wound again, and we end up writing down the value of the transaction. And that's just going to be another sore spot for investors. So I would recommend that you really review that in terms of getting our quarterly results in place. And I -- I suspect the SEC has strong feelings about that, so feel free to give me a call. I'm jumping on a call here with Jaime and LBMC shortly. Thanks.") Emphasis added. *See also*, Shapiro Deposition Exhibits 158 an 158A.

163 Dalrymple Report, footnote 6. Emphasis added.

164 Gompers Report, ¶ 118.

centered around the disclosure of past financial performance (specifically, the Pre-Transaction 1Q 2019 Adjusted EBITDA) and allegedly misleading FY2019 financial guidance for the Nutrition segment … whereas [he understands] the Goodwill Claim is driven by 'a reduction in the Company's long-term forecast for the Nutrition segment.'"[165] Setting aside the limitations of Prof. Gompers' characterizations of the claims,[166] he attempts to distinguish "past financial performance … and allegedly misleading FY 2019 financial guidance"[167] (which he associates with the Nutrisystem Claim) from "a reduction in the Company's long-term forecast for the Nutrition segment" (which he associates with the Goodwill Claim).[168] As previously discussed, this distinction is inappropriate.[169] By claiming that the two claims cannot cause the same loss, Prof. Gompers appears to suggest that, for instance, Tivity could have counterfactually announced an impairment charge due to "a reduction in the Company's long-term forecast for the Nutrition

---

165 Gompers Report, ¶ 118. He also incorrectly asserts that "according to *Plaintiff*, the goodwill and trademark impairment charges revealed the relevant truth regarding the alleged misrepresentations for the Goodwill Claim, not the Nutrisystem Claim." *See* Gompers Report, ¶ 101. Emphasis added.

166 *See* Gompers Class Certification Report, ¶¶ 17-18 and Gompers Report, ¶ 8-15, stating his understanding of the Nutrisystem Claim and the Goodwill Claim. Prof. Gompers' understanding of the Nutrisystem Claim appears to have evolved from "Nutrisystem's performance in the beginning of 2019 and the acquisition's impact on Tivity's new 'nutrition segment'" (Gompers Class Certification Report, ¶ 17) to a claim that he now categorizes to be "centered around Nutrisystem's performance between January 1, 2019 and March 7, 2019… and specifically include the lack of a disclosure of Nutrisystem's adjusted EBITDA during that period… and allegedly misleading FY 2019 financial guidance for the Nutrition segment" (Gompers Report, ¶ 8).

167 Gompers Report, ¶ 118.

168 Gompers Report, ¶ 118 quoting Tivity Form 8-K, filed on February 19, 2020, Ex. 99.1, p. 2.

169 *Supra* Section II(A)(2). Prof. Gompers also asserts that "securities analysts generally did not emphasize the impairment in reports following the alleged corrective disclosure on February 19, 2020 and attributed the decline to other financial metrics besides the impairment announcement." Gompers Report, footnote 206. Prof. Gompers provides no explanation as to how this observation is relevant to his conclusions or mine. Regardless, Prof. Gompers' observation only underscores that the economic substance underlying the Nutrisystem and Goodwill Claims is the same (*e.g.*, the substantial reduction in guidance for the Nutrition segment is what drove the reduction in the Company's long-term forecast resulting in the impairment charges).

segment" without also contemporaneously lowering "financial guidance for the Nutrition segment."[170] Such an assertion is illogical and unsupported in the Gompers Report.

### C. Prof. Gompers' critiques of my analysis of the Goodwill Claim ignore Plaintiff's allegations and evidence in the case

80. According to Prof. Gompers, I "ha[ve] not reliably demonstrated that any losses were caused by the alleged misrepresentations for the Goodwill Claim."[171] Specifically, he asserts that I have "performed no analysis to: (1) support that the impairment charge could have been or should have been announced prior to the February 2020 Disclosure; (2) establish what information, if any, about the impairment was not disclosed in a timely manner; (3) isolate the price effect of any news that was not timely disclosed; (4) establish that the 'impairment triggers' were not already publicly available prior to the February 2020 Disclosure; and (5) account for prior market knowledge of risks associated with the Transaction."[172]

81. Prof. Gompers' assertions that I have not "reliably demonstrated" and that I have "performed no analysis" ignore my analysis in the Dalrymple Report and, in addition, are premised on mischaracterizations of Plaintiff's allegations. Prof. Gompers' limited and selective review of Tivity's internal projections in comparison with its disclosed guidance, including his assertion that PwC did not "deem management's position unreasonable," does not support his conclusion that the impairment charge could not or should not have been announced prior to the February 2020 Disclosure.[173] Moreover, he performs no independent analysis that would allow him to opine that Tivity's impairment charges were not untimely.

---

[170] *See* Gompers Report, ¶ 118, noting his understanding that "the Nutrisystem Claim is centered around the disclosure of past financial performance (specifically, the Pre-Transaction 1Q 2019 Adjusted EBITDA for the Nutrition segment) and allegedly misleading FY 2019 financial guidance for the Nutrition segment) ... whereas [he understands] the Goodwill Claim is driven by 'a reduction in the Company's long-term forecast for the Nutrition segment.'"

[171] Gompers Report, Section VI.C.

[172] Gompers Report, ¶ 107. *See also*, Gompers Report, ¶¶ 108-116.

[173] Gompers Report, ¶¶ 11 and 108.

82. Similar to his approach to the Nutrisystem Claim, Prof. Gompers effectively assumes away the alleged fraud in relation to the Goodwill Claim, sidestepping Plaintiff's allegations while attempting to preempt what I understand to be issues before the trier-of-fact. Thus, Prof. Gompers' purported critiques are not only premised on flawed reasoning, but they are also irrelevant to my opinions.

### 1) Prof. Gompers' assertion that I do not opine on when an impairment charge could have been or should have been announced is invalid and ignores Plaintiff's allegations

83. Prof. Gompers asserts that I have provided no support "that the impairment charge could have been or should have been announced prior to the February 2020 Disclosure."[174] This assertion appears to be based on Prof. Gompers' understanding that: (a) "Tivity analyzed whether it needed to test for impairment for Nutrisystem's tradename or its goodwill in connection with the Transaction, and if so, whether an impairment charge was necessary and concluded that no impairment test for impairment was necessary in 2Q 2019 and that no impairment charge was necessary in 3Q 2019"; and (b) "these analyses were reviewed by Tivity's external auditor, PwC, and that PwC concluded that 'we do not deem management's position unreasonable.'"[175]

84. I understand that whether and when Tivity should have recognized an impairment charge will be determined by the trier-of-fact in this matter. Prof. Gompers does not even attempt to support his purported critiques through any independent analysis, nor does he explain why evidence he cites would invalidate Plaintiff's allegations. As is the case for his other opinions, Prof. Gompers appears to have considered no evidence in support of Plaintiff's allegations; in reaching his conclusions, he appears to accept Tivity's analyses and PwC's statements at face

---

[174] Gompers Report, ¶ 107.

[175] Gompers Report, ¶ 108, citing Tivity Audit Committee Meeting materials, August 1, 2019, TVTY_STROUGO0017544–631 at 557, 587; Tivity Audit Committee Meeting package, November 4, 2019, TVTY_STROUGO0018844–9008 at 8939. Prof. Gompers also cites to the Expert Report of Michael F. Maloney, CPA, CFF, CFE dated January 10, 2023 (footnote 194).

value, without investigation or skepticism.[176] Regardless, as is clear from the Dalrymple Report, whether the impairments should have been announced before the February 2020 Disclosure is clearly outside the scope of my analysis. Thus, Prof. Gompers' purported critiques on this basis are invalid.

#### 2) Prof. Gompers' assertions that the impairment charges were informed by unanticipated events are irrelevant

85. Prof. Gompers asserts that "Tivity's updated long-range forecasts that formed the basis for the February 19, 2020 impairment charges were informed by unanticipated events that occurred in 4Q 2019 and January 2020."[177] He cites to certain events that he contends "factored into the projections used in the impairment analysis: (a) COO Zier's departure was announced on December 9, 2019, and Nutrition division president Keira Krausz resigned in Q1 2020; (b) 4Q 2019 revenue and adjusted EBITDA missed their targets; (c) '[P]reliminary 2020 diet season results including number of orders and average sales price prices…were lower than forecasted in the Q3 [long-range forecast.]'; and (d) '[S]ome of [Tivity's] competitors lowered full year guidance in Q4 [2019] indicating the market growth was lower than initially expected.'"[178] As an example, Prof. Gompers notes that "Tivity's updated projections for the Nutrition segment as of January 2020 reduced projected 2020 revenues relative to the prior internal projections used to analyze impairment as of September 30, 2019 from $655 million to $590 million and projected 2020 adjusted EBITDA from $111 million to $64 million."[179]

86. As previously discussed, purported consistencies between internal projections and guidance do not invalidate Plaintiff's allegations and, in addition, Prof. Gompers ignores evidence

---

176 As previously discussed, Prof. Gompers ignores evidence from Tivity's internal communications that would raise questions about Tivity's internal analyses. *See, supra* Section II(B)(2).

177 Gompers Report, ¶ 109. I note that in ¶ 107 of the Gompers Report, Prof. Gompers appears to describe these assertions as my not having "establish[ed] what information, if any, about the impairment was not disclosed in a timely manner."

178 Gompers Report, ¶ 109, citing to Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777.

179 Gompers Report, ¶ 110.

from Tivity's internal communications that raises questions about the internal projections.[180] For the same reasons, Prof. Gompers' reliance on such assertions to suggest that the impairment charges could not have been made at an earlier time fail. Again, Prof. Gompers attempts to preempt a finding that I understand is before the trier-of-fact, and his purported critique is irrelevant to my opinions.

87. Prof. Gompers suggests that because certain specific information (*e.g.*, actual financial results) could not have been disclosed earlier, Tivity could not have provided updated long-range forecasts earlier in the Class Period. Once again, he fails to address Plaintiff's allegations, resorting to his own speculation about findings of fact. It is my understanding that Plaintiff intends to show that Tivity could have and should have made the same or substantially similar impairments by no later than Q2 2019.[181] Furthermore, supposedly "unanticipated events" such as Q4 2019 financial results and preliminary 2020 diet season performance are within the zone of risk allegedly concealed by Defendants' fraud.[182]

88. Prof. Gompers also notes that, for instance, some of Tivity's competitors lowered guidance in Q4 2019, which he suggests indicates "market growth was lower than initially expected."[183] In an efficient market, however, disclosures from Tivity's competitors would have been reflected in Tivity's share price prior to the February 2020 Disclosure.[184] Similarly, the negative impact of Ms. Zier's departure, which was announced on December 9, 2019, was already reflected in Tivity's share price prior to the February 2020 Disclosure when the impairment charge

---

[180] *Supra* Section II(B)(2).

[181] Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA. dated January 10, 2023, ¶ 7, noting an impairment of goodwill of $136 million on the Nutrition reporting unit and an impairment of $240 million on the Nutrisystem tradename, for a total impairment charge of $376 million as of June 30, 2019. Tivity ultimately booked an impairment of $137 million on the Nutrition reporting segment and an impairment of $240 million on the Nutrisystem tradename, for a total impairment charge of $377.1 million as of December 31, 2019 in its February 19, 2020 disclosure. *See also*, Consolidated Complaint, ¶¶ 136-170.

[182] Dalrymple Report, ¶¶ 99-100.

[183] Gompers Report, ¶ 109. *See also* Memo from Marcus Heitor, "Timing of Impairment of Intangible Assets," February 21, 2020, PwC002775–777 at 775.

[184] I note that Prof. Gompers and I both agree that Tivity's common stock traded in a semi-strong form efficient market.

was announced. The share price reaction to the February 2020 Disclosure reflects only the *incremental* information not already expected by the market prior to the disclosure (*i.e.*, it would not include the share price impact from previous disclosures).[185] Prof. Gompers fails to recognize that, to the extent the supposed "unanticipated events" to which Prof. Gompers cites (Ms. Zier's departure and competitors lowering guidance) are events that had been previously disclosed, such information would have been reflected in Tivity's share by the time of the February 2020 Disclosure.

### 3) Prof. Gompers' assertion that I have failed to disentangle the impact of the untimely disclosure from that of the timely disclosure is inapt

89. Similarly, Prof. Gompers asserts that "to the extent some portion of the impairment was disclosed in an untimely manner," I have failed to perform an analysis to "disentangle the impact of the untimely disclosure from that of the timely disclosure to determine whether the untimely disclosure caused investor losses."[186]

90. As previously discussed, revelations about the Nutrition segment's true performance and Tivity's failure to successfully integrate the Nutrisystem business, including what Prof. Gompers characterizes as "timely" information, are within the zone of risk allegedly concealed by Defendants' fraud.[187] Prof. Gompers' invalid critique further underscores the flaw in his reasoning – he has already asserted that the entire impairment charge was not disclosed in an untimely manner by ignoring what Plaintiff alleges and intends to prove. As such, he fails to identify what "timely disclosure" needs to be "disentangled" under Plaintiff's theory, since he disregards Plaintiff's theory altogether.

---

185 As Prof. Gompers notes, "If information released on a given day was not new and instead only repeated information that was publicly available, then in an efficient market it would not be expected to change a stock price." Gompers Report, ¶ 40.
186 Gompers Report, ¶ 111.
187 Dalrymple Report, ¶¶ 99-100.

#### 4) Prof. Gompers' assertion that impairment triggers were public knowledge prior to the February 2020 Disclosure is irrelevant to my inflation calculations

91. According to Prof. Gompers, the "impairment triggers" that Plaintiff alleges were public knowledge and that "[i]f Tivity's stock traded in an efficient market during the Class Period, the stock price should reflect this publicly available information, including the potential valuation implications."[188]

92. Prof. Gompers fails to recognize that in an efficient market, to the extent these impairment triggers were publicly available and such information was reflected in Tivity's stock price prior to the February 2020 Disclosure, the associated share price impact could only include the *incremental* information not already reflected in Tivity's share price.[189] In other words, my inflation estimates do *not* include the impact from impairment triggers that Prof. Gompers asserts was known before the February 2020 Disclosure.[190] Moreover, in claiming that the impairment triggers were publicly known, Prof. Gompers fails to distinguish between criteria that might trigger an impairment review and an impairment itself – if the impairment triggers were known yet Tivity still did not impair its goodwill or the Nutrisystem tradename, then this could indicate to market

---

[188] Gompers Report, ¶ 114. Specifically, Prof. Gompers references the following (Gompers Report, ¶ 112):

a. "Sustained underperformance of the Nutrition segment, including a failed 2019 diet season, which generated 9.2% less revenue than the prior year and only $5 million in adjusted EBITDA, compounding the woes of the previously poor 2018 diet season and creating a shortfall that Defendants only belatedly admitted would 'result in lower performance for the remainder of the year.'"

b. "A reduction in Nutrition segment guidance in 2Q19 that continued to conceal the full 1Q19 adjusted EBITDA loss of $8.3 million, making even updated guidance unachievable."

[189] As I have discussed in Section II(B)(1), I disagree with Prof. Gompers that the Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed on August 7, 2019.

[190] By way of example, Prof. Gompers estimates the share-price impact attributable to the reduced guidance following the August 2019 Earnings Announcement based on his Assumed Misrepresentation. If the trier-of-fact finds that there was corrective information that was partially revealed on August 7, 2019, and that the information revealed in the subsequent two corrective disclosures fell within the zone of risk concealed by Defendants' alleged fraud, my inflation estimates would be conservative (*i.e.*, understated) since they are based only on the two alleged corrective disclosures.

participants that the company reviewed its intangible assets but decided not to take an impairment charge.[191] While Prof. Gompers may disagree whether the information revealed about the Goodwill Claim was within the zone of risk concealed by Defendants' alleged fraud, I understand that such a finding is before the trier-of-fact.

#### 5) Prof. Gompers' assertion that I do not account for "prior market knowledge of risks associated with the Transaction" is inapt and irrelevant to my opinions

93. Prof. Gompers asserts that "Tivity disclosed risks associated with acquiring and integrating Nutrisystem in its SEC filings prior to the Class Period, and analysts also commented on these publicly disclosed risks prior to and during the Class Period."[192] Prof. Gompers makes these same assertions in relation to the Nutrisystem Claim.[193]

94. As previously discussed, Prof. Gompers' assertions that allegedly corrective information is either timely or is the materialization of disclosed risks are inapt.[194] As I explain in the Dalrymple Report, "inflation would have been present in Tivity's shares beginning at the time that the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk until the inflation was removed through the corrective disclosures."[195] Whether information revealed on the alleged corrective disclosure dates was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme is a finding for the trier-of-fact, and not for Prof. Gompers to summarily dismiss based on Tivity's generalized risk disclosures.

---

191 *See, e.g.*, Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA. dated January 10, 2023, ¶ 38.
192 Gompers Report, ¶ 115 and footnote 207.
193 Gompers Report, ¶¶ 96-100.
194 *See supra* Section II(B)(4).
195 Dalrymple Report, ¶ 111.

### D. Prof. Gompers' opinions about share price inflation during the Class Period are inapt and ignore Plaintiff's allegations

95. In addition to purported issues related to my measurement of inflation by reference to the corrective disclosures, Prof. Gompers also takes issue with my application of inflation during the Class Period. As I explain in the Dalrymple Report, "inflation would have been present in Tivity's shares beginning at the time that the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk until the inflation was removed through the corrective disclosures."[196] According to Prof. Gompers, however, Plaintiff's allegations that the information contained in the corrective disclosures was within zone of risk concealed is invalid.[197]

96. Prof. Gompers characterizes my damages approach as using "'back-casting' to estimate the 'but-for' price and the level of alleged inflation throughout the Class Period."[198] He asserts that "a mismatch that makes back-casting inappropriate is where an alleged corrective disclosure represents materialization of risk, while an alleged misrepresentation represents a misrepresentation about the degree of risk."[199] Prof. Gompers contends that, given this and other purported mismatches, I have "not established that back-casting is appropriate in this matter."[200]

97. As I explain in the Dalrymple Report, "I have measured the loss caused by Tivity's alleged scheme to defraud and false and misleading statements and omissions by reference to the share price reactions corresponding to corrective disclosures on December 9, 2019 and February 19, 2020, adjusting for the impact of unrelated factors."[201] Prof. Gompers' suggestion that this approach fails because "there is simply no economic justification for equating the price effect on the alleged corrective event day with the earlier alleged inflation" is inapt.[202] Under Plaintiff's theory, damages are appropriately measured by reference to the loss caused by the corrective

---

[196] Dalrymple Report, ¶ 111.
[197] As previously discussed, this opinion is inappropriate. *See supra* Section II(A)(1).
[198] Gompers Report, ¶ 136.
[199] Gompers Report, ¶ 137.
[200] Gompers Report, ¶ 137.
[201] Dalrymple Report, ¶ 10.
[202] Gompers Report, ¶ 136.

disclosures, not by reference to what Prof. Gompers describes as "a hypothetical 'but-for' world" in which he contends "Mr. Dalrymple's 'zone of risk' assertion" would not apply.[203]

98. Even if damages were measured relative to Prof. Gompers' "hypothetical 'but-for' world", I note that the Class Period covers a period of less than one year, during which time Tivity's business structure remained consistent.[204] Prof. Gompers presents no evidence to suggest that the relationship between the share price and the information Plaintiff alleges was within the zone of risk concealed by the fraud would have varied over the Class Period. Accordingly, the "but-for" prices implied by my inflation calculations are reasonable and appropriate, beginning when the trier-of-fact finds that information revealed through the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud.[205] As I explain in the Dalrymple Report, the constant dollar method I apply "is a widely accepted approach to estimating share price inflation and is consistent with the legal framework for measuring damages."[206]

99. Moreover, although Prof. Gompers contends that inflation arising from Defendants' alleged misrepresentations may vary on each day of the Class Period, I note that he also estimates inflation to be between $0.26 and $1.67 per share based on changes in analyst expectations before and after the Q2 2019 Earnings Announcement.[207] Prof. Gompers also uses a "back-casting" approach to conclude that "that Tivity's stock price would have been inflated by $0.26–$1.67

---

[203] Gompers Report, ¶ 131. As previously discussed, Plaintiff's allegations that information revealed through the corrective disclosures fell within the zone of risk concealed by Defendants' alleged fraud does not mean that Plaintiff alleges that Defendants concealed a particular risk that later materialized. *Supra* Section II(A)(1). Prof. Gompers' contention that there is a "mismatch" on this basis (on any other basis, as I explain herein) is misplaced.

[204] *See, e.g.*, Dalrymple Report, footnote 189.

[205] Prof. Gompers' assertion that "that the value impact of the 'but-for' impairment would also have varied over time, contrary to Mr. Dalrymple's 'constant dollar method'" fails for the same reason. Gompers Report, ¶ 137. In addition, Prof. Gompers fails to consider Plaintiff's allegations and evidence that the impairment charges would have been virtually the same in Q2 2019. *See, e.g.*, *supra* footnote 162 and *infra* footnote 211.

[206] Dalrymple Report, ¶ 120, citing Jonathan Eisenberg, *Litigating Securities Class Actions* (Vol. 1 2020), pp. 4-23-4-24 and *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336, (2005).

[207] Gompers Report, Section VIII. *See also infra* Section II(E), which discusses the flaws in Prof. Gompers' inflation estimates.

between May 9, 2019 and August 7, 2019,"[208] notwithstanding the purported flaws he enumerates with respect to this approach.[209]

100. Furthermore, while Prof. Gompers notes that "another of Plaintiff's experts analyzed potential impairments at different points in time and found lower impairment in 2Q 2019 than was ultimately announced in February 2020,"[210] I understand that the Plaintiff's expert in this matter concluded that Tivity should have booked an impairment charge no later than August 7, 2019 that was substantially the same as what was ultimately disclosed on February 19, 2020, consistent with Plaintiff's theory of liability that the information revealed in the February 2020 Disclosure was within the zone of risk allegedly concealed.[211] Under Plaintiff's theory, however, such a finding would inform the trier-of-fact as to *whether* the impairment revealed through the February 2020 Disclosure was within the zone of risk concealed by Defendants' alleged misrepresentations and scheme, but the loss would still be measured by reference to the share price decline following the February 2020 Disclosure.

101. Similarly, Prof. Gompers' reasoning that I have not reliably demonstrated that Tivity's stock price was inflated at the start of the Class Period on March 8, 2019 for the Nutrisystem Claim is flawed. According to Prof. Gompers, "[my] analysis is unreliable because [I assume] that Tivity could have and should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA the day the Transaction closed" and that this is "akin to [me] assuming that a company can disclose

---

208 Gompers Report, ¶ 138.

209 *See* Gompers Report, ¶¶ 123-125 and 135-145.

210 Gompers Report, ¶ 137.

211 Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA. dated January 10, 2023, ¶ 7, noting an impairment of goodwill of $136 million on the Nutrition reporting unit and an impairment of $240 million on the Nutrisystem tradename, for a total impairment charge of $376 million as of June 30, 2019. Tivity ultimately booked an impairment of $137 million on the Nutrition reporting segment and an impairment of $240 million on the Nutrisystem tradename, for a total impairment charge of $377.1 million as of December 31, 2019 in its February 19, 2020 disclosure. *See* Tivity Form 8-K and accompanying press release dated February 19, 2020, "Tivity Health Reports Fourth-Quarter and Fiscal Year 2019 Results." Prof. Gompers also fails to note that the inflation estimates I present in the Dalrymple Report are conservative and would not change based on nominal differences in impairment charges. *See, e.g.*, Dalrymple Report, ¶ 106, Appendix C, and footnote 192.

its quarterly financial results the day after the quarter closes."[212] Not only is this purported critique grounded in Prof. Gompers' mischaracterizations of both the Nutrisystem Claim and my opinions, it ignores Plaintiff's allegation that the information about the Nutrition segment revealed through the February 2020 Disclosure was within the zone of risk concealed by Defendants' fraud, including (but not limited to) Defendants' failure to disclose Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA.

102. Furthermore, while I understand Plaintiff alleges that the impairment charge should have been disclosed no later than August 7, 2019 for the Goodwill Claim, it is my understanding that there is nothing that precluded Tivity from notifying investors that its previously disclosed guidance was unachievable or that the Nutrition segment was not on track to meet its guidance, or that such a disclosure can only be made quarterly in the form of an earnings release for the Nutrisystem Claim. While Prof. Gompers focuses exclusively on Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA for the period between January 1, 2019 and March 7, 2019, he fails to recognize Plaintiff's broader allegations that Tivity misled investors as to the Nutrition segment's performance and future prospects. Nevertheless, I understand that such a finding is before the trier-of-fact. Prof. Gompers' criticism regarding when the alleged disclosures could have been made is misplaced and irrelevant to my opinions.

## E. Prof. Gompers' opinion that damages are no more than $1.67 per share is unreliable and ignores Plaintiff's claims

103. Having incorrectly concluded that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA was disclosed by August 7, 2019 when Tivity released its 2Q 2019 financial results, Prof. Gompers performs an alternative inflation calculation that is not tied to Plaintiff's allegations in this matter. While Plaintiff has not identified August 7, 2019 as an alleged partial corrective disclosure date, Prof. Gompers concludes that, based on the "assumption that the finder of fact finds that (1) Tivity should have disclosed Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA earlier than it did, and (2) that Tivity could have and should have announced FY 2019

[212] Gompers Report, ¶ 133. Prof. Gompers does not appear to take issue with the start date for the Goodwill Claim on August 7, 2019, when Tivity filed its 2Q 2019 financial results.

adjusted EBITDA guidance of $80-84 million on May 8, 2019, consistent with the updated guidance the Company announced on August 7, 2019 (the 'Assumed Misrepresentation')," Tivity's share price was inflated by no more than $1.67 per share between May 9, 2019 and August 7, 2019.[213] Prof. Gompers arrives at his conclusion based on the untenable assumption that the alleged fraud had been revealed by August 7, 2019, and estimates the per-share impact resulting from changes in analyst guidance before and after the August 7, 2019 earnings release.

a. Prof. Gompers finds an average reduction of $12.3 million in FY 2019 estimates for Tivity (which he ascribes to the Nutrition segment), arriving at a reduction in Tivity's share price of $0.26.[214] This per-share amount assumes that the reduced guidance would only impact Tivity for FY 2019.[215] Prof. Gompers also estimates a per-share impact of $0.38 based on changes in analyst guidance for both FY 2019 ($12.3 million) and FY 2020 ($6.2 million).[216] For both calculations, Prof. Gompers assumes that the impact would be non-recurring.[217]

b. Prof. Gompers also calculates the "share price inflation under the assumption that Plaintiff[] [is] able to demonstrate that the disclosure of Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA caused analysts to change their expectations about the Nutrition segment's performance in perpetuity."[218] Based on "discount rates ranging from 8.5% to 10.5% and assuming that changes in adjusted EBITDA expectations are comparable to changes in cash flow

---

213 Gompers Report, ¶ 138.

214 Gompers Report, ¶ 142 and Gompers Report, Exhibit 3. Equal to $12.3 million divided by 47.8 million shares outstanding.

215 Gompers Report, ¶ 143.

216 Gompers Report, ¶ 144 and Gompers Report, Exhibit 3. Prof. Gompers estimates an EBITDA reduction of $6.2 million in FY 2020 for the Nutrition segment equal to $44.5 million in revenue reduction multiplied by an implied EBITDA margin of 14% for the Nutrition segment. He discounts this amount based on discount rates between 8.5% and 10.5%.

217 *See* Gompers Report, ¶ 145. The significant share price reaction following the February 2020 Disclosure belies Prof. Gompers' assumption that market participants would have factored in a one-year impact had this information been known.

218 Gompers Report, ¶ 145 and Gompers Report, Exhibit 3.

expectations," Prof. Gompers estimates that the "share price inflation attributable to the Assumed Misrepresentation is $1.38 to $1.67."[219]

104. As discussed in Section II(B)(1), Prof. Gompers' contention that Nutrisystem's Pre-Transaction 1Q 2019 Adjusted EBITDA loss was disclosed on August 7, 2019 when Tivity released its 2Q 2019 financial results is incorrect. Prof. Gompers' estimation of inflation of *no greater than* $1.67 per share between May 9, 2019 and August 7, 2019 ignores the share price declines resulting from the information revealed in the alleged corrective disclosures on December 9, 2019 and February 19, 2020. As I have discussed in Sections II(A) and II(B) of this report, this is based on Prof. Gompers' flawed and incomplete interpretation of Plaintiff's allegations, which leads him to erroneously conclude that the alleged corrective disclosure dates do not tie to the alleged misrepresentations in this matter.[220] Prof. Gompers' inflation estimates are therefore nothing more than computations based on flawed assumptions, which do not address Plaintiff's allegations in this matter.

---

219 Gompers Report, ¶ 145 and Gompers Report, Exhibit 3. Notwithstanding the irrelevance of these calculations, as they do not address Plaintiff's allegations in this matter, Prof. Gompers fails to apply any growth rate and assumes that the discount rate is equivalent to the capitalization rate for purposes of estimating the impact of the Nutrition segment's reduced performance in perpetuity. I note that the documents to which Prof. Gompers cites for discount rates also refer to long-term growth rates of up to 3 percent. *See e.g.*, "Impairment Assessment at September 30, 2019," November 5, 2019, PwC007100-106 at 104; and "Valuation of Certain Acquired Tangible and Intangible Assets of Nutrisystem, Inc.," April 23, 2019, PwC008297-353 at 340; and "ASC 350 – Intangibles – Goodwill and Other," February 25, 2020, PwC004501-569 at 556. Had Prof. Gompers also applied these growth rates, his inflation estimates would have been higher.

220 Prof. Gompers fails to recognize that, if the trier-of-fact finds there was a partial corrective disclosure on August 7, 2019 by virtue of the Tivity's reduced guidance for the Nutrition segment and that the information revealed in the alleged corrective disclosures also fell within the zone of risk concealed by Defendants, then Prof. Gompers' per share inflation estimates would be additive to the inflation estimates I have provided in the Dalrymple Report. Thus, Prof. Gompers' analysis only underscores that the inflation estimates in the Dalrymple Report are conservative.

### III. Further Work

105. My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

W. Scott Dalrymple, CFA
BVA Group
Partner

**Robert Strougo, et al. vs Tivity Health, Inc. et al.**
**Supplemental Appendix B - Additional Information Considered**

**Bates Ranges:**

(1) KPMG-TIVTENN-008710 - KPMG-TIVTENN-008712
(2) PwC002775 - PwC002777
(3) PwC007100 - PwC007106
(4) PwC004501 - PwC004569
(5) PwC008297 - PwC008353
(6) RRA 001617 - RRA 001617
(7) TVTY_STROUGO0002415 - TVTY_STROUGO0002416
(8) TVTY_STROUGO0010384 - TVTY_STROUGO0010386
(9) TVTY_STROUGO0028908 - TVTY_STROUGO0028912
(10) TVTY_STROUGO0047485 - TVTY_STROUGO0047485
(11) TVTY_STROUGO0063527 - TVTY_STROUGO0063528
(12) TVTY_STROUGO0064650 - TVTY_STROUGO0064650
(13) TVTY_STROUGO0066779 - TVTY_STROUGO0066779
(14) TVTY_STROUGO0068066 - TVTY_STROUGO0068069
(15) TVTY_STROUGO0069132 - TVTY_STROUGO0069132
(16) TVTY_STROUGO0069216 - TVTY_STROUGO0069217
(17) TVTY_STROUGO0073382 - TVTY_STROUGO0073383
(18) TVTY_STROUGO0073525 - TVTY_STROUGO0073526
(19) TVTY_STROUGO0075442 - TVTY_STROUGO0075446
(20) TVTY_STROUGO0075631 - TVTY_STROUGO0075634
(21) TVTY_STROUGO0077686 - TVTY_STROUGO0077686
(22) TVTY_STROUGO0078108 - TVTY_STROUGO0078112
(23) TVTY_STROUGO0081293 - TVTY_STROUGO0081295
(24) TVTY_STROUGO0083249 - TVTY_STROUGO0083252
(25) TVTY_STROUGO0083516 - TVTY_STROUGO0083517
(26) TVTY_STROUGO0084306 - TVTY_STROUGO0084307
(27) TVTY_STROUGO0087392 - TVTY_STROUGO0087394
(28) TVTY_STROUGO0087439 - TVTY_STROUGO0087440
(29) TVTY_STROUGO0087611 - TVTY_STROUGO0087613
(30) TVTY_STROUGO0087786 - TVTY_STROUGO0087787
(31) TVTY_STROUGO0088749 - TVTY_STROUGO0088749
(32) TVTY_STROUGO0089650 - TVTY_STROUGO0089652
(33) TVTY_STROUGO0090145 - TVTY_STROUGO0090147
(34) TVTY_STROUGO0147993 - TVTY_STROUGO0147993
(35) TVTY_STROUGO0180053 - TVTY_STROUGO0180053
(36) TVTY_STROUGO0180062 - TVTY_STROUGO0180062
(37) TVTY_STROUGO0180068 - TVTY_STROUGO0180068
(38) TVTY_STROUGO0136054 - TVTY_STROUGO0136055
(39) TVTY_STROUGO0136082 - TVTY_STROUGO0136082
(40) TVTY_STROUGO0136694 - TVTY_STROUGO0136694

**Robert Strougo, et al. vs Tivity Health, Inc. et al.**
**Supplemental Appendix B - Additional Information Considered**

(41) TVTY_STROUGO0151662 - TVTY_STROUGO0151664
(42) TVTY_STROUGO0216744 - TVTY_STROUGO0216751
(43) TVTY_STROUGO0226690 - TVTY_STROUGO0226697
(44) TVTY_STROUGO0230647 - TVTY_STROUGO0230649
(45) TVTY_STROUGO0277891 - TVTY_STROUGO0277893
(46) TVTY_STROUGO0321523 - TVTY_STROUGO0321524
(47) TVTY_STROUGO0330828 - TVTY_STROUGO0330879
(48) TVTY_STROUGO0332078 - TVTY_STROUGO0332082
(49) TVTY_STROUGO0333458 - TVTY_STROUGO0333458
(50) TVTY_STROUGO0337979 - TVTY_STROUGO0337979
(51) TVTY_STROUGO0338486 - TVTY_STROUGO0336488
(52) TVTY_STROUGO0382075 - TVTY_STROUGO0382075
(53) TVTY_STROUGO0382645 - TVTY_STROUGO0382645
(54) TVTY_STROUGO0384889 - TVTY_STROUGO0384891
(55) TVTY_STROUGO0391082 - TVTY_STROUGO0391083
(56) TVTY_STROUGO0407684 - TVTY_STROUGO0407684
(57) TVTY_STROUGO0413778 - TVTY_STROUGO0413779

**Expert Reports:**

(1) Expert Report of W. Scott Dalrymple, CFA, January 10, 2023 and reliance materials
(2) Expert Report of Mark L. Zyla, CPA/ABV, CFA, ASA, January 10, 2023
(3) Expert Report of Michael F. Maloney, CPA, CFF, CFE, January 10, 2023
(4) Expert Report of Cathy Hwang, January 10, 2023
(5) Expert Report of Bradley Henn, February 7, 2023
(6) Rebuttal Expert Report of Michael F. Maloney, CPA, CFF, CFE, February 7, 2023
(7) Rebuttal Report of Jason S. Flemmons, CPA, CFE, CFF, February 7, 2023
(8) Expert Report of Paul A. Gompers, Ph.D., February 7, 2023 and reliance materials

**Depositions:**

(1) Deposition of Dawn Zier, November 18, 2022 and exhibits
(2) Deposition of Lee Shapiro, December 21, 2022 and exhibits

**Articles and Books:**

(1) Aswath Damodaran, *Investment Valuation: Tools and Techniques for Determining the Value of Any Asset* (3rd ed. 2012)

**Case Law:**

(1) *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, 830 F.3d 376 (2016)