# Exhibit 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

ROBERT STROUGO, Individually )
and on Behalf of All Others )
Similarly Situated, )
)
Plaintiffs, )
)
vs. ) Civil Action No.
) 3:20-cv-00165
TIVITY HEALTH, INC., et al., )
)
Defendants. )
________________________________)

CONFIDENTIAL
VIRTUAL VIDEOCONFERENCE VIDEO-RECORDED
DEPOSITION OF PAUL GOMPERS, PH.D.

Wednesday, June 21, 2023
Remotely Testifying from Boston, Massachusetts

Stenographically Reported By:
Hanna Kim, CLR, CSR No. 13083
Job No. 5886300

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

ROBERT STROUGO, Individually )
and on Behalf of All Others )
Similarly Situated, )
)
Plaintiffs, )
)
vs. ) Civil Action No.
) 3:20-cv-00165
TIVITY HEALTH, INC., et al., )
)
Defendants. )
________________________________)

CONFIDENTIAL, virtual videoconference video-recorded deposition of PAUL GOMPERS, PH.D., taken on behalf of the Plaintiffs, on Wednesday, June 21, 2023, remotely testifying from Boston, Massachusetts, upon the stipulations of counsel thereof, before Hanna Kim, CLR, Certified Shorthand Reporter, No. 13083.

REMOTE VIDEOCONFERENCE APPEARANCES OF COUNSEL:

For Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD LLP
BY: CHRISTOPHER M. WOOD, ESQ.
BY: SARA B. POLYCHRON, ESQ.
BY: HENRY BATOR, ESQ.
655 West Broadway, Suite 1900
San Diego, California 92101
619.231.1058
cwood@rgrdlaw.com

For Defendants:

KING & SPALDING LLP
BY: LISA R. BUGNI, ESQ.
BY: JESSICA P. CORLEY, ESQ.
BY: BRANDON KEEL, ESQ.
BY: MATT ROSENTHAL, ESQ.
1180 Peachtree Street, N.E., Suite 1600
Atlanta, Georgia 30309
404.572.4600
lbugni@kslaw.com

Also Present:

JOANN YAGER, Videographer

Do you see that?

A. Yes.

Q. And you don't list the -- the Court's order in this case from June 2022 certifying the class in that section; right? 10:23:46

A. It's not listed here. I have -- I have actually, not in preparation for -- not in preparation for my report, but when it was issued, I -- I read it. And then I've actually, subsequent to submitting my report and subsequent to 10:24:04 Mr. Darymple's second report, I -- I've reviewed that again as well as the -- the -- the most recent class cert memo which was issued, I guess, a couple of weeks ago.

Q. Did you -- did you review the Court's 10:24:22 June 2022 order certifying the class in -- or, I'm sorry, let me ask that question again.

Did you consider the Court's June 2022 order certifying the class in drafting this report that we're looking at today? 10:24:38

MS. BUGNI: Object to the form.

THE WITNESS: It's not listed under the -- the legal documents. I've certainly -- certainly reviewed it and -- but in preparation for my report, what I was -- what -- in -- in particular what I was 10:25:00

interested in are the -- both the consolidated complaint and the -- the -- the -- the Judge's decision on the motion to dismiss, both of which are sort of listed here.

Again, I -- I -- I -- I have certainly reviewed it, but didn't consider it before writing the report. 10:25:17

BY MR. WOOD:

Q. So you -- you tried to make sure that your Appendix C was accurate when it was prepared; right? 10:25:37

A. That's -- that's correct.

Q. Okay. If you -- if you turn to page 18 of your re- -- of your report, in paragraph 43, you include a list -- you -- you -- you say in the second sentence of Paragraph 43, "A financial economist must perform certain steps of analysis to establish loss causation and measure damages, if any, caused by the correction of alleged misrepresentations." [As read] 10:26:12

Do you see that? 10:26:27

A. Yes.

Q. And then you have a, b, c, d on -- on the next page that completes that paragraph; right?

A. Yes.

Q. And there's -- in terms of your -- your 10:26:37

list, a, b, c, d, on page 19, there's nothing cited there; right?
A. Correct.
Q. And what is you're a, b, c, d list, your -- your -- your steps, what is that based on? 10:26:57
A. It's based on my 30-year career as a -- as a pro- -- professor, a financial economist, having published dozens of papers, books, case studies, teaching Ph.D. students and MBA students.
The -- the -- the expert opinions that -- 10:27:19 that I've offered -- and, again, this is -- this is based on -- this is sort of an economic foundation for how one would establish loss causation. And -- and -- and given my background, these are the particular steps that -- that would be necessary 10:27:34 from a -- from a financial economics perspective.
Q. Is it -- are those steps based on any case law?
A. I'm -- I'm not a -- I'm not a lawyer, and I -- I can't offer legal opinions. 10:27:49
What I would hope is that given my expertise and training in financial economics, that offering opinions based on the foundations of financial economics, that they would be helpful to courts in adjudicating matter from a legal 10:28:04

perspective.

But these -- these steps, these four steps, these are elements of -- of a financial economics analysis of loss causation, not offering an opinion as a legal -- as a legal matter. 10:28:18

Q. And -- and you don't cite any case law on -- I -- I recognize you cite Dura in footnote 71 about inflation alone not being sufficient. But in terms of you're a, B, C, D steps -- A, B, C, D steps, you don't cite any -- any case law there; 10:28:35 right?

A. That -- that's -- that's correct. These are -- again, I come back to the -- the issue that I'm -- I'm a financial economist. And -- and I -- I offer opinions based on the -- the -- the -- the 10:28:51 field of -- of -- of inquiry in which I've worked for the last 30 years. And -- and so, th- -- this is offering opinions that I hope are helpful in the context of -- of sort of a legal proceeding. But it's not -- it's not -- it's not cited to particular 10:29:09 legal -- legal cases.

Q. If you look at step B in your process, on -- we're on -- again, we're on Paragraph 43 on page 19, you say, "Determine the information that could and should have been disclosed instead of or 10:29:30

in addition to the alleged misstatements or
omissions (i.e., the 'but-for disclosures')."
Do you see that?
A. Yes.
Q. And when you use the word "determine" 10:29:43
there, are you saying that a financial economic -- a
financial economist has to independently make those
determinations, or you saying they need to have some
counterfactual assumptions?
MS. BUGNI: Object to the form. 10:29:59
THE WITNESS: So generally speaking,
the -- there's an articulation of -- of -- by -- by
Plaintiffs in their Complaint about the particular
information, which was misstated or omitted. And a
financial economist can take that counterfactual 10:30:24
from the Complaint and sort of say these pieces of
infor- -- ma- -- mation [verbatim] are alleged to
have been withheld from the market or -- or -- or
incorrectly given to the market. And then these
other steps have to -- have to -- have to draw a -- 10:30:43
a -- a connection. You can't -- you can't just
assume something. You -- it's important then to
look at -- at the entire context of information.
So -- so certainly the -- the expert can
rely on what Plaintiff alleged was misstated or 10:31:00

omitted, but a financial economist doing the kind of analysis on loss causation, and then I'm sure we'll get to -- to damages, needs to assess, was that information known or knowable of -- at various times throughout the class period. And then try -- and -- 10:31:21 and then trying to assess the -- the cause -- the sort of causal connection between, on the loss causation side, what ultimately is revealed on the alleged corrective disclosure dates, and is there a causal connection between what Plaintiff claim was 10:31:37 misstated or omitted and what was ultimately revealed on the -- on the alleged corrective disclosure dates.

And so -- so -- I'm -- I'm -- I'm fine with -- with -- with assuming some counterfactual. 10:31:48 But you -- you just can't assume like Mr. Dalrymple does that everything that is revealed on the alleged corrective disclosure date is actually corrective.

You -- there -- a financial economist -- one area that financial economists explore for the 10:32:05 last 50 years is -- is how information affects prices. And -- and it's important to look at the totality of information in that context.

And so -- so -- I'm sorry to be a little long-winded, but -- but -- but -- but I -- I think 10:32:21

it's totally fine to take the Complaint and the -- and the -- and the alleged misstatements or omissions, but then you have to do a lot more analysis in order to demonstrate loss causation.

BY MR. WOOD: 10:32:37

Q. And -- thank you.

And when -- when you say that the financial economists should determine the information that could and should have been disclosed, you're -- you're not saying like from a 10:32:44 legal perspective that the financial economists needs [verbatim] to determine what the companies, you know, what SEC reporting requirements require in terms of disclosure? That's not what you're saying; right? 10:32:56

MS. BUGNI: Object to form.

THE WITNESS: No, I'm not asking for sort of a legal determination. But the -- but certainly looking at the available information to the company at a particular point in time is important to 10:33:09 understand whether or not the -- the -- the information that Plaintiff alleged was misstated or omitted is something that the company could have disclosed at various points in time or what component of that misstated or omitted in- -- 10:33:28

information, the -- the company could have --
have -- have disclosed.
And so, you know, it's -- it's not making a legal adjudication. It's understanding -- it's understanding what -- what's the information set that the company has at its disposal at any point in time. 10:33:46
BY MR. WOOD:
Q. And is that -- was that something you -- that you tried to do in this case in your opinions, is understanding the information set that the company had at its disposal? 10:33:56
MS. BUGNI: Object to the form.
THE WITNESS: I -- I think more specifically, I wanted to -- I did want to understand what -- what information was -- was sort of internally available. And -- and sort of as an example, what were the -- what were the internal projections of the company at the time, and how did those internal projections relate to the public guidance that -- that Tivity had -- had -- had given. 10:34:09 10:34:29
And -- and in my report, I sort of point out that -- that Mr. Dalrymple, in his opening report, doesn't even consider that when as a -- as a 10:34:46

matter of establishing loss causation and damages, it's -- it's critical for an economist to -- to -- to consider -- to consider what was -- what was the internal information set that the company had.

BY MR. WOOD: 10:35:05

Q. And -- and so, I -- I think my question specifically is whether -- whether you tried to understand the information set that the company had at its disposal when you were writing your report.

A. Well, certainly not in its -- its -- its 10:35:23 totality. But as it would relate to, in particular, the opinions offered by Mr. Dalrymple, I certainly tried to understand, at -- at least within the context specifically, and that's why I reference the -- that's why I reference the -- the -- the sort 10:35:45 of internal projections.

If -- if one of the allegations is that the guidance that the -- that the company, that Tivity gave was misleading and overoptimistic, it's critical to understand what the internal information 10:36:04 set is and how the guidance they gave relates to those -- to those internal projections and at least evaluate it. And in the -- and in Mr. Darymple's opening report, he -- he -- he didn't look at it at all. 10:36:20

believe there's even some language in this section, where -- where I talk about it.

It seemed that -- that the particular counterfactual that I was asked to assume seems counter to my understanding of what the internal 10:37:57 projection said. Or to put it another way, when the -- when the -- when the public guidance was given, the internal projections were consistent with the guidance which was given at the beginning of the class period and then again in -- in -- in -- in 10:38:11 May.

Q. In spite of that, though, you were still able to come up with your no more than 1.67 per share damage number; right?

A. Again, conditional on -- on sort of the 10:38:24 counterfactual. And -- and, like I said, I think I'm clear in this section that -- that -- that it seems to be counter to my review of what the internal information says but conditional in that counterfactual, then -- then that is correct, that 10:38:37 it would be no more than $1.67.

Q. Okay. And if we -- so if we turn back to page 19 and move on to -- to step C in Paragraph 43, it says, "Analyze the alleged misstatements or omissions and determine whether they were a 10:39:15

substantial cause of the stock price decline on the alleged corrective event days."
And then you go on.
Do you see that?
A. Yes. 10:39:26
Q. And when -- what do you mean -- what does it mean for a statement [verbatim] or omission to be a substantial cause of a stock price decline?
A. So that there's a -- a causal connection between the misstatement or omission and the alleged 10:39:51 corrective disclosure date. So, in particular, sometimes when there's a -- a mismatch between the -- what the alleged corrective disclosure event is and the information which -- which Plaintiff allege hid the truth, there has to be an analysis 10:40:03 which demonstrates the causal connection.
Or to put it in another way and maybe specifically in this case, so my understanding is that Plaintiff alleged that -- that because -- as it was -- I'll -- the -- we'll go to the Nutrisystem 10:40:31 place. So my understanding is that Plaintiff alleged that because the pre-acquisition period adjusted EBITDA was not disclosed, as well as the contention that guidance was unrealistic, that the market was misled about the -- the risk of a 10:40:47

particular event that might happen.

And so, there needs -- given that -- that -- that this case entails a particular risk, which -- which occurred, one needs to make a causal connection between understanding how the misstatements or omission potentially affected the market's perception of that risk occurring in the future. 10:41:03

So it doesn't have to be identical. You don't have to have a mirror image corrective disclosure to allege misstatement or omissions, but you do need to make a causal connection which -- which shows that -- that -- again, in this case given that it's a risk, that -- that the alleged misstatements or omissions affected the market's perception of the risk of particular events happening. 10:41:21 10:41:31

THE COURT REPORTER: I'm going to ask, Professor, if you could just slow down just a little bit when you're speaking. Thank you. 10:41:48

THE WITNESS: I will -- I will -- I will try. I -- I -- I apologize. I know that I often speak quickly, and so I will -- I'll try to slow down.

BY MR. WOOD: 10:41:56

And -- and so, whether it's Zier's departure in December or the events which happened in February, those aren't a direct reflection of what Plaintiff alleged were misstated or omitted.

Q. It -- but how -- how does a financial 10:43:41 economist go about determining whether something is a mismatch or whether it's causally related? And I -- so, for example, I think there are cases where it's very clear, right, like if a company says, I guarantee we'll sell a million cars, right, and then 10:43:57 a month later they say, we have sold zero cars, right, it seems like they're pretty closely related, then that's an easy case; right?

There may be things on the other end where, I don't know, a company says we're going to 10:44:12 sell a million cars, and later on they say, we didn't sell any boats, right, where it's like, well, that's different. A boat's not a car.

And then there's gray area in between, right, where maybe things get complicated. And 10:44:23 I'm -- I'm wondering how a financial economist goes about determining whether a statement is causally related to a -- a -- a quote "corrective disclosure," particularly in those gray areas?

MS. BUGNI: Object to the form. 10:44:38

THE WITNESS: It -- it would depend upon the facts and circumstances.

What I can tell you here is that just looking at the stock price reaction to the risk ultimately actually occurring, which is the way 10:44:58 Mr. Dalrymple does it, doesn't -- doesn't demonstrate loss causation, it's -- it's -- it -- it -- it's a risk actually occurring. And the question is, one needs to find a way to establish how the omitted information or the misstated 10:45:22 information would affect the market's perception of that risk occurring.

It's not -- it's not looking at the event of that risk actually occurring. You have -- you have to assess how it affects the market's 10:45:38 assessment of that probability, and it would depend upon the facts and circumstances. I wasn't asked to do it here because I'm a -- a -- a rebuttal expert. But what I can tell you affirmatively, is that Mr. Dalrymple just hasn't done it. 10:45:53

BY MR. WOOD:

Q. And by "done it," you're saying looking at assessing how the market -- how the -- assessing how -- how the risk impacted the market's perception? 10:46:07

A. No. What I mean is, how -- how what Plaintiff allege was misstated or omitted affected the market's assessment of the risks of these future events happening. That's -- that's what I mean. So -- so looking at -- looking at when -- when a 10:46:34 risk ultimately happens, when that risk ultimately materializes, that -- that does not measure nor reflect nor provide evidence that the misstated or omitted information cause -- caused the loss. It -- it -- it -- it -- it's just not because, back to the 10:46:59 point, you have to understand how the misstated or omitted information would have affected the market's perception of that risk.

MR. WOOD: I'm going to introduce another -- a document. This is tab 11, Sara. 10:47:23

(Gompers Deposition Exhibit 599 was marked electronically.)

BY MR. WOOD:

Q. All right.

And this has been marked as Exhibit 599. 10:48:09

Professor Gompers, this is a -- it's a legal opinion from the Sixth Circuit Court of Appeals, which is the -- the Court of Appeals over the Middle District of Tennessee. And the opinion is the -- the "OHIO PUBLIC EMPLOYEES RETIREMENT 10:48:27

SYSTEM v. FEDERAL HOME LOAN MORTGAGE CORPORATION." It's 830 F.3rd 376.

Do you know if you've read this opinion, Professor Gompers?

A. I certainly haven't reviewed it recently if I've ever read it. I may have. I just -- as I sit here, I don't recall. 10:48:42

Q. Okay. And I -- I know you're not a lawyer. I'm not asking you for a legal opinion. So there's no -- I don't want to be misconstrued. 10:48:56

On -- on page 5 of the opinion, there's a section under heading C called "Theories of Loss Causation."

Do you see that?

A. Yes. 10:49:20

Q. And in the -- the second paragraph of that section, the Sixth Circuit writes, "Loss causation is the" -- "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." [As read] 10:49:34

Does -- again, I know you're not a lawyer, but does that sentence make sense to you?

MS. BUGNI: Object to the form.

THE WITNESS: It would seem to me to be consistent with what I was describing earl- -- 10:49:48

earlier, a causal connection between the misstatements or omissions and what was ultimately disclosed and caused declines on the alleged corrective disclosure date. Again, I -- I can't interpret this, but it seems at least intuitively 10:50:08 consistent.

BY MR. WOOD:

Q. Yeah. And -- and obviously, your report is about loss causation. You're not a lawyer, but you're looking at it from an economic perspective; 10:50:17 right?

A. Yes.

Q. Okay. And then the Sixth Circuit cites Lentell from the Second Circuit. And then says, "It partakes of the traditional elements of loss in 10:50:26 proximate causation." And then the Court cites Dura, which you also cite in your report in footnote 71; right?

A. Yes.

Q. Okay. And then the Sixth Circuit says, 10:50:40 "Any analogy to the common law tort concept, however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather the --

THE COURT REPORTER: Slow down, Counsel, a 10:51:00

little bit when you're reading, please. Thank you.

MR. WOOD: Sure. I'll -- I'll just -- I'll start over there.

BY MR. WOOD:

Q. After citing Dura, the Sixth Circuit says, "Any analogy to the common law tort concept, however, would be imperfect because the alleged misstatements do not generally cause a security to drop in value, but rather, the 'underlying circumstance that is concealed or misstated.'" 10:51:04 10:51:18

Do you see that?

A. Yes.

Q. And is that -- well, do you agree with that statement from an economic perspective?

MS. BUGNI: Object to the form. 10:51:31

THE WITNESS: So -- so generally -- again, I'm not a lawyer. I can't -- again, I -- I can't opine as to a sort of legal matter. But this would seem to me to sort of be consistent with the general notion that there can be a mismatch between what's alleged as a corrective disclosure event and the information which is either misstated or omitted. And so -- so -- so I'm fine with that. 10:51:49

The real question is understanding if -- to understand -- to -- to understand as a matter of 10:52:07

economics, if there's loss causation. And then -- and then in the second step, to estimate damages, one needs to assess how the information which was misstated or omitted affected the market's assessment of that risk. 10:52:26

So -- so the -- to -- to the extent that -- that events are uncertain with or without misstatements or omissions, an economist, in order to measure loss causation, needs to demonstrate that the information misstated or omitted affected the 10:52:41 market's perception of a particular risk occurring in the future. And then that differential, it represents inflation, not the realization of that particular risk.

BY MR. WOOD: 10:52:57

Q. Okay. The Sixth Circuit then says, "Thus, in the securities fraud context, 'a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and 10:53:16 omissions alleged by the disappointed investor.'"

Do you see that?

A. Yes.

Q. And from an economic perspective, how would you determine whether a loss was -- was within 10:53:29

the zone of risk concealed by a misrepresentation or omission?

MS. BUGNI: Object to the form.

THE WITNESS: It -- it would depend upon the facts and circumstances of the particular case. 10:53:43 I gave the example in my report of a pharmaceutical -- of -- of a pharmaceutical case. I actually worked -- this is now probably 15 years ago -- on a -- on a Bristol Myers securities litigation that had to do with a particular drug. 10:54:07 And there, I had access to information, which was what was the -- what was Bristol Myers' internal assessment of the probability of a particular drug being approved. The drug was called Vanlev. And then I also could estimate, based on investment 10:54:22 analysts, what their assessment of the probability of approval was because they had particular drug-by-drug projections.

And so -- so in that case, I could -- I could directly go and compare the firm -- the -- the 10:54:39 firm's internal assessment of a particular risk occurring and what the market, at a given point in time, was -- was assessing the risk. So -- so -- so what's important is to look at the particular facts and circumstances and to try and understand can you 10:54:55

establish that the information which was misstated or omitted affected the market's assessment of a particular risk or set of risks occurring.

BY MR. WOOD:

Q. You don't -- in your -- in your steps A, B, C, D in paragraph 43, you don't -- you don't use the term "zone of risk"; right? 10:55:12

A. This is more general in terms of -- of -- of loss causation. It certainly encompasses my understanding -- again, not -- I'm not a -- I'm not a lawyer -- various approaches in terms of -- of -- of liability. And in particular, we've been discussing my understanding of what Plaintiffs claim here about particular information affecting the market's perception of a particular risk or a set of risks occurring in the future and -- and -- and providing context to this A, B, C, D, in the context of -- of my understanding of Plaintiffs' theory of liability. 10:55:33 10:55:55

Q. And so, is -- when -- when you say in -- in part C of your steps, "Analyze the alleged misstatements and omissions to determine whether they were a substantial cause of the stock price decline," in -- in your mind, is that -- is that different from what we're reading here in the Sixth 10:56:12 10:56:27

discounted value of expected future cash flow.

BY MR. WOOD:

Q. Right.

The DCF method; right?

A. Correct. 11:16:49

Q. And so you're -- right.

You're valuing the -- the likelihood of future cash flows as of a certain date in time?

A. Correct.

Q. Okay. Were -- in -- in reaching your 11:16:59 conclusions, did you rely on any other expert reports that have been submitted in this case?

And -- and to just -- to be a little more specific, while you're thinking of -- of that answer, what I'm really getting at is, is there any 11:17:32 expert report which is really critical to your opinions such that if that expert report's wrong, then your opinion no longer stands?

That's -- when I say "rely," that's what I mean. Are you... 11:17:48

A. No. I -- I mean, I've certainly reviewed Mr. Zyla's report, but I'm not relying on it or any other report for my opinions.

Q. Do you have an opinion about whether Tivity timely impaired the goodwill and trade name 11:18:07

values associated with the nutrition segment?
A. I haven't been asked to offer an opinion on that, so I'm not a -- I'm not being offered as a -- as an account- -- at a -- as an intangible asset valuation expert, accounting expert. And so, no. 11:18:29
But the -- my -- my report does -- does point out that Mr. Dalrymple doesn't consider -- doesn't consider whether or not their -- the internal information at the company, which was known or knowable at a certain date, his -- his contention that the -- that the good- -- or Plaintiffs' contention that the goodwill write-off should have happened no later than the second quarter, he doesn't assess what information internal to the company was known or knowable as of that date, which would be something that he would sort of have to do. 11:19:02 11:19:18
But -- but, again, I'm not offering an opinion on -- on -- on what date, if any, Tivity should have taken a goodwill impairment charge. 11:19:33
Q. And you understand that Mr. Dalrymple is -- or his opinion as to the goodwill claim is premised on Plaintiffs proving that the goodwill was inflated in the second quarter?
MS. BUGNI: Object to the form. 11:19:54

THE WITNESS: I -- it's certainly conditional on -- on Plaintiffs proving that impairment charge should have happened as of, at the latest, the second quarter of 2019.

At the same time, it -- it's -- and this relates, Mr. Wood, to what we were discussing a little bit earlier, it's still important to understand the information which was known or knowable to evaluate the -- the sort of value of information. 11:20:15 11:20:33

So -- so -- so certainly he's assuming that, but in some sense Mr. Dalrymple is just sort of a calculator. He's -- he -- he's run a regression analysis. And he's basically saying, I'm assuming that everything on -- on this date, on December 9th, is -- is corrective. I'm assuming everything except the healthcare margin compression on February 20th is -- is corrective. 11:20:49

And he's not din [verbatim] -- done any of the additional analysis that a financial economist would do at this stage, which is to evaluate the information that -- that -- that -- that was available. What was out there, what was known to the market, what was known to the company. And -- and -- and that's the critical step that -- that -- 11:21:03 11:21:19

or at least one of the critical steps that he doesn't evaluate.

So I have no -- I have no issue with him assuming a counterfactual, but I do have an issue with him not under- -- not undertaking an analysis 11:21:33 about the -- the -- the information set for both the public and for the company.

BY MR. WOOD:

Q. You agree, though -- so if we stick with the February 20 healthcare compression piece that 11:21:47 you mentioned, you agree that Mr. Dalrymple looked at the February 20th drop and determined that the healthcare compression piece of the February 19 disclosure was not something that was -- you -- within the zone or the risk allegedly concealed by 11:22:08 the alleged fraud; right?

MS. BUGNI: Object to the form.

THE WITNESS: Mr. Dalrymple makes an adjustment and acknowledges that the margin compression in the healthcare segment going forward 11:22:23 was confounding information, and he -- he -- he does an adjustment for that, yes.

BY MR. WOOD:

Q. And you -- no, I think it was at 2.20, I think, was his adjustment for that. This is in -- 11:22:36

his analysis.

Q. And -- and in your report, you don't say Oh, the 2.20 is wrong; it really should have been 3.50 or something else.

Right? 11:24:23

A. Correct.

Q. Okay. In paragraph 20- -- let me just make sure I'm where I want to be.

THE COURT REPORTER: I'm sorry, I didn't hear you, Mr. Wood. 11:24:42

MR. WOOD: That's okay. I was talking to myself.

BY MR. WOOD:

Q. If you go to paragraph 26 of your report, Professor Gompers, it's on page 10. 11:24:52

A. Okay. Let's see.

Q. And there you -- you've summarized the alleged corrective disclosure that you understand that's pled in the Complaint; right?

A. Yes. 11:25:11

Q. And one of the items that you have in that discussion is the disclosure of the 8.3 million in adjusted EBITDA that's in the second block quote that you cite from paragraph 80 of the Complaint; right? 11:25:31

A. Yes.
Q. And nowhere in paragraph 26 do you mention the decline in the -- or the reduced FY 2020 guidance; right?
A. These are all taken from the Complaint. 11:25:49 I'm just sort of reading through this.
So -- so these are all just direct quotes from the Complaint. Later on I do discuss the -- the 2020 guidance in terms of the context of -- of what Mr. Dalrymple says, but -- but this is -- these 11:26:25 are all just directly taken from -- from the Complaint.
Q. And if we -- right. So actually let's take a look at the Complaint.
MR. WOOD: Sara, if you want to introduce 11:26:39 that.
(Previously marked Deposition Exhibit 520 was referenced.)
BY MR. WOOD:
Q. So this should be Exhibit 520, 11:27:19 Professor Gompers.
A. Ah, okay. It's in the -- okay. It's out of order. So it's Exhibit --
Q. Yeah.
A. Yeah, Exhibit -- okay. I -- I was -- 11:27:29

paragraphs 128 and 129 of your report. If you want to let me know when you've -- when you've had a chance to turn there.

A. Okay. Yes.

Q. So in this hypothetical, you're positing a situation where the drug company improperly inflates the percentage chance that a drug would be approved; right? 11:41:07

A. Correct, relative to what they -- relative to what they knew and estimated internally, their in- -- their internal estimate of approval is different than what they conveyed and what the market believed. 11:41:31

Q. Such that when it actually didn't get approved because there's a differential, you can't take the entirety of that stock drop because they didn't -- they didn't know that it wasn't going to be approved; they only had access to information that would lower the chances of approval to 20 percent instead of 50; right? 11:41:48 11:42:03

A. Yeah.

MS. BUGNI: Object to the form.

THE WITNESS: That there's a difference between the perception of the company of the risk of the particular event versus what the market 11:42:11

perceives as the -- the probability of that event occurring.

BY MR. WOOD:

Q. And -- right.

And so in your hypothetical -- so in your hypothetical they should have said there's a 20 percent chance of approval instead of saying 50; right? 11:42:19

A. Yes.

Q. And, therefore, even though there was a $1 stock price decline, only $0.60 would be damages because the other $0.40 is -- is the -- is the -- is the 20 percent, right, which they -- which is left over? I know I'm not being clear about that, but... 11:42:31

MS. BUGNI: Object to the form. 11:42:53

THE WITNESS: Right, it's -- it's -- it's the materialization of a specific event actually occurring. And so even if there was no misstatement or omission, the realization of -- of the event, the realization of -- of non-approval would still lead to a -- to a stock price decline. 11:43:08

BY MR. WOOD:

Q. Now, if you -- if you change your hypothetical just a little bit, let's say that the -- the company says that there's a 50 percent 11:43:23

chance of the drug being approved when really they know that there's a -- a 0 percent chance or as close to 0 as you can get without actually being 0, in -- in that circumstance, you would agree that the entirety of the $1 loss would be damages; right? 11:43:42

MS. BUGNI: Object to the form.

THE WITNESS: So un- -- under that sort of hypothetical, where the company knew with certainty that the drug wouldn't be approved, then in that case the -- the entirety of the stock price would 11:43:58 be -- would -- would -- would represent losses and damages.

That's not consistent with my understanding here. And certainly it's the case that we know, for example, December 9th, that 11:44:15 executives often depart companies which were -- are acquired. There's academic research which -- which shows this to be the case.

The -- Tivity disclosed that there was the probability this happened. Similarly, we know 11:44:30 that -- that future company performance is sort of uncertain. And so it's not the case that these events which occur in December and that -- and that occur in February have a 0 percent probability.

What needs to -- what -- what 11:44:43

Mr. Dalrymple needs to do is to understand, given what the company knew at various points in time, what was the assessment of that probability and how does the information that was misstated or -- or omitted affect the -- the risk that these events 11:45:00 would occur.

And there's nothing about -- there's nothing about what -- what Mr. Dalrymple does that -- that did that. And -- and I know he was asked at his -- his deposition, but -- but it's the 11:45:15 same criticism that the judge had in the AAC case about looking at the stock price decline and trying to -- to -- to -- to -- to measure -- to measure damages in that case.

It's -- it's these uncertain events you 11:45:29 have to do a different set of analyses instead of just looking at the simple stock price decline.

BY MR. WOOD:

Q. But -- so -- but you agree that if Tivity had known at the beginning of the class period with 11:45:40 certainty that -- that Ms. Zier would be departing, then that is no longer a risk, right, in the future -- let's say a specific point in time.

Let's say they knew at the beginning of the class period that she would be leaving for 11:45:55

certain in December of 2019.

That's not a risk at that point; right? That's a certainty?

MS. BUGNI: Object to the form.

THE WITNESS: One would still need to -- 11:46:04
to -- to establish a causal connection between her departure and the information which was misstated or omitted.

So even if they knew for certain if -- even if they knew with a hundred percent 11:46:14
probability, which is counter to -- to my understanding, you would still need to make a link between the information which -- which Plaintiff [verbatim] allege was -- was misstated or omitted.

Or to put it another way, when I read the 11:46:32
Complaint, I don't see an allegation that -- that Tivity withheld from the market the fact that -- that -- that Ms. Zier would depart at some future date.

BY MR. WOOD: 11:46:48

Q. Do you know -- do you know why Ms. Zier left Tivity?

A. So I haven't been asked to investigate it. My understanding is that -- that she chose to depart. She -- she -- she came and said that she 11:46:59

So Mr. Tramuto is -- is writing to Ms. Saddington. And a couple of lines down he said, "You should keep in mind the following."

He's talking about Ms. Zier here, and he says, "Issued long range forecast to TVTY in December with revenue projections of 761mm." [As read] 12:22:24

And then says, "January of 2019 - held back for many weeks the reality the 761mm would not be achieved. Provided feedback we are not a 'blame culture' and one that supports leadership to navigate through the challenges." [As read] 12:22:41

And then it says, "February" -- "Feb 2019 - finally presented a revised revised guidance of 685-700mm. TVTY finance team cautiously accepted the numbers with the caveat they did not believe they would be achieved." [As read] 12:22:58

Do you see that?

MS. BUGNI: Object to the form.

THE WITNESS: So I -- I -- I -- I see that, yes. 12:23:13

BY MR. WOOD:

Q. And so, the entry on February 2019, that Ms. Zier presented a revised revised guidance of 685 to 700 million, and the Tivity finance team 12:23:26

cautiously accepted the numbers with the caveat they did not believe they would be achieved, the -- has the -- in reading that in -- in the last few weeks, impacted your opinion at all?

A. No. 12:23:43

Q. And why not?

A. Again, they -- the -- the -- the -- the guidance that they -- that they -- they issued was -- I'm trying to remember. The original guidance was 680 -- yeah, so it was -- it was sort 12:23:57 of, you know, consistent. I haven't investigated this. This is clearly leading up to the revisions that were ultimately made in -- in -- in -- in August. But -- but, no, this -- this doesn't change at all my opinion that the internal projections were 12:24:18 sort of consistent with -- with the guidance which was publicly given.

Q. Well, you agree that a company should hopefully believe in their own internal projections; right? 12:24:33

MS. BUGNI: Object to the form.

THE WITNESS: Again, I -- I -- I see nothing which says that -- that the -- the guidance given wasn't -- wasn't consistent with these internal projections, nor that contemporaneously 12:24:43

they -- they -- they didn't -- didn't agree with this. My understanding is that -- is that there was some frustration because the early part of Q2 wasn't continuing the trend in -- in -- in March.

So I've seen nothing which would -- so -- 12:25:00 so one, I've seen nothing which would say that they didn't -- when they gave the guidance back in February, that they didn't believe the internal projections.

Second, I haven't been asked to 12:25:15 affirmatively offer an opinion that the projections were done reasonably and -- and -- and -- and were -- were sort of accurate.

My opinion is that Mr. Dalrymple completely ignores these internal projections and 12:25:32 doesn't all -- at all assess the information that the company knew at various points in time and could reasonably have disclosed given what it knew. So -- so I -- this doesn't change at all my opinion that -- that -- that the -- the internal projections 12:25:48 were consistent and that Mr. Dalrymple should have considered them.

BY MR. WOOD:

Q. But you were not asked to look at whether the internal projections were reasonable. That -- 12:25:58

that's what you said; right?
A. I wasn't asked to offer an -- an internal -- I wasn't asked to offer an affirmative opinion that the projections were done in a reasonable manner. The section that -- the section of my report which refers to the projections, are sort of clear that when one looks at the most proximal projections to the guidance which was given, those projections are consistent with the guidance that was given. 12:26:14 12:26:29
And -- and as such, a financial economist who looks at whether or not there's loss causation and damages, needs to assess what information was known or knowable to the company and -- and -- and -- and to factor that into their analysis. And in Mr. Dalrymple's opening report, there's -- there's no discussion of -- of these projections. 12:26:46
Q. And -- and you didn't feel the need to determine whether or not the internal projections were reasonable in rendering the opinion that you issued in paragraph 7 -- 69 through 72? 12:27:04
A. As a rebuttal expert to Mr. Dalrymple, I didn't believe that was necessary. And as I sit here and having reviewed all of the particular documents that Mr. Dalrymple cites in his second 12:27:25

report, I -- you know, I've seen nothing which would say that the company didn't -- didn't reasonably assess at the time that the guidance was given what their -- what their inter- -- internal projections were. 12:27:42

So it -- it doesn't cause me to -- to put it another way, I haven't seen anything in those which -- which would cause me to believe that -- that -- that they weren't reasonable. I haven't been asked to offer that opinion. Mr. Dalrymple's 12:27:53 report doesn't change anything about my -- my -- my report in this matter.

Q. And we can -- we can both read the sentence here in Exhibit 47, the -- "TVTY finance team cautiously accepted the numbers with the caveat 12:28:10 they did not believe they would be achieved."

That -- that sentence isn't something that concerns you about the reliability of this revised guidance here?

MS. BUGNI: Object to the form. 12:28:24

THE WITNESS: So again, I -- I -- it doesn't cause me to -- to -- to -- to change my opinion, that the -- the projections -- the projections most proximal to the original guidance were consistent with what they gave. And it doesn't 12:28:38

why, from an economics prospective, you care at all
about how the market came to understand a certain
piece of information. Like, in terms of just doing
the analysis to figure out the difference between
what was understood and what the truth was, why do 12:51:18
you care whether it was the company that said
something that gave the market an understanding
versus a third party who said something that gave
the market an understanding versus, you know,
analysts coming up with an understanding that's 12:51:32
different from what the comp- -- company believed
internally?

MS. BUGNI: Object to the form.

THE WITNESS: So this -- this -- this --
this is -- this is information which the company -- 12:51:43
does not come from the company. This is information
from -- from investment analysts. This is not --
the company didn't say what -- you know, didn't say
in -- in July or didn't -- or didn't say in -- in
May or didn't say in -- in August what the -- what 12:51:59
the projected 2020 revenue guidance for the
nutrition segment was.

Again, I'm not a lawyer. I'm unaware of a
requirement that companies have to correct external
forecasts, which are inconsistent with theirs. 12:52:17

Again, I -- I can't offer a legal opinion. I've -- I've never heard of that.

But as a matter of financial economics, because what you're interested in is looking at the value implications of the -- of what the company 12:52:30 either said, misstated, or -- or -- or -- or what the -- what specifically the company sort of omitted. And here, there's very specific allegations about what that information was. The -- comparing -- comparing analyst forecasts in August 12:52:54 of projected 2020 revenue to what the company internally did would be irrelevant from a loss causation and damages perspective.

BY MR. WOOD:

Q. But -- but that's tautological, right, 12:53:05 because you're saying that -- you're predicating your analysis on it has to be what the company said.

MS. BUGNI: Object to the form.

BY MR. WOOD:

Q. That's what you're looking at? 12:53:15

A. So -- so, one, I'm unaware of anywhere in the Complaint in which there's the allegation that the company should and did not correct analyst [verbatim].

Two, in terms of the matters in which I've 12:53:33

been engaged as a financial economist to look at the issue of loss causation and damages, it's comparing what Plaintiffs alleged the company knew and didn't disclose or -- or misstated and -- and the -- the value implications of -- of -- of that. 12:53:53

So, again, I can't opine as a legal matter. But generally speaking, I've seen lots of circumstances in which companies have different internal assessment than external analysts. And I've never seen a circumstance in which it's been 12:54:11 argued that something that analysts said that the company didn't say, that there was a legal requirement or even an allegation that they had the duty to -- to -- to -- to correct.

Again, I'm not a lawyer, but I've -- I've 12:54:24 not seen that, and certainly it's not something that's been pled in this particular case.

Q. And -- okay.

And you didn't look at the -- going back to the S-4 that was filed at the beginning of 2019 12:54:36 with the Nutrisystem projections in it, you didn't look at the value implications of those -- those projections; right?

MS. BUGNI: Object to the form.

THE WITNESS: What I was comparing and 12:54:47

CERTIFICATE OF REPORTER

I, Hanna Kim, a Certified Shorthand Reporter, do hereby certify:

That prior to being examined, the witness in the foregoing proceedings was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said proceedings were taken before me at the time and place therein set forth remotely via videoconference and were taken down by me in shorthand and thereafter transcribed into typewriting under my direction and supervision;

I further certify that I am neither counsel for, nor related to, any party to said proceedings, not in anywise interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [x] was [ ] was not requested.

In witness whereof, I have hereunto subscribed my name.

Dated: July 7, 2023.

Hanna Kim, CLR, CSR No. 13083