# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ROBERT STROUGO, Individually and      )
on Behalf of All Others Similarly      )
Situated,      )
     )
     **Lead Plaintiff,**      )
     )
v.      )      **No. 3:20-cv-00165**
     )
TIVITY HEALTH, INC., et al.,      )
     )
     **Defendants.**      )

## <u>MEMORANDUM OPINION</u>

In anticipation of trial in this putative securities class action, the parties each filed motions asking the Court to exclude expert and opinion testimony of various expert witnesses. Lead Plaintiff Sheet Metal Workers Local No. 33, Cleveland District, Pension Fund ("Lead Plaintiff") filed a Motion to Exclude Testimony and Opinions of Paul A. Gompers ("Gompers"). (Doc. No. 333). Defendants Tivity Health, Inc. ("Tivity"), former Tivity Chief Executive Officer ("CEO") Donato Tramuto ("Tramuto"), Chief Financial Officer ("CFO") Adam C. Holland ("Holland"), and President and Chief Operating Officer ("COO") Dawn Zier ("Zier") (collectively, "Defendants") filed a Motion to Exclude W. Scott Dalrymple's ("Dalrymple") Expert Opinions and Testimony (Doc. No. 325); a Motion to Exclude the Expert Opinions and Testimony of Mark Zyla ("Zyla") (Doc. No. 320); and a Motion to Exclude the Expert Opinions and Testimony of Jason S. Flemmons ("Flemmons") (Doc. No. 328). On May 12 and 13, 2025, the Court held a hearing on the parties' four <u>Daubert</u> motions and reserved ruling pending further consideration. (<u>See</u> Doc. No. 325).

The Court now addresses the motions on Dalrymple's and Gompers's proposed expert testimony and opinions. (Doc. Nos. 325, 333). For the reasons set forth below, Defendants' Motion to Exclude the Expert Opinions and Testimony of W. Scott Dalrymple (Doc. No. 325) will be granted, and Lead Plaintiff's Motion to Exclude Testimony and Opinions of Paul Gompers (Doc. No. 333) will be denied as moot.

## I.    BACKGROUND

The basic facts of this case have been set forth repeatedly by the Court throughout the course of this litigation. In short, this securities fraud putative class action is based on allegations that Tivity, a publicly traded company, as well as various high-ranking executives, made false or misleading statements and omissions, and had a scheme to defraud investors regarding, facts material to both: the purported success of Tivity's acquisition of Nutrisystem, Inc. ("Nutrisystem") in Q1 of 2019 ("Nutrisystem Claim"); and the valuation of Tivity's goodwill and the Nutrisystem tradename throughout 2019 ("Goodwill Claim"). According to Lead Plaintiff, Defendants' materially false or misleading statements and omissions on these issues led to significant losses in shareholder value when, on February 19, 2020, Defendants disclosed Tivity's financial results for 2019 and forecasts for 2020, and announced Tramuto's termination and Krausz's departure ("Corrective Disclosure").

Predictably, the effect (or lack thereof) of the allegedly fraudulent statements and omissions on the Corrective Disclosure and Tivity's eventual decreased stock price is a central contested factual issue of this case. That is where Dalrymple's expert opinions and testimony comes in. He seeks to opine on the amount of loss Tivity shareholders experienced from Defendants' scheme to defraud them, as well as their false and misleading statements and omissions, through evaluation of five items in the Corrective Disclosure. (Doc. No. 362 ¶ 10). While the Court credited Dalrymple's opinions at summary judgment (Doc. No. 302 at 26–27), it

2

did so with great reservations as to their admissibility. Now, a motion on that very issue is before the Court for review.[1] (Doc. No. 325).

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of an expert witness' testimony or opinions at trial. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 589 (1993). Under Rule 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Based on the language of Rule 702, "a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements." <u>In re Scrap Metal Antitrust Litig.</u>, 527 F.3d 517, 529 (6th Cir. 2008). "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" <u>Id.</u> (quoting Fed. R. Evid. 702). In other words, the Court should "investigate the competence a particular proffered witness would bring to bear on the issues, and whether it would aid the trier of fact in reaching its decision." <u>Mannio v. Int'l Mfg. Co.</u>, 650 F.3d 846, 850 (6th Cir. 1981).

---

[1] The parties also dispute whether Gompers's testimony and opinions—which are offered by Defendants to rebut Dalrymple's testimony and opinions—are admissible under Rule 702. (<u>See</u> Doc. No. 333). Because Gompers's opinions and testimony are offered only to rebut Dalrymple's (<u>see</u> Doc. No. 343-1 ¶ 4), and the Court finds Dalrymple's opinions and testimony inadmissible under Rule 702, <u>see</u> <u>infra</u>, the Court will focus its attention on the latter expert here.

3

"Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" In re Scrap Metal Antitrust Litig., 527 F.3d at 529 (quoting Fed. R. Evid. 702). Daubert counsels that relevance is a "fit" requirement, meaning that the expert must fit the facts of the case to the principles and methodologies used to render his or her opinion. Daubert, 509 U.S. at 591. This ensures that the expert testimony is helpful to the trier of fact, and connected to the case before the jury. Id. at 591–92. When an expert's opinion offers a legal conclusion, attempts to tell the trier of fact what verdict to render, or confuses the trier of fact, it is not helpful and thus must be excluded. Woods v. Lecureux, 110 F.3d 1215, 1220 (6th Cir. 1997).

"Third, the testimony must be reliable." In re Scrap Metal Antitrust Litig., 527 F.3d at 529 (citing Fed. R. Evid. 702). To determine reliability under Rule 702, the Court must determine not "whether [the expert's opinion] is correct, but rather [] whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." Id. at 529–30. "Four [non-exhaustive] inquiries guide the reliability analysis: Is the technique testable? Has it been subjected to peer review? What is the error rate and are there standards for lowering it? Is the technique generally accepted in the relevant scientific community?" United States v. Gissantaner, 990 F.3d 457, 463 (6th Cir. 2021). In considering those four factors, "[t]he key handholds of Rule 702" must be remembered: "[t]o be admissible, any relevant scientific or technical evidence must be the 'product of reliable principles and methods' and must have been 'reliably applied' in the case." Id. (quoting Fed. R. Evid. 702(c) and (d)).

In evaluating these factors, the Court acts as the "gatekeeper" of the expert opinion evidence, Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142 (1997), a function it must exercise "with heightened care." United States v. Cunningham, 679 F.3d 355, 380 (6th Cir. 2012) (quotations

4

omitted). The Court will not exclude expert testimony "merely because the factual bases for an expert's opinion are weak." Andler v. Clear Channel Broad., Inc., 670 F.3d 717, 729 (6th Cir. 2012) (citations omitted).  Indeed, Rule 702 does not "require anything approaching absolute certainty." Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 671–72 (6th Cir. 2010) (citing Daubert, 508 U.S. at 590)).  Under Daubert, experts are "permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." Dilts v. United Grp. Servs., LLC, 500 F. App'x 440, 445 (6th Cir. 2012) (quoting Daubert, 509 U.S. at 592).  Still, Daubert and Rule 702 require that "the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand," Jahn v. Equine Servs. PSC, 233 F.3d 382, 390 (6th Cir. 2000), and the expert's knowledge must be based on "more than subjective belief or unsupported speculation." Tamraz, 620 F.3d at 670 (citation and quotations omitted)).

Lastly, and of note, the "party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) (citing Daubert, 509 U.S. at 592 n.10); see Sigler v. Am. Honda Motor Co., 532 F.3d 469, 478 (6th Cir. 2008).

## III.    ANALYSIS

Dalrymple is an economist hired by Lead Plaintiff to testify and opine on his analysis of "share price inflation and damages associated with Plaintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding Tivity's business and operations that led to artificially inflated share prices between March 8, 2019 and February 19, 2020" by analyzing the impact of the Corrective

5

Disclosure on Tivity's stock price. (Doc. No. 228-4 ¶ 1). This inquiry goes to the loss causation and damages elements of Lead Plaintiff's Section 10(b) and scheme claims. See In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 469 (6th Cir. 2014) (articulating elements of Section 10(b) and Rule 10b-5 claim); Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S, 11 F.4th 90, 105 (2d Cir. 2021) (scheme claim requires evidence establishing the "effect the scheme had on the investors in the securities at issue") (citation and quotations omitted); see also In re Parmalat Sec. Litig., 383 F. Supp. 2d 616, 622 (S.D.N.Y. 2005) (for a scheme claim, must show that "defendants' actions caused the plaintiffs' injuries"). As Lead Plaintiff repeatedly stated in its briefing and during the Daubert hearing, Dalrymple provides a single analysis for all of Lead Plaintiff's remaining claims.[2] (See Doc. No. 228-4). Because the parties repeatedly discuss Dalrymple's opinions primarily in the context of Lead Plaintiff's Section 10(b) Goodwill and Nutrisystem claims, the Court will put its focus there as well.

For Lead Plaintiff to show loss causation through the theory that Defendants' fraud was revealed through the Corrective Disclosure, it must show "both that corrective information was revealed and that this revelation caused the resulting decline in price."[3] In re Williams Sec. Litig.-

---

[2] Lead Plaintiff's assumption that all of its claims can stand on the same damages calculation is, to put it kindly, problematic in its own right. The risk of that questionable decision has come to bear, as the Court's determination of the admissibility of Dalrymple's damages calculation—through Lead Plaintiff's own litigation strategy—impacts each of its remaining claims.

[3] Lead Plaintiff confirmed at the Daubert hearing that it is proceeding under a corrective disclosure theory of liability, despite its response to Defendants' motion (as well as other representations made in the record) suggesting it was pursuing a materialization of the risk theory premised on the notion that there was a 100 percent certainty that the risks from Defendants' fraud contained in the Corrective Disclosure would materialize. (See Doc. No. 400 at 18 (citing In re BP p.l.c. Sec. Litig., 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016))). True, as Lead Plaintiff notes, the materialization of the risk and corrective disclosure theories are not "fundamentally different pathways for proving loss causation," and so the Court's analysis below changes little even if Lead Plaintiff attempted to change its theory of liability yet again. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 261 (2d Cir. 2016). In any event, even if the Court were to entertain Lead Plaintiff's

6

WCG Subglass, 558 F.3d 1130, 1140 (10th Cir. 2009). "To be corrective, the disclosure need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." Id. Given this, it flows that Lead Plaintiff "bears the burden of showing that [its] losses were attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price." Id. at 1137; Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 343 (2005) (plaintiff does not show loss causation if the lower share price reflects "not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); see Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 725 (11th Cir. 2012) (plaintiff need not prove that the fraud "was the sole cause of the security's decline in value" to establish loss causation, but it must show that "it was a 'substantial' or 'significant contributing cause'") (citation and quotations omitted).

The standard to establish damages in a corrective disclosure case is more exacting. To establish damages based on out-of-pocket losses, Lead Plaintiff must determine "the difference

---

new theory that there is a 100 percent chance the risks in the Corrective Disclosure would materialize by the beginning of the class period such that Dalrymple did not need to disaggregate its damages, it fails on three fronts. First, this theory has not been disclosed in this case, and even conflicts with Lead Plaintiff's allegations that some of the risks did not even arise until the class period had already begun. (See Doc. No. 105 ¶¶ 136–56 (alleging that Tivity's goodwill was not impaired until Q2 2019)). Second, unlike the plaintiff's case in In re Vivendi where the expert did not need to disaggregate "damages caused by the risk from damages caused by the materialization of the risk," 634 F. Supp. 2d at 370, here, it was at best "highly likely" that the events in the Corrective Disclosure would occur such that Lead Plaintiff is "consequently not permitted to claim 100% of the stock decline" under this theory. In re BP p.l.c. Sec. Litig., 2016 WL 3090779, at *33. Third, it does not fit with Dalrymple's opinions, given he relies exclusively on a corrective disclosure theory that he admitted during the Daubert hearing was not predicated on a finding that Defendants concealed their fraud at any particular point in time. Given these clear deficiencies, the Court need not consider Lead Plaintiff's new purported theory of liability further.

between the *inflated* price at which the plaintiffs bought their stock, buoyed by [Defendants']
alleged misrepresentations [and omissions] . . . and the '*true*' price, meaning the theoretical price
that the [Tivity] stock would have traded for had the relevant information been properly disclosed."
Ludlow v. BP, PLC., 800 F.3d 674, 683 (5th Cir. 2015). Because of this, Lead Plaintiff must show
that all non-fraudulent "contributing forces" are "isolated and removed" to recover damages.
Robbins v. Koger Props., Inc., 116 F.3d 1441, 1447 n.5 (11th Cir. 1997). These forces can include
the market's prior knowledge of the fraud, see In re Williams Sec. Litig.-WCG Subclass, 558 F.3d
at 1142 (market's prior knowledge of fraud cannot be included in damages calculation), or some
other material information not related to the alleged fraud revealed on the same day the defendant's
fraud comes to bear. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA)
LLC, 752 F.3d 82, 95 (1st Cir. 2014) ("Thus, when conducting an event study, an expert must
address confounding information that entered the market on the event date."); see In re REMEC
Inc. Sec. Litig., 702 F. Supp. 2d 1202, 1274 (S.D. Cal. 2010) (same); see also Meyer v. Greene,
710 F.3d 1189, 1199 (11th Cir. 2013) (discussing confounding factor analysis for corrective
disclosure claim).

    Defendants concede Dalrymple is qualified to opine on the loss in Tivity's stock value that
is attributable to Defendants' fraud. (See Doc. No. 326 at 6–24 (arguing only that Dalrymple's
opinions are inadmissible on relevance and reliability grounds)). That concession is appropriate,
given Dalrymple's qualifications and his extensive experience with conducting regression analyses
of the nature used here to measure Defendants' fraud. (See Doc. No. 228-4 ¶¶ 3–6, Appendix A).
Nevertheless, Defendants contend Dalrymple's testimony is both unreliable and irrelevant because
he does not, through any methodologically sound calculation, disaggregate the fraud from non-
fraudulent factors in his analysis of the Corrective Disclosure's impact on Tivity's stock price

drop.  (Doc. No. 326 at 6–24).  In response, Lead Plaintiff argues that Dalrymple's analysis is entirely appropriate, consistent with its theory of the case, and provides the jury with helpful information on the damages tied to the revelation of the information in the Corrective Disclosure (which, in its view, all exposed Defendants' fraud unless tied to Healthcare segment guidance).  (Doc. No. 400 at 3–16).

      1. <u>Dalrymple's Analysis</u>

To understand the parties' respective arguments, the Court starts with dissecting how Dalrymple comes to his conclusion that $8.19 of the $10.39 market-adjusted stock price decline tied to the Corrective Disclosure is entirely attributable to Defendants' alleged fraud.  (<u>See, e.g.</u>, Doc. No. 228-4 ¶¶ 10, 106, 111, 117–18).  First, Dalrymple assumes that Tivity's stocks had been trading on a semi-strong form of an efficient market prior to Tivity's release of the Corrective Disclosure on February 19, 2020.  (<u>Id.</u> ¶¶ 74–75).  Then, Dalrymple conducts a market model event study by using a regression model to predict expected returns on Tivity's stock during the event window (i.e., the day of the Corrective Disclosure).  (<u>Id.</u> ¶¶ 76–82).  "An event study . . . is a statistical regression analysis that examines the effect of an event[, such as the release of the Corrective Disclosure,] on a dependent variable, such as [Tivity's] stock price."  <u>United States v. Schiff</u>, 602 F.3d 152, 173 n.29 (3d Cir. 2010) (citation and quotations omitted).  In doing this, Dalrymple "subtract[s] predicted returns from the actual returns" to "estimate the change in [] [Tivity's] share price that is not explained by wider market phenomena."  (Doc. No. 228-4 ¶¶ 77, 79).  Dalrymple then analyses the abnormal stock returns on the date of the Corrective Disclosure, removes only confounding information "unrelated to the allegations" that is "released at the same time" by deducting a $2.20 per-share effect that he attributes to negative Healthcare segment guidance (<u>id.</u> ¶¶ 73, 106; <u>id.</u> at Appendix C), and takes the end result, $8.19 per-share, as the

"estimate of the [C]orrective [D]isclosure's effect on the value of [] [Tivity's] shares." (Id. ¶¶ 80, 85, 90–93; see id. at Exs. 1, 2).

Upon evaluating Dalrymple's reports, his deposition, and his testimony during the Daubert hearing, it is evident that he fails to provide any opinions that reliably supports Lead Plaintiff's theories of loss causation and damages that would be helpful to a jury. Rather than conducting a rigorous scientific/economic analysis to find the proportion of Tivity's stock drop that is attributable to Defendants' fraud by identifying and removing all non-fraudulent information, Dalrymple predetermines, without any application of any method or principle, what constitutes such information to align with Lead Plaintiff's theory of liability. Tellingly, Dalrymple makes no attempt to separate the varying purported causes of Tivity's stock drop included in the Corrective Disclosure—the Q4 and 2019 earnings results, Q1 and FY 2020 earnings guidance, impairments to Tivity's goodwill and the Nutrisystem tradename, Krausz's resignation, and Tramuto's termination—to determine whether some, all, or none of that information was attributable to Defendants' fraud. (Doc. No. 327-1 at 183:23–184:12 ("I understand what plaintiffs allege, and those four factors are attributable about the true performance and expectations about the nutrition segment"), 162:17–25 ("I assumed—I mean, I was told that's what the plaintiff's allege."); see id. at 174:4–25, 204:17–205:4)). Indeed, both during the Daubert hearing and in his deposition, Dalrymple confirmed he could not "tie these [five] particular [items] to any of the alleged misrepresentations or describe why they should be considered 'corrective[,]'" nor apportion the $8.19 Tivity stock inflation to any particular item(s) in the Corrective Disclosure. In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1140 (upholding district court's exclusion of expert's loss causation and damages testimony and opinions for the same failures).

Dalrymple explains this seemingly glaring omission in his analysis. He contends that isolating the effects of the five items in the Corrective Disclosure is unnecessary given all that information is within what Lead Plaintiffs believe to be the zone of risk of Defendants' concealed fraud. (See Doc. No. 228-4 at ¶¶ 90–94). Dalrymple confirmed as much while testifying at the Daubert hearing, as he repeatedly emphasized that he did not confirm that the information revealed had been concealed by Defendants' alleged fraud, but instead he made an "assumption" of the liability Lead Plaintiff seeks to prove. Based on that assumption, he labels any negative information about the Nutrition segment a "corrective" disclosure, and attributes all losses to the revelation of fraud because Lead Plaintiff says so. See In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1140 (criticizing another expert for similar reliance on plaintiff's representations of fraud). In turn, Dalrymple fails to both (1) bridge *any* connection between the alleged corrective information, Defendants' fraud, and Tivity's stock decline, and (2) apply any principled or economic method to support his conclusion that the items in the Corrective Disclosure did not constitute confounding information that required removal from his total damages calculation.[4] Ultimately, Dalrymple's judgment calls on what constitutes corrective and confounding information "without any methodological underpinning" is not the stuff reliable scientific analysis is made of.[5] Bricklayers, 752 F.3d at 95.

---

[4] This failure is somewhat remarkable considering Lead Plaintiff's remarks at the Daubert hearing that the overarching economic principle at issue is that an expert must take out confounding information from his damages calculation.

[5] Even Lead Plaintiff's counsel seems to understand as much. During the Daubert hearing on the pending motion challenging the admissibility of Mark Zyla's testimony, Lead Plaintiff discussed Dalrymple's work in reference to Zyla's to buttress its argument that the latter is admissible. Specifically, Lead Plaintiff first remarked that the Court had heard argument that Dalrymple was relying blindly on assumptions from counsel. Then, counsel immediately proceeded to state that Zyla did his own analysis of more than 150 pages to support his testimony. While Lead Plaintiff stopped short of comparing its two experts' efforts, the logical conclusion to Lead Plaintiff's argument is that Zyla did something Dalrymple did not. The Court agrees.

2. <u>Dalrymple Fails to Properly Analyze the "Corrective" Nutrition Segment Financial Disclosures.</u>

Dalrymple's aggregation of the five items in the Corrective Disclosure (the Q4 and 2019 earnings results, Q1 and FY 2020 earnings guidance, impairments to Tivity's goodwill and the Nutrisystem tradename, and the announcements of Tramuto's termination and Krausz's resignation) as a single bundle of new information, despite acknowledgement that some of the information implicated information beyond Defendant's alleged fraud, demonstrates the issue with his approach. On the first three factors, Dalrymple opines that "the financial performance of the Nutrition segment" is "the predominant cause of the significant share price decline on February 20, 2020" based on his "review of the information disclosed in the [Corrective] Disclosure and associated analyst coverage[.]" (Doc. No. 228-4 ¶ 100). But he makes no effort to determine whether the Q4 and 2019 earnings results, Q1 and FY 2020 earnings guidance, and impairments to Tivity's goodwill and the Nutrisystem tradename were actually "corrective." Nor does he account for that some of that financial information—information that, according to Lead Plaintiff, made the stock price fall—had already been anticipated by the market based on prior disclosures that the Nutrisystem acquisition may prove unsuccessful. <u>See</u> <u>In re Williams Sec. Litig.-WCG Subclass</u>, 558 F.3d at 1142.

These omissions are particularly problematic considering Dalrymple knew that "the market *did* know" information about the Nutrition segment's poor performance prior to the release of the Corrective Disclosure. <u>Id.</u> at 1141. For instance, Dalrymple knew that: the market had "concerns about the Nutrition segment's current performance" after Tivity's disclosure of Zier's departure (Doc. No. 228-4 ¶ 108); Zier's termination "raised investors' concerns over the upcoming diet season and current performance of the Nutrition segment" (<u>id.</u> ¶ 110); "there was some likelihood that the 2020 diet season would fail" (Doc. No. 327-1 at 133:11–25); "future cash flows were not

12

certain" (id. at 133:15–16); "[a]t the beginning of 2019, there was a risk that future cash flows would be lower than what they would be expected" (id. at 134:19–21); "investors [] generally recognize that there is risk to any future cash flows, and some of those cash flows are derived from acquisitions" (id. at 135:910–13); and those risks included the possibility that "Tivity paid more for Nutrisystem than" it was worth (id. at 142:17–143:22). As discussed during the Daubert hearing, Dalrymple also reviewed Tivity's 10-K filed on February 26, 2019 (Doc. No. 327-5), which warned that: "[a]fter the completion of the [Nutrisystem] Merger, we may fail to realize the anticipated benefits and cost savings of the Merger, which could adversely affect the value of our common stock" (id. at 9); and "[t]he combined company will record goodwill and other intangible assets that could become impaired and result in material non-cash charges to the results of operations of the combined company in the future" (id. at 13). Because Dalrymple knew the market already anticipated that the Nutrisystem merger may have failed irrespective of Defendants' fraud, his analysis "should [have] carefully consider[ed] whether other factors [other than Defendants' alleged fraud] might have been at play" in causing Tivity's stock price decline. In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1141.

But Dalrymple ignores this information. See infra, Section III.3.n.6. He confirmed as much during the Daubert hearing, as he repeatedly testified that he did not isolate the known risks information from his calculation—despite acknowledgement that at least some of them had economic significance—based solely on his false understanding that Lead Plaintiff's claims did not require as much. Accordingly, Dalrymple presents an analysis that does not address whether the relevant information in the Corrective Disclosure was truly "corrective" of Defendants' fraud, and does not exclude the possibility, or account for in any way, that Tivity's stock drop occurred not from information Defendants hid from the public, but from market forces that investors already

had knowledge of. See Hubbard, 688 F.3d at 730 (upholding district court's grant of judgment as a matter of law in favor of defendant where plaintiff's expert did not account for market forces that the defendant had warned of); In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1142 (upholding district court's determination that expert failed to show evidence of loss causation where expert "made no attempt to show why [] losses were entirely attributable to the revelation of fraud and nothing else"). While Dalrymple may well have reached the same conclusion in his reports had he considered these factors, without such analysis the Court cannot conclude that his opinions satisfy Rule 702.

3. Dalrymple Fails to Properly Analyze the "Corrective" Executive Departure Announcement Disclosures.

Dalrymple's treatment of Tivity's executive departures revealed in the Corrective Disclosure is equally flawed. As with Dalrymple's acknowledgement that Tivity's financial information could contain non-fraud related information, he understood "that Mr. Tramuto's eventual departure from the company may have been anticipated." (Doc. No. 228-4 ¶ 103 n.225). Based on his review of Tivity's Form 10-K, he also understood that Tivity warned investors that it "and Nutrisystem may have difficulty attracting, motivating and retaining executives and other key employees in light of the Merger" as early as February 2019. (Doc. No. 327-5 at 10). Again, however, Dalrymple summarily declares in his report that "the evidence indicates th[e] nature and timing of [Tramuto's] departure was unexpected prior to the" Corrective Disclosure—without accounting for, or removing, any confounding variables from his analysis. (Doc. No. 228-4 ¶ 103 n.225). Dalrymple admitted as much during the Daubert hearing, as he confirmed that he made no effort to isolate those disclosed risks from his analysis, despite their possible economic significance. Without any methodological underpinning justifying this omission, Dalrymple fails to both causally link Defendants' fraud to Tivity's stock decline, and to identify the exact portion

14

of that decline that differentiates between any revealed fraud from Tramuto's firing and investor reactions to an executive change they already saw coming. See Hubbard, 688 F.3d at 730; see also In re Sci. Atlanta, Inc. Sec. Litig., 754 F. Supp. 2d 1339, 1379 (N.D. Ga. 2010), aff'd sub nom. Phillips v. Sci.-Atlanta, Inc., 489 F. App'x 339 (11th Cir. 2012) ("As in Omnicom, this new characterization of previously-known information presents a confounding factor, the effect of which Plaintiffs have failed to isolate."). Failing to do so is not reliable, nor helpful to the jury.[6]

Moreover, Dalrymple's analysis of the purported corrective disclosures announcing Tramuto's termination and Krausz's resignation suffers from another flaw: these items are, as a matter of law, not within the zone of risk of Defendants' alleged fraud.[7] Despite Lead Plaintiff arguing otherwise, "[t]he zone of risk . . . is not infinite in size." See In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1142. As with Zier's departure, there is no evidence in the record that Tivity's announcements of Krausz's resignation and Tramuto's termination revealed any fraud perpetuated by Defendants. (See Doc. No. 302 at 28). Without this, the announcement of Tivity's executive departures cannot fall within the "zone of risk" of Defendants' alleged fraud (see Doc. No. 228-19 at 21). See In re Omnicom Grp., Inc. Sec. Litig., 597 F.3d 501, 514 (2d Cir. 2010) (even where plaintiff alleges a zone of risk theory of liability, plaintiff must still show an

---

[6] To the extent that Dalrymple asserts that he did not need to account for these economically-significant risks because they were already reflected in the Tivity's share price prior to the release of the Corrective Disclosure, that rationale in unpersuasive considering Dalrymple admitted at the Daubert hearing that he did not explain this in his opening report, and may have done so in his reply report in only a "general" sense. Regardless, this rationale is in part based on Dalrymple's flawed understand of Lead Plaintiff's new theory of liability based on an assertion that the risks in the Corrective Disclosure would materialize with 100 percent certainty, which the Court has rejected. See supra, Section III.n.3.

[7] At summary judgment, the Court found Dalrymple's report including these departures sufficient at that stage of litigation, given his assertion that he did disaggregate this information from Defendants' fraud. Now, with a Daubert motion fully briefed before the Court, Dalrymple's statement stating as much fails the Rule 702 inquiry.

15

executive's departure reveals fraud to support loss causation); id. (generalized investor reaction to executive's departure is too tenuously connected to alleged fraud to support liability, given "[t]he securities laws require disclosure that is adequate to allow investors to make judgments about a company's intrinsic value").

Dalrymple's report suggests Lead Plaintiff is aware that the executive departure announcements do not fall within the all-encompassing "zone of risk" it asserts is present here. For example, Dalrymple opines that "the announcement of executive leadership changes had limited, if any, negative impact on Tivity's share price[.]"  (Doc. No. 228-4 ¶ 103 n.226). Tellingly, Dalrymple does not make any effort to opine on what that "limited" or "negative" impact on Tivity's share price is, nor could he quantify it during the Daubert hearing.  (See id.).  This is because Dalrymple has no methodologically coherent basis for that determination.  Indeed, all Dalrymple says on this issue is that:

> Tivity's share price decline of approximately 45 percent after the February 2020 Disclosure generally followed the approximately 43 percent decline in FY20 EPS expectations from securities analysts" and he had "not seen evidence that the cost of executive terminations and the accelerated replacement of Mr. Tramuto materially affected earnings expectations.

(Id.).  Matching the 43 % earnings-estimate cut to a 45 % price drop shows only that the two numbers are similar; it does not demonstrate that earnings revisions alone caused the decline. Without a regression or other economic testing or technique that controls for the simultaneous executive exits and the other news in the release, the comparison is a mere coincidence-of-percentages, not evidence of loss causation or damages.  Because Dalrymple does not provide any bridge between his opinion that the announcement of Tivity's executive departures had "limited, if any, negative impact" on Tivity's share price and an analytical framework supporting that conclusion, Dalrymple's attempt to remove this non-fraud information from his

16

equation is merely inadmissible *ipse dixit*.[8]  See Joiner, 552 U.S. at 146 ("Nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").  Without Dalrymple reliability removing this non-fraud information from his damages calculation, he fails to provide a sound basis for his damages calculation meant to *only* encompass Lead Plaintiff's harm stemming from Defendants' alleged misconduct.

### 4.  Dalrymple's Demeanor at the Daubert Hearing Underscores Why His Opinions Should Be Excluded.

The shortcomings of Dalrymple's analyses are compounded by his demeanor on the stand. Dalrymple has extensive experience as an expert in litigation.  He has appeared as an expert at trials and hearings on nine prior occasions and has sat for twenty depositions.  (Doc. No. 228-4 at 50–52).  However, one would not have known it from his presentation at the Daubert hearing.  Not only did Dalrymple appear nervous and defense throughout his testimony, but he also proved to be evasive and inconsistent when answering parties' and the Court's questions.  For example, during one exchange with Defendants' counsel, Dalrymple directly contradicted his prior deposition testimony that he it did not causally connect any alleged misstatements to any of the five items from the Corrective Disclosure he based his opinions on by attempting to assert the opposite during the Daubert hearing.  While testifying is no doubt a stressful experience, even for

---

[8] As Defendants emphasize, the unreliability of this bare-bones analysis is highlighted by Dalrymple's contrasting treatment of the Zier departure.  There, Dalrymple concluded (albeit insufficiently) that the entire $2.23 decline in Tivity's stock price following its announcement of Zier's departure could be attributed to the market's realization of Defendants' fraud.  (See Doc. No. 22-4 ¶¶ 10, 85, 89).  In contrast, Dalrymple determines that Tivity terminating its former CEO, and its former President of the Nutrition Business Unit resigning had "little, if any, negative impact" on Tivity's share price.  (Id. ¶ 103 n.226).  While the Court does not question the correctness of Dalrymple's conclusions, his explanation of this discrepancy at the Daubert hearing—where he noted that the various other items in the Corrective Disclosure subsumed the price drop such that the executive departures did not matter—is not supported by any coherent economic analysis in his report.

17

those familiar with the courtroom, Dalrymple's contradictory positions about such basic elements of his reports and the tone and tenor of his testimony further underscores the problems with Dalrymple's testimony and opinions.

5. Dalrymple's Testimony and Opinions Are Inadmissible Under Rule 702.

Lead Plaintiff consistently emphasizes that an expert may "express an opinion that is based on facts that the expert assumes, but does not know, to be true" to support Dalrymple's assumption that all five items in the Corrective Disclosure revealed Defendants' fraud. Williams v. Illinois, 567 U.S. 50, 57 (2012), abrogated by Smith v. Arizona, 602 U.S. 779 (2024). But Dalrymple cannot rely on Lead Plaintiff's assumptions to such extremis as to relieve him of his obligation to apply "sufficient facts or data" through a "reliable principle[] or method" to connect corrective information to Tivity's stock decline, or to calculate the loss attributable to Defendants' fraud, based on the evidence before him. See Fed. R. Evid. 702(b), (d). See Electra v. 59 Murray Enterprises, Inc., 987 F.3d 233, 254 (2d Cir. 2021) ("A district court has discretion under Federal Rule of Evidence 703 to determine whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony.") (citation and quotations omitted); Myers v. Weinberger, 514 F.2d 293, 294 (6th Cir. 1975) (to the extent an expert's assumptions present a hypothetical, such questions should be "an accurate summation of the evidence already presented in the record and can neither add nor distract from that evidence").

Dalrymple fails to do as much here. Not only does he ignore the possibility that a portion of the five items in the Corrective Disclosure do not relate to Defendants' fraud, but he also chooses to ignore his own knowledge confirming as much. He then fails to properly deploy *any* reliable methodology based on sufficient data about the market to analyze whether there were any non-fraudulent factors within the Corrective Disclosure contributing to a drop in Tivity's stock, thereby

18

failing to identify the damages attributable to Defendants' fraud recoverable by Lead Plaintiff.[9]

See In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1142; see also Robbins, 116 F.3d at

1447 n.5.  The absurdity of this approach comes to bear by Dalrymple's conclusion, confirmed at

the Daubert hearing, that Lead Plaintiff's damages would be the same if it prevailed on all, or only

a portion of, its claims.  (See Doc. No. 228-4).  Because Dalrymple did not reliably determine

whether the information he relied upon was corrective of Defendants' fraud, and did not reliably

calculate the loss in value, if any, of Tivity's stock that was caused by only non-fraudulent factors,

his testimony is also unhelpful to the jury.  See Hubbard, 688 F.3d at 725; see also Daubert, 509

U.S. at 591–92 (relevancy factor ensures that the testimony is helpful to the trier of fact).

Dalrymple's failures here demonstrate the exact rationale for Rule 702's requirement that this

Court apply a preponderance standard when determining the admissibility of Dalrymple's expert

testimony, as the Committee aptly noted that:

> Judicial gatekeeping is essential because just as jurors may be unable, due to lack
> of specialized knowledge, to evaluate meaningfully the reliability of scientific and
> other methods underlying expert opinion, jurors may also lack the specialized
> knowledge to determine whether the conclusions of an expert go beyond what the
> expert's basis and methodology may reliably support.

Fed. R. Evid. 702 Advisory Committee's Note to 2023 Amendment.

---

[9] To be clear, the Court does not impose a requirement that for Dalrymple's opinion to be reliable, he must identify how each specific item in the Corrective Disclosure ties to Defendants' fraud or must utilize a method that calculates the precise number of damages attributable to the revelation of fraud for each item in the Corrective Disclosure.  As Lead Plaintiff properly asserts, "the law does not require the use of such a fine-grained quantitative method[.]"  Liberty Media Corp. v. Vivendi Universal, S.A., 923 F. Supp. 2d 511, 526 (S.D.N.Y. 2013).  But the law is clear that Dalrymple must calculate what portion of the Tivity stock decline was "attributable to the revelation of the fraud and not the myriad other factors that affect a company's stock price."  In re Williams Secs. Litig.-WCG Subclass, 558 F.3d at 1137.  Given that there was evidence before Dalrymple showing that the market had already been put on notice on some of Defendants' fraud, and some of the purported Corrective Disclosure was not corrective as a matter of law, it was incumbent on him to factor these possibilities into his analysis through a confounding variable analysis that amounted to more than a conclusory recitation of Lead Plaintiff's theory of the case.

19

Dalrymple's opinion—albeit one from an eminently qualified individual—amounts to only that. By presuming that analysts had already priced in all goodwill, integration, and diet-season risks in the Nutrition segment, Dalrymple treats any price drop from the five items in the Corrective Disclosure as necessarily fraud-related. But he finds support of this assumption only in the stock drop itself. For this, and the reasons stated above, his lack of methodological reasoning in disaggregating the fraud and non-fraud information in the Corrective Disclosure raises several "red flags that caution against certifying an expert includ[ing] reliance on anecdotal evidence, improper extrapolation . . . lack of testing, and subjectivity." Newell Rubbermaid, Inc. v. Raymond Corp., 676 F.3d 521, 527 (6th Cir. 2012) (citing Best v. Lowe's Home Ctrs., Inc., 563 F.3d 171, 177 (6th Cir. 2009); see id. ("In addition, if a purported expert's opinion was prepared solely for litigation, that may also be considered as a basis for exclusion.") (citing Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 434 (6th Cir. 2007)); see also Joiner, 522 U.S. at 146 (an expert opinion may be rejected because there is "too great [an] analytical gap" between the factual basis and opinion); In re Williams Sec. Litig.-WCG Subclass, 558 F.3d at 1140 ("we must [] be careful not to connect each and every bit of negative information about a company to an initial misrepresentation that overstated that company's chances for success"). Because Dalrymple's opinions and testimony are unreliable and irrelevant under Rule 702, they must be excluded. See Mid-State Fertilizer Co. v. Exchange Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989) (expert that provides only a "bottom line" "supplies nothing of value to the judicial process").

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Exclude W. Scott Dalrymple's Expert Opinions and Testimony (Doc. No. 325) will be granted. Because Dalrymple's opinions and testimony will be excluded at trial, Gompers's rebuttal testimony is no longer relevant to the instant

20

proceedings, and so Lead Plaintiff's Motion to Exclude Testimony and Opinions of Paul A. Gompers (Doc. No. 333) will be denied as moot. An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE